IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------------------------x
FADI AL MAQALEH,                              )
      Detainee,                               )
      United States Air Base at               )
      Bagram, Afghanistan;                    )
                                              )
AHMAD AL MAQALEH,                             )
      as the Next Friend of Fadi Al Maqaleh,  )
                                              )         1:06-cv-01669 (JDB)
      Petitioners/Plaintiffs,                 )
                                              )
v.                                            )         FIRST AMENDED PETITION
                                              )                 FOR
ROBERT GATES                                  )         WRIT OF HABEAS CORPUS
      Secretary, United States                )
      Department of Defense                   )
      1000 Defense Pentagon                   )
      Washington, D.C.  20301-1000;           )
                                              )
JOHN DOE 1,                                   )
      Custodian of Petitioner; and            )
                                              )
JOHN DOE 2,                                   )
      Custodian of Petitioner,                )
                                              )
      Respondents/Defendants.                 )
                                              )
Respondents sued in their official            )
capacity.                                     )
-------------------------------------------------------------x
```

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1.  Petitioner Fadi Al Maqaleh, who is in the custody of the United States, seeks the Great Writ. He acts on his own behalf and through his Next Friend, Ahmad Al Maqaleh. Mr. Fadi Al Maqaleh is a citizen of Yemen. Though he has committed no wrong, he has been held unlawfully and virtually *incommunicado* in military custody by the Respondents at Bagram Air Base in Afghanistan – for more than 5 years. Petitioner is detained without lawful basis, without charge, and without access to counsel or any fair process by which he might challenge

his detention.

2. Petitioner is being held under color and authority of the Executive, and in violation of the Constitution, laws and treaties of the United States as well as in violation of customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner or to establish in this Court a lawful basis for his detention. This Court should also order injunctive and declaratory relief.

3. Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war, or under the November 13, 2001 Executive Order described herein, Respondents Robert Gates, Secretary of the United States Department of Defense, as well as John Does 1 and 2, Custodians of Petitioner Al Maqaleh, are either ultimately responsible for, or have been charged with the responsibility of maintaining, the custody and control of the detained Petitioner at Bagram.

## I.
## JURISDICTION

4. Petitioners bring this action pursuant to 28 U.S.C. §§ 2241(a), (c)(1) and (c)(3) and 2242, and invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; Articles I, II, and III of, and the Fifth Amendment to the United States Constitution. Because they seek declaratory relief, Petitioners also rely on Fed. R. Civ. P. 57.

5. This Court is empowered under 28 U.S.C. § 2241 to grant the Writ of Habeas Corpus and to entertain the instant Petition filed by Ahmad Al Maqaleh as Next Friend under 28 U.S.C. § 2242. This Court is further empowered to entertain the Petition pursuant to the United States Supreme Court's ruling in *Rasul v. Bush*, 542 U.S. 466 (2004). This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201; to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction; and

to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

## II.
## VENUE

6. Venue is proper in the United States District Court for the District of Columbia, as the Respondent Secretary Gates resides in the district, a substantial part of the events or omissions giving rise to the claim occurred in the district, and Respondent Secretary Gates is an officer or employee of the United States or any agency thereof acting in his official capacity. 28 U.S.C. §§ 1391(b); 1391(e).

## III.
## PARTIES

7. Petitioner Fadi Al Maqaleh is a Yemeni citizen presently incarcerated and held in Respondents' unlawful custody at the United States Bagram Air Base in Afghanistan.

8. Petitioner Ahmad Al Maqaleh is Fadi Al Maqaleh's father. Because his son cannot secure access either to legal counsel or the courts of the United States, Ahmad Al Maqaleh acts as his Next Friend.

9. Respondent Gates is the Secretary of the United States Department of Defense. He has been charged with maintaining the custody and control of the detained Petitioner, and is therefore the detained Petitioner's ultimate custodian. Respondent Secretary Gates is sued in his official capacity.

10. The Respondents designated as John Does are fictitiously-named subordinate officers of the United States armed forces who have immediate physical custody of the detained Petitioner.

## IV.
## STATEMENT OF FACTS

11. Petitioner Fadi Al Maqaleh is a Yemeni citizen, previously residing in Sana'a, Republic of Yemen.

12. Petitioner Fadi Al Maqaleh is now approximately 25 years old.

13. Petitioner Ahmad Al Maqaleh is Fadi Al Maqaleh's father and currently resides in Sana'a, Republic of Yemen.

14. Petitioner Ahmad Al Maqaleh first learned that his son, Fadi, was in the custody of United States military forces when he received a letter from his son via the International Committee of the Red Cross (ICRC) in or about 2003.

