IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FADI AL MAQALEH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT GATES, *et al.,* | ) |
| | ) |
| Respondents. | ) |

Civil Action No. 06-CV-01669 (JDB)

**RESPONDENTS' MOTION TO DISMISS FOR LACK OF JURISDICTION**

Pursuant to this Court's Order of February 13, 2007, respondents move to dismiss the

First Amended Petition for Writ of Habeas Corpus for lack of subject matter jurisdiction.

Petitioner Fadi Al Maqaleh alleges that he is a Yemeni citizen detained by the United States

Department of Defense ("DoD") at Bagram Airfield, a United States military base in

Afghanistan.  He alleges, through his purported next friend, that his detention and conditions of

confinement violate the Constitution, the Geneva Conventions, and the common law, among

other things, and seeks release from DoD custody as a primary form of relief.

Assuming the facts in the First Amended Petition to be true,[1] this Court has no

jurisdiction over this action.  As the Court of Appeals for the District of Columbia Circuit

recently held in *Boumediene v. Bush,* No. 05-5062, – F.3d – , 2007 WL 506581 (D.C. Cir. Feb.

20, 2007), federal courts have no jurisdiction over petitions for writs of habeas corpus filed by

aliens captured abroad and detained as enemy combatants in a military base outside the sovereign

---

[1]  DoD is currently detaining at Bagram Airfield a Yemeni citizen whose name is the same as, or closely similar to, petitioner's name. *See* Declaration of Colonel James W. Gray ["Gray Decl."], ¶ 19.   For purposes of this motion to dismiss, respondents will assume that the Yemeni detainee is petitioner.

territory of the United States.  As the Court of Appeals concluded, any contrary argument is squarely foreclosed by the jurisdiction-restriction provisions of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006), which limit the reach of the federal habeas statute and applies to all cases pending on the date of the MCA enactment, such as this one.  *See* MCA § 7(b).  The Court of Appeals also rejected the contention that the MCA, so applied, is unconstitutional.

The Constitution does not provide petitioner with an independent right to habeas or other relief.  The Supreme Court long ago rejected in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), that aliens detained abroad by the United States have constitutional rights.  Recognizing *Eisentrager* to be the controlling precedent on this point, the Court of Appeals held in *Boumediene* that Guantanamo Bay Naval Base detainees cannot invoke protections under the Constitution, whether under the Due Process Clause of the Fifth Amendment, the Suspension Clause in Article 1, Section 9, or otherwise.  This is so not only because those detainees lack ties to the United States, but also because Guantanamo Bay is not a sovereign territory of the United States.  Similarly here, petitioner does not claim to have any significant, voluntary connections to the United States, nor can he seriously argue that Bagram Airfield is a sovereign territory of the United States—a determination that is ultimately reserved for "the legislative and executive departments.'" *Boumediene*, Slip Op. at 20 (quoting *Vermilya-Brown Co. Connell,* 335 U.S. 377, 280 (1948)).  *Boumediene* thus forecloses any attempt by petitioner to seek protections under the Constitution or to raise challenges to the MCA's constitutionality.

Furthermore, to the extent petitioner argues that this Court has jurisdiction under the common law to review his claims, that argument is also foreclosed by *Boumediene*.  As the Court of Appeals held, the common law never encompassed habeas claims by an alien captured and

detained outside the territory of the sovereign, and even if there were such a thing as common law jurisdiction in the federal courts, the MCA quite clearly eliminated that jurisdiction.

Finally, even before the enactment of the MCA and other than in the special circumstances at issue in *Rasul v. Bush*, 542 U.S. 466 (2004), the federal habeas statute had never been interpreted to apply to aliens held at military bases overseas. *Rasul* involved a military installation, the Guantanamo Bay Naval Base ("Guantanamo"),[2] over which the foreign sovereign expressly has consented to the United States' "complete jurisdiction and control" for over a century. *Id.* at 480. There is no similar consent, however, by the Government of Afghanistan regarding Bagram Airfield, nor does the United State exercise "plenary and exclusive jurisdiction" over Bagram as is the case at Guantanamo. *Id.* at 475. Instead, the United States' use of that military base, along with the significant presence of multinational forces there, is a wartime necessity subject to an agreement with the host nation. Thus, even had Congress not acted to supersede the holding in *Rasul* by enacting the MCA, the logic of *Rasul* would not extend to this case.

In sum, this court has no jurisdiction to review petitioner's claims. To hold otherwise would not only violate the plain language of section 7 of the MCA, but it would also mean the expansion of habeas jurisdiction to cover thousands, if not tens of thousands, of enemy combatants anywhere in the world in both current and future armed conflicts. As aptly observed by the Supreme Court more than half a century ago in *Eisentrager*, such an expansion would have a crippling effect on our war efforts: "It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to

---

[2] Guantanamo was the very extra-territorial location as to which the Court of Appeals held in *Boumediene* that the MCA is applicable and constitutional.

submission to call him to account in his own civil courts and divert his efforts and attention from

the military offense abroad to the legal defensive at home." 399 U.S. at 779. The considerable

practical difficulties in connection with allowing alien enemy combatants captured at the

battlefield and detained in a theater of war the privilege of access to our civil courts also cannot

be understated. Accordingly, this Court should dismiss this case for lack of jurisdiction.

## BACKGROUND

I.    **Bagram Airfield in Afghanistan**

Bagram Airfield is located approximately 40 miles north of Kabul in the Parwan Province

of the Islamic Republic of Afghanistan. Between at least 1999 and 2001, the Taliban and the

Northern Alliance forces actively contested control over the airbase, with the base changing

hands several times. In the military campaign against al Qaeda and the Taliban regime in

Afghanistan, American troops were deployed to the Airfield starting in late 2001 and early 2002,

along with multinational armed forces, and had priority use of the Airfield for coalition

operations. *See* Declaration of Colonel James Gray, ["Gray Decl."], ¶ 5 . Today, the U.S.

military force at Bagram Airfield is partnered with the Afghan National Security Forces, as well

as other multinational forces, to conduct full spectrum operations to defeat al Qaeda, the Taliban,

and associated movements. *See id.* ¶ 2. Its mission is to establish security, deter the re-

emergence of terrorism, and enhance the sovereignty of Afghanistan. *See id.*

Since at least 2003 and consistent with Afghan sovereignty, the United States has entered

into several accommodation consignment agreements with the government of Afghanistan

regarding the use of the land and facilities at Bagram Airfield. *Id.* ¶ 6. The most recent

agreement, which is similar to prior agreements, was executed on September 28, 2006. *Id.;*

Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between

the Islamic Republic of Afghanistan and the United States of America ["Accommodation Agreement"], attached as Ex. 1 to Gray Decl. Pursuant to that agreement, Afghanistan, as the "host nation," consigns all facilities and land located at Bagram Airfield "for use by the United States and Coalition Forces for military purposes." Accommodation Agreement at 1; Gray Decl. ¶ 6. The United States, as the "lessee," has exclusive use and possession of the premises during the existence of the Agreement without rent or any other consideration. Accommodation Agreement at 1 and ¶¶ 5, 9. The Agreement specifically warrants that Afghanistan is the sole owner of the premises or otherwise has the right, without any restrictions, to grant the "use" of the premises. *Id.* ¶ 8. It also includes a hold-harmless provision whereby Afghanistan agrees that all claims arising out of the United States' possession of the premises may be directed to Afghanistan for processing and payment, if any. *See id.* The Agreement is to continue in effect until the United States or its successor determines that it no longer needs the premises. *Id.* ¶ 4; Gray Decl. ¶ 6.

Many different activities are conducted at Bagram Airfield, which has a significant multinational military presence. Gray Decl. ¶ 7. While the United States guards the Airfield, there are numerous national compounds located within the Airfield, with each nation separately controlling access to its respective compound. *Id.* Afghans also regularly have access to the Airfield. *Id.* ¶ 8. They range from local nationals performing contracted work to representatives of the Government of Afghanistan who assist in detainee citizenship interviews. *Id.* In addition, the United States operates a detention facility at Bagram Airfield known as the Bagram Theater Internment Facility ("BTIF") to hold some of the aliens (that is, non-Americans) believed to be either members or supporters of al Qaeda, the Taliban or associated movements. *Id.* ¶ 9. The Department of Defense ("DoD") has registered these detainees with the International Committee

of the Red Cross ("ICRC"), and the ICRC regularly accesses the facility to conduct private interviews with the detainees there. *Id.* ¶ 10. Additionally, representatives of the Government of Afghanistan have access to Afghan detainees at the BTIF. *Id.*

The Secretary of Defense has issued guidelines regarding the assessment of DoD detainees' enemy combatant status in Afghanistan. *See id.* ¶ 12. In accordance with those guidelines, the detaining combatant commander, or his designee, must review the initial enemy combatant determination made in the field within 90 days of a detainee's capture. *Id.* This review is based on all relevant information available on the date of the review and may be subject to further review based upon newly discovered evidence or information. *Id.* If necessary for a proper review, the detaining combatant commander, or his designee, may interview witnesses, providing they are reasonably available and such interviews would not affect combat, intelligence gathering, law enforcement, or support operations. *Id.* The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination regarding the detainee's status. *Id.* After the initial 90-day status review, the detaining combatant commander, or his designee, is required to reassess the detainee's status annually. *Id.* If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released. *Id.* Since the war began in Afghanistan, the United States has captured, screened, and released many individuals. *Id.* ¶ 9.

The commanding general in charge of Bagram Airfield has established an Enemy Combatant Review Board ("ECRB") to conduct enemy combatant status reviews. *See id.* The ECRB is a panel of five commissioned officers who evaluate the detainees' status based on a variety of information, including classified intelligence and testimony from individuals involved

in the capture and interrogation of the detainee. *Id.* The ECRB makes its recommendation regarding a detainee's status by a majority vote, and forwards that recommendation to the commanding general, or his designee, for final determination. *Id.*

Even if an Afghan detainee is determined to be an enemy combatant, that person may be transferred to the Government of Afghanistan pursuant to a national reconciliation program. *See id.* ¶¶ 14-15. Sponsored by the Government of Afghanistan, this reconciliation program is designed to allow combatants who are ready to put down their weapons to join in their country's progress by living peaceful and productive lives. *Id.* ¶ 15. DoD has released Afghan detainees from the BTIF pursuant to this program as part of the United States' ongoing effort to support the Government of Afghanistan in its program for strengthening peace. *Id.* These detainees are returned by the Government of Afghanistan to their village elders for reintegration into society. *Id.* In addition, pursuant to a diplomatic arrangement reached with the Government of Afghanistan, the United States anticipates transferring a significant percentage of the Afghan detainees at the BTIF to the Government of Afghanistan in the foreseeable future. *See id.* ¶ 16. To accomplish that arrangement, the United States is currently funding the renovation of an Afghan prison, known as the Afghan National Detention Center. *Id.* The United States is also providing other aid to the Government of Afghanistan regarding the operation of that prison, both to facilitate these transfers and to ensure that the detention facility would meet international standards. *Id.* Some Afghan detainees and detainees who are nationals of third countries, however, will not be transferred to the Government of Afghanistan but will remain in DoD custody. *See id.* ¶ 18.

Petitioner was captured in Zabul, Afghanistan and detained at the BTIF. *See* Gray Decl. ¶ 20. He was determined to be an enemy combatant both at the time of the capture and in

subsequent reviews.[3]  *See id*.

On September 28, 2006, petitioner filed a petition for a writ of habeas corpus through his next friend.  He amended the petition on February 12, 2007.  The First Amended Petition seeks to invoke the jurisdiction of this Court under the federal habeas statute, 28 U.S.C. § 2241, the federal question statute, 28 U.S.C. § 1331, the Alien Tort Statute, 28 U.S.C. § 1350, and the All Writs Act, 28 U.S.C. § 1651.[4]

## II.    The Statutory Background

The federal habeas statute provides that federal district courts have authority "within their respective jurisdictions" to consider a request for habeas corpus relief made by petitioners claiming to be held in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2241(a), (c)(3).  Until the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466 (2004), this statute had never been interpreted to apply to aliens held in foreign territories by the United States.  *Rasul* held that aliens enemy combatants detained at Guantanamo had a statutory right to habeas relief because Cuba's express consent to the United States' "complete jurisdiction and control over and within [the naval base]" brought the base within the meaning of the habeas statute's distinctive phrase relating to the power of courts to issue writs of habeas corpus "within their respective jurisdictions."  *Id.* at 471; *see* 28 U.S.C. § 2241(a).

