**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FADI AL MAQALEH, *et al.*,** ) | |
| ) | |
| **Petitioners,** ) | |
| ) | **06-CV-01669 (JDB)** |
| **v.** ) | |
| ) | |
| **ROBERT GATES, *et al.*,** ) | |
| ) | |
| **Respondents.** ) | |

## PETITIONERS' UNOPPOSED MOTION TO FILE CORRECTED BRIEF IN OPPOSITION TO RESPONDENTS' MOTION TO DISMISS

Petitioners, through undersigned counsel, respectfully request that Court permit the filing of the attached corrected Brief in Opposition to Respondents' Motion to Dismiss the petition, in substitution of the prior version of that Brief which was filed in error on March 30th, 2007.  In support of this motion, Petitioners inform the court as follows:

1. Petitioners, through undersigned counsel, filed their Brief in Opposition to Respondents' Motion to Dismiss the First Amended Petition on Friday, March 30th, 2007.[1]  In doing so, undersigned counsel erroneously caused a prior version of the Brief to be filed, rather than the final version – which had corrected several typos, citations, and other matters of a non-substantive nature.

---

[1] Undersigned counsel began attempts to file the brief in opposition at approximately 10:30 PM on Friday, March 30, 2007.  Due to an irregularity with the Court's electronic filing system which counsel cannot explain,

2.  Petitioners' counsel became aware of her mistake yesterday, and contacted Respondents' counsel to obtain her consent to the present motion.  Petitioners' counsel provided Respondents' counsel with a copy of the corrected version indicating where changes had been made.  Respondents' counsel indicated that she did not oppose the present motion.

3.  According to the prior briefing schedule entered by the Court in this matter, Respondents' Reply to Petitioners' Opposition is not due until April 20, 2007.

Accordingly, Petitioners respectfully request that the Court grant the present unopposed motion, and permit the filing of the corrected version of the Brief in Opposition to Respondents' Motion to Dismiss attached hereto as Exhibit 1.

Dated:          April 5, 2007

Respectfully submitted,

____/s/_____
Tina M. Foster, Esq.
*Admitted pursuant to L. Civ. R. 83.2(g)*
International Justice Network
PO Box 610119
Bayside, NY 11361-0119
Tel: 917.442.9580
Fax: 917.591.3353

*Attorney for Petitioners*

---

the filing was not accepted by the ECF system until a few minutes after midnight – technically Saturday, March 31, 2007.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
**FADI AL MAQALEH,** *et al.*,                 )
                                                          )
          **Petitioners,**                           )
                                                          )          **06-CV-01669 (JDB)**
      **v.**                                              )
                                                          )
**ROBERT GATES,** *et al.*,                      )          **ORAL ARGUMENT REQUESTED**
                                                          )
          **Respondents.**                        )
_____ )

## PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO DISMISS FOR LACK OF JURISDICTION

Petitioner Fadi Al Maqaleh, acting through his next friend, Ahmad Al Maqaleh, and by and through undersigned counsel, submits this Opposition to Respondents' Motion to Dismiss this petition for lack of jurisdiction.  Petitioner, who has been imprisoned without charge by Respondents at a US military prison for more than five years, seeks the Great Writ.

Respondents maintain that Petitioner is not entitled to know the reason for his arrest, detention, and continued imprisonment because Respondents – in their sole discretion – have chosen to house Petitioner at the US military prison at Bagram, Afghanistan, rather than the US military prison at Guantanamo Bay, Cuba. Whatever "exigencies of battle" Respondents may wish to cite to justify Petitioners' initial arrest and temporary detention at Bagram, they cannot now – after *five years* – insist that Petitioners' continued detention on that basis is lawful.   Resp. Mot. at 4.

Respondents' justification for denying Petitioner access to any forum in which he can challenge the legality of his detention or treatment is a familiar one. Petitioner is not a US citizen, and thus, Respondents allege, his imprisonment by the US government overseas cannot be challenged in this (or any) court of law. [1] However, Respondents' arguments that non-citizens held outside the sovereign territory of the United States lack any cognizable rights and are not entitled to invoke this Court's jurisdiction have already been considered and rejected by the Supreme Court of the United States. In addition, and contrary to Respondents' assertions, their position finds no support in the recent statutory scheme enacted by Congress to regulate the Department of Defense treatment of alleged enemy combatants. Accordingly, this Court must deny Respondents' motion to dismiss the Petition for lack of jurisdiction.

## BACKGROUND

### Factual Background

Petitioner Fadi Al Maqaleh, through his father and Next Friend, Ahmad al Maqaleh, seeks the great writ. The facts and circumstances about how Petitioner came to be in Respondents' custody are entirely a mystery. [2] What little may be assumed as fact for the

---

[1] Respondents do not take the position that there is any other court that has jurisdiction to hear Petitioner's case. Indeed, it is hard to even imagine how any other Court could attempt to adjudicate the claims of Petitioner – a Yemeni citizen -- held *incommunicado,* without access to counsel of any nationality, and held by US forces at a US military base in Afghanistan.

[2] Though respondents have put in an affidavit alleging that Petitioner was "captured" in Afghanistan, Petitioner is not provided any opportunity to admit or deny this factual assertion because Respondents are holding him incommunicado and without access to counsel. In fact, Respondents have prevented Petitioner from communicating to anyone how he came to be at Bagram. *See* Pet. 18. As discussed more fully at Section I, *infra*, Respondents cannot rely on extrinsic evidence outside the pleadings and simultaneously deny Petitioner an opportunity to put forth his own evidence. Moreover, even taking Respondents' allegation that Petitioner was "captured" in Afghanistan at face value, such an unsupported conclusion is meaningless without further information. Respondents' own records reveal that a large number of detainees purportedly "captured" by US forces in Afghanistan were brought there by bounty hunters or other third parties and were not originally taken into custody by US soldiers on a battlefield. *See* Mark Denbeaux et. al*., Report on Guantánamo Detainees: A Profile of 517 Detainees through Analysis of Dept. of Defense Data* (Seton Hall Univ. Feb. 8, 2006), *available at* http://law.shu.edu/aaafinal.pdf. *See also* Petition currently pending in *Ruzatullah et. al., v. Rumsfeld et. al*, 06-cv-

2

purposes of this motion is set forth in the Petition itself.[3]     Petitioner is not an "enemy combatant."  Pet. at ¶ 22.  Petitioner has not received any process through which he has been determined to be properly detained as an enemy combatant.  Pet. at ¶ 28. Despite this, Petitioner has been imprisoned for five years at a prison facility in a territory subject to Respondents' exclusive jurisdiction and control.  Pet. at ¶ 1.

However, even assuming *arguendo* that Respondents' assertions of fact are true (which would be a complete reversal of the parties' burdens of proof on a motion to dismiss), Respondents do not contest the following facts relevant to the present motion:

- Petitioner has been held in Respondents' custody for approximately five years.

- Petitioner has not been charged with any crime or offense.

- Petitioner has not been determined to be an enemy combatant by a Combatant Status Review Tribunal or its equivalent.

- Petitioner is being held incommunicado, without access to counsel, and has not been permitted to communicate the facts and circumstances of his capture and detention to anyone other than Respondents.

