IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FADI AL MAQALEH, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v.              ) | Civil Action No. 06-CV-01669 (JDB) |
| ) | |
| ROBERT GATES, ) | |
| Secretary, United States Department of ) | |
| Defense, *et al.,* ) | |
| ) | |
| Respondents. ) | |

**RESPONDENTS' REPLY TO PETITIONER'S OPPOSITION TO
RESPONDENTS' MOTION TO DISMISS FOR LACK OF JURISDICTION**

Respondents respectfully submit this reply brief in response to Petitioner's Opposition to

Respondents' Motion to Dismiss for Lack of Jurisdiction.  In their opening brief, respondents

demonstrated that this Court has no jurisdiction to hear the present habeas petition because the

petition, filed by an alien enemy combatant detained at Bagram Airfield in Afghanistan, falls

squarely within the jurisdiction-limiting provision of the Military Commissions Act of 2006

("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006).  Respondents also demonstrated that

petitioner does not have a constitutional right to habeas relief because under *Johnson v.

Eisentrager*, 339 U.S. 763 (1950), aliens detained abroad, who have no significant voluntary

connections with this country, cannot invoke protections under the Constitution.

As respondents further demonstrated, the recent decision of the Court of Appeals for the

District of Columbia Circuit in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir.), *cert. denied*, 127

S.Ct. 1478 (2007), removes all doubt that the MCA divests federal courts of jurisdiction to

review petitions for writs of habeas corpus filed by aliens captured abroad and detained as enemy

combatants in an overseas military base.  Finding *Eisentrager* to be the "controlling precedent"

on the constitutional question, *id.* at 991, the Court of Appeals also held that the MCA does not violate the Suspension Clause because "[p]recedent in [the D.C. Circuit] and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States."  *Id.*

In response, petitioner argues that the MCA is inapplicable to him because he has not properly been determined to be an enemy combatant by a "competent tribunal" as he erroneously contends is required by the MCA, and that at a minimum, he is entitled to discovery on that jurisdictional question.  He also argues that *Boumediene* – which is now the settled law of this Circuit – is wrongly decided because it conflicts with the earlier-decided decision in *Rasul v. Bush*, 542 U.S. 466 (2004).  Further, petitioner devotes significant energy attempting to show that his detention violates the Geneva Conventions.

As discussed below, the concept of "competent tribunal" is irrelevant to the jurisdictional inquiry here because the plain language of the MCA's jurisdiction-limiting provision requires for its application only that the United States has determined petitioner to be an enemy combatant. The record is clear that that predicate for the statute's application has been met here.  No discovery is necessary, much less any need for this Court to examine military decisions made in the theater of active military operations.  Moreover, despite petitioner's arguments to the contrary, this Court must follow the controlling Circuit precedent of *Boumediene*.  Finally, petitioner's reliance on the Geneva Conventions does not help him.  Not only does the MCA explicitly preclude such reliance, but the issue of whether petitioner's detention violates the Geneva Conventions does not affect the fact that this Court has no jurisdiction to proceed now.

**ARGUMENT**

I.    **UNDER THE MCA, THIS COURT HAS NO SUBJECT MATTER JURISDICTION TO REVIEW THE PRESENT PETITION**

A.    **The MCA's Jurisdiction-Limiting Provision Applies As Long As the Alien Habeas Petitioner is "Determined By the United States" To Have Been Properly Detained As An Enemy Combatant**.

In their opening brief, respondents demonstrated that this Court has no jurisdiction in this case because § 7 of the MCA provides that "[n]o court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." MCA § 7(a).[1] Through the declaration of Colonel James W. Gray, respondents established that the Department of Defense ("DoD") has determined petitioner to be an enemy combatant and is detaining him as such. *See* Gray Decl., ¶ 20 (dkt. #7).[2] As a matter of background, respondents also described the review process in Afghanistan for determining a detainee's enemy combatant status, which includes review by what is known as the Enemy Combatant Review Board ("ECRB"). *See* Respondents' Mot. to Dismiss. at 6-7 (dkt. #7); *see also* Gray Decl., ¶¶ 11-13.

_____

[1] As respondents further showed (Respondents' Mot. to Dismiss at 11-12), the MCA's jurisdiction-limiting provision extends not only to purely habeas claims, but also to all cases "which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." MCA § 7(b). Thus, this Court similarly has no jurisdiction over petitioner's conditions of confinement claims. *See Paracha v. Gates*, Nos. 05-5194, 05-5211, 05-5333 (D.C. Cir. April 9, 2007) (ordering the dismissal of Guantanamo detainee's motion relating to conditions of his confinement because the district court lacks jurisdiction to consider these claims under 28 U.S.C. § 2241(e)) (attached as Exhibit 1).

[2] In fact, petitioners' enemy combatant status was recently validated again following the ECRB's review on March 1, 2007. *See* Second Declaration of Colonel James W. Gray ["2d Gray Decl."], ¶ 3 (attached hereto as Exhibit 2).

3

In response, petitioner argues that § 7 is inapplicable here because, he says, its application depends upon whether petitioner's enemy combatant status was determined by a "competent tribunal," *see* Pet. Opp. at 26, and, he further contends, the ECRB is not such a tribunal. As discussed below, petitioner's arguments have no merit.

### 1. The Concept of "Competent Tribunal" Is Irrelevant to the Application of the MCA's Jurisdiction-Limiting Provision.

Despite petitioner's attempts to define the term "competent tribunal," that term is irrelevant to the application of the jurisdiction-limiting provision of § 7 in the MCA, which requires only that the habeas petitioner be "determined by the United States" to have been properly detained as an enemy combatant or to be awaiting such a determination. References to determination by a "competent tribunal," in contrast, are in § 3 of the MCA, which concerns the trial of unlawful enemy combatants by military commissions for war crimes. Specifically, the term appears in the subsection defining an "unlawful enemy combatant," which is:

> (i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or
>
> (ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal ["CSRT"] or another competent tribunal established under the authority of the President or the Secretary of Defense.

10 U.S.C. § 948a(1). Section 3 then provides that "a finding by a ["CSRT"] or another competent tribunal established under the authority of the President or the Secretary of Defense that a person is an unlawful enemy combatant is dispositive for purposes of jurisdiction for trial by military commission under this chapter." 10 U.S.C. § 948d(c). The issue before this Court is

not whether petitioner may be tried by a military commission for war crimes under § 3; rather, the issue is whether the habeas petitioner has been "determined by the United States" to be enemy combatants. Thus, whether the ECRB is a "competent tribunal" within the meaning of § 3 is irrelevant to a determination of whether this Court can exercise jurisdiction to hear this habeas petition under § 7.

      **2.**      **Petitioner Is Not Entitled to A CSRT for Purposes of Determining His Enemy Combatant Status, Nor Can He Rely On the Geneva Conventions in Invoking this Court's Jurisdiction**.

In arguing that an ECRB is not a "competent tribunal" within the meaning of MCA § 3, petitioner cites to the procedures available in a CSRT, which in turn closely track the procedures used to adjudicate prisoner-of-war status under Article 5 of the Third Geneva Convention, as set forth in Army Regulation 190-8. *See* Pet. Opp. at 24. Petitioner is not entitled to such procedures, however, because there is no mandate in the DTA, or the MCA, that the military conduct CSRTs for enemy combatants that it captures. Indeed, Congress was aware that the procedures used for determining a detainee's enemy combatant status differ depending on whether the detainee is held at Guantanamo or in Afghanistan or Iraq, and that CSRTs are conducted at only Guantanamo. *See* DTA § 1005 (a) (requiring the Secretary of Defense to submit a report setting forth procedures of "[CSRTs] and Administrative Review Boards . . . that are in operation at Guantanamo Bay" and for determination of the status of aliens in DoD custody in Afghanistan and Iraq). Nevertheless, the MCA's jurisdiction-limiting provision is written broadly to cover all detainees who have been "determined by the United States" to be enemy combatants or are awaiting such determination. *See* MCA § 7(a).

