**Exhibit 1**

Dockets.Justia.com

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 05-5194**                    **September Term, 2006**

**04cv02022**

**Filed On: April 9, 2007** [1033613]

Saifullah Paracha, Detainee, Guantanamo Bay Naval
Station and Farhat Paracha, Next Friend,
      Appellants

     v.

George W. Bush, Jr., et al.,
      Appellees

—————————————————————

Consolidated with 05-5211, 05-5333

———

06-1038

———

Saifullah Paracha,
      Petitioner

     v.

Robert M. Gates, Secretary of Defense,
      Respondent

———

06-1117

———

Saifullah Paracha,
      Petitioner

     v.

Robert M. Gates, Secretary of Defense,
      Respondent

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 05-5194**                                              **September Term, 2006**

**BEFORE:**    Ginsburg, Chief Judge, Randolph, Circuit Judge, and Edwards,
                      Senior Circuit Judge

## O R D E R

Upon consideration of the motion of respondents-appellees to govern future
proceedings and to dismiss Nos. 05-5194, 05-5211, and 05-5333, to proceed with
petition for review No. 06-1038, and to dismiss No. 06-1117; and the motion of
petitioner-appellant to consider and grant his dispositive motion, it is

**ORDERED** that the motion of petitioner-appellant to consider and grant his
dispositive motion in all of his cases be denied without prejudice to any claims raised by
petitioner in No. 06-1038. It is

**FURTHER ORDERED** that Nos. 05-5194 and 05-5333 be remanded to the
district court with instructions to dismiss the petitions for writ of habeas corpus for lack
of jurisdiction. See Boumediene v. Bush, 476 F.3d 981 (D.C. Cir. 2007), cert. denied,
___ S.Ct. ___, 2007 WL 957363 (April 2, 2007) (No. 06-1195, 06-1196). It is

**FURTHER ORDERED** that No. 05-5211 be dismissed as moot without prejudice
to any claims raised by petitioner in No. 06-1038. It is

**FURTHER ORDERED** that petitioner's motions relating to conditions of his
confinement be dismissed. The court lacks jurisdiction to consider these claims. See
28 U.S.C. § 2241(e); Section 7(a) of the Military Commissions Act of 2006, Pub. L. No.
109-366, 120 Stat. 2600 (2006). It is

**FURTHER ORDERED** that No. 06-1117 be dismissed. The court lacks
jurisdiction to review Administrative Review Board determinations. See Sections
1005(e)(2)(A), (e)(3)(A) of the Detainee Treatment Act of 2005, Pub. L. No. 109-148,
119 Stat. 2680 (2005). It is

**FURTHER ORDERED** that the following briefing schedule apply in No. 06-1038:

| | |
|---|---|
| Brief for Petitioner | July 16, 2007 |
| Appendix | July 16, 2007 |
| Brief for Respondent | August 15, 2007 |
| Reply Brief for Petitioner | August 31, 2007 |

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 05-5194**                          **September Term, 2006**

The parties are directed to take into account the court's disposition of No. 06-1197, Bismullah v. Gates, and No. 06-1397, Parhat v. Gates (scheduled for argument on May 15, 2007), in addressing issues related to discovery and this court's scope of review. The court will not entertain any motions for extension of time to file briefs but may permit supplemental briefing if No. 06-1197 and No. 06-1397 are decided after completion of briefing in No. 06-1038. The briefs and appendix are to be filed and served by hand by 4:00 p.m. on the date each is due. It is

**FURTHER ORDERED** that No. 06-1038 be scheduled for oral argument on September 17, 2007, at 9:30 a.m. before Chief Judge Ginsburg, Circuit Judge Randolph, and Senior Circuit Judge Edwards. The time and date of oral argument will not change absent further order of the court. The parties will be notified by separate order of the allocation of time for oral argument.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate in Nos. 05-5194, 05-5333, and 06-1117 until seven days after disposition of any timely petition for rehearing or rehearing en banc. See Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Deputy Clerk

**Exhibit 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FADI AL MAQALEH,<br><br>     Petitioner,<br><br>    v.<br><br>ROBERT GATES,<br> Secretary, United Stated Department of<br> Defense, *et al.*,<br><br>     Respondents. | Civil Action No. 06-CV-01669 (JDB) |

## SECOND DECLARATION OF COLONEL JAMES W. GRAY

I, Colonel James W. Gray, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

 1. I currently serve as Commander of Task Force Guardian, Combined/Joint Task Force Force-82 ("CJTF-82"), as well as Commander of Detention Operations, CJTF-82. The statements in this declaration are based upon my personal knowledge and upon information made available to me in the performance of my official duties. I previously have submitted a declaration in the above-captioned case.