15. Since that time, Petitioner Ahmad Al Maqaleh has received several additional letters from his son, Fadi, via the ICRC.

16. Petitioner Ahmad Al Maqaleh was informed by members of the ICRC that his son is being detained by U.S. forces at the United States Bagram Airbase in Afghanistan.

17. At the top of each page of the letters received by Petitioner Ahmad Al Maqaleh via the ICRC appear the handwritten letters "BT" in English, further indicating that Petitioner Fadi Al Maqaleh is being held by U.S. forces at the "Bagram Theater" in Afghanistan.

18. On information and belief, Respondents redacted from the ICRC letters, or otherwise did not permit Petitioner Fadi Al Maqaleh to relay via the ICRC letters, the facts and circumstances of his capture and/or how he came to be in Respondents' custody.

19. Undersigned counsel personally met with Petitioner's father, Ahmad Al Maqaleh, in his family's home in Sana'a, Republic of Yemen in January 2006.

20. Petitioner Ahmad Al Maqaleh, knowing that his son would want him to take any peaceful and legal means to secure his son's release from US custody, acts as his son's next friend and has requested undersigned counsel to take any appropriate legal action on behalf of detained Petitioner, including the filing of a writ of habeas corpus in the courts of the United States.

21. On information and belief, Petitioner is not, nor has he ever been, an enemy alien, a lawful or unlawful belligerent, or a combatant of any kind under the definition adopted by the United States Government in any civil or military proceeding.

22. On information and belief, Petitioner is not, nor has he ever been, an "enemy combatant" who

was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who [was] engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004).

23. On information and belief, Petitioner had no involvement, direct or indirect, in the terrorist attacks on the United States on September 11, 2001, the ensuing armed conflict, or any act of international terrorism attributed by the United States to Al Qaeda or any other terrorist organization.

24. On information and belief, Petitioner was not in Afghanistan at the time of his capture.

25. On information and belief, Petitioner was not taken into custody by US military forces.

26. On information and belief, upon being transferred into Respondents' custody, Petitioner promptly identified himself by correct name and nationality to the United States. He requested that the United States provide him with access to his family and to legal counsel. Since then, his only access to his family has been through the limited written correspondence permitted by the International Committee of the Red Cross. He has been denied all access to legal counsel.

27. On information and belief, Petitioner has not been afforded any procedures that would satisfy his rights under the most fundamental common law notions of due process, the Constitution, laws and treaties of the United States, or customary international law.

28. On information and belief, since the United States took the Petitioner into custody, the United States military has held him virtually *incommunicado* and without legal process. On information and belief, he has been interrogated repeatedly by agents of the United States Departments of Defense and Justice, although he has not been charged with an offense, nor has he been notified of any pending or contemplated charges. He has made no appearance before either a military or civilian tribunal of any sort, nor has he been provided counsel or the means to contact counsel. He has not been informed of his rights under the United States Constitution, the regulations of the United States Military, the Geneva Conventions, the Vienna Convention,

the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, or customary international law. Indeed, Respondents have taken the position that he should not be told of these rights. As a result, the detained Petitioner is completely unable either to protect, or to vindicate his rights under domestic and international law.

### Authorization for Use of Military Force

29. In the wake of the September 11, 2001 attacks on the United States, the United States, at the direction of President Bush, began a massive military campaign against the Taliban Government, then in power in Afghanistan. On September 18, 2001, a Joint Resolution of Congress authorized President Bush to use force against those "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF").

30. As Petitioner Fadi Al Maqaleh did not participate in the armed conflict at any point in time, he is not properly detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war, or the AUMF.

### President Bush's Military Order

31. On November 13, 2001, President Bush issued a Military Order authorizing indefinite detention without due process of law. The Order authorizes the Secretary of Defense, now Respondent Gates, to detain anyone President Bush has "reason to believe":

   i.   is or was a member of the organization known as al Qaida;
   ii.  has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or
   iii. has knowingly harbored one or more individuals described in subparagraphs (i) and (ii)

6

*See* Executive Order, 66 Fed. Reg. 57833 § 2 (November 13, 2001). President Bush must make this determination in writing. The Order was neither authorized nor directed by Congress, and is beyond the scope of the Joint Resolution providing the AUMF passed by Congress on September 14, 2001.