In response to *Rasul*, Congress amended the habeas statute specifically to preclude

---

[3]  Petitioner received an enemy combatant status review by the ECRB in December 15, 2005, following which his status as an enemy combatant was validated.  *See* Gray Decl. ¶ 20. The ECRB's most recent review of his status was on March 1, 2007.  *Id.*

[4]  Although the petition also cites the Administrative Procedures Act, 5 U.S.C. § 702, as a jurisdictional basis, "the APA grants a cause of action rather than subject matter jurisdiction." *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13, 18 (D.C. Cir. 2006) (citing *Califano v. Sanders,* 430 U.S. 99, 107 (1977)).

jurisdiction in the federal courts over Guantanamo detainees' habeas or other claims relating to any aspect of the detention, except as provided by the judicial review provisions in the amendment itself.  *See* the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, 119 Stat. 2680 (10 U.S.C. § 801 note) (2005).  That amendment vested exclusive jurisdiction in the United States Court of Appeals for the District of Columbia Circuit to review the validity of any final determination of a Combatant Status Review Tribunal ("CSRT"), and of any final decision of a military commission, regarding Guantanamo detainees.  *See* DTA § 1005(e)(2) (2005).

Although the DTA's provision withdrawing jurisdiction "t[ook] effect on the date of [its] enactment," *see* DTA § 1005(h)(1) (2005), the Supreme Court in *Hamdan v. Rumsfeld* found no congressional intent to apply the provision retroactively in the circumstances of that case, and thus held the provision inapplicable to the habeas petition before it, which had been filed prior to the enactment of the DTA.   548 U.S. __, 126 S. Ct. 2749, 2762-69 (2006).

In response to this and other holdings in *Hamdan*, Congress enacted the MCA to clarify the jurisdictional restrictions on habeas petitions and other detention-related claims filed by alien enemy combatants in DoD custody.  That statute specifies that the DTA's jurisdiction-limiting provisions are applicable "to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." MCA § 7(b).  The MCA also expanded the jurisdictional restrictions under the DTA to cover not only those aliens enemy combatants detained at Guantanamo but also all those alien enemy combatants in the custody of the United States anywhere in the world.  *See id.* § 7(a).

Thus, the habeas statute now provides in 28 U.S.C. § 2241 subsection (e) that

> (1) No court, justice, or judge shall have jurisdiction to hear or
> consider an application for a writ of habeas corpus filed by or on

9

behalf of an alien detained by the United States who has been
determined by the United States to have been properly detained as
an enemy combatant or is awaiting such determination.

(2) Except as provided in paragraphs (2) and (3) of section 1005(e)
of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no
court, justice, or judge shall have jurisdiction to hear or consider
any other action against the United States or its agents relating to
any aspect of the detention, transfer, treatment, trial, or conditions
of confinement of an alien who is or was detained by the United
States and has been determined by the United States to have been
properly detained as an enemy combatant or is awaiting such
determination.

See MCA § 7(a).  DTA § 1005(e)(2) and (3), in turn, gives the D.C. Circuit exclusive jurisdiction

to determine the validity of "any final decision of a Combatant Status Review Tribunal that an

alien is properly detained as an enemy combatant," and of "any final decision rendered by a

military commission," with regard to anyone held by the United States.  See DTA

§ 1005(e)(2)(A), (e)(3)(A); MCA §§ 9, 10.

**ARGUMENT**

I.    **THIS COURT LACKS JURISDICTION TO REVIEW THIS CASE**

A.    **The Court of Appeals' Decision in *Boumediene* Removes All Doubt That
      Petitioner Has No Statutory Right to Habeas or Other Relief Relating to His
      Detention or Conditions of Confinement**

As discussed in the preceding section, developments in Guantanamo detainees' habeas

corpus litigation brought about Congress' enactment of the MCA, which unambiguously

determined that alien enemy combatants held abroad do not have a statutory right to habeas

relief.  In light of the fact that there are alien enemy combatants in DoD custody elsewhere in the

world (both in the current conflict as well as possibly in future conflicts), the MCA's provision

limiting habeas jurisdiction is written broadly to cover any alien "detained by the United States

10

who ha[ve] been determined by the United States to has been properly detained as an enemy combatant or is awaiting such determination." *See* MCA § 7(a)(1). The MCA also covers any such alien's non-habeas claims, specifically precluding jurisdiction in federal courts over claims "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement," except as provided in the DTA. *Id.* § 7(a)(2).

Petitioner is an alien who has been determined by the United States to be an enemy combatant and is detained as such at Bagram Airfield. *See* Gray Decl. ¶ 20. His habeas petition, as well as his non-habeas claims (all of which relate to an aspect of the detention, transfer, treatment, and conditions of confinement), therefore, fall squarely within the jurisdiction-restriction provisions of the MCA. Lest there be any doubt, the MCA further specifically precludes petitioner's claims based on the Geneva Conventions, by providing that "[n]o person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceedings . . . as a source of rights in any court of the United States." MCA § 5.

Any argument that the MCA is inapplicable because it was enacted after the filing of the present action is foreclosed not only by the express language of the MCA but also by the Court of Appeals' decision in *Boumediene*. The MCA expressly applies "to all cases, without exception, pending on or after the date of the enactment of this Act, which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001," *id.* § 7(b), which would include this case challenging petitioner's detention and condition of confinement. Although the Guantanamo detainees in *Boumediene* had argued that section 7(b) nevertheless does not apply to their pending habeas petitions, the court found the argument "creative but not cogent." Slip op. at 10. As the Court of

11

Appeals noted, to accept the argument "would be to defy the will of Congress," *id.* at 10, because "[w]ithout exception, both the proponents and opponents of section 7 [of the MCA] understood the provision to eliminate habeas jurisdiction over pending cases," *id.* at 9 n.2. *See also Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), – F. Supp. 2d –; 2006 WL 3625015, *3 (D.D.C. Dec. 13, 2006) (holding that the MCA clearly divests the district court of jurisdiction over pending habeas petitions filed by Guantanamo detainees).

The plain language of the MCA clearly precludes this Court from reviewing the present action, a reading that is confirmed by the Court of Appeals' decision in *Boumediene* . "Without jurisdiction [a] court cannot proceed at all in any cause." *Steel Co v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Accordingly, this Court should dismiss this case for want of jurisdiction.