---

1707 (GK) Petition (Document No. 1) at ¶ 22 (noting that Petitioner held at Bagram was captured when "U.S. military forces forcibly and without warning entered [petitioner's] home in Jalalabad, where he was peacefully enjoying an evening with his family").  In other words, even if Petitioner came to be in US custody in Afghanistan, it does not follow that he was participating in any hostilities against US forces there.

[3] In order to decide the instant motion, the court must either treat the fact alleged in the Petition as true, or allow Petitioners to take discovery to rebut the jurisdictional facts alleged in Respondents' motion to dismiss.   *See* discussion, *infra*, Section I.

- Petitioner is being held at a prison facility controlled by Respondents where he may be subjected to abusive treatment and torture, and where multiple detainees have been tortured to death by Respondents' agents.

Despite these undisputed facts, Respondents take the position that the Court lacks jurisdiction to consider Petitioners' case because it is not authorized to do so under the United States Constitution, the common law, or the habeas statute. The implication of Respondents position – that there is no set of facts, no matter how shocking or manifestly unjust, that would permit this Court to review the legality of Petitioners' detention -- is not only morally repugnant, but is also contrary to law.

## **Legal Background**

Since 9/11, the Supreme Court has twice considered – and affirmed -- the rights of aliens alleged to be "enemy combatants" held outside the sovereign territory of the United States. In *Rasul v. Bush*, 542 U.S. 466 (2004), the Court held that aliens held at Guantanamo, no less than US citizens, were entitled to invoke the jurisdiction of the federal courts under § 2241. *Rasul*, 542 U.S. at 481. More recently, the Court held that an alleged "enemy combatant" at Guantanamo was entitled to invoke the protections of Common Article 3 of the Geneva Conventions in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006).

Congress in turn has passed two pieces of legislation relating to the decisions: the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, 119 Stat. 2680; and the Military Commissions Act of 2006 ("MCA"), Pub. L. 109-366, 120 Stat. 2600 (2006). Contrary to Respondents' assertion, nothing in these statutes eliminates this Court's jurisdiction to hear Petitioner's claims. In fact, both the DTA and the MCA *support* Petitioners' position that this

court has jurisdiction – at a minimum under the habeas statute – to grant the writ on behalf of Petitioner.  A discussion of the relevant case law and statutes is instructive.

The first habeas petitions were filed on behalf of non-US citizens detained by US forces in the "war on terror" in this District in February 2002.  *Rasul v. Bush*, 215 F.Supp.2d 55 (D.D.C. 2002).  Petitioners in those cases – who were held at the US Naval Base at Guantanamo – invoked the jurisdiction of the federal courts under, *inter alia,* § 2241 of the habeas statute.  *Id.* In those cases, Respondents argued (and both the District Court and the Court of Appeals agreed) that petitioners were not entitled to relief because the habeas statute did not apply to aliens held outside of US sovereign territory.  *Al Odah v. United States*, 321 F.3d 1134 (D.C.Cir. 2003). The Supreme Court, having considered Respondents arguments below, reversed the lower courts' decisions the following year in *Rasul*.  542 U.S. at 466.  Finding that § 2241 of the habeas statute was equally applicable to citizens and non-citizens alike, the Supreme Court held that the courts of this District have jurisdiction over the habeas petitions of alleged enemy combatants held by the US military outside the sovereign territory of the United States at the Guantanamo prison.  Similarly, the Court held that the district court had jurisdiction over the detainees' non-habeas claims because nothing in the federal question statute or the Alien Tort Act categorically excluded aliens outside the United States from bringing such claims.  *Rasul*, 542 U.S. at 484-85.

On July 7, 2004, The Department of Defense announced that it would convene Combatant Status Review Tribunals ("CSRTs") at Guantánamo, in order to provide prisoners with a modicum of due process. Memorandum to the Sec'y of the Navy from Paul Wolfowitz, Deputy Sec'y of Def. (Jul. 7, 2004). [4] CSRTs are informal military hearings intended to review

---

[4] Available at http://www.defenselink.mil/news/Jul2004/d20040707review.pdf (last viewed Mar. 23, 2007).

prisoners' status as enemy combatants, putatively "modeled after Army Regulation 190-8 governing the determination of prisoner of war status."[5]  *In re Guantánamo Detainees*, 355 F.Supp.2d 443, 467-68 (D.D.C. 2005) (citing Gov't Motion to Dismiss at 34-35).

The following year - after the majority of the CSRTs at Guantanamo had been completed -- Congress passed the Detainee Treatment Act of 2005 ("DTA", Pub. L. No. 109-148, 119 Stat. 2680, 2739-2744 (2005).  The DTA mandates the humane treatment of all detainees -- not just persons detained at Guantanamo Bay -- in US custody, except "persons" detained "pursuant to a criminal or immigration law of the United States."  DTA § 1002(a)-(b). The DTA prohibits "the cruel, inhuman, or degrading treatment of punishment" of any "individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location." *Id.* at § 1003(a).  At the same time, it provides that all detainees at Guantanamo are afforded an opportunity to appear at a CSRT to challenge their designation by the Department of Defense as enemy combatants, and to appeal any final decision of the CSRT directly to the United States Court of Appeals for the District of Columbia Circuit.   *Id.* at § 1005(e)(2).  At the same time, Congress amended § 2241 by adding a subsection which stripped the US courts of jurisdiction to consider habeas petitions filed on behalf of alleged enemy combatants --- *at Guantanamo. Id.* at § 1005(e)(1).  Importantly, the DTA *did not* purport to strip the jurisdiction of the courts to hear habeas cases on behalf of alleged enemy combatants in US custody at any other locations, but did *explicitly require* the Department of Defense to make public the procedures in place for determining the enemy status of detainees in US custody in Afghanistan and Iraq. *Id.* at § 1005(a)(1)(B).

---

[5]  Petitioners in a CSRT are assigned a personal representative and have the opportunity to be present at their hearing.   Memorandum for the Sec'y of the Navy (July 7, 2004) ¶¶ c, g(4), *available at* http://www.defenselink.mil/news/Jul2004/d20040707review.pdf. They also, theoretically, have the opportunity to present evidence, but the personal representative does not act as a lawyer in gathering evidence. *Id.* ¶ g(10)

The following June, the Supreme Court considered the case of another alien at Guantanamo alleged to be an enemy combatant in *Hamdan v. Rumsfeld,* 126 S. Ct. 2749 (2006). In *Hamdan*, the Supreme Court held, *inter alia,* that Congress did not intend to retroactively strip habeas jurisdiction under § 2241 for Guantanamo detainees whose petitions were pending at the time of enactment. *Hamdan,* 126 S. Ct. at 2766-69.   The Court in *Hamdan* also held that the petitioner – a Yemeni citizen accused of being Osama Bin Laden's driver -- was entitled to the protections of Common Article 3 of the Geneva Conventions while in US custody, and that the military commissions proposed by executive to try him of war crimes was unconstitutional because it was unauthorized by Congress.  *Hamdan,* 126 S. Ct. at 2805.