Nor does Army Regulation 190-8, which implements the Geneva Conventions, *see* AR 190-8 § 1-1(b), or the Geneva Conventions themselves lend petitioner any support. Although

Army Regulation 190-8 does refer to "competent tribunal," the term as used in that regulation

relates to tribunals constituted to adjudicate prisoner-of-war ("POW") status under Article 5 of

the 1949 Geneva Convention *if there is doubt* as to whether the detainee is entitled to POW

status.[3]  *See* AR 190-8, § 1-6.[4]  Although the Supreme Court left open in *Hamdan v. Bush*, 126

S.Ct. 1749, 2795 n. 61 (2006), whether Article 5 of the 1949 Geneva Convention applies to the

armed conflict with al Qaeda, there is no doubt that petitioner is not a prisoner of war.  The

President had already determined that Taliban or al Qaeda detainees do not qualify as prisoners

of war under Article 4 of the 1949 Geneva Convention.  *See* Memo. for the Vice President, et al.

From President, Re:  Humane Treatment of al Qaeda and Taliban Detainees at 2 (Feb. 7, 2002),

attached as Exhibit 3.  That determination is unquestionably correct because these fighters (and

indeed, their associated forces) fail to carry arms openly, wear uniforms, have a fixed distinctive

sign recognizable at a distance, or conduct their operations in accordance with the laws and

customs of war.  *See* 1949 Geneva Convention, Art. 4 (defining prisoners of war and those who

would be treated as prisoners of war).  Moreover, subsection 1-5(a)(2) of Army Regulation 190-8

provides that prisoners receive the protections of the Convention only "until some other legal

status is determined by *competent authority*" (emphasis added), and, as the D.C. Circuit has held,

---

[3]  Notably, Army Regulation 190-8 does not purport to provide an all-inclusive definition of an Article 5 tribunal under the Third Geneva Convention.

[4]  AR 190-8, § 1-6 provides:

> In accordance with Article 5, GPW  [the 1949 Geneva Convention
> Relative to the Treatment of Prisoners of War], if any doubt arises
> as to whether a person, having committed a belligerent act and
> been taken into custody by the US Armed Forces, belongs to any of
> the categories enumerated in Article 4, GPW, such persons shall
> enjoy the protection of the present Convention until such times as
> their status has been determined by a competent tribunal.

the President, in making his decisions regarding the POW status of al Qaeda and Taliban

detainees, is such an authority. *Hamdan v. Rumsfeld*, 415 F.3d 33, 43 (D.C. Cir. 2005), *reversed*

*on other ground*, 126 S. Ct. 2749 (2006).

In any event, despite petitioner's significant reliance on the Geneva Conventions as

somehow providing this Court with subject matter jurisdiction (which they do not), Congress, in

enacting the MCA as a response to *Hamdan*, made clear that the Geneva Conventions are not

judicially enforceable by private individuals. Section 5(a) of the MCA provides that "no person

may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil

action or proceeding to which the United States . . . is a party as a source of rights in any court of

the United States."

Although petitioner argues that § 5(a) is not retroactive (*see* Pet. Opp. at 19), there is no

issue of retroactivity. The law, settled since even before the MCA's enactment, is that treaties,

such as the Geneva Conventions, are presumed not to create individually enforceable rights. It

has long been recognized that a treaty "is primarily a compact between independent nations,"

*Head Money Cases*, 112 U.S. 580, 597 (1884), and absent a clear contrary intent, a treaty

"depends for the enforcement of its provisions on the interest and the honor of the governments

which are parties to it." *Id.*; *see also Whitney v. Robertson*, 124 U.S. 190, 194-195 (1888);

*Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 937 (D.C.

Cir. 1988). If a treaty is violated, this "becomes the subject of international negotiations and

reclamation," not the subject of a lawsuit. *Head Money Cases*, 112 U.S. at 597. And "[i]t is

obvious that with all this the judicial courts have nothing to do and can give no redress." *Id.*; *see*

*also Holmes v. Laird*, 459 F.2d 1211, 1213, 1222 (D.C. Cir. 1972) (denying U.S. soldiers' claims

that because the NATO Status of Forces Agreement granted individual members of the armed

forces specific rights, a federal court could adjudicate a claim based upon those treaty rights; holding that "the corrective machinery specified in the treaty itself is nonjudicial"). Section 5 of the MCA simply provides a clear statement of Congress' intent to continue to follow the norm with respect to treaties, which is to limit enforcement of a treaty to diplomatic and non-judicial processes. Accordingly, the Geneva Conventions cannot lend petitioner any support in this case.

> **3.    DoD Has Satisfied the DTA's Requirement That It Reports to Congress the Procedures in Operation in Afghanistan for Determining Alien Detainees' Enemy Combatant Status.**

Although conceding that "[u]ndoubtedly, Congress granted the DoD broad latitude in developing the procedures in question," Pet. Opp. at 24, petitioner accuses DoD of failing to report to Congress the procedures in place in Afghanistan for determining enemy combatant status as required by the DTA. *Id.* at 23-24. This contention has nothing to do with the MCA's jurisdiction-limiting aspects, but even if it did, petitioner's accusation would be unfounded.

Section 1005(a)(1)(B) of the DTA requires the Secretary of Defense to submit to Congress: "the procedures in operation in Afghanistan and Iraq for a determination of the status of aliens detained in the custody or under the physical control of the Department of Defense in those countries."[5] DoD submitted such a report on August 10, 2006.[6] The unclassified enclosure of the report is attached hereto as Exhibit 4. The relevant procedures set forth in that report were fully discussed in respondents' motion to dismiss and in the Gray Declaration, *see* Miler Decl.

---

[5] Section 1005(d) of the DTA further requires the Secretary to submit, not later than December 31 each year, an annual report on the review process for aliens in DoD custody outside the United States. DoD plans to submit its first annual report by the end of this year.

[6] Although the DTA requires that a report be submitted not later than 180 days after the December 30, 2005 enactment of the DTA, DoD received a 60 day extension from Congress to submit the report.

¶¶ 11-13.  Those procedures include the authority of the detaining combatant commander to convene, at his discretion, a "panel of commissioned officers to review the available evidence and reach a recommended determination."  *See* Ex. 3 at 3; Gray Decl. ¶ 12.  As explained in the Gray declaration, the Commanding General convened such a panel, the ECRB, at Bagram.  *See* Gray Decl. ¶ 13.  Thus, to the extent petitioner argues that the ECRB is somehow unlawful because DoD allegedly withheld it and other procedures from Congress, the argument is without any foundation.

<blockquote>

**4.     Petitioner Is Not Entitled to Discovery Regarding the Combatant Status Review Procedures in Afghanistan Nor the United States' Determination of His Enemy Combatant Status**.

</blockquote>

Petitioner also seeks discovery regarding this Court's jurisdiction for several purported reasons.  First, because respondents have introduced extrinsic facts relevant to the jurisdictional inquiry, and because this Court cannot convert a motion to dismiss for want of jurisdiction into a summary judgment proceeding, petitioner contend that he must be allowed discovery as to those extra-pleading matters.  *See* Pet. Opp. at 8-10.  Second, petitioner asserts that the jurisdictional issue here requires an examination of the United States' determination of petitioner's combatant status and the process that the petitioner actually received, which in turn, petitioner says, requires discovery.  *Id.* at 22.  Third, petitioner argues that there are factual disputes as to the degree of the United States' control over Bagram Airfield as compared to Guantanamo Bay, and thus, that he is entitled to discovery on that and other issues discussed in the declarations of Colonel Gray.  *See id.* at 15 n. 9.

Petitioner's arguments are without merit and no discovery is warranted.  Contrary to petitioner's suggestion, this Court would be able to consider extra-pleading materials in

reviewing a Rule 12(b)(1) motion.  As the D.C. Circuit has explained, one of the "important distinctions between a dismissal pursuant to subdivision b(1) and one under b(6) ... [is that under b(1) ] the court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction to hear the action."  *Wilderness Soc. v. Griles*, 824 F.2d 4, 16 n. 10 (D.C. Cir. 1987) (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 12.07(2.-1), at 12-45-46 (1986)).  In other words, "although a Rule 12(b)(1) motion cannot be converted into a motion for summary judgment as a Rule 12(b)(6) motion can, *see* Fed. R. Civ. P. 12(b), a district court can assure that appropriate extra-pleading materials are consulted in determining the threshold jurisdictional issue."  *Id.* Thus, "'where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'"  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C. Cir.1992)).