 2. Petitioner Fadi Al Maqaleh was captured in Afghanistan on 10 September 2004 .

 3. The Enemy Combatant Review Board ("ECRB") last reviewed his enemy combatant

status on 1 March 2007. Following that review, his status as an enemy combatant was validated.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___19___ April 2007.

Colonel James W. Gray
Colonel, U.S. Army
Commander, Task Force Guardian

Commander of Detention Operations
Combined / Joint Task Force-82

2

**Exhibit 3**

JUN. 17. 2004  2:27PM     LEGAL                                    NO. 499    r. 2

UNCLASSIFIED

*THE WHITE HOUSE*

*WASHINGTON*

February 7, 2002

MEMORANDUM FOR THE VICE PRESIDENT
              THE SECRETARY OF STATE
              THE SECRETARY OF DEFENSE
              THE ATTORNEY GENERAL
              CHIEF OF STAFF TO THE PRESIDENT
              DIRECTOR OF CENTRAL INTELLIGENCE
              ASSISTANT TO THE PRESIDENT FOR NATIONAL
                  SECURITY AFFAIRS
              CHAIRMAN OF THE JOINT CHIEFS OF STAFF

SUBJECT:     Humane Treatment of al Qaeda and Taliban Detainees

1.  Our recent extensive discussions regarding the status
    of al Qaeda and Taliban detainees confirm that the appli-
    cation of the Geneva Convention Relative to the Treatment
    of Prisoners of War of August 12, 1949 (Geneva) to the
    conflict with al Qaeda and the Taliban involves complex
    legal questions. By its terms, Geneva applies to conflicts
    involving "High Contracting Parties," which can only be
    states. Moreover, it assumes the existence of "regular"
    armed forces fighting on behalf of states. However, the
    war against terrorism ushers in a new paradigm, one in
    which groups with broad, international reach commit horrific
    acts against innocent civilians, sometimes with the direct
    support of states. Our Nation recognizes that this new
    paradigm -- ushered in not by us, but by terrorists --
    requires new thinking in the law of war, but thinking that
    should nevertheless be consistent with the principles of
    Geneva.

2.  Pursuant to my authority as Commander in Chief and Chief
    Executive of the United States, and relying on the opinion
    of the Department of Justice dated January 22, 2002, and on
    the legal opinion rendered by the Attorney General in his
    letter of February 1, 2002, I hereby determine as follows:

    a.  I accept the legal conclusion of the Department of
        Justice and determine that none of the provisions
        of Geneva apply to our conflict with al Qaeda in
        Afghanistan or elsewhere throughout the world because,
        among other reasons, al Qaeda is not a High Contracting
        Party to Geneva.

    b.  I accept the legal conclusion of the Attorney General
        and the Department of Justice that I have the authority
        under the Constitution to suspend Geneva as between
        the United States and Afghanistan, but I decline to

NSC DECLASSIFICATION REVIEW [E.O. 12958 as amended]
DECLASSIFIED IN FULL ON 6/17/2004
by R.Soubers

Reason:  1.5 (d)
Declassify on:  02/07/12

UNCLASSIFIED

JUN. 17. 2004  2:27PM    LEGAL

NO. 444    P. 2

UNCLASSIFIED

2

exercise that authority at this time. Accordingly, I determine that the provisions of Geneva will apply to our present conflict with the Taliban. I reserve the right to exercise this authority in this or future conflicts.

    c.    I also accept the legal conclusion of the Department of Justice and determine that common Article 3 of Geneva does not apply to either al Qaeda or Taliban detainees, because, among other reasons, the relevant conflicts are international in scope and common Article 3 applies only to "armed conflict not of an international character."

    d.    Based on the facts supplied by the Department of Defense and the recommendation of the Department of Justice, I determine that the Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war under Article 4 of Geneva. I note that, because Geneva does not apply to our conflict with al Qaeda, al Qaeda detainees also do not qualify as prisoners of war.