32. The Military Order vests the President with complete discretion to identify the individuals that fall within its scope. It establishes no standards governing the use of his discretion. Once a person has been detained, the Order contains no provision for him to be notified of the charges he may face. On the contrary, the Order authorizes detainees to be held without charges. It contains no provision for detainees to be notified of their rights under domestic and international law, and provides neither the right to counsel, nor the right to consular access. It provides no right to appear before a neutral tribunal to review the legality of a detainee's continued detention and no provision for appeal to an Article III court. In fact, the Order expressly bars review by any court. For those detainees who will not be tried before a tribunal, the Order authorizes indefinite and unreviewable detention, based on nothing more than the President's written determination that an individual is subject to its terms.

33. Petitioner Fadi Al Maqaleh is not properly subject to the Executive Order, and, in any event, the Executive Order is unjust, *ultra vires*, and violates the laws, treaties, and Constitution of the United States. Petitioner has been, and is being, detained unlawfully purportedly pursuant to President Bush's authority as Commander-in-Chief and/or under the laws and usages of war.

### Bagram Air Base

34. Bagram Air Base, where the Petitioner is presently incarcerated, is subject to the exclusive jurisdiction and control of the United States military. The detained Petitioner is in the physical and legal custody of the United States, at a United States military facility that is subject to United States constitutional and statutory law, and answerable to the federal judiciary. *See Rasul v. Bush*, 542 U.S. 466, 483-84 (2004).

35. While Bagram Air Base has been in operation since 2002, relatively little has been made public about the detention facility where Afghans and many other foreign nationals detained by U.S. forces are held. *See, e.g.*, Tim Golden & Eric Schmitt, *A Growing Afghan Prison Rivals Bleak Guantánamo*, N.Y. Times, Feb. 26, 2006, at 1. Of the estimated 500 detainees at Bagram, most are Afghans, but it is also believed that Arabs, Pakistanis and some Central Asians are being held there. *See* Matthew Pennington, *Inmates Detail U.S. Prison Near Kabul*, Associated Press, Oct. 2, 2006.

36. Both military personnel and former detainees have described the prison conditions at Bagram to be far worse than those at Guantánamo. Golden & Schmitt, s*upra,* at 1 (quoting a Defense Department official who had toured both detention facilities as stating "Anyone who has been to Bagram would tell you it's worse."). *See also* Nicholas D. Kristof, Editorial, *Sami's Shame, And Ours*, N.Y. Times, Oct. 17, 2006, at 21 (quoting a former Bagram prisoner, presently detained at Guantánamo, describing the time he spent at Bagram as "the longest days of [his] life"); Pamela Constable, *An Afghan Boy's Life in U.S. Custody; Camp in Cuba Was Welcome Change After Harsh Regime at Bagram*, Wash. Post, Feb. 12, 2004, at A01 (noting that 13-year old boy's detention at Guantánamo was "in sharp contrast to the harrowing month and a half he spent at Bagram").

37. Human rights groups have also found the abuse of detainees in Bagram to be "in many ways worse" than that in Iraq. *See* Duncan Campbell & Suzanne Goldenberg, *America's Afghan Gulag,* Manchester Guardian Wkly., July 2, 2004 – July 8, 2004, at 15 (quoting Human Rights Watch: "In some ways, the abuses in Afghanistan are more troubling than those reported in Iraq… The detention system in Afghanistan, unlike the system in Iraq, is not operated even nominally in compliance with the Geneva conventions…").

38. Like the detainees who were transferred to Guantánamo in its early days, the Bagram detainees are reportedly held in primitive wire-mesh cages. *See* Golden & Schmitt, *supra*, at 1. A former

8

prisoner who had been detained for more than two years at Bagram described his cell as "a cage" like ones he had seen where they kept the animals at the Karachi Zoo in Pakistan. *Id*. Former detainees have described sharing their "cages" – often containing nothing more than a bucket to serve as a toilet – with a dozen other detainees. *Id*.

39. According to one detainee, bright lights shone around the clock, and those who tried to shield their faces were punished by having to assume and maintain "stress positions." Eliza Griswold, *American Gulag: Prisoners' Tales from the War on Terror*, Harper's Mag., Sept. 1, 2006, at 41. Loudspeakers were reportedly used to keep prisoners awake. *See* Campbell & Goldenberg, *supra*, at 15. In addition, detainees at Bagram are forbidden from looking at each other or talking, and face punishment for doing so. *Id.* (quoting former detainee who recalled "if we talked to each other, we were sent into a dark room and had our hands tied").