**B.    The MCA Confirms The Long-Standing Principle that Aliens Detained Abroad Are Outside the Scope of the Habeas Statute**

Relying on *Rasul v. Bush*, 542 U.S. 466 (2004), petitioner argues that Bagram Airfield "is subject to the exclusive jurisdiction and control of the United States military . . . and is subject to the United States . . . statutory law, and answerable to the federal judiciary." 1st Amended Pet. at ¶ 34. Petitioner's reliance on *Rasul* is misplaced, first, because *Rasul*'s holding that detainees held at Guantanamo enjoy a statutory right to habeas corpus has since been overruled by the MCA. The habeas statute, as *Rasul* interpreted it, no longer exists, and per section 7 of the MCA is clearly inapplicable to petitioner's claim.

Second, *Rasul* is uniquely about the Guantanamo Bay Naval Base, over which the foreign sovereign had expressly consented to United States' jurisdiction and control. Indeed, until Rasul, the federal habeas statute had never been interpreted to apply to foreign nationals taken captive during military operations overseas and held in military bases leased from foreign governments.

12

The logic of *Rasul* would not extend to confer habeas jurisdiction to detention at every military facility that the United States operates throughout the world, much less the battlefield of Afghanistan. *Rasul*'s holding rested on the unique agreement the United States had with Cuba regarding Guantanamo Bay, and Cuba's specific consent to the United States' "plenary and exclusive jurisdiction" over the base for more than a century. *Id.* at 471. As the Supreme Court noted, the 1903 Lease Agreement between the two governments provided that "the United States shall exercise complete jurisdiction and control over and within [the Guantanamo Bay Naval Base]," *id.* at 471; *see also* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418 ("1903 Lease"); and according to the Court, the United States "may continue to exercise such control permanently if it so chooses." *Id.* at 480 (citing 1903 Lease, Art. III; Treaty on Relations with Cuba, May 29, 1934, U.S.-Cuba, 48 Stat. 1082, T.S. No. 866, Art. III). As interpreted by the Supreme Court, *id.* at 480-81, that control brought Guantanamo within the meaning of the habeas statute, particularly its distinctive phrase relating to the power of courts to issue writs of habeas corpus "within their respective jurisdictions." 22 U.S.C. § 2241.

In contrast to the "complete jurisdiction and control," which may be exercised by the United States in Guantanamo Bay, the United States enjoys no similar mandate regarding Bagram Airfield. Instead, its use of the base is necessitated by the war against the Taliban and al Qaeda. Gray Decl. ¶ 4. The Accommodation Consignment Agreement between the United States and Afghanistan regarding Bagram Airfield—which recognizes Afghanistan as a "host nation," and the United States as a "lessee," Accommodation Agreement at 1—speaks of only "exclusive, peaceable, undisturbed and uninterrupted possession" and "use" of the leased premises for military operations by the United States and coalition forces. *See* Accommodation Agreement ¶ 9. A military base on foreign soil in a zone of active military operations is hardly

the type of territory that is under unchallenged and indefinite control of the United States like

Guantanamo Bay such that it was within a federal court's habeas jurisdiction.

Moreover, even were the logic of *Rasul* somehow to extend to dissimilar circumstances

including detention at other facilities abroad, the MCA specifically superseded *Rasul* and makes

unmistakably clear that this Court lacks jurisdiction over petitioner's claims. *See Boumediene*,

Slip Op. at 13.

## II.    PETITIONER HAS NO CONSTITUTIONAL RIGHT TO HABEAS OR OTHER RELIEF

Although petitioner also seeks to invoke constitutional protections, it has long been

settled that aliens outside the sovereign territory of the United States have no constitutional

rights. This was confirmed most recently in *Boumediene*, demonstrating the continued vitality of

the Supreme Court's decisions in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), *United States v.*

*Verdugo-Urquidez*, 494 U.S. 259 (1990), and *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and

their application to the circumstances present here.

In *Eisentrager*, a group of German nationals—who were captured in China by U.S. forces

during World War II and imprisoned in a U.S. military base in Germany—sought habeas relief in

federal court. Although the military base in Germany was controlled by the U.S. Army, 339 U.S.

at 763, the Supreme Court held these prisoners to have no constitutional right to habeas relief in

federal court because the prisoners "at no relevant time were within any territory over which the

United States is sovereign, and the scenes of their offense, their capture, their trial, and their

punishment were all beyond the territorial jurisdiction of any court of the United States." *Id.* at

777-78.

The Court further held the Fifth Amendment inapplicable to these aliens because there is

14

no textual or historical support for "[s]uch extraterritorial application of organic law." *Id.* at

782-85; *see also id.* at 768.  As the Court noted, such application "would have been so significant

an innovation in the practice of governments that, if intended or apprehended, it could scarcely

have failed to excite contemporary comment.  Not one word can be cited.  No decision of this

Court supports such a view. . . . None of the learned commentators on our Constitution has ever

hinted at it.  The practice of every modern government is opposed to it." *Id.* at 784-85.  The

Court further noted that "the alien has been accorded an ascending scale of rights as he increases

his identity with our society," 339 U.S. at 770, and the privilege of litigation has been extended

to aliens "only because permitting their presence in the country implied protection." *Id.* at 777-

78.

As the Supreme Court later explained in *Verdugo-Urquidez*, *Eisentrager*'s rejection of

constitutional claims by alien prisoners in U.S. custody at a military base abroad was "emphatic"

because aliens have no constitutional rights outside United States sovereign territory.  494 U.S. at

269.  *Verdugo-Urquidez* itself held that mere presence in the sovereign territory of the United

States may not be enough to invoke protections under the Constitution, if the alien has not

"developed substantial voluntary connections with this country." *Id.* at 271-72.  *Verdugo-

Urquidez* involved a non-resident alien, who had no previous significant voluntary connection

with the United States and was involuntarily transported to the United States.  The Court held

that the alien had no Fourth Amendment right with respect to the search of his property abroad by

U.S. agents because presence in the United States that is "lawful but involuntary [] is not of the

sort to indicate any substantial connection with our country." *Id.* at 271.  To hold otherwise, the

Court reasoned, "would have significant and deleterious consequences for the United States in

conducting activities beyond its boundaries," particularly since the government "frequently employs Armed Forces outside this country." *Id.* at 273. Thereafter in *Zadvydas*, the Supreme Court again relied on *Eisentrager* to find it "well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." 533 U.S. at 693.