In response, Congress passed the Military Commissions Act of 2006, which, *inter alia,* authorized military commissions to try detainees accused of crimes.  MCA § 3(a). The MCA contains detailed provisions governing the trial of alleged enemy combatants for war crimes under the Uniform Code of Military Justice. *Id.* It also incorporates by reference the provisions in the Detainee Treatment Act relating to both the humane treatment of prisoners in US custody, as well as the procedures in place at Guantanamo for determining enemy combatant status by CSRT.  *Id.*   The MCA also amended the federal habeas statute, 28 U.S.C. § 2241 *et seq.*, by adding the following provisions:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
>
> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. §801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been

determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

MCA § 7(a) (internal quotation marks omitted).  Subsection (b) states:

The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.

MCA § 7(b).

The Supreme Court has not considered the case of any alien detained as an alleged enemy combatant since the passage of the MCA, although it may do so in the very near future.[6] Respondents' assertion to the contrary notwithstanding, there is nothing in the MCA that precludes Petitioner from invoking this court's jurisdiction under the habeas statute.   As discussed more fully below, to the extent that Respondents rely on *Boumediene v. Bush,* 476 F. 3d 981 (D.C. Cir. 2007) as the basis for the present motion, that reliance is similarly misplaced.

## ARGUMENT

### I.   Legal Standard

In their Motion to Dismiss, Respondents state that for the purposes of their motion they "[a]ssume the facts in the First Amended Petition to be true."  Resp. Mot. at  1.  Indeed, it is well

---

[6] A petition for writ of certiorari is currently pending before the Supreme Court on behalf of Guantanamo detainees whose cases were recently dismissed in *Boumediene v. Bush*, 476 F. 3d 981 (D.C. Cir. 2007).  Regardless of when the Supreme Court next considers the detainee cases, their plight is not likely to escape the attention of Congress for long.  See, *e.g.,* 153 Cong. Rec. S2749-03 (Mar. 7, 2007) (statement of Sen. Specter (R-PA)) ("The decision by the court of appeals [in *Boumediene*], I submit, will be overturned by the Supreme Court of the United States because of Circuit Court's ruling that the *Rasul* case dealt only with the statutory provisions on habeas corpus. The Circuit Court ignored the binding language of *Rasul*, which said that the habeas corpus rights were grounded in common law in effect in 1789 and were, in fact, part of the Constitution. Where habeas corpus is a right in the Constitution, and it is such a right because the Constitution expressly states that habeas corpus shall not be suspended except in cases of invasion or rebellion—and no one contends that there is either invasion or rebellion at issue—Congress cannot legislate a derogation of that constitutional right. Any act of Congress is obviously trumped by a constitutional provision. Where you have habeas corpus in effect in 1789 and the constitutional provision prohibiting its suspension, the legislation passed in the Military Commission Act I think ultimately will be determined by the Supreme Court to be unconstitutional, pretty clearly on the face of the opinion of the Court articulated by Justice Stevens.")

settled that on a motion to dismiss, the Court must treat the petition's allegations as true and draw all reasonable inferences in the petitioners' favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624-25 (D.C. Cir.1997); *United States ex rel New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004). Accordingly, the Court must deny Respondents' motion, absent a showing that "it appears beyond doubt that the [Petitioner] can prove no set of facts in support of his claim that would entitle him to relief." *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quotation and citation omitted).

However, Respondents have also introduced extrinsic evidence – namely the Affidavit of Colonel James Gray ("Gray Decl.") and the exhibit thereto – intended to refute the truth of essential jurisdictional facts plead by the Petitioner, including the fact that "Bagram Air Base . . . is subject to the exclusive jurisdiction and control of the United States military." Pet. ¶ 34). Where extrinsic evidence is introduced "challeng[ing] the factual basis of the court's jurisdiction," the court may consider such evidence, but only after it affords the nonmoving party an "'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (quoting *Prakash v. American University.*, 727 F.2d 1174, 1180 (D.C. Cir. 1984)). Further, it is well-settled that the Court cannot convert a motion to dismiss for lack of subject matter jurisdiction to one for summary judgment. *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp.2d 73, 80 (D.D.C. 2003). Instead, the motion to dismiss must be denied, and, following discovery, a separate summary judgment motion may be filed. *Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987).

Because Respondents have introduced extrinsic evidence to contest the facts pled in the petition, Petitioner is entitled to take discovery related to all disputed jurisdictional facts. *See Ignatiev v. U.S.*, 238 F.3d 464, 467 (D.C. Cir. 2001) ("We have . . . required that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion.")  Alternatively, Respondents may choose to avoid jurisdictional discovery by assuming for the purposes of the instant motion the truth of the facts pled in the petition.  Having it both ways, however, is not an option.

## II.  This Court Has Jurisdiction To Hear Petitioners' Claims Under 28 U.S.C. § 2241

*Rasul* held that the federal habeas statute has extraterritorial reach when the U.S. exercises complete jurisdiction and control over the territory where the detainee is being held. *Rasul*, 542 U.S. at 480.  Respondents' assertion that *Rasul* was "uniquely about the Guantanamo Bay Naval Base" is of no moment. Resp. Mot. at 12.  The Supreme Court's reasoning in *Rasul* applies with equal force to aliens held at Bagram as it does to aliens held at Guantanamo.

Indeed, Respondents themselves have argued that there is no legally significant distinction between aliens held at Guantanamo and aliens held at Bagram.  *See* Brief for the Respondents at 44, *Rasul*, 542 U.S. 466 (Nos. 03-334, 03-343) (arguing against "drawing an arbitrary legal distinction between aliens held at a facility, such as the Bagram Air Force Base in Afghanistan, which is controlled by the U.S. military and located outside the sovereign territory of the United States, and aliens held at a facility, such as the Guantanamo Naval Base in Cuba, which is controlled by the U.S. military and located outside the sovereign territory of the United States").

       1.       **Petitioner is entitled to invoke this Court's jurisdiction under §2241 regardless of citizenship.**

The habeas statute itself contains no geographic limitation, and it is beyond dispute that prior to the passage of the MCA, the habeas statute drew "no distinction between Americans and aliens held in federal custody." *Rasul,* 542 U.S. at 481.[7]  *See also Abu Ali v. Ashcroft,* 350 F.Supp.2d 28, 42 (D.D.C. 2004) (rejecting the Government's argument that the habeas statute contains an "implicit territorial restriction"). Notwithstanding the conclusion in Rasul that there is no distinction between citizens and non-citizens for the purposes of determining habeas jurisdiction, Respondents nevertheless assert that federal courts have no jurisdiction to hear habeas petitions on behalf of aliens detained outside the sovereign territory of the United States. Resp. Mot. at 1-2.  Respondents apparently seek to raise the ghost of *Johnson v. Eisentrager*, 339 U.S. 763 (1950) in support of this contention.  *Id.* at 14-17.  In *Eisentrager*, the Supreme Court held that German war criminals convicted and sentenced by a lawful military commission for violating the laws of war in China could not seek habeas relief in the federal courts.  Seizing on this passage, the Government here argues that Bagram, at least for these purposes, is not different from wartime China because the lease governing the base grants Afghanistan "sovereignty" over the territory.  *Id.* at 17.  The Court in *Eisentrager* also observed that the petitioners had not come within United States sovereignty.  *Eisentrager,* 339 U.S. at 778.  But at no time did the Court establish this as essential to the result.