Moreover, the D.C. Circuit has held that "[a] plaintiff has no right to discovery in opposing a motion under 12(b)(1)," *Haase v. Sessions*, 835 F. 2d 902, 908 (D. C. Cir. 1987), and the Supreme Court has also held that "'[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.'"  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 295 (1969)).  While the court may nevertheless grant discovery to resolve factual disputes necessary to determining the court's habeas jurisdiction, discovery is inappropriate where, as here, petitioner has no basis for disputing the respondents' jurisdictional showing. *Cf. Coalition for Underground Expansion*,

333 F.3d at 198 (rejecting plaintiffs' argument that the district court erred in considering a declaration submitted by the defendant on a Rule 12(b)(1) motion without affording the plaintiff an opportunity for discovery, where plaintiff has made no factual allegations which, if substantiated, would establish jurisdiction); *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999) (in a habeas case, "discovery is available only in the discretion of the court and for good cause shown."); Rule 6(a) of the Rules Governing Section 2254 Cases[7] (requiring leave of court for good cause shown before discovery may be conducted in habeas case by state prisoners).

Here, petitioner has failed to establish good cause for jurisdictional discovery. There is no basis for discovery because this Court clearly lacks jurisdiction under the MCA and *Boumediene. Cf. Hicks v. Bush*, No. 02-CV-0299 (CKK), 2007 WL 902303 at *5 (D.D.C. Mar. 23, 2007) ("In *Boumediene*, the D.C. Circuit clearly held that Congress intended to deprive the federal district courts of jurisdiction over 'all cases, without exception, pending on or after the date of the enactment of [the MCA] which relate to any aspect of the detention, transfer, treatment, trial or conditions of detention of an alien detained by the United States since September 11, 2001,' and that Congress did so constitutionally . . . . As such, this Court lacks jurisdiction to review Petitioner's habeas petition."). As discussed before, the only factual question relevant to this Court's jurisdiction here is whether petitioner has been "determined by the United States to have been properly detained as an enemy combatant." MCA § 7. The plain language of § 7 indicates that the determination of enemy combatant status (and whether an alien is properly detained pursuant to that determination) is for the United States alone to make.

---

[7] Whether or not the Rules Governing Section 2254 Cases actually apply here, the limitation of discovery in such cases is instructive at least by analogy.

Indeed, any determination that a detainee is an enemy combatant is also a determination that the detainee is "properly detained as an enemy combatant" because it is established that all enemy combatants may be properly detained during armed conflict. *See Hamdi*, 542 U.S. at 520-21; *Ex parte Quirin*, 317 U.S. 1 (1942). Accordingly, once respondents have shown that the United States has determined petitioner to be an enemy combatant, there is no basis for petitioner to dispute that fact, and the jurisdictional inquiry is at an end.

Nevertheless, petitioner argues that he is entitled to examine whether the United States' determination of his enemy combatant status was properly made. But § 7 does not say that the jurisdictional bar applies only where the alien has been "properly determined" to be an enemy combatant. To the extent petitioner seeks to re-write the statute along those lines, he would make the jurisdiction-limiting provision applicable only after the normal habeas inquiry, and thus render § 7 entirely ineffective. In other words, while § 7 plainly provides that this Court has no jurisdiction to hear a habeas petition challenging the legality of an alien enemy combatant's detention (or any aspect of the enemy combatant's detention), petitioner's revision of the statute would require this Court to address whether his detention is based on a proper determination of his enemy combatant status. Essentially, petitioner is seeking the same relief as would be available if Congress never enacted § 7. That he cannot do.

As for the alleged "factual dispute" regarding the United States' control over Bagram, the manufacture of such a dispute by petitioner would not entitle him to discovery even if the legal impediments just addressed did not bar it. As discussed in detail in the next sections, the degree of United States' control over Bagram is irrelevant to the jurisdictional inquiry here because as a statutory matter, application of § 7 of the MCA does not depend on where the alien enemy

combatant is held by the United States.  As a constitutional matter, the D.C. Circuit has also held

that § 7 does not violate the Suspension Clause when applied to aliens outside the sovereign

territory of the United States.

Finally, it is worth noting that the type of discovery petitioner proposes would intrude on

the military operations in Afghanistan and entail the very type of litigation found inconceivable

by the Supreme Court in *Eisentrager*, 339 U.S. at 779.  As Judge Hogan aptly noted recently

when dismissing a suit by former detainees in Afghanistan and Iraq against U.S. government

officials:

> The discovery process alone risks aiding our enemies by affording
> them a mechanism to obtain what information they could about
> military affairs and disrupt command missions by wresting
> officials from the battlefield to answer compelled deposition and
> other discovery inquiries about the military's interrogation and
> detention policies, practices, and procedures.

*In re Iraq and Afghanistan Detainees Litigation*, No. 06-0145, – F. Supp. 2d –, 2007 WL

926145, *15 (D.D.C. March 27, 2007).

In sum, petitioner is not entitled to discovery.

**B.    The Degree of the United States' Control Over Bagram Airfield Does
Not Affect the Interpretation of the Habeas Statute Both Before and
After the Statute's Amendment.**

In their opening brief, respondents showed that even had Congress not amended the

federal habeas statute, the logic of the Supreme Court's decision in *Rasul*, would not extend to

Bagram.  *See* Respondents' Mot. to Dismiss at 12-14.  Unlike Cuba, which has expressly

consented to the United States' "complete jurisdiction and control" over Guantanamo, *see Rasul*,

542 U.S. at 471, the Government of Afghanistan has made no similar concession regarding

Bagram.  In response, petitioner maintains that *Rasul* is controlling on the statutory question

because the United States' control over Bagram Airfield is similar, if not greater, than its control

over Guantanamo.  *See* Pet. Opp. at 12-17.  According to petitioner, as to both Bagram and

Guantanamo, the host nation exercises no legal jurisdiction over the base, nor has the host nation

entered into a Status of Force Agreement ("SOFA") with the United States.

      Petitioner is wrong.  First, his arguments rest on the false premise that the MCA's

jurisdiction-limiting provision is inapplicable to him because he allegedly has not been

determined by the United States to be properly detained as enemy combatants.  In fact, the United

States has made such a determination, and the plain language of the amended habeas statute

precludes this Court's jurisdiction, wherever petitioner may be detained.  *See* MCA § 7.  Given

that the MCA clearly applies here and that it is also intended to overrule *Rasul* even as to

Guantanamo, this Court need not, and should not, reach the issue of the United States' control

over Bagram, nor can petitioner advance his case by arguing that Bagram is just like

Guantanamo.

      Second, even if the United States had not determined petitioner to be an enemy

combatant, the pre-amended habeas statute was not intended to be, nor has it ever been, extended

beyond the United States, except in the unique circumstance of Guantanamo.  Bagram is not like

Guantanamo, however, other than that neither is a sovereign territory of the United States.  The

United States' presence at Bagram Airfield is necessitated by the war against al Qaeda, the

Taliban, and their affiliates and supporters.  *See* Gray Decl. ¶ 5; Letter from the President to the

Speaker of the House of Representatives and the President Pro Tempore of the Senate (Sept. 19,

2003), *available at* http://www.whitehouse.gov/news/releases/2003/09/20030919-1.html.  The

14

United States began combat efforts in Afghanistan in October 2001, and the military continues to fight in this area. As a result of the United States' presence in the area, and contrary to petitioner's representation, the United States did execute a SOFA in 2002 with the Government of Afghanistan regarding the United States' activities in Afghanistan, including Bagram Airfield. *See* Diplomatic Note 202, attached hereto as Exhibit 5. The agreement, effected through an exchange of diplomatic notes, recognizes that United States personnel "may be present in Afghanistan in connection with cooperative efforts in response to terrorism, humanitarian and civic assistance, military training and exercises, and other activities." *Id.* at 1. The agreement further ensures, among other things, that such personnel be accorded a status equivalent to that accorded to American embassy administrative and technical staff. *See id.* Importantly, under the SOFA, the United States' jurisdiction in Afghanistan extends only to U.S. personnel:

> The Government of Afghanistan recognizes the particular importance of disciplinary control by United States military authorities over United States personnel and, therefore, Afghanistan authorizes the United States Government to exercise criminal jurisdiction over United States personnel. The Government of Afghanistan and the Government of the United States of America confirm that such personnel may not be surrendered to, or otherwise transferred to, the custody of an international tribunal or any other entity or state without the express consent of the Government of the United States.