3.    Of course, our values as a Nation, values that we share with many nations in the world, call for us to treat detainees humanely, including those who are not legally entitled to such treatment. Our Nation has been and will continue to be a strong supporter of Geneva and its principles. As a matter of policy, the United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva.

4.    The United States will hold states, organizations, and individuals who gain control of United States personnel responsible for treating such personnel humanely and consistent with applicable law.

5.    I hereby reaffirm the order previously issued by the Secretary of Defense to the United States Armed Forces requiring that the detainees be treated humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva.

6.    I hereby direct the Secretary of State to communicate my determinations in an appropriate manner to our allies, and other countries and international organizations cooperating in the war against terrorism of global reach.



UNCLASSIFIED

**Exhibit 4**

**SECRET//NOFORN**
**UNCLASSIFIED WHEN SEPARATED FROM ENCLOSURE 2**
THE UNDER SECRETARY OF DEFENSE
2000 DEFENSE PENTAGON
WASHINGTON, DC 20301-2000





POLICY

AUG 1 0 2006

The Honorable James Sensenbrenner, Jr.
Chairman, House Committee on the Judiciary
United States House of Representatives
Washington, DC 20515

Dear Chairman Sensenbrenner:

Please find enclosed the Department of Defense's report (Enclosures 1 and 2) on the review process for aliens in the custody of the Department of Defense outside the United States and on the training of Iraqi Security forces regarding treatment of detainees, consistent with Sections 1405(a)(1), 1405(c), and Section 1406(c) of the Detainee Treatment Act of 2005, Public Law Number 109-163, Title XIV. Additional information that is classified can be found in Enclosure 2.

I look forward to providing your Committee the annual report regarding implementation and reporting requirements pursuant to Sections 1405(d) and 1406(d).

Sincerely,

Eric S. Edelman

Enclosure: As stated.

cc: The Honorable John Conyers, Jr.
    Ranking Member

**SECRET//NOFORN**
**UNCLASSIFIED WHEN SEPARATED**
**FROM ENCLOSURE 2**



Derived from: Multiple Sources
Reasons: 1.5 (a)(c) & (d)

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

ENCLOSURE (1)

This enclosure is submitted to the Senate Committee on Armed Services, the Senate Committee on the Judiciary, the House Committee on Armed Services, and the House Committee on the Judiciary to satisfy the requirements set forth in The Detainee Treatment Act of 2005, Pub. L. No. 109-163, Title XIV (herein referred to as "the Act" or the "DTA").

## Procedures for Status Review of Detainees held in Guantanamo Bay, Cuba

In regard to section 1405(a)(1)(A):

The Department of Defense provides you at Tab A copies of the revised Combatant Status Review Tribunal (CSRT) and the revised Administrative Review Board (ARB) procedures currently in effect at Guantanamo Bay, Cuba. The CSRT process is a formal review of all available information related to a detainee to determine whether each person meets the criteria to be designated as an enemy combatant. The ARB process is an annual review to determine the need to continue the detention of an enemy combatant. In tandem, these processes satisfy the requirements of the Act.

In regard to section 1405(a)(3) regarding consideration of new evidence:

CSRT/ARB procedures were amended to be consistent with Section 1405(a)(3) of the DTA. The documents in Tab A are the current guidance/policy for the CSRT/ARB proceedings. This letter and its attachments are intended to provide the notice under Section 1405(c) as to modification of the CSRT and ARB procedures.

In regard to policy/procedure changes pursuant to section 1405(a)(2):

In response to the requirements of section 1405(a)(2), the Department would note that on June 23, 2004, the Secretary of Defense appointed then Secretary of the Navy Gordon England as the Designated Civilian Official (DCO). At the time of Mr. England's appointment, he was holding an office to which appointments are required by law to be made by the President, by and with the advice and consent of the Senate. Mr. England currently serves as the Deputy Secretary of Defense, an office to which appointments are required by law to be made by the President, by and with the advice and consent of the Senate. Current guidance and policies on the appointment of the DCO conform with the requirements of the Act.