40. The State Department has described Bagram as a "temporary 'collection center' where some detainees stop over en route to their permanent location" – typically Guantánamo. *See* U.S. Dep't of State, *Information Memorandum re: Nationalities at Bagram* (2002), *available at* http://www.aclu.org/torturefoia/released/120704.html; Emily Bazelon, *From Bagram to Abu Ghraib,* Mother Jones, Mar. 1, 2005, at 50. Department of Defense officials have expressed concern that while the Bagram detention facility was not built to house prisoners for more than a brief period of time, "now it's a *long-term facility* without the money or resources." *See* Golden & Schmitt, *supra*, at 1 (emphasis supplied). Moreover, they have admitted that the "[Department of Defense] system for releasing detainees whose intelligence value turned out to be negligible did not keep pace with the numbers [they] were bringing in." *Id*.

41. One Pentagon official has stated that, as of February 2006, the average stay of a detainee at Bagram is more than fourteen months. *Id*. However, some detainees have been held without charge for as long as three to four years. *See* Pennington, *supra*.

42. According to military intelligence officials at Bagram, only a small fraction of the detainees

9

held there were considered important or suspicious enough to be transferred to Guantánamo for further interrogation. *See* Tim Golden, *Army Faltered in Investigating Detainee Abuse,* N.Y. Times, May 22, 2005, at 1. Nevertheless, most new detainees were hooded, shackled and isolated for at least 24 hours, and sometimes as long as 72 hours. *Id.*

43. Former Bagram detainees have consistently described abusive interrogation tactics amounting to torture and cruel, inhuman or degrading treatment at the hands of their captors. For example, Bagram detainees have reported being held in solitary confinement for up to eleven months straight, as well as being starved, beaten, kicked, left out in the freezing cold, and sexually humiliated. Pennington, *supra*; Kristof, *supra*, at 21.

44. Importantly, at least two Bagram detainees have died while in custody. *See* Golden, *supra*, at 1. Documents leaked from an Army investigation into the deaths revealed that the deaths had been ruled a homicide, contradicting the military's earlier assertions that both had died of natural causes. *Id*. *See also* Autopsy Reports, *available at* http://action.aclu.org/torturefoia/released/102405. Both detainees had been chained to the ceiling for days at a time and brutally beaten. *See* Julian Borger, *Report Implicates Top Brass in Bagram Scandal*, Guardian (London), May 21, 2005, at 4. In one case, the detainee was reportedly killed over a five-day period by "destroying his leg muscle tissue with repeated unlawful knee strikes" that according to the medical examiner were so severe that "even if he had survived, both legs would have to be amputated." Douglas Jehl, *Army Details Scale of Abuse in Afghan Jail*, N.Y. Times, March 12, 2005, at 1. The other detainee who died while in custody at Bagram was similarly tortured, and died of a pulmonary embolism from being beaten while he was chained to the ceiling by his wrists. *Id*. Coroners said that his legs "had basically been pulpified" and looked as though they had been run over by a bus. Borger, *supra*, at 4.

45. Reports indicate that the deaths were not isolated incidents, but part of a pattern of abuse at

Bagram. The Army Criminal Investigation Command revealed that the prisoner abuse at Bagram went far beyond the two deaths, and described the abuse of another prisoner who had been tortured by "kicks to the groin and leg, shoving or slamming him into walls/tables, forcing the detainee to maintain painful, contorted body positions during interview and forcing water into his mouth until he could not breathe." *See* Jehl, *supra*, at 1. Another detainee was abused by a military interrogator who had "placed his penis along the face" of the detainee, and later "simulated anally sodomizing him (over his clothes)." *Id*. Other Bagram detainees have also complained of acts of sexual brutality. *See* Suzanne Goldenberg & James Meek, *Papers Reveal Bagram Abuse: Prisoners subjected to 'mock executions'; Photographs of detainees being sexually humiliated*, Guardian (London), Feb. 18, 2005, at 1 (reporting that soldiers "forcibly rammed a stick up [detainee's] rectum"). In addition, there have been reports of 'mock executions' at Bagram. *Id.* One detainee described being threatened with dogs, stripped and photographed "in shameful and obscene positions," and placed in a cage with a hook and a hanging rope, from which he was hung blindfolded for two days. *Id.*

46.  While many former Bagram officers have denied knowledge of any serious mistreatment of detainees prior to the two homicides, reports indicate that many of the methods cited as a basis for the criminal charges, including chaining prisoners to the ceilings of isolation cells for long periods, were either standard practice at Bagram or well known to those who oversaw it. Tim Golden, *Abuse Cases Open Command Issues at Army Prison*, N.Y. Times, August 8, 2005, at 1. One former guard said that he and other policemen were specifically instructed at Bagram how to deliver the type of blows that killed the two detainees, and that the strikes were commonly used when detainees were being hooded or shackled. *Id*. In addition, the results of the Army investigation following the deaths of the two detainees substantiated Human Rights Watch's own investigation showing that beatings and stress positions were widely used. Jehl, *supra*, at 1 (quoting Human Rights Watch's finding that "far from a few isolated cases," abuse

11

in Afghanistan was "the rule more than exception").