Following this Supreme Court precedent, as well as precedent in this Circuit, the Court of Appeals' recent holding in *Boumediene*—that alien detainees at Guantanamo have no constitutional rights—therefore did not come as a surprise. Recognizing *Eisentrager* to be the "controlling precedent," *Boumediene*, Slip Op. at 18, the Court of Appeals found that any distinction between the naval base at Guantanamo Bay and the prison in Landsberg, Germany, where the petitioners in *Eisentrager* were held, was immaterial to the application of the Suspension Clause. Slip Op. at 20. As the Court of Appeals reasoned, "[t]he text of the lease and decisions of circuit courts and the Supreme Court all make clear that Cuba—not the United States—has sovereignty over Guantanamo Bay." *Id.* Because "[p]recedent in [the D.C. Circuit] and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States," the Court of Appeals held that aliens detained at Guantanamo cannot invoke protections under the Constitution. Slip Op. at 18; *see also Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), 2006 WL 3625015 at *7-*9 (D.D.C. Dec. 13, 2006) (holding that an alien detainee held at Guantanamo may not "claim entitlement to a constitutionally guaranteed writ [of habeas corpus]" because Guantanamo lies outside "the sovereign realm" and such a detainee lacks any voluntary connection with the United States "that would justify the invocation of a constitutional right to habeas corpus").

16

Like the prisoners in *Eisentrager* and the detainees in *Boumediene*, petitioner is an alien detained at a military base abroad who otherwise has no connections to this country.[5]  The Supreme Court and Court of Appeals precedent makes quite clear, therefore, that petitioner is not entitled to rights under the United States Constitution.

Nevertheless, petitioner cites *Rasul* in support of his claim to constitutional protections. *See* 1st Amended Pet. ¶¶ 5, 34.  *Rasul* does not help him, however, because its holding was focused narrowly on the *statutory* reach of the federal habeas statute, *see* 542 U.S. at 476-79, and does not purport to overrule *Eisentrager*.  The only question before the Court in *Rasul* was exactly as the Court framed it, which was "whether the *habeas statute* confers a right to judicial review of the legality of Executive detention of aliens in a territory over which the United States exercises 'plenary and exclusive jurisdiction,' but not 'ultimate sovereignty.'"  542 U.S. at 475 (emphasis added).  In fact, far from overruling settled law under *Eisentrager* and its progeny ruling that the Constitution does not apply extraterritorially to aliens, *Rasul* expressly distinguished between the statutory and constitutional holdings of *Eisentrager* and limited its analysis to the proper interpretation of section 2241.  *See id.* at 476-79.

Thus, in *Boumediene*, the Court of Appeals rejected the precise argument raised by

---

[5]  Courts have repeatedly recognized that the establishment of a military base in foreign territory does not effect a transfer of sovereignty in the United States, and no court has ever held to the contrary.  *See United States v. Spelar*, 338 U.S. 217, 221-22 (1949) (lease for military air base in Newfoundland "effected no transfer of sovereignty with respect to the military bases concerned"); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380-81 (1948) (U.S. naval base in Bermuda, controlled by the United States under lease with Great Britain, was outside United States sovereignty because the governing lease had "effected no transfer of sovereignty"); *Holder v. Holder*, 392 F.3d 1009, 1020 n.10 (9th Cir. 2004) (recognizing U.S. air force base in Germany not under United States sovereignty); *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("[A] United States military base is not sovereign territory of the United States.").

petitioner here, holding that "[t]he *Rasul* decision, resting as it did on statutory interpretation, *see* 542 U.S. at 475, 483-84, could not possibly have affected the constitutional holding of *Eisentrager*." Slip Op. 20 n.10. And the Court further observed, "[e]ven if *Rasul* somehow calls *Eisentrager*'s constitutional holding into question . . . we would be bound to follow *Eisentrager*." *Id*.

## III.    PETITIONER HAS NO COMMON LAW RIGHT TO HABEAS CORPUS

Finally, to the extent petitioner contends that he has a common law right to habeas corpus, that argument has no merit; indeed, that argument was soundly rejected by the Court of Appeals in *Boumediene*. In interpreting the habeas statute, the Supreme Court in *Rasul* had examined "the historical reach of the writ," noting that at common law courts exercised habeas jurisdiction over the claims of not only "aliens detained within sovereign territory of the realm," but also "persons detained in the so-called 'exempt jurisdictions,' where ordinary writs did not run, and all other dominions under the sovereign's control." *Id.* at 481-82 & nn. 11-13. That observation, however, does not help petitioner because the "persons" cited by the Court to be in "exempt jurisdictions" or other dominions under the sovereign's control were all citizens (or subjects) of the sovereign that was holding them. *See id.* at 481-82 nn. 12-13. And "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar." *Eisentrager*, 339 U.S. at 770. As the Court of Appeals noted in *Boumediene*, "'[n]ot one of the cases mentioned in *Rasul* held that an alien captured abroad and detained outside the United States—or in 'territory over which the United States exercises exclusive jurisdiction and control,' *Rasul*, 542 U.S. at 475—had a common law . . . right to the writ of habeas corpus.'" *Boumediene*, Slip Op. at 18 (quoting *Hamdan v. Rumsfeld*, No. 04-

18

1519, 2006 WL 3625015, at *7 (D.D.C. Dec. 13, 2006) (Robertson, J.)).[6]

Importantly, as the Court of Appeals also noted, "the observation about common law habeas in *Rasul*, 542 U.S. at 482-82, referred to the practice in England," and "[e]ven if there were such a thing as common law jurisdiction in the federal courts, § 2241(e)(1) quite clearly eliminates all 'jurisdiction to hear or consider an application for a writ of habeas corpus' by a detainee, whatever the source of that jurisdiction." *Boumediene*, Slip Op at 13 n. 5 (quoting 28 U.S.C. § 2241(e)(1)).

In sum, this Court has no common law jurisdiction to review the present habeas petition.

## CONCLUSION

For the foregoing reasons, this Court should dismiss this petition for want of jurisdiction.