In *Rasul*, the Court emphasized that the question of "sovereignty" was virtually irrelevant in the face of the U.S. Government's jurisdiction and control over the Guantanamo base.  *See Rasul*, 542 U.S. at 482 (noting that "later cases confirmed that the reach of the writ depended not on formal notions of territorial sovereignty, but rather on the practical question of 'the exact

---

[7]  While the MCA amends 28 U.S.C. § 2241(e) to differentiate between citizens and non-citizens, that section relates only to the *exception* to otherwise existing jurisdiction.  Petitioner does not fall within the exception to §2241 jurisdiction under subsection (e) because he has not been "determined by the United States to have been properly detained as an enemy combatant" nor is he  "awaiting such determination." MCA § 7(a).

extent and nature of the jurisdiction or dominion exercised in fact by the Crown'" (*quoting Ex Parte Mwenya*, [1960] 1 Q.B. 241, 303 (C.A.) (Lord Evershed, M.R.)).  The decision certainly does not stand for the proposition that "sovereignty" determines the issue of jurisdiction, as Respondents suggest. Resp. Mot. at 1-2.

<blockquote>
**2.    Bagram is a territory subject to the exclusive jurisdiction and control of the United States.**
</blockquote>

Respondents concede that "the U.S. military exercises control over the detainees at Bagram Air Force Base… and would not detain prisoners in a facility that it did not control." *See* Brief for the Respondents at 44, *Rasul*, 542 U.S. 466 (Nos. 03-334, 03-343).   Respondents are thus left to distinguish Bagram from Guantanamo on other grounds.  Inexplicably, Respondents rely heavily on the terms of the Accommodation Consignment Agreement between the United States and Afghanistan regarding Bagram ("Bagram Lease") – which bears striking similarity to the agreement in force between the United States and Cuba – at least in every key respect noted by the Court in *Rasul*.[8]  Respondents' proffered exhibits make clear that the United States' control over Bagram equals or exceeds its control over Guantánamo.  This is illustrated in the simple table below:

| **Indicia of Control** | **Guantánamo Leases** | **Bagram Lease** |
|---|---|---|
| | | |

---

[8] The U.S. executed three operative leases with Cuba: Lease of Lands for Coaling and Naval Stations, U.S.-Cuba, Feb. 23, 1903, T.S. No. 418, Art. III; Lease of Certain Areas for Naval or Coaling Stations, U.S.-Cuba, July 2, 1903, T.S. No. 426, Arts. I-II; Treaty Defining Relations with Cuba, U.S.-Cuba, May 29, 1934, T.S. No. 866, Art. III.

| Right to exclusive use of the premises | "the Republic of Cuba consents that during this period of the occupation by the United States…the United States shall exercise complete jurisdiction and control over and within said areas." T.S. 418 (Feb. 23, 1903), Art. III. | • Afghanistan "hereby consigns to the UNITED STATES to have and to hold for the *exclusive use* of the UNITED STATES Forces land, facilities, and appurtances (*sic*) currently owned by or otherwise under the control of" Afghanistan…(italics added) Gray Decl., Exh. 1 ¶ 1 <br><br>• Afghanistan warrants that the United States "shall have exclusive, peaceable, undisturbed and uninterrupted possession" without "any interruption whatsoever by [Afghanistan] or its agents." *Id.* ¶ 9. |
|---|---|---|
| Right to assign use of the property to another party without the consent of the host nation. | None. | "The UNITED STATES shall have the right to assign this agreement to a successor nation or organization." *Id.* at ¶ 2. |
| Right of reversion | None | "The UNITED STATES shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use…" *Id.* ¶ 12. |
| Right to perpetual possession at the United States' discretion | "So long as the United States of America shall not abandon the said naval station of Guantánamo Bay…" T.S. 866 (June 1934), Art. III. | The lease continues in effect "until the UNITED STATES or its successors determine that the Premises are no longer required for its use." *Id* ¶ 4. |
| Occupation with *de minimis* or no rental obligation | "annual sum of two thousand dollars, in gold coin." T.S. 426 (Jul. 2, 1903), Art. I. | The HOST NATION makes the Premises available to the UNITED STATES without |

| | | rental or any other consideration for use of the Premises. Id. ¶5 |
|---|---|---|
| Right of Host Nation to exert control over use of premises | None. | None.<br>The United States is permitted to "hold and enjoy the Premises during the period of th[e] agreement without any interruption whatsoever by the HOST NATION or its agents." *Id.* ¶ 9 |

Thus, the terms of the operative leases evidence that the United States' control over Bagram is *at least* as comprehensive and exclusive as its control over Guantánamo. Indeed, a strong argument can be made that U.S. control over Bagram is *greater* than its control over Guantánamo, because the United States can not only occupy the land *id.* at ¶¶ 1, 9, rent free, *id.* at ¶ 5, for as long as it wishes, *id.* at ¶ 4, without any interference from, Afghanistan *id.* at ¶ 9, but can also assign the property, on the same terms, to a successor entity, *id.* at ¶ 2, and, if and when the successor chooses to abandon the property, exercise a right of reverter to take back possession *id.*, at ¶ 12 – all in derogation of any rights of Afghanistan to the property.

Bagram and Guantánamo are also similar in that the host countries exercise no legal jurisdiction at either base. Based on the terms of the Bagram Lease agreement proffered by Respondents, the government of Afghanistan cannot exercise any more control over the US military base at Bagram than the government of Cuba can exercise over the US military base at Guantanamo. Ordinarily, the concurrent jurisdiction of the United States and a host nation in respect of a military base is authorized in a Status of Forces Agreement ("SOFA") negotiated between the two countries. Respondents have proffered no SOFA between the United States and Afghanistan, and to petitioners' knowledge, no such agreement exists. In the absence of a SOFA, the absolute language of the lease strongly supports the conclusion that Afghanistan has

no right to exercise jurisdiction of any nature at Bagram. Until September 11th, Guantánamo was the only overseas military base without a SOFA. *See* Gerald Neuman, *Closing the Guantánamo Loophole*, 50 Loyola L. Rev. 1, 39 (2004).

The single lease submitted by respondents suggests that any use of the Bagram property, by any person, entity or country, is solely at the discretion of the United States. [9] *See* Gray Decl. Ex. 1 ¶ 1 (consigning Bagram to United States for its "exclusive use"); and ¶9 (giving United States "exclusive, peaceable, undisturbed, and uninterrupted possession" of the Bagram base). Contrary to the suggestion in the Gray Declaration (¶6), the power to grant another country the right to use part of Bagram does not undermine the United States' control over the property, it confirms it.