*Id* at 3. In other words, common crimes committed by Afghan citizens at Bagram would be prosecuted by the Government of Afghanistan, not the United States, and the Government of Afghanistan in that respect has legal jurisdiction over Bagram.

The lease agreement between the two governments regarding Bagram Airfield is not to the contrary. Far from granting the United States "complete jurisdiction and control" as is the

case in Guantanamo, the Bagram lease is silent about U.S. jurisdiction over the Airfield. While the lease speaks in terms of "exclusive use" and "exclusive, peaceable, undisturbed and uninterrupted possession" of the premises and gives the United States the right to assign the lease, Gray Decl. Ex., 1 at ¶¶ 1, 9, that is no different from an ordinary commercial lease. The lease simply does not give the United States jurisdiction over the Airfield because the issue of jurisdiction is governed by the SOFA. What the lease does warrant is that the Government of Afghanistan "is the sole owner of the Premises and/or has the right, without any restrictions, to grant the use of the Premises" to the United States. *See* Gray Decl., Ex. 1 at ¶ 8. Indeed, consistent with that ownership, the Government of Afghanistan agrees that all claims arising out of the United States' possession of the premises may be directed to the Government of Afghanistan for processing and payment, if any. *See id.*

As for petitioner's protestation that the United States has used the Bagram detention facility "as a long-term prison for detainees taken into custody in other countries," *see* Pet. Opp. at 17, even if true, it does not change the jurisdictional analysis. That petitioner and other enemy combatants captured in Afghanistan (and allegedly elsewhere) have been detained there long term is due to the fact that the war is on-going and the detention is necessary for reasons of military necessity.[8] As explained in Colonel Gray's declaration,

> The detention of these enemy combatants [at Bagram] prevents
> them from returning to the battlefield and engaging in further
> armed attacks against innocent civilians and U.S. and coalition
> forces. Detention also serves as a deterrent against future attacks

---

[8] Although the first amended habeas petition alleges that petitioner has been detained for more than 5 years, the Yemeni detainee whom DoD assumes for purpose of the motion to dismiss to be petitioner was captured in Afghanistan on September 10, 2004. *See* 2d Gray Decl. ¶ 2; *see also* Gray Decl. ¶ 19.

> by denying the enemy the fighters needed to conduct war.
> Interrogations during detention enable the United States to gather
> important intelligence to prevent future attacks.

*See* Gray Decl. ¶ 9; *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (noting the "weighty and sensitive governmental interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States;" and "[t]he purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again").

In any event, as the Supreme Court recognized in *Hamdi*, 542 U.S. at 518-19, the detention of enemy combatants during an armed conflict is a necessary attribute and by-product of war.[9]  It is simply inconceivable that Congress ever intended to thrust federal courts into the extraordinary role of reviewing the military's conduct of hostilities overseas, second-guessing the military's determination as to which captured aliens pose a threat to the United States or have strategic intelligence value, and in practical effect, superintending the Executive conduct of an armed conflict – even while American troops are on the ground engaged in daily combatant operations.  Put differently, the habeas statute, even before its amendment, was not intended to reach aliens detained by the United States anywhere in the world during active hostilities.  The MCA now makes absolutely clear that Congress has no such intention, and clarifies that habeas

---

[9]  Indeed, in World War I, American forces had custody of approximately 48,000 prisoners of war in France between the 1918 armistice and the treaty of peace in 1920.  *See* George Lewis and John Mewha, *History of Prisoner of War Utilization by the United States Army 1776-1945*, Dep't of the Army Pamphlet No. 20-213 at 63.  By the end of World War II, U.S. forces had custody of approximately 2 million enemy combatants.  *See id.* at 244.  Many of the detainees were not repatriated for several years after the conclusion of the hostilities.  *See id.* at 243-245.  And as to both World Wars, only a small fraction of the detainees was prosecuted and punished for war crimes, while the vast majority were simply detained during the conflict.

statute is not intend for the judiciary to exercise jurisdiction in such circumstances.

In sum, even if petitioner had not been determined by the United States to be an enemy combatant, the habeas statute's territorial reach would not extend to Bagram under *Rasul*.

## II.    PETITIONER CANNOT INVOKE PROTECTIONS UNDER THE CONSTITUTION

### A.    *Boumediene* Confirms that Petitioner Has No Habeas Rights Protected by the Constitution.

Petitioner next argues that he is entitled to habeas relief under the common law as protected by the Constitution, contending that *Rasul* is controlling on the constitutional question as well, as opposed to *Eisentrager*.  That argument, however, is foreclosed by *Boumediene*. *Boumediene* holds that § 7 of MCA, as applied to aliens captured abroad and detained as enemy combatants in an overseas military base outside the sovereign territory of the United States, does not violate the Suspension Clause of the Constitution.  476 F.3d at 988-992.  This is so not only because "the writ in 1789 would not have been available to aliens held at an overseas military base leased from a foreign government," *id.* at 990-91, but also because "[p]recedent in [the D.C. Circuit] and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States," *id.* at 991.

Specifically, the Court of Appeals recognized *Eisentrager* to be the "controlling precedent," *id.*, because like the military base in Landsberg, Germany, where the petitioners in *Eisentrager* were held, the United States has no sovereignty over Guantanamo.  *Id.*  As for *Rasul*, the Court of Appeals noted that "'[n]ot one of the cases mentioned in *Rasul* held that an alien captured abroad and detained outside the United States—or in 'territory over which the United States exercises exclusive jurisdiction and control,' *Rasul*, 542 U.S. at 475—had a common law .

. . right to the writ of habeas corpus.'" *Id.* at 990 (quoting *Hamdan v. Rumsfeld*, No. 04-1519, 2006 WL 3625015, at *7 (D.D.C. Dec. 13, 2006) (Robertson, J.)). "[T]he observation about common law habeas in *Rasul*," the Court of Appeals noted, "referred to the practice in England, and "[e]ven if there were such a thing as common law jurisdiction in the federal courts, § 2241(e)(1) quite clearly eliminates all 'jurisdiction to hear or consider an application for a writ of habeas corpus' by a detainee, whatever the source of that jurisdiction." *Id.* at 988 n. 5 (quoting 28 U.S.C. § 2241(e)(1)).

Here, petitioner does not, and cannot, contend that Bagram is not a sovereign territory of the United States because "'the determination of sovereignty over an area,' the Supreme Court has held, 'is for the legislative and executive departments.'" *Boumediene*, 476 F.3d at 992 (quoting *Vermilya-Brown Co. v. Connell,* 335 U.S. 377, 380 (1948)); *accord In re Iraq and Afghanistan Detainees Litigation*, No. 06-0145, – F. Supp. 2d –, 2007 WL 926145, *12 (D.D.C. March 27, 2007) . Nevertheless petitioner insists that he is entitled to invoke protections under the Suspension Clause. According to petitioner, *Boumediene* is wrongly decided. This Court, however, must follow controlling Circuit precedent, as Judge Hogan recently did in *In re Iraq and Afghanistan Detainees Litigation*, No. 06-0145, – F. Supp. 2d –, 2007 WL 926145, *9 (D.D.C. March 27, 2007), when dismissing damage claims against DoD officials by foreign nationals previously detained at Bagram and in military facilities in Iraq. As Judge Hogan held, these aliens have no constitutional rights, and the D.C. Circuit's decision in *Boumediene* "removes any doubt about whether this Circuit views the Constitution as conferring any rights on nonresident aliens detained abroad." *Id. Boumediene* is the law of the Circuit, and this Court is bound by it. *Cf. Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 49 (D.C. Cir.

19

1987) ( "[w]hether or not [a prior case's] position on this point is correct . . . this panel is bound

by that position as the law of the circuit"), *vacated in part on other grounds*, 857 F.2d 1516

(D.C. Cir. 1988).