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

In regard to section 1405(b)(1) concerning assessments whether any statement derived from or relating to detainees was obtained as a result of coercion:

CSRT/ARB procedures were amended to be consistent with Section 1405(b)(1) of the DTA. The documents at Tab A are the current guidance/policy for the CSRT/ARB proceedings. This letter and its attachments are intended to provide the notice under Section 1405(c) as to modification of the CSRT and ARB procedures.

## Procedures for Status Review of Detainees held in Afghanistan

In regard to Section 1405 (a)(1)(B):

*Detainee Status Determination Procedures:*

The Secretary of Defense has issued "Global Screening Criteria for Detainees," a classified document, providing guidance to Commander, U.S. Central Command (USCENTCOM) for determining the status of persons detained by U.S. forces in Afghanistan. The Secretary's guidance provides:

Unless otherwise directed by the Secretary of defense, within 90 days of a detainee being brought under DoD control, the detaining combatant commander, or his designee, shall review the initial determination that the detainee is an enemy combatant (EC). Such review shall be made based upon all available and relevant information available on the date of review and may be subject to further review based upon newly discovered evidence or information.

The detaining combatant commander or his designee shall produce a written assessment regarding the detainee's EC status based upon his review of all available and relevant information concerning the detainee. The review shall be administrative in nature and shall not be deemed to create any right, benefit, or privilege, substantive or procedural, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person. The detaining combatant commander shall be guided by the following:

(a) The detaining combatant commander shall consider all relevant and reasonably available information, including any new information that has been identified since the initial status determination.

(b) If necessary to make a proper review, the detaining combatant commander may interview witnesses, provided they are reasonably

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED FROM ENCLOSURE 2

available and such interviews would not affect combat, intelligence gathering, law enforcement or support operations.

(c) The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination.

After the initial 90-day status review, the detaining combatant commander shall, on an annual basis, reassess the status of each detainee.

If, as a result of a periodic EC review (90-day or annual), a detaining combatant commander concludes that a detainee may no longer meet the definition of an EC, the detaining combatant commander shall identify the detainee for possible release or transfer as appropriate.

Enclosure (2) sets forth the procedures in implementation of the Secretary's guidance for determination of the status of detainees in Afghanistan.

## Procedures for Status Review of Detainees held in Iraq

In regard to Section 1405 (a)(1)(B):

*Overview*

Review of a detainee's status occurs at several different levels – initially at brigade and division unit levels, then at a theater internment facility, and then by the joint U.S. –Iraqi Combined Review and Release Board (CRRB).

o If a capturing unit decides to detain an individual, an initial review of a detainee's status is conducted at the brigade or division level by a detention review authority. The detention review authority reviews the supporting documentation and information regarding the detainee to determine if detention of the individual is necessary for imperative reasons of security.

■ If the detention review authority determines that detention of an individual is not necessary for imperative reasons of security, then the detention review authority will recommend that the individual be released.

o After a detainee arrives at a theater internment facility (TIF), a military magistrate conducts another review of the individual's status. The

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

military magistrate likewise reviews the supporting documentation and information regarding the detainee to determine if detention of the individual is necessary for imperative reasons of security.

- If the military magistrate determines that detention of an individual is not necessary for imperative reasons of security, then the military magistrate will recommend that the individual be released.

- If the military magistrate determines that the individual should continue to be detained for imperative reasons of security, then written notice will be provided to the detainee informing him or her of the basis for detention and the right to appeal the status determination. If the detainee exercises the right by providing a written statement of appeal, the statement will be included in the detainee's case file for consideration by the CRRB.

o Following magistrate review, a detainee's status is reviewed on a regular basis, at least every six months, by the CRRB.

- After reviewing a detainee's status, the CRRB may recommend release, conditional release, or continued internment of the detainee for imperative reasons of security.