47. In fact, many of the harsh interrogation techniques practiced at Abu Ghraib are believed to have originated in Bagram. *See* Major General George R. Fay, *AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade* (2004) (hereinafter "Fay-Jones Report"), *available at* http://news.findlaw.com/hdocs/docs/dod/fay82504rpt.pdf. *See also* Bazelon, *supra*, at 50 (noting that former head of interrogation unit at Bagram who was reassigned to Abu Ghraib implemented an interrogation policy that was "remarkably similar" to the one she had developed in Bagram). According to the Fay-Jones Report, interrogators in Afghanistan have been "removing clothing, isolating people for long periods of time, using stress positions, exploiting fear of dogs and implementing sleep and light deprivation." Fay, *supra*, at 29. Notably, these interrogation techniques are "not approved by military doctrine or included in Army field manuals." Bazelon, *supra*, at 50.

48. At least one Department of Defense official has commented that unlike the Guantánamo detainees, the Bagram detainees have been successfully kept "out of sight, out of mind." Golden & Schmitt, *supra*, at 1.

## V.
## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

(COMMON LAW DUE PROCESS AND
THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION —
UNLAWFUL DEPRIVATION OF LIBERTY)

49. Petitioners incorporate paragraphs 1-48 by reference.

50. By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well as the Due Process Clause of the Fifth Amendment to the Constitution of the United States. Respondents' actions deny the detained Petitioner the process accorded to persons seized and detained by the United States

military in times of armed conflict as established by, *inter alia*, the Uniform Code of Military Justice, Army Regulation 190-8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

51. To the extent that Petitioner Fadi Al Maqaleh's detention purports to be authorized by the Executive Order, that Order violates the Fifth Amendment on its face and as applied to Petitioner.

52. Accordingly, the detained Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

**SECOND CLAIM FOR RELIEF**

(DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT
TO THE UNITED STATES CONSTITUTION —
UNLAWFUL CONDITIONS OF CONFINEMENT)

53. Petitioners incorporate paragraphs 1-52 by reference.

54. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of the detained Petitioner to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

55. Accordingly, the detained Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

**THIRD CLAIM FOR RELIEF**

(ARTICLE II OF THE UNITED STATES CONSTITUTION
— UNLAWFUL DETENTION)

56. Petitioners incorporate paragraphs 1-55 by reference.

57. Petitioner Fadi Al Maqaleh has not, nor has he ever been, an enemy alien, a lawful or unlawful

belligerent, or a combatant of any kind. The Executive lacks the authority to order or direct military officials to detain civilians who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004).

58. By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that military officials seize the detained Petitioner and transfer him to military detention, and by authorizing and ordering his continued military detention. Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of the detained Petitioner.

59. The military seizure and detention of Petitioner Fadi Al Maqaleh by the Respondents is *ultra vires* and illegal because it is in violation of Article II of the United States Constitution. To the extent that the Executive asserts that the detained Petitioner's detention is authorized by the Executive Order, that Order exceeds the Executive's authority under Article II and is *ultra vires* and void on its face and as applied to the detained Petitioner.

60. To the extent that Respondents assert that their authority to detain the Petitioner derives from a source other than the Executive Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the United States Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

61. Accordingly, the detained Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

### FOURTH CLAIM FOR RELIEF

(VIOLATION OF THE APA — ARBITRARY
AND CAPRICIOUS UNLAWFUL DETENTION)

62. Petitioners incorporate paragraphs 1-61 by reference.

63. Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or who were not engaged in combat against the United States. *See, e.g.*, Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.")

64. By arbitrarily and capriciously detaining Petitioner Fadi Al Maqaleh in military custody in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

65. Accordingly, the detained Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

**FIFTH CLAIM FOR RELIEF**

(VIOLATION OF THE APA — TORTURE, CRUEL, INHUMAN
OR DEGRADING TREATMENT)

66. Petitioners incorporate paragraphs 1-65 by reference.

67. By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject the detained Petitioner to torture and/or cruel, inhuman or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedures Act, 5 U.S.C. § 706(2).