Dated: March 5, 2007                          Respectfully submitted,

                                              PETER D. KEISLER
                                              Assistant Attorney General

                                              DOUGLAS N. LETTER
                                              Terrorism Litigation Counsel

                                                /s/  Jean Lin
                                              JOSEPH H. HUNT (D.C. Bar No. 431134)
                                              VINCENT M. GARVEY (D.C. Bar No. 127191)
                                              JUDRY L. SUBAR (D.C. Bar No. 347518)
                                              JEAN LIN
                                              JAMES LUH
                                              Attorneys

---

[6] By the same token, in assessing the scope of common law habeas in 1789, when the first Judiciary Act created the federal courts and granted jurisdiction to issue writs of habeas corpus, and the scope of which is protected by the Suspension Clause, *see INS v. St. Cyr*, 533 U.S. 289, 301 (2001), the Court of Appeals also found "no case prior to 1789" supporting the proposition that the writ would have been available to aliens at an overseas military base leased from a foreign government. *Boumediene*, Slip Op. at 18. In any case, the court found that *Eisentrager* ended any doubt about the scope of common law habeas. *Id.*

19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-3716
Fax:  (202) 616-8470

Attorneys for Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FADI AL MAQALEH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-01669 (JDB) |
| | ) | |
| ROBERT GATES, | ) | |
| Secretary, United Stated Department of | ) | |
| Defense, *et al.*, | ) | |
| | ) | |
| Respondents. | | |

## DECLARATION OF COLONEL JAMES W. GRAY

I, Colonel James W. Gray, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I currently serve as Commander of Task Force Guardian, Combined/Joint Task Force Force-76 ("CJTF-76"), as well as Commander of Detention Operations, CJTF-76. The statements in this declaration are based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. CJTF-76 is headquartered at Bagram Airfield in Afghanistan. CJTF-76, along with Afghan National Security Forces, conducts full spectrum operations to defeat al Qaeda, the Taliban, and their affiliates and supporters. CJTF-76 integrates joint, interagency and multinational forces partnered with the Afghans in order to establish security, deter the re-emergence of terrorism, and enhance the sovereignty of Afghanistan.

3. Task Force Guardian, a subordinate unit of CJTF-76, is under United States national command and control. Task Force Guardian is responsible for operating the Bagram Theater

1

Internment Facility ("BTIF"), a Department of Defense ("DoD") detention facility located at the Bagram Airfield. I have served as the Commander of Task Force Guardian and Commander of Detention Operations, CJTF-76, since December 1, 2006. In this position, I am responsible for all aspects of detention operations for CJTF-76.

4. I have reviewed the First Amended Petition for Writ of Habeas Corpus filed in this action.

## Bagram Airfield, Afghanistan

5. Bagram Airfield is located approximately forty miles north of Kabul in the Parwan province of the Islamic Republic of Afghanistan ("Afghanistan"). In the military campaign against al Qaeda and the Taliban regime in Afghanistan, American troops were deployed to the base starting in late 2001 and early 2002, along with multinational armed forces, and had priority use of the airfield for coalition operations. The United States' use of Bagram Airfield was and is necessitated by its ongoing war against al Qaeda, the Taliban and their affiliates and supporters.

6. U.S. and coalition military operations are conducted from Bagram Airfield. Currently, the nature of the United States' use of Bagram Airfield is pursuant to an Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between the Islamic Republic of Afghanistan and the United States of America, executed on September 28, 2006. See Exhibit 1 (Lease Agreement). This agreement follows similar such arrangements dating back to at least 2003. Under this Agreement, Afghanistan, as the "host nation," consigns all facilities and land located at Bagram Airfield "for use by the United States and coalition forces for military purposes." This Agreement continues until the United States (or its successors)

2

determine that the premises are no longer required for its use.

7. A significant multinational presence exists at Bagram Airfield as part of CJTF-76's mission. While the United States guards Bagram Airfield, there are numerous national compounds located within it. Each nation separately controls access to its respective compound on the Airfield. The United States does not have complete, plenary jurisdiction on Bagram Airfield.

8. Afghan citizens enter Bagram Airfield on a daily basis. These Afghans range from local nationals performing contracted work (such as cleaning services) to representative of the Afghan government.

### The Bagram Theater Internment Facility

9. The United States and its multinational partners are conducting an ongoing military campaign against al Qaeda, the Taliban regime, and their affiliates and supporters in Afghanistan. During the execution of this campaign, the U.S. Armed Forces and allied forces have captured or procured the surrender of thousands of individuals believed to be members or supporters of either al Qaeda or the Taliban. Since the war began in Afghanistan, the United States has captured, screened and released many individuals. A small percentage of these individuals are or have been detained at the Bagram Theater Internment Facility. The detention of these enemy combatants prevents them from returning to the battlefield and engaging in further armed attacks against innocent civilians and U.S. and coalition forces. Detention also serves as a deterrent against future attacks by denying the enemy the fighters needed to conduct war. Interrogations during detention enable the United States to gather important intelligence to prevent future attacks.

10. DoD has registered individuals held under its control at the BTIF with the International Committee of the Red Cross ("ICRC"). The ICRC has regular access to this facility and conducts private interviews with detainees. Additionally, representatives of the Government of Afghanistan have access to Afghan detainees at the BTIF.

### Assessment of Enemy Combatants in Afghanistan

11. Detainees under DoD control in Afghanistan are subject to a review process that first validates whether an individual is an enemy combatant. This status (as an enemy combatant) is initially determined at the place of capture.

12. By direction of the Secretary of Defense, within 90 days of a detainee being brought under DoD control, the detaining combatant commander, or his designee, shall review the initial enemy combatant determination made in the field. Such review is based on all reasonably available and relevant information available on the date of the review and may be subject to further review based upon newly discovered evidence or information. If necessary for a proper review, the detaining combatant commander, or his designee, may interview witnesses, providing they are reasonably available and such interviews would not affect combat, intelligence gathering, law enforcement or support operations. The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination regarding the detainee's status. After the initial 90-day status review, the detaining combatant commander, or his designee, is required, on an annual basis, to reassess the status of each detainee. If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released.

4

13. In Afghanistan, this review process is conducted by the Commanding General, CJTF-76, under the authority delegated by the Secretary of Defense through the combatant commander. As noted above, Secretary of Defense guidance requires a review of the detainee's enemy combatant status by the 90-day point and annually thereafter. At the BTIF, however, such reviews are usually conducted within 75 days of capture and every six months thereafter. CJTF-76 is responsible for establishing the Enemy Combatant Review Board ("ECRB") to accomplish these reviews. The ECRB is a panel of five commissioned officers who evaluate the detainees' status and make a recommendation by majority vote to the Commanding General, CJTF-76, or his designee as to detainees' status. ECRB decisions are based on information derived from a variety of sources, including classified intelligence and testimony from individuals involved in the capture and interrogation of the detainee. The specific implementing guidance for the ECRBs is classified, as are the documents prepared regarding the ECRB's evaluation of the detainee's status.