3.    **Respondents cannot evade the jurisdiction of this Court by housing Petitioner at a facility in close proximity to ongoing hostilities.**

Respondents also attempt to distinguish *Rasul* based on their assertion that Bagram – unlike Guantanamo – is in a theatre of battle. Respondents claim that Bagram is a merely a "wartime necessity" that is subject to an agreement with the host nation. Resp. Mot. at 3. Significantly, Respondents decline to identify the 'war' which necessitates the base. Though logic might suggest that a military base in Afghanistan would be necessary to conduct ongoing military operations in that country, it is far from clear that the "military exigencies" claimed by Respondents to justify Petitioner's detention relate to the war in Afghanistan. Respondents' argument suggests that the military base and the prison facility at Bagram are somehow only temporary. However, Respondents not only have the right to occupy Bagram indefinitely

---

[9]   If the Court is in any doubt as to the degree of control exercised by the United States at Bagram, and its comparison with the United States' control of Guantánamo petitioners respectfully submit that, at the least, the issue is a disputed question of fact. Petitioners have had no opportunity to take discovery concerning the facts asserted in the Miller and Gray Declarations. They should be permitted to do so before this Court may dismiss the instant petition.

pursuant to the Bagram Lease, but also concede that they intend to hold some detainees at Bagram *indefinitely*. *See* Gray Decl. ¶ 18.  Moreover, Petitioner has now been in US custody at Bagram for more than 5 years.  "Perhaps, where detainees are taken from a zone of hostilities, detention without proceedings or trial would be justified by military necessity for a matter of weeks; but as the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker." *Rasul*, 542 U.S. at 488 (Kennedy, J., concurring**).**

The fact that the Bagram prison facility houses a significant number of non-Afghans, like Petitioner, is evidence that the detainees at Bagram detainees are not all simply "battlefield" captures relating to ongoing hostilities in Afghanistan.  Rather, it suggests that the Bagram prison houses detainees captured as part of the US-led "war on terror" – which Respondents maintain has no geographic or temporal boundaries.  *See* Gray Decl. at ¶¶ 17-18 (noting presence of non-Afghans in DoD custody). Since the summer of 2004, when the Supreme Court in *Rasul* made clear that Respondents were not entitled to establish a lawless enclave at Guantanamo, almost no detainees have been transported to Guantanamo.  *See*, *e.g*., Tim Golden & Eric Schmitt*,* "A Growing Afghan Prison Rivals Bleak Guantánamo," *New York Times*, Feb. 26, 2006, at 1. It is clear that one goal of the Guantanamo prison was to provide a place where US laws (including those prohibiting torture and other forms of coercive interrogation measures) would not apply. *Id.* Now that Guantanamo is no longer hidden behind the veil of secrecy Respondents once sought to preserve, it is even more likely that "war on terror" detainees will be held at Bagram. [10]

---

[10] *See* Brief for the Respondents at 22, *Rasul*, 542 U.S. 466 (Nos. 03-334, 03-343) (arguing against the extension of habeas jurisdiction to Guantanamo because "it would create a perverse incentive to detain large numbers of captured combatants in close proximity to the hostilities").

According to the Respondents, "the logic of *Rasul* would not extend to confer habeas jurisdiction at every military facility that the United States operates throughout the world, much less the battlefield of Afghanistan." Respondents' Motion at 13. Regardless of the "military exigencies" that may exist to justify a temporary detention facility at Bagram, it is well-established that Respondents' have also used the Bagram detention facility as a long-term prison for detainees taken into custody in other countries. *See, e.g., generally* Moazzam Begg, *Enemy Combatant: My Imprisonment at Guantánamo, Bagram, and Kandahar* (New Press 2006); *see also* Matthew Pennington, "Inmates Detail U.S. Prison Near Kabul," *Associated Press*, Oct. 2, 2006. In fact, many of the prisoners currently held at Guantanamo were first detained at Bagram for lengthy periods of time prior to their transfer. *Id.* Respondents concede that the prison populations of the two bases are interchangeable – and that they have the power to transfer prisoners back and forth at will. *See* Declaration of Colonel Rose M. Miller ("Miller Decl") ¶ 17 ("some Afghan detainees and detainees who are nationals of third countries are expected to remain in DoD custody either at BTIF or through a transfer to the Guantánamo Bay Naval Base") filed as Exhibit 1 to Respondents' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Document No. 5) in *Ruzatullah et. al., v. Rumsfeld et. al*, 06-cv-1707 (GK), Nov. 20, 2006.

This Court has held that Respondents may not "deliberately shield [detainees] from constitutional scrutiny" by holding or transferring them to territories that are believed to be beyond the jurisdictional reach of the courts. *See Abu Ali v. Ashcroft*, 350 F. Supp.2d 28 (D.D.C. 2004) (noting that one consideration supporting habeas jurisdiction was the allegation that the government was holding detainee in Saudi prison to evade jurisdiction). Even more recently, this Circuit has addressed whether addressed whether the federal habeas statute protected a U.S.

citizen held in Iraq from arbitrary detention by U.S. forces. *Omar v. Harvey*, No. No. 06-5126, --- F.3d ---, 2007 WL 420137 (D.C. Cir. 2007). In *Omar*, Respondents argued, *inter alia*, "that federal courts lack[ed] jurisdiction to entertain habeas corpus petitions filed by individuals detained by American military officials operating as part of a multinational force." *Id.* at *4. The Court disagreed, finding that the petition fell within its jurisdiction because Omar was concededly in the custody of the U.S. military. The Court also concluded that, although Omar had been designated an "enemy combatant" and a "security internee" by the U.S. military, the case was not controlled by prior precedent denying habeas relief to war criminals convicted by international tribunals. *Id.* In reaching this conclusion, the Court drew a sharp distinction between pre- and post-conviction habeas petitioners, and noted that military determinations "are a far cry from trial, judgment and sentencing." *Id.* Accordingly, they would not bar jurisdiction "given that challenging extrajudicial detention is among the most fundamental purposes of habeas." *Omar*, 2007 WL 420137 at *6.

**3.    Petitioner's Detention is in Violation of the Constitution, Laws and Treaties of the United States**

As the Supreme Court held in *Rasul*, "detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing - "unquestionably describe[s] custody in violation of the Constitution or laws or treaties of the United States." *Rasul*, 542 U.S. at 484 n.15 (quoting 28 U.S.C. § 2241 (c)(3)).

Petitioner's detention violates both customary international law and treaties. For example, the Supreme Court has recently made clear that detainees are entitled to the protection of Common Article 3 to the Geneva Conventions, which guarantees minimal protections against

torture, cruel treatment, and outrages on personal dignity, in addition to certain procedural rights. *Hamdan,* 126 S. Ct. at 2757.   Although one provision of the MCA purports to prohibit use of the Conventions as "a source of rights" by private parties, this provision, in contrast to the other provisions of the MCA, does not contain an effective date or retroactivity provision.  Because the instant petition was filed prior to the enactment of the MCA, the MCA's preclusion concerning the Geneva Conventions is not applicable here.  *See Landgraf v. U.S.I. Film Products*, 511 U.S. 244, 265 (1994) (noting deeply rooted "presumption against retroactive legislation"); *I.N.S. v. St. Cyr*, 533 U.S. 289, 316 (2001) (statute does not affect pending claims "absent a clear indication that Congress intended such a result").