The D.C. Circuit's decision in *Omar v. Harvey*, 479 F.3d 1 (2007), relied on by

petitioner, is not to the contrary.  In that case, the Court of Appeals held that the district court has

jurisdiction over a habeas petition filed on behalf of a U.S. citizen being held in Iraq by U.S.

forces acting as part of the Multi-National Force–Iraq ("MNF-I") and who had not been charged

or convicted by a non-U.S. court.[10]  *Omar* does not involve application of the MCA's

jurisdiction-limiting provision because the habeas petitioner there is a U.S. citizen, and as the

Supreme Court long ago noted in *Eisentrager*, "[c]itizenship as a head of jurisdiction and a

ground of protection was old when Paul invoked it in his appeal to Caesar."  339 U.S. at 770.

Petitioner here, of course, is not a United States citizen .

**B.    Petitioner Has No Due Process Rights That Would Entitle Him to Challenge
the Procedures Used to Determine His Enemy Combatant Status**.

Given that petitioner has no constitutional rights, this Court need not address whether the

enemy combatant status review procedures available in Afghanistan meet constitutional Due

Process requirements or whether they constitute an alternative adequate remedy for purposes of

the Suspension Clause.  Although petitioner complains about the lack of judicial review of the

United States' determination of his enemy combatant status, there is also no constitutional

impediment for Congress to limit judicial review in that fashion.  *See* U.S. Const. Art. III, § 1;

---

[10]    *Compare Omar with Munaf v. Geren*, No. 06-5324, (D.C. Cir. Apr. 6, 2007) (district
court has no power or authority to hear habeas petition by a U.S. citizen held in Iraq by U.S.
forces acting as part of MNF-I because the habeas petitioner has been convicted by an Iraqi
criminal court).

*see also Snyder v. Harris*, 394 U.S. 332, 341-342 (1969) ("If there is a present need to expand the jurisdiction of those courts we cannot overlook the fact that the Constitution specifically vests that power in the Congress, not in the courts."); *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 117 (1981) (Brennan, J., joined by Marshall, Stevens, and O'Connor, JJ., concurring in the judgment) ("it is exclusively Congress' responsibility to determine the jurisdiction of the federal courts").  Congress, moreover, is far better situated than the courts to weigh the significant foreign policy and military ramifications of extending federal jurisdiction over claims of aliens held abroad and to address the myriad of factors that might enter the equation.  In enacting the MCA, Congress decided not to grant judicial review to every alien enemy combatant detained by the United States, and did not limit the jurisdictional provisions of that statute to those who have received CSRTs.[11]  That judgment is not reviewable by this Court in this case.

---

[11]  *Cf.* 152 Cong. Rec. S10270-71 (daily ed. September 27, 2006) (statement of Sen. Kyl)("Because the military, in response to criticism of Guantanamo, started giving everyone at Guantanamo a CSRT hearing, these critics contend, it should be compelled to do so for all future detainees, and for all future wars. . . .  This the Armed Services committees and this Congress declined to do.  Aside from the fact that these detainees, aliens all, are not entitled to CSRTs or any Article 5 type hearing under the Geneva Convention, it would be absurdly impractical to require the military to provide such hearings in all future conflicts.  Consider, for example, the case of World War II.  As I mentioned earlier, the United states detained over 2,000,000 enemy combatants during that conflict.  How on earth could we possibly expect the military to conduct CSRTs for 2 million people?  And how could the DC Circuit be expected to handle 2 million appeals from CSRTs, even under the de minims facial challenge authorized by the DTA?  It is simply inconceivable.").

## CONCLUSION

For the foregoing reasons, this Court should dismiss this petition for want of jurisdiction.


Dated: April 20, 2007                          Respectfully submitted,

                                               PETER D. KEISLER
                                               Assistant Attorney General

                                               DOUGLAS N. LETTER
                                               Terrorism Litigation Counsel

                                               ___/s/___Jean Lin_____
                                               JOSEPH H. HUNT (D.C. Bar No. 431134)
                                               VINCENT M. GARVEY (D.C. Bar No. 127191)
                                               JUDRY L. SUBAR (D.C. Bar No. 347518)
                                               JEAN LIN
                                               Attorneys
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               20 Massachusetts Ave., N.W.
                                               Washington, DC  20530
                                               Tel:  (202) 514-3716
                                               Fax:  (202) 616-8470
                                               Attorneys for Respondents

22

Exhibit 1

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 05-5194**                    **September Term, 2006**

**04cv02022**

**Filed On: April 9, 2007** [1033613]

Saifullah Paracha, Detainee, Guantanamo Bay Naval
Station and Farhat Paracha, Next Friend,
    Appellants

    v.

George W. Bush, Jr., et al.,
    Appellees

_____

Consolidated with 05-5211, 05-5333

_____

    06-1038

Saifullah Paracha,
    Petitioner

    v.

Robert M. Gates, Secretary of Defense,
    Respondent

_____

    06-1117

Saifullah Paracha,
    Petitioner

    v.

Robert M. Gates, Secretary of Defense,
    Respondent

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 05-5194**                              **September Term, 2006**

**BEFORE:**    Ginsburg, Chief Judge, Randolph, Circuit Judge, and Edwards,
Senior Circuit Judge

## O R D E R

Upon consideration of the motion of respondents-appellees to govern future proceedings and to dismiss Nos. 05-5194, 05-5211, and 05-5333, to proceed with petition for review No. 06-1038, and to dismiss No. 06-1117; and the motion of petitioner-appellant to consider and grant his dispositive motion, it is

**ORDERED** that the motion of petitioner-appellant to consider and grant his dispositive motion in all of his cases be denied without prejudice to any claims raised by petitioner in No. 06-1038. It is

**FURTHER ORDERED** that Nos. 05-5194 and 05-5333 be remanded to the district court with instructions to dismiss the petitions for writ of habeas corpus for lack of jurisdiction. See Boumediene v. Bush, 476 F.3d 981 (D.C. Cir. 2007), cert. denied, ___ S.Ct. ___, 2007 WL 957363 (April 2, 2007) (No. 06-1195, 06-1196). It is

**FURTHER ORDERED** that No. 05-5211 be dismissed as moot without prejudice to any claims raised by petitioner in No. 06-1038. It is

**FURTHER ORDERED** that petitioner's motions relating to conditions of his confinement be dismissed. The court lacks jurisdiction to consider these claims. See 28 U.S.C. § 2241(e); Section 7(a) of the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006). It is

**FURTHER ORDERED** that No. 06-1117 be dismissed. The court lacks jurisdiction to review Administrative Review Board determinations. See Sections 1005(e)(2)(A), (e)(3)(A) of the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 (2005). It is

**FURTHER ORDERED** that the following briefing schedule apply in No. 06-1038:

| | |
|---|---|
| Brief for Petitioner | July 16, 2007 |
| Appendix | July 16, 2007 |
| Brief for Respondent | August 15, 2007 |
| Reply Brief for Petitioner | August 31, 2007 |

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 05-5194**                    **September Term, 2006**

The parties are directed to take into account the court's disposition of No. 06-1197, Bismullah v. Gates, and No. 06-1397, Parhat v. Gates (scheduled for argument on May 15, 2007), in addressing issues related to discovery and this court's scope of review. The court will not entertain any motions for extension of time to file briefs but may permit supplemental briefing if No. 06-1197 and No. 06-1397 are decided after completion of briefing in No. 06-1038. The briefs and appendix are to be filed and served by hand by 4:00 p.m. on the date each is due. It is

**FURTHER ORDERED** that No. 06-1038 be scheduled for oral argument on September 17, 2007, at 9:30 a.m. before Chief Judge Ginsburg, Circuit Judge Randolph, and Senior Circuit Judge Edwards. The time and date of oral argument will not change absent further order of the court. The parties will be notified by separate order of the allocation of time for oral argument.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate in Nos. 05-5194, 05-5333, and 06-1117 until seven days after disposition of any timely petition for rehearing or rehearing en banc. See Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

**Per Curiam**

FOR THE COURT:
Mark J. Langer, Clerk

BY:

Deputy Clerk

Page 3

**Exhibit 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FADI AL MAQALEH,<br><br>                    Petitioner,<br><br>          v.<br><br>ROBERT GATES,<br>     Secretary, United Stated Department of<br>     Defense, *et al.*,<br><br>                    Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 06-CV-01669 (JDB)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### SECOND DECLARATION OF COLONEL JAMES W. GRAY

I, Colonel James W. Gray, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I currently serve as Commander of Task Force Guardian, Combined/Joint Task Force Force-82 ("CJTF-82"), as well as Commander of Detention Operations, CJTF-82. The statements in this declaration are based upon my personal knowledge and upon information made available to me in the performance of my official duties. I previously have submitted a declaration in the above-captioned case.