- With respect to individuals detained after June 28, 2004, Coalition Provision Authority (CPA) Memorandum No. 3 (Revised) provides that the Joint Detainee Committee (established under CPA Order No. 99) must approve detention of such individuals extending beyond 18 months from the date of their induction into an MNF internment facility.

o Where sufficient evidence exists, some detainees are referred for prosecution in the Central Criminal Court of Iraq.

- Detainees referred to the CCCI have a hearing before an Iraqi investigative judge who determines whether such individuals should proceed to trial in the CCCI for criminal wrongdoing.

## Training of Iraqi Security Forces Regarding Treatment of Detainees

Section 1406(a)(1) provides that the Secretary of Defense shall prescribe policies designed to ensure that all military and civilian DoD personnel or contractor personnel of the Department responsible for the training of Iraqi

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

Security Forces (ISF) provide training to such units regarding international obligations and laws applicable to the humane treatment of detainees, including protections afforded under the Geneva Conventions and the Convention Against Torture. Section 1406(c) provides that not less than 30 days after the date on which such policies are first prescribed, the Secretary of Defense shall submit to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives copies of such regulations, policies, or orders, together with a report on steps taken to the date of the report to implement Section 1406.

The Deputy Secretary of Defense provided written guidance to Commander, USCENTCOM directing that such training be provided. USCENTCOM has confirmed that, prior to enactment of the Act, the Department was already engaged in Iraqi Security Forces training activities that are consistent with the requirements of the Act, as more fully explained below.

Training of the ISF is a critical step to ensuring the safety, security, and stability of a free Iraq. All Multi-National Force-Iraq training of Iraqi Security forces is conducted and organized by the Multi-National Security Transition Command-Iraq (MNSTC-I). Its mission is to organize, train, equip, and mentor Iraqi Security Forces, in order to support Iraq's ultimate goal of a unified, stable and democratic Iraq, which provides a representative government for the Iraqi people; is underpinned by new and protected freedoms for all Iraqis and a growing market economy; and is able to defend itself and not pose a threat to the region. Moreover, part of MNSTC-I's mission is to ensure that the rule of law and human rights are a cornerstone of its program for training Iraqi Security Forces.

The Coalition Military Assistant Training Team (CMATT) division within MNSTC-I is primarily responsible for the training of ISF forces on the areas relevant to the Detainee Treatment Act. It has established a training academy, the Iraqi Military Academy Al Rustamiyah (IMAR), for the training of ISF and other Iraqi forces.

The curriculum includes topics such as: leadership, doctrine, principles of war, marksmanship, map reading and navigation, tactics, signals/communications, management, state and international affairs, human rights and civil affairs, military geography and more.

The curriculum is founded on the following principles:

o  Respect for Iraqi democracy
o  Respect for human rights

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED FROM ENCLOSURE 2

SECRET//NOFORN
UNCLASSIFIED WHEN SEPARATED
FROM ENCLOSURE 2

o   Integration of all elements of Iraqi society
o   An intellectual and academic approach to training, in addition to the
    military leadership training

Additional information is available on the MNSTCI website at
http://www.mnstci.iraq.centcom.mil/index.htm

For general information about MNFI training:
http://www.mnf-iraq.com/training.htm

**Exhibit 5**

CERTIFICATION OF TRUE COPY

Transitional Islamic State of Afghanistan  )
                                           )
City and Province of Kabul                 )  ss:
                                           )
Embassy of the United States of America    )

     I certify that the annexed document is a true and faithful copy of the original, and that it has been carefully examined by me, compared with said original, and found to agree with it word for word and figure for figure.

     The original was delivered to the Ministry of Foreign Affairs of the Transitional Islamic State of Afghanistan on September 26, 2002.

Amber M. Baskette

Consul of the United States of America

November 14, 2002





*Embassy of the United States of America*

## DIPLOMATIC NOTE

No. 202

The Embassy of the United States of America presents it compliments to the Ministry of Foreign Affairs of the Islamic Transitional Government of Afghanistan, and has the honor to refer to discussions between representatives of our two governments regarding issues related to United States military and civilian personnel of the United States Department of Defense who may be present in Afghanistan in connection with cooperative efforts in response to terrorism, humanitarian and civic assistance, military training and exercises, and other activities.