68. Accordingly, the detained Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

**SIXTH CLAIM FOR RELIEF**

(FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION — VIOLATION OF THE RIGHT TO COUNSEL AND
TO ACCESS TO THE COURTS)

69. Petitioners incorporate paragraphs 1-68 by reference.

70. By denying Petitioner Fadi Al Maqaleh access to counsel or the courts, Respondents have violated the detained Petitioner's rights under the Fifth and Sixth Amendments to the United States Constitution.

71. Accordingly, the detained Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

## SEVENTH CLAIM FOR RELIEF

(INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW
— ARBITRARY DENIAL OF DUE PROCESS)

72. Petitioners incorporate paragraphs 1-71 by reference.

73. By the actions described above, Respondents have denied and continue to deny the detained Petitioner the process due to persons seized and detained by the United States military in times of armed conflict as established by customary international humanitarian and human rights law as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

74. Because Respondents are detaining Petitioner "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," Petitioners' claim arises under 28 U.S.C. § 2241, and the detained Petitioner is entitled to habeas relief.

75. The detained Petitioner is also entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

## EIGHTH CLAIM FOR RELIEF

(INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW
— TORTURE, CRUEL, INHUMAN OR DEGRADING TREATMENT)

76. Petitioners incorporate paragraphs 1-75 by reference.

77. By the actions described above, Respondents have denied and continue to deny the detained Petitioner the right to be free from torture, cruel, inhuman or degrading treatment of all persons

seized and detained by the United States military in times of armed conflict as established by customary international humanitarian and human rights law -- as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

78. Because Respondents are detaining Petitioner "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," Petitioners' claim arises under 28 U.S.C. § 2241, and the detained Petitioner is entitled to habeas relief.

79. The detained Petitioner is also entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

### NINTH CLAIM FOR RELIEF

(GENEVA CONVENTIONS
— ARBITRARY DENIAL OF DUE PROCESS)

80. Petitioners incorporate paragraphs 1-79 by reference.

81. By the actions described above, Respondents, acting under color of law, have denied and continue to deny the detained Petitioner the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

82. Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law, and constitute enforceable claims under 28 U.S.C. § 2241 (c)(3).

83. Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

84. Accordingly, the detained Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

### TENTH CLAIM FOR RELIEF

(GENEVA CONVENTIONS
— TORTURE, CRUEL, INHUMAN OR DEGRADING TREATMENT)

85. Petitioners incorporate paragraphs 1-84 by reference.

86. By the actions described above, Respondents have denied and continue to deny the detained Petitioner the right to be free from torture, cruel, inhuman or degrading treatment of all persons seized and detained in times of armed conflict as established by customary international humanitarian and human rights law, as expressed in specific provisions of the Geneva Conventions.

87. Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law, and constitute enforceable claims under 28 U.S.C. § 2241 (c)(3).

88. Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

89. Accordingly, the detained Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

### VI.
### PRAYER FOR RELIEF

**WHEREFORE**, Petitioners pray for relief as follows:

1. Grant Petitioner Ahmad Al Maqaleh Next Friend status, as Next Friend of Fadi Al Maqaleh;

2. Order Petitioner Fadi Al Maqaleh released from Respondents' unlawful custody;

3. Order Respondents to allow counsel to meet and confer with the detained Petitioner Fadi Al Maqaleh, in private and unmonitored attorney-client conversations;

4. Order Respondents to make a prompt return to the writ in accordance with 28 U.S.C. § 2243 and to the extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary hearing, at which Petitioners may adduce proof in support of their allegations;

5.  Such other relief as the Court may deem necessary and appropriate to protect the detained Petitioner Fadi Al Maqaleh's rights under the United States Constitution, the Habeas Statute, and International Law.

Dated:      February 12, 2007           Respectfully submitted,

                                        /s/ Tina M. Foster
                                        Tina M. Foster, Esq.
                                        *Admitted pursuant to L. Civ. R. 83.2(g)*
                                        International Justice Network
                                        PO Box 610119
                                        Bayside, NY 11361-0119
                                        Tel: 917.442.9580
                                        Fax: 917.591.3353

                                        *Attorney for Petitioners*

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 12th day of February, 2007.

_____
Tina M. Foster