## Enemy Combatants at Bagram

14. Even if an individual is determined to be an enemy combatant following the reviews discussed above, there are several ways in which the detainee can leave DoD custody in Afghanistan.

15. The Government of Afghanistan sponsors a national reconciliation program designed to allow combatants who are ready to put down their weapons to join in their country's progress by living peaceful and productive lives in Afghan society. The ECRB process described above nominates Afghan detainees from the BTIF for entry into the reconciliation program. Once nominated, individuals are vetted and selected by a Government of Afghanistan commission for

5

return to their village elders and reintegration into society. After DoD releases detainees to the custody of the Government of Afghanistan for participation in this program, the United States no longer exercises any custody or control over these former detainees.

16. In addition, pursuant to a diplomatic arrangement reached with the Government of Afghanistan, a significant percentage of the Afghan detainees at the BTIF is expected to be transferred to the Government of Afghanistan, likely within the next year. The United States is currently funding the renovation of an Afghan prison, the Afghan National Detention Center. The United States is also providing other aid to the Government of Afghanistan regarding the operation of this prison, both to facilitate these transfers and to ensure an Afghan detention capability which meets international standards. The prison is to be owned and operated by the Government of Afghanistan.

17. Under certain circumstances, the detaining combatant commander is authorized to permit the release of certain enemy combatants (including citizens of Afghanistan) from the BITF to their home countries. The criteria and procedures for that program are classified. Following the release of these individuals, the United States no longer exercises any custody or control over these former detainees.

18. Some Afghan detainees and detainees who are nationals of third countries are expected to remain in DoD custody.

### Petitioner Fadi Al Maqaleh

19. Our records reflect that we are currently detaining at the BTIF a Yemeni citizen whose name is the same as or closely similar to Petitioner's name and whose father's name is the same as or closely similar to the name of Petitioner's father.

6

20.  This detainee was captured in Zabul, Afghanistan.  The Enemy Combatant Review Board ("ECRB") reviewed his enemy combatant status on 15 December 2005.  Following that review, his status as an enemy combatant was validated.  Most recently, the ECRB conducted another review of his status on 1 March, 2007.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __3__ March, 2007.

Colonel James W. Gray
Colonel, U.S. Army
Commander, Task Force Guardian
Commander of Detention Operations,
Combined / Joint Task Force-76

7

Exhibit 1

(Declaration of Colonel James W. Gray)

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

ACCOMMODATION CONSIGNMENT AGREEMENT

FOR LANDS AND FACILITIES AT

BAGRAM AIRFIELD

BETWEEN

THE ISLAMIC REPUBLIC OF AFGHANISTAN

REPRESENTED BY

HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE

AND

THE UNITED STATES OF AMERICA

This ACCOMMODATION CONSIGNMENT AGREEMENT made and entered into this 28th day of September 2006, by and between THE ISLAMIC REPUBLIC OF AFGHANISTAN, REPRESENTED BY HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK, MINISTER OF DEFENSE, OF THE OFFICE OF THE MINISTRY OF DEFENSE, hereinafter referred to as the HOST NATION, and The UNITED STATES OF AMERICA, hereinafter referred to as the LESSEE, or the UNITED STATES:

WITNESSETH THAT:

WHEREAS: The UNITED STATES and the HOST NATION, hereinafter referred to jointly as the PARTIES, wish to enter into an Accommodation Consignment Agreement, hereinafter referred to as the Agreement, whereby the HOST NATION consigns all facilities and land located at BAGRAM AIRFIELD, PARWAN owned by the HOST NATION, or PARWAN PROVINCE, or PRIVATE INDIVIDUALS, or OTHERS, for use by the UNITED STATES and Coalition Forces for military purposes; and.

WHEREAS: The MINISTER OF DEFENSE, is the bona fide representatives of the HOST NATION for all Real Estate matters legal or otherwise pertaining to or occurring at PARWAN PROVINCE; and has authority to execute Real Estate documents on behalf of THE ISLAMIC REPUBLIC OF AFGHANISTAN; and

WHEREAS: The PARTIES further desire that all previous Real Estate and use agreements at PARWAN PROVINCE, between the UNITED STATES and the HOST NATION, or PARWAN PROVINCE, or PRIVATE INDIVIDUALS, or OTHERS, will be terminated upon the execution of this Agreement by both PARTIES.

NOW THEREFORE, in accordance with the desires of the PARTIES and in consideration of the mutual benefits to be derived therefrom, the PARTIES hereto mutually covenant and agree as follows:

1. The HOST NATION hereby consigns to the UNITED STATES to have and to hold for the exclusive use of the UNITED STATES Forces land, facilities, and appurtances currently owned by or otherwise under the control of the HOST NATION, or PARWAN PROVINCE, or PRIVATE INDIVIDUALS, or OTHERS, at PARWAN PROVINCE, hereinafter referred to as "the Premises" described as: One parcel

HN_____

US (·A·)

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

of land containing approximately 8082 jeribs (approximately 16,164,248 square meters) located within PARWAN Province, Afghanistan, and more particularly described as located within the following grid coordinates:

42SWD2165165842
42SWD2220765799
42SWD2285465102
42SWD2297564547
42SWD2297263721
42SWD2301863125
42SWD2309363085
42SWD2371563710
42SWD2437965919
42SWD2506864666
42SWD2653864898
42SWD2787565943
42SWD2722267302
42SWD2561568407
42SWD2587668650
42SWD2575668797
42SWD2609869452
42SWD2573668823
42SWD2549369261
42SWD2482269430
42SWD2481868906
42SWD2441469060
42SWD2420468236
42SWD2356868275
42SWD2265766138
42SWD2240365893
42SWD2274064648
42SWD2371364596
42SWD2384764764
42SWD2382964921
42SWD2275065491
42SWD2257165535
42SWD2248166374
42SWD2311267244
42SWD2430968936
42SWD2669664709
42SWD2701864970
42SWD2369868338

as shown in purple in Exhibit "A", attached hereto and made a part of this agreement, to be used for LESSEE'S purposes.

2. The **UNITED STATES** shall have the right to assign this agreement to a successor nation or organization. This agreement in its entirety shall apply to the **UNITED STATES** and the successor nations or organizations, hereinafter referred to as "the Successor."

3. The **UNITED STATES** shall have the right to enter into a Lease or Local Administrative Agreement with successor nations or organizations for any and all fixtures, additions, alterations, improvements, or structures owned by the **UNITED STATES** and located on the property which is the subject of this agreement.