Under the Supremacy Clause, "all Treaties made . . . under the Authority of the United States" share with the Constitution and federal statutes the status of "supreme Law of the Land." U.S. Const., art. VI, cl. 2. *See Edye v. Robertson*, 112 U.S. 580, 598-99 (1884) ("A treaty . . .  is a law of the land as an act of congress is."); *see also Zicherman v. Korean Airlines*, 516 U.S. 217, 226 (1996); *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 167 (1999).  Given that the Conventions have the status of supreme federal law, and they create individual rights under international law, it necessarily follows that the Conventions create individual rights under domestic law. *See United States v. Schooner Peggy*, 5 U.S. 103, 110 (1801) ("[W]here a treaty is the law of the land, and as such affects the rights of the parties litigating in court, that treaty as much binds those rights and is as much to be regarded by the courts as an act of congress…").  Indeed, the core meaning of the Supremacy Clause, as applied to treaties, is that it converts primary international rights and duties into primary domestic rights and duties, without the need

for implementing legislation.[11] Under these principles, there can be no doubt that the primary individual rights delineated in the Third and Fourth Conventions are enforceable in the federal courts under the Supremacy Clause. *See, e.g., Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564, 590 (S.D.N.Y. 2002) (declaring that the Third Geneva Convention "under the Supremacy Clause has the force of domestic law.").

Moreover, even if the US were not a party to the Geneva Conventions, the protections guaranteed by the Conventions are well established as norms of customary international law which are enforceable by Petitioner by means of a writ of habeas corpus. Petitioners' international humanitarian law claims may be vindicated by way of habeas corpus because customary international law forms part of the "laws . . . of the United States" within the meaning of 28 U.S.C. §2241(c)(3). Customary international law claims are also enforceable under 28 U.S.C. § 2241(c)(1) because they provide cognizable grounds to rebut any Executive justification for the legality of detention under the common law writ.

It is widely accepted that the existence of a rule of customary international law requires the presence of two elements:  State practice (*usus*), and the belief that such practice is required or prohibited as a matter of law depending on the nature of the rule (*opinio juris sive necessitates*).[12] The cardinal humanitarian protections against torture and coercive interrogation tactics and the due process rights afforded military detainees by the Geneva Conventions represent the codification of customary international law principles extant at the time of the drafting of the 1949 Conventions.

---

[11] *See also* Derek Jinks & David Sloss, *Is the President Bound by the Geneva Conventions?*, 90 Cornell L. Rev. 97, 123-24 (2004); David Sloss, *Non-Self-Executing Treaties: Exposing a Constitutional Falacy*, 36 U.C. Davis L. Rev. 1, 46-48 (2002).
[12] *See* International Court of Justice, *Continental Shelf case* (*Libyan Arab Jamhiriya v. Malta*), Judgment, 3 June 1985, *ICJ Reports 1985*, pp. 29-30.  *See also* Jean-Marie Henckaerts, *Study on Customary International*

International humanitarian law has been codified in a number of international treaties—with the four Geneva Conventions on the Protection of War Victims[13] and the two Additional Protocols[14] as the principal instruments—and can also be found in the universally acknowledged body of customary international law—the norms reflecting the actual practices of nations, developed over time, and accepted by them as binding legal rules.[15]   *See United States v. Paquete Habana*, 175 U.S. 677, 711 (1900).     The nature of the 1949 Geneva Conventions as the embodiment of customary international law, the world-wide ratification of the Conventions, and the consistent State practice acknowledging and following the Conventions, establish that the rules codified in them are properly deemed customary international law norms.

For more than a century, this Court has upheld the principle that our nation's courts have the power to ascertain and enforce individual rights arising under customary international law. As the Court opined first in *The Paquete Habana*: "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often questions of right depending upon it are duly presented for their determination." *The Paquette Habana*, 175 U.S. at 700.   The Court recently reaffirmed this principle in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732-39 (2004) (reviewing numerous sources to determine whether the detention at issue violated customary law before concluding that it did not), and *Hamdi v. Rumsfeld*, 542 U.S. 507, 520-21 (2004) (looking to customary international law and to the Third

---

*Humanitarian Law:  A Contribution to the Understanding and Respect for the Rule of Law in Armed Conflict*, 87 Int'l Rev. of the Red Cross 1, 4 (2005) (hereafter "Study on Customary International Humanitarian Law").

[13] Each of the four Conventions prescribes rules defining the proper treatment of one category of "protected persons" – the sick and wounded on land; the sick, wounded, and shipwrecked at sea; prisoners of war; and civilians.  The central idea of the Conventions is to ensure compliance with a minimum standard for the treatment of persons subject to the authority of the enemy.

[14] Protocol [No. I] Additional to the Geneva Conventions of 12 August 1949 relating to the Protection of Victims of International Armed Conflicts (8 June 1977) 1125 *UNTS* 3-434 (hereafter "Protocol I"); Protocol [No. II] Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (8 June 1977) 1125 *UNTS* 609-699 (hereafter "Protocol II").

[15] Restatement (Third) of the Foreign Relations Law of the United States § 102 (2) (1987).

Geneva Convention, Article 118 to determine whether Hamdi's detention could continue past the cessation of hostilities). In fact, *Sosa* expressly addresses the issue of whether the Alien Tort Statute constitutes a grant of jurisdiction to the courts to interpret customary law: "The First Congress, which reflected the understanding of the framing generation and included some of the Framers, assumed that federal courts could properly identify some international norms as enforceable in the exercise of § 1350 jurisdiction." 542 U.S. at 730.

### III. The MCA's Jurisdiction-Stripping Provision Does Not Apply to Petitioner.

Section 7(a) of the MCA amends 28 U.S.C. § 2241 to strip federal courts of jurisdiction to consider the habeas petition of an alien detained abroad who has "been *determined* by the United States to have been *properly detained* as an enemy combatant or is *awaiting* such determination." MCA § 7(a) (emphasis added). Respondents assert that Petitioner has *in fact* been determined to be an enemy combatant and therefore falls within the exception to habeas jurisdiction that was enacted in the MCA. In support of this factual assertion, Respondents submit the Declaration of Colonel James W. Gray, in which he vaguely describes a process by which Petitioner's enemy combatant status "may" have been determined. Compare Gray Decl. ¶¶ 11-13 (describing "process" generally *which may or may not be reviewed by ECRB*) with Gray Dec. ¶ 20 (stating that an ECRB "validated" Petitioners' status).

By introducing and relying on this extrinsic information, Respondents in essence concede that the petition is legally sufficient on its face and the Court cannot order dismissal based solely on the allegations of the petition. The key jurisdictional question before this Court – whether petitioners are "properly detained" as enemy combatants – requires an examination of the United State's purported determination of petitioners' combatant status and the process that petitioners received.

This Court cannot make the determination that petitioners have been "determined" by the United States to be "properly detained" as enemy combatants without permitting petitioners to take discovery concerning the procedures on which respondents rely, and as to which they have made factual representations to this Court.     *See, e.g.*, *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001).   As the D.C. Circuit has stated, where "the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence."   *Wilderness Soc. v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987) (quoting *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981)).

Even without discovery, however, this Court may rule that the decision-making vaguely described in the Gray Declaration does *not* constitute a determination by a "competent tribunal" that Petitioner is an enemy combatant.   Significantly, the process cited by Respondents is a apparently neither the "Combatant Status Review Tribunal" previously relied upon by Respondents to determine enemy combatant status, nor is it an "Annual Review Board" used by Respondents to periodically review a determination of that status.   Rather, Respondents allege that there is *yet another* process, called an "Enemy Combatant Review Board" or "ECRB," through which they have determined that Petitioner is an enemy combatant.