2. Petitioner Fadi Al Maqaleh was captured in Afghanistan on 10 September 2004 .

3. The Enemy Combatant Review Board ("ECRB") last reviewed his enemy combatant

1

status on 1 March 2007. Following that review, his status as an enemy combatant was validated.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __19__ April 2007.

Colonel James W. Gray
Colonel, U.S. Army
Commander, Task Force Guardian

Commander of Detention Operations
Combined / Joint Task Force-82

2

**Exhibit 3**

JUN. 17. 2004  2:27PM    LEGAL                                    NO. 499    P. 2

UNCLASSIFIED

### THE WHITE HOUSE

WASHINGTON

February 7, 2002

MEMORANDUM FOR THE VICE PRESIDENT
THE SECRETARY OF STATE
THE SECRETARY OF DEFENSE
THE ATTORNEY GENERAL
CHIEF OF STAFF TO THE PRESIDENT
DIRECTOR OF CENTRAL INTELLIGENCE
ASSISTANT TO THE PRESIDENT FOR NATIONAL
        SECURITY AFFAIRS
CHAIRMAN OF THE JOINT CHIEFS OF STAFF

SUBJECT:        Humane Treatment of al Qaeda and Taliban Detainees

1.    Our recent extensive discussions regarding the status
      of al Qaeda and Taliban detainees confirm that the appli-
      cation of the Geneva Convention Relative to the Treatment
      of Prisoners of War of August 12, 1949 (Geneva) to the
      conflict with al Qaeda and the Taliban involves complex
      legal questions.  By its terms, Geneva applies to conflicts
      involving "High Contracting Parties," which can only be
      states.  Moreover, it assumes the existence of "regular"
      armed forces fighting on behalf of states.  However, the
      war against terrorism ushers in a new paradigm, one in
      which groups with broad, international reach commit horrific
      acts against innocent civilians, sometimes with the direct
      support of states.  Our Nation recognizes that this new
      paradigm -- ushered in not by us, but by terrorists --
      requires new thinking in the law of war, but thinking that
      should nevertheless be consistent with the principles of
      Geneva.

2.    Pursuant to my authority as Commander in Chief and Chief
      Executive of the United States, and relying on the opinion
      of the Department of Justice dated January 22, 2002, and on
      the legal opinion rendered by the Attorney General in his
      letter of February 1, 2002, I hereby determine as follows:

      a.    I accept the legal conclusion of the Department of
            Justice and determine that none of the provisions
            of Geneva apply to our conflict with al Qaeda in
            Afghanistan or elsewhere throughout the world because,
            among other reasons, al Qaeda is not a High Contracting
            Party to Geneva.

      b.    I accept the legal conclusion of the Attorney General
            and the Department of Justice that I have the authority
            under the Constitution to suspend Geneva as between
            the United States and Afghanistan, but I decline to

NSC DECLASSIFICATION REVIEW [E.O. 12958 as amended]
DECLASSIFIED IN FULL ON 6/17/2004
by R.Soubers

Reason:  1.5 (d)
Declassify on:  02/07/12

UNCLASSIFIED

JUN. 17. 2004  2:27PM    LEGAL

NO. 444    P. 3

UNCLASSIFIED

2

exercise that authority at this time. Accordingly, I determine that the provisions of Geneva will apply to our present conflict with the Taliban. I reserve the right to exercise this authority in this or future conflicts.

c.  I also accept the legal conclusion of the Department of Justice and determine that common Article 3 of Geneva does not apply to either al Qaeda or Taliban detainees, because, among other reasons, the relevant conflicts are international in scope and common Article 3 applies only to "armed conflict not of an international character."

d.  Based on the facts supplied by the Department of Defense and the recommendation of the Department of Justice, I determine that the Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war under Article 4 of Geneva. I note that, because Geneva does not apply to our conflict with al Qaeda, al Qaeda detainees also do not qualify as prisoners of war.

3.  Of course, our values as a Nation, values that we share with many nations in the world, call for us to treat detainees humanely, including those who are not legally entitled to such treatment. Our Nation has been and will continue to be a strong supporter of Geneva and its principles. As a matter of policy, the United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva.

4.  The United States will hold states, organizations, and individuals who gain control of United States personnel responsible for treating such personnel humanely and consistent with applicable law.

5.  I hereby reaffirm the order previously issued by the Secretary of Defense to the United States Armed Forces requiring that the detainees be treated humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva.

6.  I hereby direct the Secretary of State to communicate my determinations in an appropriate manner to our allies, and other countries and international organizations cooperating in the war against terrorism of global reach.



UNCLASSIFIED

**Exhibit 4**




**SECRET//NOFORN**
**UNCLASSIFIED WHEN SEPARATED FROM ENCLOSURE 2**
THE UNDER SECRETARY OF DEFENSE
2000 DEFENSE PENTAGON
WASHINGTON, DC  20301-2000

POLICY

AUG 1 0 2006

The Honorable James Sensenbrenner, Jr.
Chairman, House Committee on the Judiciary
United States House of Representatives
Washington, DC  20515

Dear Chairman Sensenbrenner:

Please find enclosed the Department of Defense's report (Enclosures 1 and 2) on the review process for aliens in the custody of the Department of Defense outside the United States and on the training of Iraqi Security forces regarding treatment of detainees, consistent with Sections 1405(a)(1), 1405(c), and Section 1406(c) of the Detainee Treatment Act of 2005, Public Law Number 109-163, Title XIV.  Additional information that is classified can be found in Enclosure 2.

I look forward to providing your Committee the annual report regarding implementation and reporting requirements pursuant to Sections 1405(d) and 1406(d).

Sincerely,

Eric S. Edelman

Enclosure: As stated.

cc: The Honorable John Conyers, Jr.
    Ranking Member

**SECRET//NOFORN**
**UNCLASSIFIED WHEN SEPARATED**
**FROM ENCLOSURE 2**



Derived from: Multiple Sources
Reasons: 1.5 (a)(c) & (d)

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

ENCLOSURE (1)

This enclosure is submitted to the Senate Committee on Armed Services, the Senate Committee on the Judiciary, the House Committee on Armed Services, and the House Committee on the Judiciary to satisfy the requirements set forth in The Detainee Treatment Act of 2005, Pub. L. No. 109-163, Title XIV (herein referred to as "the Act" or the "DTA").

## Procedures for Status Review of Detainees held in Guantanamo Bay, Cuba

In regard to section 1405(a)(1)(A):

The Department of Defense provides you at Tab A copies of the revised Combatant Status Review Tribunal (CSRT) and the revised Administrative Review Board (ARB) procedures currently in effect at Guantanamo Bay, Cuba. The CSRT process is a formal review of all available information related to a detainee to determine whether each person meets the criteria to be designated as an enemy combatant. The ARB process is an annual review to determine the need to continue the detention of an enemy combatant. In tandem, these processes satisfy the requirements of the Act.

In regard to section 1405(a)(3) regarding consideration of new evidence:

CSRT/ARB procedures were amended to be consistent with Section 1405(a)(3) of the DTA. The documents in Tab A are the current guidance/policy for the CSRT/ARB proceedings. This letter and its attachments are intended to provide the notice under Section 1405(c) as to modification of the CSRT and ARB procedures.