The Embassy proposes, without prejudice to the conduct of ongoing military operations by the United States, that such personnel be accorded a status equivalent to that accorded to the administrative and technical staff of the Embassy of the United States of America under the Vienna Convention on Diplomatic Relations of April 18, 1961; that United States personnel be permitted to enter and exit Afghanistan with United States identification and with collective movement or individual travel orders; that Afghan authorities shall accept as valid, without a driving fee or test, driving licenses or permits issued by the appropriate United States authorities to United States personnel for the operation of vehicles; and that such personnel be authorized to wear uniforms while performing official duties and to carry weapons when their orders call for it.

The Embassy further proposes that vehicles and aircraft owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan; however, the United States armed forces shall pay reasonable charges for services requested and received. Aircraft and vehicles of the United States shall be free of inspections.

The Government of the United States of America, its military and civilian personnel, contractors and contractor personnel shall not be liable to pay any tax or similar charge assessed within Afghanistan.

The Government of the United States of America, its military and civilian personnel, contractors and contractor personnel may import into, export out of, and use in the Republic of Afghanistan any personal property, equipment, supplies, materials, technology, training or services required to implement this agreement. Such importation, exportation and use shall be exempt from any inspection, license, other restrictions, customs duties, taxes or any other charges assessed within Afghanistan. The governments of the United States of America and Afghanistan shall cooperate in taking such steps as shall be necessary to ensure the security of United States personnel and property in Afghanistan.

In the event that the government of the United States of America awards contracts for the acquisition of articles and services, including construction, such contracts shall be awarded in accordance with the laws and regulations of the Government of the United States of America. Acquisition of articles and services in the republic of Afghanistan by or on behalf of the Government of the United States of America in implementing this agreement shall not be subject to any taxes, customs duties or similar charges in Afghanistan.

The Government of Afghanistan recognizes the particular importance of disciplinary control by United States military authorities over United States personnel and, therefore, Afghanistan authorizes the United States Government to exercise criminal jurisdiction over United States personnel. The Government of Afghanistan and the Government of the United States of America confirm that such personnel may not be surrendered to, or otherwise transferred to, the custody of an international tribunal or any other entity or state without the express consent of the Government of the United States.

The Government of Afghanistan recognizes that it shall be necessary for United States personnel and systems to use the radio spectrum. The United States Government shall be allowed to operate its own telecommunication systems (as telecommunication is defined in the 1992 Constitution of the International Telecommunication Union). This shall include the right to utilize such means and services as required to assure full ability to operate telecommunication systems, and the right to use all necessary radio spectrum for this purpose. Use of radio spectrum shall be free of cost.

Finally, the Embassy proposes that, other than contractual claims, the parties waive any and all claims against each other for damage to, or loss or destruction of, property owned by each party, or death or injury to any military or civilian personnel of the armed forces of either party, arising out of activities in Afghanistan under this agreement. Claims by third parties arising out of the acts or omissions of any United States personnel may, at the discretion of the United States Government, be dealt with and settled by the United States Government in accordance with United States law.

If the foregoing is acceptable to the Government of Afghanistan, the Embassy proposes that this note, together with the Ministry's reply to that effect, shall constitute an agreement between the two governments which shall enter into force on the date of the Ministry's reply.

The Embassy of the United States of America avails itself of this opportunity to renew to the Ministry of Foreign Affairs of the Transitional Islamic Government of Afghanistan the assurances of its highest consideration.

Embassy of the United States of America

Kabul, September 26, 2002



Transitional Islamic State of Afghanistan
Ministry of Foreign Affairs

[SEAL]

America and Canada Political Affairs Division                    Document No. 93
                                                                 Date: May 28, 2003

To the Embassy of the United States of America in Kabul:

Pursuant to Note No. 791, dated December 12, 2002, regarding the conclusion of an agreement for application of the provisions of the 1961 Vienna Convention to the civilian and military personnel of the United States Department of Defense present in Afghanistan for the useful campaign against terrorism, humanitarian assistance, and other activities, the Ministry of Foreign Affairs declares its concurrence with the terms of Note No. 202, dated September 26, 2002, which reads as follows.