4. The term of this Agreement shall commence the earlier the date of execution by the **HOST NATION**, or 31 days from the date of this Agreement and shall continue until the **UNITED STATES** or its successors determine that the Premises are no longer required for its use.

HN_____

US_____

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

5. The HOST NATION makes the Premises available to the UNITED STATES without rental or any other consideration for use of the Premises.

6. The UNITED STATES shall be responsible for obtaining and making payment of all other charges for utilities and services it deems necessary to its operations, including but not limited to heat, electricity, hot water, refuse collection, annual cleaning and adjustment of heating systems. Arrangements and payments of utilities and services used shall be made by separate contract.

7. The UNITED STATES shall have the right, during the existence of this Agreement, to make alterations and additions, including, but not limited to grade, condition, installing drainage facilities, place gravel or hard stand, attach fixtures, erect improvements and structures or signs, and remove all obstructions which may constitute a hindrance, in or upon the Premises. Any such fixtures, additions, alterations, improvements or structures, so placed in upon or attached to the said Premises, shall remain the property of the UNITED STATES and, at the option of the UNITED STATES, may be left in place, removed or otherwise disposed of by the UNITED STATES, except as otherwise directed in this Agreement. If the UNITED STATES elects to leave in place any or all of the said additions, fixtures, structures or improvements, it shall have no further obligation with respect to restoration of any of the Premises to the previous condition. Any such fixtures, structures or improvements abandoned by the UNITED STATES shall become the property of the HOST NATION.

8. The MINISTER OF DEFENSE hereby warrants and guarantees that the HOST NATION is the sole owner of the Premises and/or has the right, without any restrictions, to grant the use of the Premises. The HOST NATION will hold the UNITED STATES harmless against any claim arising out of the UNITED STATES' possession of land encompassed by the Premises. Any person that brings a claim for possession of land encompassed by the Premises will be directed to the HOST NATION through the MINISTRY OF DEFENSE or its representative, who shall process the claim and make a decision to accept the claim or deny the claim, whichever the HOST NATION deems appropriate. In cases where the HOST NATION makes a decision to honor the claim, the HOST NATION is responsible for payment. While HOST NATION adjudicates any claim by any third party, HOST NATION, authorizes the UNITED STATES to continue to with operations and maintain exclusive control of the area described in this Agreement

9. The HOST NATION covenants and warrants that the UNITED STATES shall have exclusive, peaceable, undisturbed and uninterrupted possession of the Premises during the existence of this agreement. The UNITED STATES shall hold and enjoy the Premises during the period of this agreement without any interruption whatsoever by the HOST NATION or its agents.

10. Any notice under the terms of this consignment agreement, including by the UNITED STATES to give notice of its intent to terminate the Agreement, shall be in writing signed by a duly authorized representative of the party giving such notice, and if given by the UNITED STATES, or the Successor in possession, a copy shall be addressed to:

HE GENERAL ABDUL RAHIM WARDAK
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE
THE ISLAMIC REPUBLIC OF AFGHANISTAN
KABUL, AFGHANISTAN

and if given by the HOST NATION, shall be addressed to:

ATTN: CREST
CJTF76 CJ7
BAGRAM AIRFIELD, AFGHANISTAN          or,

U. S. ARMY CORPS OF ENGINEERS
SAVANNAH DISTRICT
ATTN: SASRE
100 WEST OGLETHORPE STREET
P.O. BOX 889
SAVANNAH, GEORGIA 31402-0889

HN_____

US_____

PARWAN PROVINCE

DACA-AED-5-06-6559<br>
BAGRAM AIRFIELD

11. The UNITED STATES or the Successor in possession of the Premises shall have the right to terminate this agreement in whole or in part by providing HOST NATION written notice of its intent. If the Agreement is terminated in part, the terms and conditions of the Agreement remain in full force and effect for the remaining Premises.

12. If any Successor elects to terminate this Agreement, in whole or in part, during its use of the Premises, the UNITED STATES shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use of the surrendered Premises to the HOST NATION. The UNITED STATES shall have use of the surrendered Premises on the date of its notice to the HOST NATION. If the UNITED STATES does not provide said notice, the surrendered Premises shall revert to the possession of the HOST NATION.

13. This Agreement supersedes all previous agreements between the UNITED STATES and HOST NATION for the use of Bagram Airfield, including, but not limited to Accommodation Consignment Agreement numbered DACA-AED-5-06-472 dated 30 AUGUST 2006.

14. This Agreement is executed in English. A courtesy translation may be furnished to the HOST NATION. In the event of inconsistency between any terms and conditions of this Agreement and its translation, the English language version shall have precedence and control.

IN WITNESS WHEREOF, the PARTIES hereto have hereunto subscribed their names.

FOR THE ISLAMIC REPUBLIC OF AFGHANISTAN:

Witness: _____

HE GENERAL ABDUL RAHIM WARDAK        (DATE)
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE
KABUL, AFGHANISTAN

AND

FOR THE UNITED STATES OF AMERICA:

9-26-2006                Witness: _____

CHRISTOPHER D. DIRR                (DATE)
REALTY CONTRACTING OFFICER
CONTINGENCY REAL ESTATE SUPPORT TEAM (CREST)
PURSUANT TO AUTHORITY GRANTED BY THE SECRETARY OF THE ARMY
CJTF76 CJ7
BAGRAM AIRFIELD, AFGHANISTAN
DSN: (318) 231-2925

HN ____
US ____

# Reference Map: Bagram



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|                                      | )  |                                   |
|--------------------------------------|----|-----------------------------------|
| FADI AL MAQALEH,                     | )  |                                   |
|                                      | )  |                                   |
| Petitioner,                          | )  |                                   |
|                                      | )  |                                   |
| v.                                   | )  | Civil Action No. 06-CV-01669 (JDB) |
|                                      | )  |                                   |
| DONALD RUMSFELD, *et al.,*           | )  |                                   |
|                                      | )  |                                   |
| Respondents.                         | )  |                                   |

_____)

Upon Respondents' Motion to Dismiss for Lack of Jurisdiction, it is hereby

ORDERED that the motion is GRANTED, it is further

ORDERED that the First Amended Petition for Writ of Habeas Corpus is dismissed with

prejudice.


Dated: _____        _____

        _____ UNITED STATES DISTRICT JUDGE