In enacting the DTA and MCA, Congress required the United States to provide tribunals for the determination of enemy combatant status and to promulgate specific, formal procedures to be applied by those tribunals.   Specifically, the MCA mandates that DoD submit to Congress "the procedures in operation in Afghanistan and Iraq" for determining enemy combatant status of "aliens detained in the custody or under the physical control of the Department of Defense in

those countries."   MCA § 1005(a)(1)(B).   The DTA further requires the submission of an

"annual report."  *Id.* § 1005(d):

"(d) Annual Report –

>    (1)     REPORT REQUIRED – The Secretary of Defense shall submit to Congress an annual report on the annual review process for aliens in the custody of the Department of Defense outside the United States.  Each such report shall be submitted in unclassified form, with a classified annex, if necessary.  The report shall be submitted not later than December 31 each year.

>    (2)     ELEMENTS OF REPORT – Each such report shall include the following with respect to the year covered by the report:

> >    (A)     The number of detainees whose status was reviewed.
> >    (B)     The procedures used at each location.

*Id.* § 1005.  Undoubtedly, Congress granted the DoD broad latitude in developing the procedures

in question.   But this latitude does not constitute unfettered discretion.   Congress retained

oversight and the opportunity to review the procedures by requiring the procedures in question to

be reported formally to Congress for review.   To Petitioner's knowledge, Respondents' never

submitted the required reports.

Having disregarded the DTA's requirement that the procedures in place for determining

the enemy combatant status of detainees in Afghanistan are to be submitted to Congress,

Respondents allege *for the first time in the Affidavit proffered in this case* that such

determinations are being made pursuant to a classified ECRB process -- which they have

apparently fashioned out of whole cloth. [16]  By contrast, "the CSRT procedures used to adjudicate

enemy combatant status are based on and closely track the procedures used to adjudicate

prisoner-of-war status under Article 5 of the Geneva Convention, as set forth in Army

Regulation 190-8, which was cited with approval by the plurality in *Hamdi*."   Opening Brief for

---

[16] The ECRB purportedly last reviewed Petitioner's enemy combatant status on March 1, 2007.  *See* Gray Decl. ¶ 20.  Respondents have not disclosed the resultant determination.

the United States, *et al.* at 33, *Boumediene*, 476 F.3d 981 (D.C. Cir. 2007) (Nos. 05-5064, 05-5095 through 05-5116) (referring to *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004)).

From what little information Respondents cite in the instant motion, the procedures used by the Department of Defense at Bagram do not provide any safeguards *at all* for ensuring that Petitioners are being properly detained as enemy combatants. Nearly all of the procedures described by Respondents depend upon the "discretion" of the "detaining combatant commander." Resp. Mot. at 6. This is the case even though the Department of Defense's own directives are clear that Petitioner would at least be entitled to the following if he were held at Guantanamo:

- "[A]ll detainees shall be notified of the opportunity to contest designation as an enemy combatant…"

- "Each detainee shall be assigned… a personal representative for the purpose of assisting the detainee in connection with the review process…"

- "The detainee shall be allowed to attend all [CSRT] proceedings, except for proceedings involving deliberations and voting by members or testimony and other matter that would compromise national security if held in the presence of the detainee. . . ."

- "The detainee shall be provided with an interpreter, if necessary."

- "The detainee shall be allowed to call witnesses . . . and to question those witnesses called by the Tribunal. . . ."

- "The detainee shall have the right to testify or otherwise address the Tribunal in oral or written form, and to introduce relevant documentary evidence."

- A determination that a detainee is an enemy combatant must be supported by a "[p]reponderance of the evidence" allowing for "a rebuttable presumption in favor of the Government's evidence."

- A complete record of the CSRT proceedings will be prepared

*See* Department of Defense "Order Establishing Combatant Status Review Tribunal" (July 7, 2004), *available at* http:// www.defenselink.mil/news/Jul2004/d20040707review.pdf.

The MCA requires that the determination of enemy combatant status be made by a competent tribunal.  Section 3 of the MCA defines an "unlawful enemy combatant" as one who "has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or *another competent tribunal* established under the authority of the President or the Secretary of Defense" (emphasis added).  MCA § 3(a) (amending 10 U.S.C. § 948a(1)(A)(ii)).[17] As explained above, Congress enacted the MCA amidst a debate clearly focused on granting enemy combatant detainees certain minimum standards of due process.  Even proponents of the jurisdiction-stripping provision of the MCA recognized that the statute would not eliminate the ability of the detainee to challenge the basis for his detention before a tribunal.[18]  Had Congress intended otherwise, it could simply have stripped the courts of jurisdiction over *any* alien detained outside the United States -- full stop.  Instead, it limited the jurisdiction-stripping provision to aliens who have had the opportunity to challenge their enemy combatant status

---

[17]  "Tribunal" means a court or other adjudicative body that performs the functions of a court.  Black's Law Dictionary defines "tribunal" as "[a] court or other adjudicatory body."  *Black's Law Dictionary*, 1544 (8th ed. 2004).  This definition of "tribunal" was confirmed recently by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).  In *Intel*, the Supreme Court interpreted "foreign or international tribunal" in the foreign discovery statute, 28 U.S.C. § 1782(a), as requiring an adjudicative and dispositive proceeding.  The Court held that a "tribunal" means a proceeding "that leads to a dispositive ruling, *i.e.*, a final administrative action both responsive to the complaint and reviewable in court."  *Id.* at 255.  Other courts interpreting the term "tribunal" have concurred that the term implies a fact-finding body with both neutrality and adjudicative power.  *See, e.g.*, *In re Letters Rogatory Issued by the Director of Inspection of the Government of India*, 385 F.2d 1017 (2d Cir. 1967) (hereinafter "*India*") ("tribunal" requires objective decision maker); *Fonseca v. Blumenthal*, 620 F.2d 322 (2nd Cir. 1980) (same); *Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880 (5th Cir. 1999) ("tribunal" requires "impartial adjudicative proceeding"); *In re Letters of Request to Examine Witnesses from the Queen's Bench for Manitoba, Canada*, 59 F.R.D. 625 (N.D. Cal. 1973) (adjudicative proceeding required).  As Judge Friendly held in *India*, a tribunal requires a decision-maker that has no "institutional interest in a particular result."  385 F.2d at 1020.

[18]  *See e.g.*, 152 Cong. Rec. S10354-02, S10361 (Sept. 28, 2006) (statement of Sen. Cornyn) ("When people come here and suggest that we are stripping all legal rights from terrorists who are detained at Guantanamo Bay, they are simply flying in the face of the Detainee Treatment Act that we passed in December 2005, which provides not only a review through a combatant status review tribunal, with elaborate procedures to make sure there is a fair hearing, but then a right to appeal to the District of Columbia Circuit Court of Appeals, not only to make sure that the right standards were applied—that is, whether the military applied the right rules to the facts—but also to attack the constitutionality of the system should they choose to do so."; 152 Cong. Rec. H7925-02, H7937 (Sept. 29, 2006) (statement of Rep. Hunter, Chair of House Armed Services Committee and sponsor) ("[The MCA] gives them a lot of rights.  It gives a lot of rights to the terrorists that they would never have in their native land.  It also gives them rights that American soldiers don't have.  There is no American soldier that has the right to an attorney, to a

before a competent tribunal.