In regard to policy/procedure changes pursuant to section 1405(a)(2):

In response to the requirements of section 1405(a)(2), the Department would note that on June 23, 2004, the Secretary of Defense appointed then Secretary of the Navy Gordon England as the Designated Civilian Official (DCO). At the time of Mr. England's appointment, he was holding an office to which appointments are required by law to be made by the President, by and with the advice and consent of the Senate. Mr. England currently serves as the Deputy Secretary of Defense, an office to which appointments are required by law to be made by the President, by and with the advice and consent of the Senate. Current guidance and policies on the appointment of the DCO conform with the requirements of the Act.

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

In regard to section 1405(b)(1) concerning assessments whether any statement derived from or relating to detainees was obtained as a result of coercion:

CSRT/ARB procedures were amended to be consistent with Section 1405(b)(1) of the DTA. The documents at Tab A are the current guidance/policy for the CSRT/ARB proceedings. This letter and its attachments are intended to provide the notice under Section 1405(c) as to modification of the CSRT and ARB procedures.

## Procedures for Status Review of Detainees held in Afghanistan

In regard to Section 1405 (a)(1)(B):

*Detainee Status Determination Procedures:*

The Secretary of Defense has issued "Global Screening Criteria for Detainees," a classified document, providing guidance to Commander, U.S. Central Command (USCENTCOM) for determining the status of persons detained by U.S, forces in Afghanistan. The Secretary's guidance provides:

Unless otherwise directed by the Secretary of defense, within 90 days of a detainee being brought under DoD control, the detaining combatant commander, or his designee, shall review the initial determination that the detainee is an enemy combatant (EC). Such review shall be made based upon all available and relevant information available on the date of review and may be subject to further review based upon newly discovered evidence or information.

The detaining combatant commander or his designee shall produce a written assessment regarding the detainee's EC status based upon his review of all available and relevant information concerning the detainee. The review shall be administrative in nature and shall not be deemed to create any right, benefit, or privilege, substantive or procedural, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person. The detaining combatant commander shall be guided by the following:

(a) The detaining combatant commander shall consider all relevant and reasonably available information, including any new information that has been identified since the initial status determination.

(b) If necessary to make a proper review, the detaining combatant commander may interview witnesses, provided they are reasonably

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED FROM ENCLOSURE 2

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

available and such interviews would not affect combat, intelligence gathering, law enforcement or support operations.

(c) The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination.

After the initial 90-day status review, the detaining combatant commander shall, on an annual basis, reassess the status of each detainee.

If, as a result of a periodic EC review (90-day or annual), a detaining combatant commander concludes that a detainee may no longer meet the definition of an EC, the detaining combatant commander shall identify the detainee for possible release or transfer as appropriate.

Enclosure (2) sets forth the procedures in implementation of the Secretary's guidance for determination of the status of detainees in Afghanistan.

## Procedures for Status Review of Detainees held in Iraq

In regard to Section 1405 (a)(1)(B):

*Overview*

Review of a detainee's status occurs at several different levels – initially at brigade and division unit levels, then at a theater internment facility, and then by the joint U.S. –Iraqi Combined Review and Release Board (CRRB).

○ If a capturing unit decides to detain an individual, an initial review of a detainee's status is conducted at the brigade or division level by a detention review authority. The detention review authority reviews the supporting documentation and information regarding the detainee to determine if detention of the individual is necessary for imperative reasons of security.

▪ If the detention review authority determines that detention of an individual is not necessary for imperative reasons of security, then the detention review authority will recommend that the individual be released.

○ After a detainee arrives at a theater internment facility (TIF), a military magistrate conducts another review of the individual's status. The

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

military magistrate likewise reviews the supporting documentation and information regarding the detainee to determine if detention of the individual is necessary for imperative reasons of security.

- If the military magistrate determines that detention of an individual is not necessary for imperative reasons of security, then the military magistrate will recommend that the individual be released.

- If the military magistrate determines that the individual should continue to be detained for imperative reasons of security, then written notice will be provided to the detainee informing him or her of the basis for detention and the right to appeal the status determination. If the detainee exercises the right by providing a written statement of appeal, the statement will be included in the detainee's case file for consideration by the CRRB.

o Following magistrate review, a detainee's status is reviewed on a regular basis, at least every six months, by the CRRB.

- After reviewing a detainee's status, the CRRB may recommend release, conditional release, or continued internment of the detainee for imperative reasons of security.

- With respect to individuals detained after June 28, 2004, Coalition Provision Authority (CPA) Memorandum No. 3 (Revised) provides that the Joint Detainee Committee (established under CPA Order No. 99) must approve detention of such individuals extending beyond 18 months from the date of their induction into an MNF internment facility.

o Where sufficient evidence exists, some detainees are referred for prosecution in the Central Criminal Court of Iraq.

- Detainees referred to the CCCI have a hearing before an Iraqi investigative judge who determines whether such individuals should proceed to trial in the CCCI for criminal wrongdoing.

## Training of Iraqi Security Forces Regarding Treatment of Detainees

Section 1406(a)(1) provides that the Secretary of Defense shall prescribe policies designed to ensure that all military and civilian DoD personnel or contractor personnel of the Department responsible for the training of Iraqi

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED FROM ENCLOSURE 2

4

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

Security Forces (ISF) provide training to such units regarding international obligations and laws applicable to the humane treatment of detainees, including protections afforded under the Geneva Conventions and the Convention Against Torture. Section 1406(c) provides that not less than 30 days after the date on which such policies are first prescribed, the Secretary of Defense shall submit to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives copies of such regulations, policies, or orders, together with a report on steps taken to the date of the report to implement Section 1406.

The Deputy Secretary of Defense provided written guidance to Commander, USCENTCOM directing that such training be provided. USCENTCOM has confirmed that, prior to enactment of the Act, the Department was already engaged in Iraqi Security Forces training activities that are consistent with the requirements of the Act, as more fully explained below.

Training of the ISF is a critical step to ensuring the safety, security, and stability of a free Iraq. All Multi-National Force-Iraq training of Iraqi Security forces is conducted and organized by the Multi-National Security Transition Command-Iraq (MNSTC-I). Its mission is to organize, train, equip, and mentor Iraqi Security Forces, in order to support Iraq's ultimate goal of a unified, stable and democratic Iraq, which provides a representative government for the Iraqi people; is underpinned by new and protected freedoms for all Iraqis and a growing market economy; and is able to defend itself and not pose a threat to the region. Moreover, part of MNSTC-I's mission is to ensure that the rule of law and human rights are a cornerstone of its program for training Iraqi Security Forces.

The Coalition Military Assistant Training Team (CMATT) division within MNSTC-I is primarily responsible for the training of ISF forces on the areas relevant to the Detainee Treatment Act. It has established a training academy, the Iraqi Military Academy Al Rustamiyah (IMAR), for the training of ISF and other Iraqi forces.

The curriculum includes topics such as: leadership, doctrine, principles of war, marksmanship, map reading and navigation, tactics, signals/communications, management, state and international affairs, human rights and civil affairs, military geography and more.

The curriculum is founded on the following principles:

o  Respect for Iraqi democracy
o  Respect for human rights

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED FROM ENCLOSURE 2

5

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

o   Integration of all elements of Iraqi society
o   An intellectual and academic approach to training, in addition to the
    military leadership training

Additional information is available on the MNSTCI website at
http://www.mnstci.iraq.centcom.mil/index.htm

For general information about MNFI training:
http://www.mnf-iraq.com/training.htm

**Exhibit 5**

CERTIFICATION OF TRUE COPY

Transitional Islamic State of Afghanistan  )
                                           )
City and Province of Kabul                 )  ss:
                                           )
Embassy of the United States of America    )

      I certify that the annexed document is a true and faithful copy of the original, and that it has been carefully examined by me, compared with said original, and found to agree with it word for word and figure for figure.

      The original was delivered to the Ministry of Foreign Affairs of the Transitional Islamic State of Afghanistan on September 26, 2002.

Amber M. Baskette

Consul of the United States of America

November 14, 2002





*Embassy of the United States of America*

## *DIPLOMATIC NOTE*

No. 202

The Embassy of the United States of America presents it compliments to the Ministry of Foreign Affairs of the Islamic Transitional Government of Afghanistan, and has the honor to refer to discussions between representatives of our two governments regarding issues related to United States military and civilian personnel of the United States Department of Defense who may be present in Afghanistan in connection with cooperative efforts in response to terrorism, humanitarian and civic assistance, military training and exercises, and other activities.