(The Embassy of the United States of America without prejudice to the ongoing military operations by the United States, proposes that such personnel be given the status equivalent to the one given to the administrative and technical staff of the United States Embassy under the Vienna Convention on Diplomatic Relations of April 18, 1961; that the personnel of the United States be permitted to enter and exit Afghanistan with United States identification and with collective movement or individual travel orders; that Afghan authorities shall accept as valid, without a driving fee or test, the licenses and permits issued by the appropriate authorities of the United States to the personnel of the United States for operating vehicles; and that while performing official duties, the personnel should be authorized to wear uniforms and carry weapons when needed.

The Embassy also proposes that vehicles and airplanes owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan. However, the United States armed forces shall pay reasonable charges for service requested or received. US planes and vehicles of the United States shall be free of inspection.

The Government of the United States, its military and civilian personnel, contractors and contractor personnel shall not be liable for any kind of tax or other similar fees assessed within Afghanistan.

The Government of the United States, its military and civilian personnel, contractors and contractors personnel may import and export any personal property, equipment, supplies, materials, technology, training services that are required for the implementation of this agreement and use them in Afghanistan. Such importation, exportation and use should be exempt from any inspection, license, other limitations, tariffs or any other rental charges assessed in Afghanistan. If necessary, the Governments

of the United States and Afghanistan shall cooperate for takings steps to ensure the security of the United States personnel and property in Afghanistan.

If at any time the Government of the United States of America awards contracts to acquire materials and services, including construction, they should be awarded in accordance with the law and regulations of the Government of the United States. The acquisition of material and services in Afghanistan by the Government of the United States of America or on its behalf in implementation of this agreement shall not be subject to any taxes, tariffs or similar charges in Afghanistan.

The government of Afghanistan recognizes the particular importance of disciplinary control by the United States military authorities over United States personnel and the Government of Afghanistan authorizes the United States of America to exercise its criminal jurisdiction over the personnel of the United States. The Government of Afghanistan and the Government of the United States confirms that without the explicit consent of the Government of the United States, such personnel may not be surrendered to, or otherwise transferred to the custody of an international tribunal or any other entity or State.

The Government of Afghanistan recognizes the right of use of the radio spectrum for the personnel and systems of the United States. The United States shall be allowed to operate its own telecommunication systems (as defined in the constitution of the International Telecommunication Union). This shall include the right to use such means and services as required, assuring full ability to operate telecommunication systems, and the right to use all necessary radio spectrum for this purpose. Use of the radio spectrum shall be free of cost.

Finally the Embassy proposes that, other than contractual claims, the parties waive any and all claims against each other for damage to or loss or destruction of property owned by either party, or death or injury to any military or civilian personnel of the armed forces of either party, as a result of activities in Afghanistan under this agreement. Claims by third parties that will arise as a result of the actions or omissions of United States personnel should, at the discretion of the United States Government, be dealt with and settled in accordance with United States law).

With reference to the content of the above Note of the esteemed Embassy, the Ministry of Foreign Affairs declares that this document shall enter into force upon signature.

Respectfully,

[Signature]

Doctor Abdullah
Minister of Foreign Affairs of the
Transitional Islamic State of Afghanistan

Transitional Islamic State of Afghanistan
Ministry of Foreign Affairs

[SEAL]

Fifth Political Department

Document No. 791
Date: December 12, 2002

## Note

The Ministry of Foreign Affairs of the Transitional Islamic Government of Afghanistan respectfully informs the Embassy of the United States of America:

Following the negotiations between the Honorable Minister of Foreign Affairs and the American side that took place in Washington, the Ministry of Foreign Affairs declares its concurrence with the content of Note No. 202 dated, September 26, 2002, of the esteemed Embassy regarding the application of the provisions of the 1961 Vienna Convention to the civilian and military personnel of the United States of America.

The Ministry of Foreign Affairs avails itself of this opportunity to reiterate the assurances of its consideration.

[Stamp of the Ministry of Foreign Affairs]

To the Embassy of the United States of America in Kabul