## IV.    Petitioner Has a Right to Habeas Relief at Common Law and under the Constitution.

Respondents rely on the D.C. Circuit's recent decision in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007) to argue that Petitioner has no constitutional right to seek habeas relief. In *Boumediene*, a divided panel of the D.C. Circuit held that because the Guantánamo detainees are aliens held outside the sovereign territory of the United States, they can not assert any constitutional entitlement to the writ of habeas corpus. The majority *Boumediene* decision is premised on an express holding that the writ of habeas corpus, as it existed in 1789, would not have been available to aliens held outside of "U.S. sovereign territory." *Id.* at 990-91. This premise is demonstrably incorrect. As discussed in further detail below, the Supreme Court's Suspension Clause jurisprudence recognizes that the writ, as it existed in 1789, provides the floor rather than the ceiling for the constitutional protections of habeas jurisdiction. *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). In any event, the holding in *Boumediene* is not controlling.

Respondents further assert that *Rasul* does not help Petitioner with respect to his constitutional claim because "its holding was focused narrowly on the *statutory* reach of the federal habeas statute." Resp. Mot. at 17. However, the Supreme Court in *Rasul* applied the federal habeas statute to Guantánamo based on an express determination that "application of the habeas statute to persons detained at [Guantánamo] is *consistent with the historical reach* of the writ of habeas corpus." *Rasul,* 542 U.S. at 466, 481 (2004) (emphasis added.) Surely, the historical reach of the writ is a constant. It does not narrow when the issue is a question of constitutional, rather than statutory, interpretation.

As the Supreme Court has repeatedly held, "at the absolute minimum, the Suspension

---

combatant status review and, if he doesn't like that review, to an appellate court, like the D.C. Circuit Court, to

Clause protects the [common law] writ 'as it existed in 1789.'" *I.N.S. v. St. Cyr*, 533 U.S. 289,

301 (2001) (quoting *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996)).    Quoting from Lord

Mansfield's 1759 opinion in *King v. Cowle*, the *Rasul* Court recognized that that the pre-1789

"historical reach of the writ of habeas corpus" extended to all "persons detained . . . [in] territory

. . . 'under the subjection of the Crown.'" *Rasul*, 542 U.S. at 482 (quoting *King v. Cowle*, 2 Burr.

834, 854-44, 97 Eng. Rep. 587, 598-99 (K.B.)).    At common law, "the reach of the writ

depended not on formal notions of territorial sovereignty, but rather on the practical question of

the exact extent and nature of the jurisdiction or domination exercised in fact by the Crown." *Id*.

Respondents erroneously claim that "the 'persons' cited by the Court [in *Rasul*] . . . were all

citizens (or subjects) of the sovereign that was holding them."  Resp. Mot. at 18.   In fact, the

Court cites *In re Ning Yi-Ching* for the proposition that "the remedy of *habeas corpus* was not

confined to British subjects but would extend to any person detained within the reach of the

writ." *Rasul*, 542 U.S. at 482n.14.

Respondents once again seek to raise the ghost of *Johnson v. Eisentrager*, 339 U.S. 763

(1950) in support of their conclusions that Petitioner is not entitled to seek the great writ.   In

*Eisentrager*, the Supreme Court held that German war criminals convicted and sentenced by a

lawful military commission for violating the laws of war in China could not seek habeas relief in the

federal courts.    But this case differs from Johnson in several fundamental respects.    Unlike

Petitioner, the detainees in *Eisentrager* were convicted war criminals.  In their trial before a military

commission, the *Eisentrager* prisoners enjoyed the rights to notice of the charges against them, to

prompt appointment of counsel of choice, to prepare a defense, to call and confront witnesses, to

compulsory process, to discover and introduce evidence, to make an opening statement and closing

argument, and to appeal their conviction to a military panel. *Johnson v. Eisentrager*, 339 U.S. 763

---

prove that he really was not a combatant in that particular conflict.").

(1950)(Case No. 306) (Index to Pleadings Filed in Supreme Court, Respondents' Exhibit F at 37-40 (Regulations Governing the Trial of War Criminals).  The Petitioners in the present case, by contrast, are imprisoned completely without legal process.  It is one thing to hold that war criminals "tried, convicted, and sentenced by a lawful commission" whose procedural protections are not the subject of complaint, cannot seek further review in a civilian court.  It is quite another to extend that holding to people who have never been charged or afforded any legitimate process.

Nor can Respondents rely on *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), to conclude that Petitioner has no constitutional rights.  Justice Kennedy, whose concurrence made up the majority in that case, did not accept the reading of *Eisentrager* outlined in the principal opinion.  Instead, he relied entirely on the approach adopted by Justice Harlan in his concurrence in *Reid v. Covert,* 354 U.S. 1 (1957), and applied it to the case of an alien seeking constitutional protections against unreasonable searches and seizures in Mexico.  *Verdugo-Urquidez*, 494 U.S. at 277-78 (Kennedy, J., concurring) (following Justice Harlan's concurrence in *Reid*).  That approach permits the Court to evaluate, on a case by case basis, whether a particular constitutional right should apply to a particular factual context.  Although Justice Kennedy concluded that the defendant in *Verdugo-Urquidez* had received all the process he was "due," *id.* at 278,  his analysis in reaching that conclusion is what is critical.   As he explained in his concurrence in *Rasul*, *Eisentrager* itself can no longer be understood to articulate a categorical bar: "A necessary corollary of *Eisentrager* is that there are circumstances in which the courts maintain the power and the responsibility to protect persons from unlawful detention even where military affairs are implicated."  *Id.* at 487 (Kennedy, J., concurring in the judgment).

Bagram is now a long term prison facility where detainees may be secretly imprisoned and interrogated for years – without the right to even *know,* much less challenge -- the reason for

their imprisonment.  To accept Respondents' position that detainees at Bagram are without legal recourse would mean sanctioning what the Supreme Court found untenable in *Rasul*--the creation of a prison wholly outside of the law.   The fact that Respondents have chosen to hold Petitioner in a territory within their complete jurisdiction and control in Afghanistan, rather than at a territory within their complete jurisdiction and control in Cuba, certainly does not provide Respondents any further justification for Petitioners' continued detention after more than five years has passed.  Respondents' position is deeply at odds with the fundamental legal and moral principles of American democracy as well as the historical grounding of *habeas corpus.*

## **CONCLUSION**

WHEREFORE, for the reasons stated above, Petitioners respectfully requests that Respondents' motion to dismiss be denied and that the Court issue the requested writ of *habeas corpus*.

Dated:          April 4, 2007

Respectfully submitted,

____/s/_____
Tina M. Foster, Esq.
*Admitted pursuant to L. Civ. R. 83.2(g)*
International Justice Network
PO Box 610119
Bayside, NY 11361-0119
Tel: 917.442.9580
Fax: 917.591.3353

*Attorney for Petitioners*