The Embassy proposes, without prejudice to the conduct of ongoing military operations by the United States, that such personnel be accorded a status equivalent to that accorded to the administrative and technical staff of the Embassy of the United States of America under the Vienna Convention on Diplomatic Relations of April 18, 1961; that United States personnel be permitted to enter and exit Afghanistan with United States identification and with collective movement or individual travel orders; that Afghan authorities shall accept as valid, without a driving fee or test, driving licenses or permits issued by the appropriate United States authorities to United States personnel for the operation of vehicles; and that such personnel be authorized to wear uniforms while performing official duties and to carry weapons when their orders call for it.

The Embassy further proposes that vehicles and aircraft owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan; however, the United States armed forces shall pay reasonable charges for services requested and received. Aircraft and vehicles of the United States shall be free of inspections.

The Government of the United States of America, its military and civilian personnel, contractors and contractor personnel shall not be liable to pay any tax or similar charge assessed within Afghanistan.

The Government of the United States of America, its military and civilian personnel, contractors and contractor personnel may import into, export out of, and use in the Republic of Afghanistan any personal property, equipment, supplies, materials, technology, training or services required to implement this agreement. Such importation, exportation and use shall be exempt from any inspection, license, other restrictions, customs duties, taxes or any other charges assessed within Afghanistan. The governments of the United States of America and Afghanistan shall cooperate in taking such steps as shall be necessary to ensure the security of United States personnel and property in Afghanistan.

In the event that the government of the United States of America awards contracts for the acquisition of articles and services, including construction, such contracts shall be awarded in accordance with the laws and regulations of the Government of the United States of America. Acquisition of articles and services in the republic of Afghanistan by or on behalf of the Government of the United States of America in implementing this agreement shall not be subject to any taxes, customs duties or similar charges in Afghanistan.

The Government of Afghanistan recognizes the particular importance of disciplinary control by United States military authorities over United States personnel and, therefore, Afghanistan authorizes the United States Government to exercise criminal jurisdiction over United States personnel. The Government of Afghanistan and the Government of the United States of America confirm that such personnel may not be surrendered to, or otherwise transferred to, the custody of an international tribunal or any other entity or state without the express consent of the Government of the United States.

The Government of Afghanistan recognizes that it shall be necessary for United States personnel and systems to use the radio spectrum. The United States Government shall be allowed to operate its own telecommunication systems (as telecommunication is defined in the 1992 Constitution of the International Telecommunication Union). This shall include the right to utilize such means and services as required to assure full ability to operate telecommunication systems, and the right to use all necessary radio spectrum for this purpose. Use of radio spectrum shall be free of cost.

Finally, the Embassy proposes that, other than contractual claims, the parties waive any and all claims against each other for damage to, or loss or destruction of, property owned by each party, or death or injury to any military or civilian personnel of the armed forces of either party, arising out of activities in Afghanistan under this agreement. Claims by third parties arising out of the acts or omissions of any United States personnel may, at the discretion of the United States Government, be dealt with and settled by the United States Government in accordance with United States law.

If the foregoing is acceptable to the Government of Afghanistan, the Embassy proposes that this note, together with the Ministry's reply to that effect, shall constitute an agreement between the two governments which shall enter into force on the date of the Ministry's reply.

The Embassy of the United States of America avails itself of this opportunity to renew to the Ministry of Foreign Affairs of the Transitional Islamic Government of Afghanistan the assurances of its highest consideration.

Embassy of the United States of America

Kabul, September 26, 2002



Transitional Islamic State of Afghanistan
Ministry of Foreign Affairs

[SEAL]

America and Canada Political Affairs Division

Document No. 93
Date: May 28, 2003

To the Embassy of the United States of America in Kabul:

Pursuant to Note No. 791, dated December 12, 2002, regarding the conclusion of an agreement for application of the provisions of the 1961 Vienna Convention to the civilian and military personnel of the United States Department of Defense present in Afghanistan for the useful campaign against terrorism, humanitarian assistance, and other activities, the Ministry of Foreign Affairs declares its concurrence with the terms of Note No. 202, dated September 26, 2002, which reads as follows.

(The Embassy of the United States of America without prejudice to the ongoing military operations by the United States, proposes that such personnel be given the status equivalent to the one given to the administrative and technical staff of the United States Embassy under the Vienna Convention on Diplomatic Relations of April 18, 1961; that the personnel of the United States be permitted to enter and exit Afghanistan with United States identification and with collective movement or individual travel orders; that Afghan authorities shall accept as valid, without a driving fee or test, the licenses and permits issued by the appropriate authorities of the United States to the personnel of the United States for operating vehicles; and that while performing official duties, the personnel should be authorized to wear uniforms and carry weapons when needed.

The Embassy also proposes that vehicles and airplanes owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan. However, the United States armed forces shall pay reasonable charges for service requested or received. US planes and vehicles of the United States shall be free of inspection.

The Government of the United States, its military and civilian personnel, contractors and contractor personnel shall not be liable for any kind of tax or other similar fees assessed within Afghanistan.

The Government of the United States, its military and civilian personnel, contractors and contractors personnel may import and export any personal property, equipment, supplies, materials, technology, training services that are required for the implementation of this agreement and use them in Afghanistan. Such importation, exportation and use should be exempt from any inspection, license, other limitations, tariffs or any other rental charges assessed in Afghanistan. If necessary, the Governments

of the United States and Afghanistan shall cooperate for takings steps to ensure the security of the United States personnel and property in Afghanistan.

If at any time the Government of the United States of America awards contracts to acquire materials and services, including construction, they should be awarded in accordance with the law and regulations of the Government of the United States. The acquisition of material and services in Afghanistan by the Government of the United States of America or on its behalf in implementation of this agreement shall not be subject to any taxes, tariffs or similar charges in Afghanistan.

The government of Afghanistan recognizes the particular importance of disciplinary control by the United States military authorities over United States personnel and the Government of Afghanistan authorizes the United States of America to exercise its criminal jurisdiction over the personnel of the United States. The Government of Afghanistan and the Government of the United States confirms that without the explicit consent of the Government of the United States, such personnel may not be surrendered to, or otherwise transferred to the custody of an international tribunal or any other entity or State.

The Government of Afghanistan recognizes the right of use of the radio spectrum for the personnel and systems of the United States. The United States shall be allowed to operate its own telecommunication systems (as defined in the constitution of the International Telecommunication Union). This shall include the right to use such means and services as required, assuring full ability to operate telecommunication systems, and the right to use all necessary radio spectrum for this purpose. Use of the radio spectrum shall be free of cost.

Finally the Embassy proposes that, other than contractual claims, the parties waive any and all claims against each other for damage to or loss or destruction of property owned by either party, or death or injury to any military or civilian personnel of the armed forces of either party, as a result of activities in Afghanistan under this agreement. Claims by third parties that will arise as a result of the actions or omissions of United States personnel should, at the discretion of the United States Government, be dealt with and settled in accordance with United States law).

With reference to the content of the above Note of the esteemed Embassy, the Ministry of Foreign Affairs declares that this document shall enter into force upon signature.

Respectfully,

[Signature]

Doctor Abdullah
Minister of Foreign Affairs of the
Transitional Islamic State of Afghanistan

Transitional Islamic State of Afghanistan
Ministry of Foreign Affairs

[SEAL]

Fifth Political Department

Document No. 791
Date: December 12, 2002

## Note

The Ministry of Foreign Affairs of the Transitional Islamic Government of Afghanistan respectfully informs the Embassy of the United States of America:

Following the negotiations between the Honorable Minister of Foreign Affairs and the American side that took place in Washington, the Ministry of Foreign Affairs declares its concurrence with the content of Note No. 202 dated, September 26, 2002, of the esteemed Embassy regarding the application of the provisions of the 1961 Vienna Convention to the civilian and military personnel of the United States of America.

The Ministry of Foreign Affairs avails itself of this opportunity to reiterate the assurances of its consideration.

[Stamp of the Ministry of Foreign Affairs]

To the Embassy of the United States of America in Kabul