IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

FADI AL MAQALEH, *et al.*,          )
                                    )
          Petitioners,              )
                                    )
     v.                             )          Civil Action No. 1:06-cv-01669 (JBD)
                                    )
ROBERT GATES, *et al.*              )
                                    )
          Respondents.              )
_____)

**RESPONDENTS' MOTION TO DISMISS
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

Respondents hereby move to dismiss petitioner's First Amended Petition for Writ of

Habeas Corpus.  Petitioner Fadi Al Maqaleh is a Yemeni citizen detained as an enemy combatant

by the Department of Defense ("DoD") at Bagram Airfield, a United States military base in the

Islamic Republic of Afghanistan ("Afghanistan").  He alleges, through his next friend, that he

has been detained at Bagram since about 2003.  He challenges the legality of his detention and

seeks release from DoD custody as a primary form of relief.

As discussed below, even assuming petitioner's factual allegations to be true for the

purpose of this motion only, this Court has no jurisdiction to review this habeas petition.

Section 7(a) of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, explicitly

divests this Court of statutory habeas jurisdiction to review habeas petitions filed by or on behalf

of an alien held by the United States as an enemy combatant, such as petitioner Maqaleh.  *See*

MCA § 7(a).  *Boumediene v. Bush*, 128 S.Ct. 2229 (2008), recently invalidated under the

Suspension Clause the portion of § 7(a) of the MCA reflected in 28 U.S.C. § 2241(e)(1) insofar

as it applies to certain detainees held at the Guantanamo Bay Naval Station.  But that holding

was predicated to a significant extent on the unique status of Guantanamo Bay; the United States

has exercised what the Court described as complete jurisdiction and control over the Guantanamo Bay for over a century.  That exercise of jurisdiction and the distance of Guantanamo Bay from a zone of active hostilities, according to the Court, warranted the extraterritorial application of the Suspension Clause there.

The United States enjoys no similarly unbounded and indefinite control of Bagram Airfield.  The U.S. military presence at Bagram is a transient wartime necessity subject to the host nation's sovereignty, and Bagram is, indeed, in an active war zone.  While the United States enjoys the benefits conferred by a lease for Bagram Airfield and a Status of Force Agreement with Afghanistan, these benefits do not create the type of exceptional circumstances that led the Supreme Court to extend the writ to detainees held at Guantanamo Bay.  To stretch the Suspension Clause to Bagram under these circumstances would lead to the anomalous result that any alien enemy engaged in warfare abroad and detained by the United States anywhere in the world can petition U.S. civilian courts for review of the military's decision to detain him.

Many practical barriers to extending the writ to Bagram further distinguish this situation from the one in *Boumediene*.  The most significant of these is that the military base is in an active theater of war where the U.S. military, along with the host nation's security forces and the troops of some 40 nations, are engaged in daily combat.  Since military operations began in Afghanistan, U.S. and allied forces have detained thousands of individuals believed to be members or supporters of al Qaeda or the Taliban.  The expansion of habeas jurisdiction to cover thousands, if not tens of thousands, of enemy combatants detained by the United States in the course of armed conflicts would have a crippling effect on war efforts and invite considerable practical difficulties in connection with such litigation.

Thus, whereas separation-of-powers concerns motivated the *Boumediene* Court to extend the Suspension Clause to Guantanamo Bay in the unique circumstances of that case, separations-of-powers concerns compel a different result in the circumstances of this case. Federal courts should not thrust themselves into the extraordinary role of reviewing the military's conduct of active hostilities overseas, second-guessing the military's determination as to which captured aliens as part of such hostilities should be detained, and in practical effect, superintending the Executive's conduct in waging a war. Accordingly, this Court should dismiss the habeas petition for lack of jurisdiction.

## BACKGROUND

### I.   BAGRAM AIRFIELD IN AFGHANISTAN

#### A.   Presence of U.S. Military Forces on Bagram Airfield

Bagram Airfield is located approximately 40 miles north of Kabul in the Parwan Province of Afghanistan. *See* Declaration of Colonel Charles A. Tennison ["Tennison Decl."] (attached as Exhibit 1), ¶ 5. The airbase encompasses approximately 3,994 acres (*see* Ex. A to Tennison Decl., at 2), and played a key role during the Soviet occupation of Afghanistan. Between at least 1999 and 2001, the Taliban and the Northern Alliance forces actively contested control over the airbase. In the military campaign against al Qaeda and the Taliban regime in Afghanistan, American forces were deployed to the Airfield starting in late 2001, along with multinational armed forces, and had priority use of the Airfield for coalition operations. *See* Tennison Decl., ¶ 5. Today, Bagram Airfield is the largest U.S. military base in Afghanistan. The U.S. military force there, Combined/Joint Task Force-101 ("CJTF-101"), along with the Afghan National Security Forces and multinational forces, conduct full spectrum operations in order to defeat al Qaeda, the Taliban, and associated movements. *See id.* ¶ 2. The mission of

CJTF-101 is to establish security, deter the re-emergence of terrorism, and enhance the sovereignty of Afghanistan.  *See id.*

Notably, Afghan citizens, ranging from local nationals performing contracted work (such as cleaning services) to representatives of the Government of Afghanistan, access the Airfield on a daily basis.  *Id.* ¶ 8.

**B.      Presence of Multinational Forces on Bagram Airfield**

Bagram Airfield has a significant multinational military presence.  *Id.* ¶ 7.  Although the United States secures the Airfield, there are numerous national compounds located within the Airfield, with some nations controlling access to their respective compounds.  *Id.*  Specifically, many countries have been or are currently on the Airfield in support of the United States-led Operation Enduring Freedom ("OEF"), a multinational coalition military operation initiated in October 2002 to counter terrorism and bring security to Afghanistan in collaboration with Afghan forces.  *See* Tennison Decl. ¶ 7; *see also Fact Sheet*, *Department of State*, http://www.state.gov/r/pa/prs/ps/2006/60083.htm.  Today, some of those OEF coalition forces include forces from Egypt, South Korea, and Pakistan.  Tennison Decl. ¶ 7.

Many nations also have forces on the Airfield as part of the International Security Assistance Force ("ISAF") of the North Atlantic Treaty Organization ("NATO").  *See id.*  They include France, the Czech Republic, Turkey, Poland, the United Kingdom, New Zealand, Australia, Italy, Romania, Bulgaria, and Canada.  *Id.*  ISAF is a United Nations-mandated force that operates in Afghanistan and consists of troops from approximately 40 nations including the United States.[1]  Through ISAF, NATO is assisting Afghanistan to support Afghan national

---

[1]  *See ISAF Mission and Area of Operation* (available at http://www.nato.int/isaf/docu/ mediaadvisory/2008/09-september/ma080904-053.html); *see also ISAF Regional Commands*
(continued...)

sovereignty, independence, and territorial integrity.[2]  ISAF's Regional Command East, which

has approximately 16,200 troops, is headquartered at Bagram Airfield,[3] and the commander of

CJTF-101 is also the commander of ISAF's Regional Command East.  *See* Tennison Decl. ¶ 7.

### C.    The Accommodation Consignment Agreement With Afghanistan

Consistent with Afghan sovereignty, the United States' use of the land and facilities at

Bagram Airfield is governed by an accommodation consignment agreement with Afghanistan.[4]

*See id.* ¶ 6 and Ex. A (Lease).  Pursuant to that lease agreement, which was "in consideration of

the mutual benefits to be derived" from the agreement by both governments, Afghanistan, as the

"host nation," consigns all facilities and land located at Bagram Airfield "for use by the United

States and Coalition Forces for military purposes."  Lease at 1; Tennison Decl. ¶ 7.  The United

States, as the "lessee," has "exclusive use" and "exclusive, peaceable, undisturbed and

uninterrupted possession" of the premises during the existence of the lease agreement.  Lease at

1 and ¶¶ 5, 9.  The lessee is also given the right to assign the agreement to a successor nation or

organization.  *Id.* ¶ 2.  The agreement is to continue in effect until the United States or a

---

[1](...continued)
*and PRT [Provincial Reconstruction Team] Locations* (available at http://www.nato.int/isaf
/docu/epub/pdf /isaf_placemat.pdf); *see also Helping to bring security, stability and foster
development in Afghanistan*, http://www.nato.int/issues/isaf/index.html (noting that on October
5, 2006, NATO-ISAF took command of the international military forces in eastern Afghanistan
from the United States-led Coalition).

[2] *See NATO solidified cooperation with Afghanistan* (available at http://www.nato.int/
docu/update/2006/09-september/e0906a.htm).

[3] *See ISAF Regional Commands and PRT Locations* (available at http://www.nato.int/
isaf /docu/epub/pdf /isaf_placemat.pdf); *ISAF Regional Command Structure* (available at
http://www.nato.int/isaf/structure/regional_command/index.html).

[4] The current accommodation consignment agreement was executed on September 28,
2006, and is similar to prior such agreements dating back to at least 2003.  Tennison Decl. ¶ 6.

successor determines that it no longer requires the use of the Airfield. *Id.* ¶ 4; Tennison Decl. ¶ 6. Finally, the agreement specifically warrants that the host nation is the sole owner of the premises or otherwise has the right to grant the use of the premises, and includes a hold-harmless provision whereby Afghanistan agrees that all claims arising out of U.S. possession of the premises may be directed to the Afghan Ministry of Defense for processing and, as appropriate, payment. *See* Lease ¶ 8.

### D.   The United States' Status of Force Agreement With Afghanistan

While the accommodation consignment agreement governs the United States' use of the land and facilities at Bagram Airfield, the legal status of U.S. military forces in Afghanistan (including Bagram) is governed by the two sovereigns' Status of Force Agreement ("SOFA").[5] *See* Diplomatic Note 202 and exchange of notes, attached hereto as Exhibit 2. The SOFA, effected through an exchange of diplomatic notes, recognizes that United States personnel "may be present in Afghanistan in connection with cooperative efforts in response to terrorism, humanitarian and civic assistance, military training and exercises, and other activities." *Id.* at 1. The agreement provides, "without prejudice to the conduct of ongoing military operations by the United States," that such U.S. personnel are accorded a status equivalent to that accorded to American embassy administrative and technical staff under the 1961 Vienna Convention on Diplomatic Relations. *Id.*

---

[5] A SOFA is "an agreement that defines the legal position of a visiting military force deployed in the territory of a friendly state." *See* http://www.js.pentagon.mil/doctrine/ jel/doddict/data/s/05153.html. "Agreements delineating the status of visiting military forces may be bilateral or multilateral. Provisions pertaining to the status of visiting forces may be set forth in a separate agreement, or they may form a part of a more comprehensive agreement. These provisions describe how the authorities of a visiting force may control members of that force and the amenability of the force or its members to the local law or to the authority of local officials." *Id.*

Further, like other SOFAs, pursuant to which the United States typically exercises criminal jurisdiction either exclusively or concurrently with the host nation over U.S. personnel for offenses committed on the soil of the host nation, the Afghan SOFA authorizes the United States to exercise criminal jurisdiction over U.S. personnel in Afghanistan, in recognition of "the particular importance of disciplinary control by United States military authorities over United States personnel." *Id.* at 3. Afghanistan also agrees that such personnel may not be surrendered, or otherwise transferred, to the custody of an international tribunal or any other entity or state without the express consent of the United States. *Id.*

### E.    Bagram Theater Internment Facility

Since military operations began in Afghanistan, U.S. and allied forces have detained thousands of individuals believed to be members or supporters of al Qaeda or the Taliban. Tennison Decl. ¶ 9. The United States has screened and released many of those individuals. However, a small percentage of the total number of individuals captured by the United States or transferred to United States control are (or have been) held at a detention facility on the Airfield known as the Bagram Theater Internment Facility. *Id.* The detention operation there is under the United States' command and control, *see id.* ¶ 2, and DoD has registered the detainees with the National Detainee Reporting Center ("NDRC")[6] and the International Committee of the Red Cross ("ICRC"). *Id.* ¶ 10. The ICRC regularly accesses the detention facility to conduct private interviews with the detainees. *Id.* Additionally, representatives of the Government of Afghanistan have access to Afghan detainees held in the facility. *Id.*

---

[6] The NDRC accounts for persons who receive Internment Serial Numbers issued by DoD while in DoD's custody. Tennison Decl. ¶ 10.

## II.      THE DETERMINATION OF ENEMY COMBATANT STATUS

A detainee's enemy combatant status is usually determined at the initial point of DoD control. *Id.* ¶ 12.  Pursuant to guidelines issued by the Secretary of Defense regarding the detention of enemy combatants in Afghanistan, the detaining combatant commander, or his designee, must review the initial determination within 90 days and annually thereafter. *Id.* ¶ 12. The review is be based on all relevant information reasonably available on the date of the review and may be subject to further review based upon newly discovered evidence or information. *Id.* If necessary for a proper review, the Secretary of Defense also authorizes the detaining combatant commander, or his designee, to interview reasonably available witnesses, provided that such interviews would not affect combat, intelligence gathering, law enforcement, or support operations. *Id.*  In addition, the detaining combatant commander is authorized to convene, at his discretion, a panel of commissioned officers to review the available evidence and reach a recommended determination regarding the detainee's status. *Id.*  If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released. *Id.*  As noted above, since the war began in Afghanistan, the United States has screened and released many individuals. *Id.* ¶ 9.

At Bagram Airfield, barring operational requirements, a detainee is notified of the general basis of his detention within the first two weeks of in-processing into the detention facility. *Id.* ¶ 13.  The detainee's enemy combatant status reviews are conducted within 75 days of the detainee being in-processed into the detention facility and every six months thereafter. *Id.* The commanding general of Bagram has established an Unlawful Enemy Combatant Review Board ("UECRB") to conduct these reviews and to make a recommendation regarding detainee

status.  *See id.*  The UECRB is a panel of three commissioned officers who evaluate a detainee's

status based on a variety of reasonably available information, including classified intelligence

and testimony from individuals involved in the capture and interrogation of the detainee.  *Id.*

Detainees who are being screened for the first time have the opportunity to make a written

statement, and since April 2008, have the opportunity to appear before the board.  *Id.*  Detainees

are also given the opportunity to make new written statements for each subsequent six month

review.  *Id.*  Even when a detainee is determined to be an enemy combatant, the detaining

combatant commander is authorized by the Secretary of Defense, in certain circumstances, to

transfer such individuals to their home countries.  *Id.* ¶ 17.  Some detainees at Bagram, however,

are expected to remain in DoD custody, subject to the periodic administrative review described

above, until such time as they are no longer deemed to pose a threat to the United States,

coalition forces, or Afghanistan.  *Id.* ¶ 18.

Petitioner Maqaleh is a detainee at BTIF.  *See id.* ¶ 19.  DoD's records reflect that he was

captured in Zabul, Afghanistan, and was determined to be an unlawful enemy combatant both

when he was first brought under DoD custody and in subsequent reviews.  *See id.* ¶ 20.  The

UECRB's most recent reevaluation of his status was on July 17, 2008.  *Id.*  Following that

review, his status as an unlawful enemy combatants was reaffirmed.  *Id*.

## III.    THE STATUTORY BACKGROUND

Generally, federal district courts have authority "within their respective jurisdictions" to

consider a request for habeas corpus relief made by petitioners claiming to be held in violation of

the Constitution or laws or treaties of the United States.  28 U.S.C. § 2241(a), (c).  Until *Rasul v.*

*Bush*, 542 U.S. 466 (2004), the statute had never been interpreted to apply to foreign nationals

taken captive abroad and held overseas.  In 2004, *Rasul* held that the federal habeas statute could

be invoked by aliens detained by the U.S. military as enemy combatants at Guantanamo Bay because of the unique circumstances of Guantanamo Bay.  Not only has Cuba specifically consented to the United States' "plenary and exclusive jurisdiction" over the base for more than a century, *id.* at 471, but the United States may continue to exercise complete jurisdiction and control permanently if it so chooses.  *Id.* at 471, 480.  As interpreted by the Supreme Court, *id.* at 480-81, that control brought Guantanamo Bay within the meaning of the habeas statute, particularly its distinctive phrase relating to the power of courts to issue writs of habeas corpus "within their respective jurisdictions," 22 U.S.C. § 2241(a).

In response to *Rasul*, Congress amended the habeas statute to preclude federal courts' jurisdiction over habeas claims of alien enemy combatants detained by the United States at Guantanamo Bay, except as provided by the judicial review provisions in the amendment itself. That amendment, the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. § 801 note) (2005), vested exclusive jurisdiction in the United States Court of Appeals for the District of Columbia Circuit to review the validity of any final determination of a Combatant Status Review Tribunal ("CSRT"), and of any final decision of a military commission, regarding detainees at Guantanamo Bay.  *See* DTA § 1005(e)(2) (2005).  Beyond those reviews, however, Congress provided that "no court, justice, or judge shall have jurisdiction to hear or consider . . .  an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba."  DTA § 1005(e)(1) (2005).

Although the DTA's provision withdrawing jurisdiction "t[ook] effect on the date of [its] enactment," DTA § 1005(h)(1) (2005), the Supreme Court in *Hamdan v. Rumsfeld* found no congressional intent to apply the provision retroactively, and thus held the provision inapplicable

10

to the habeas petition before it, which was filed prior to the enactment of the Act.  126 S. Ct.
2749, 2762-69 (2006).  In response to this and other holdings in *Hamdan*, Congress enacted the
Military Commissions Act of 2006 to, *inter alia*, clarify the jurisdictional restrictions on habeas
petitions filed by alien enemy combatants.  That statute specifies that the DTA's jurisdiction-
limiting provision is applicable "to all cases, without exception, pending on or after the date of
the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or
conditions of detention of an alien detained by the United States since September 11, 2001."
MCA § 7(b).  The MCA also expanded the jurisdictional restrictions to cover habeas petitions
filed by or on behalf of not only those alien enemy combatants detained at Guantanamo Bay, but
all those in the custody of the United States anywhere in the world.  *See id.* § 7(a); 28 U.S.C.
§ 2241(e)(1).

Thus, the habeas statute now provides that "no court, justice, or judge shall have
jurisdiction" to consider habeas petitions "filed by or on behalf of an alien detained by the
United States who has been determined by the United States to have been properly detained as
an enemy combatant or is awaiting such determination," except as provided in section 1005(e)(2)
and (e)(3) of the DTA.  *See* MCA § 7(a).  The latter provisions, which do not apply here, gave
the D.C. Circuit exclusive jurisdiction to determine the validity of final decisions rendered by a
CSRT or a military commission.[7]  *See* DTA § 1005(e)(2)(A), (e)(3)(A); MCA §§ 9, 10.

---

[7] CSRTs are not available at Bagram.  Notably, Congress was aware that the procedures
used for determining a detainee's enemy combatant status differ depending on whether the
detainee is held at Guantanamo or in Afghanistan or Iraq, and that CSRTs are conducted at only
Guantanamo.  *See* DTA § 1005 (a) (requiring the Secretary of Defense to submit a report setting
forth procedures of "[CSRTs] and Administrative Review Boards . . . that are in operation at
Guantanamo Bay" and for determination of the status of aliens in DoD custody in Afghanistan
and Iraq).  Nevertheless, the MCA's jurisdiction-limiting provision is written broadly to cover all
detainees who have been "determined by the United States" to be enemy combatants or are

(continued...)

Separately, the MCA also expressly bars federal court review of any claim which relates "to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."  MCA§ 7(a); 28 U.S.C. § 2241(e)(2).

As will be discussed in detail below, although *Boumediene* invalided the MCA insofar as it bars certain Guantanamo detainees from seeking habeas relief in U.S. courts, the MCA remains valid as applied to the present case to bar this Court's review of petitioner's habeas and other claims relating to his detention.

## ARGUMENT

### THIS COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW THE PRESENT PETITION

### I.      The Military Commissions Act Bars This Court's Review of the Present Habeas Petition

Section 7(a) of the MCA provides, in relevant part, that "no court, justice, or judge shall have jurisdiction" to consider habeas petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant . . . "  *See* MCA § 7(a); 28 U.S.C. § 2241(e)(1).  As demonstrated in the declaration of the Commander of Detention Operations at Bagram Airfield, Colonel Tennison, petitioner has been determined to be an unlawful enemy combatant and is detained as such at Bagram.  Tennison Decl. ¶ 20.  The plain language of the MCA therefore squarely forecloses this Court's review of this present habeas petition.

---

[7](...continued)
awaiting such determination.  *See* MCA § 7(a).

*Boumediene v. Bush*, 128 S. Ct. 2229 (2008), does not change this result.  The only application of the MCA at issue in *Boumediene* was with respect to detainees held at Guantanamo Bay – a place where the Court found that the Suspension Clause operates in full force principally because of the United States' exercise of what the Court described to be *de facto* sovereignty there.  *Boumediene* held that detainees at Guantanamo Bay who only have had access to a CSRT have the privilege of habeas corpus, protected by the Suspension Clause, and that Section 7 of the MCA, *i.e.*, 28 U.S.C. § 2241(e)(1), operates as an unconstitutional suspension of the writ because Congress failed to provide an adequate and effective substitute for habeas corpus through the review procedures under the Detainee Treatment Act.  *Boumediene*, 128 S. Ct. at 2240.  This holding does not invalidate Section 7 of the MCA in all of its applications because "when confronting a constitutional flaw in a statute," the Court normally "limit[s] the solution to the problem."  *Ayotte* v. *Planned Parenthood*, 546 U.S. 320, 328-29 (2006).  As the Court recently said:

> [W]e try not to nullify more of a legislature's work than is necessary, for we know that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Regan v. Time, Inc.,* 468 U.S. 641, 652 (1984) (plurality opinion). It is axiomatic that a "statute may be invalid as applied to one state of facts and yet valid as applied to another." *Dahnke-Walker Milling Co. v. Bondurant,* 257 U.S. 282, 289 (1921).  Accordingly, the "normal rule" is that "partial, rather than facial, invalidation is the required course," such that a "statute may ... be declared invalid to the extent that it reaches too far, but otherwise left intact." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 504 (1985); *see also Tennessee v. Garner,* 471 U.S. 1 (1985); *United States v. Grace,* 461 U.S. 171, 180-183(1983).

*Id.* at 328-29.  Because *Boumediene* did not address the issue of Section 7's constitutionality as applied to detainees held in a theater of war and in circumstances other than Guantanamo, as is

the case here, Section 7's application to the present case is left intact. Accordingly, Section 7 bars this Court's review of the present habeas petition.[8]

## II.     Petitioner Does Not Have the Constitutional Privilege of Habeas Corpus

Petitioner argues that he is entitled to invoke the protection of the Suspension Clause because like detainees held at Guantanamo Bay, he is detained at Bagram Airfield, which allegedly is subject "to the exclusive jurisdiction and control of the United States military" and "to United States constitutional and statutory law, and [is] answerable to the federal judiciary." 1st Amended Pet. ¶ 34.  Petitioner is wrong because, as discussed more fully below.

### A.     The Supreme Court's Holding in *Boumediene*

In *Boumediene*, the Supreme Court held that detainees at Guantanamo Bay have a constitutional right to the writ because given the United States' plenary control over the Bay, allowing the political branches to govern the Bay without the strictures of the Suspension Clause would permit "a striking anomaly in our tripartite system of government." *Id.* at 2259.  The Court found important the unique political history of Guantanamo Bay, noting that "[t]he United States has maintained complete and uninterrupted control of the bay for over 100 years," which

_____

[8]  For similar reasons, to the extent petitioner challenges the conditions of his confinement at Bagram Airfield, *see* 1st Amended Pet. ¶¶ 36-40, 42-47, those challenges are barred by the MCA.  In determining whether Guantanamo detainee could challenge the legality of their detention and in validating 28 U.S.C. § 2241(e)(1) as applied to those detainees, *Boumediene* did not disturb § 2241(e)(1) insofar as it removes jurisdiction over conditions of confinement claims litigated through habeas.  Nor did it disturb the MCA's provision, 28 U.S.C. § 2241(e)(2), withholding jurisdiction over challenges to "any aspect" of the detention, transfer, treatment, trial, or conditions of confinement of an alien detained as an enemy combatant.  *See In re Guantanamo Bay Habeas Litigation*, Civ. Nos. 05-1509, 05-1602, 05-1704, 08-1310 (RMU), – F. Supp. 2d –, 2008 WL 3155155, *3 (D.D.C. Dec. 7, 2008).  In fact, in deciding *Boumediene*, the Court explicitly stated that it was not determining "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement," even as regards detainees at Guantanamo Bay.  128 S.Ct. at 2274.  Accordingly, this Court similarly has no jurisdiction to review petitioner's conditions of confinement claims.

began at the close of the Spanish-American War, when Spain "ceded control over the entire

island of Cuba to the United States and specifically 'relinquishe[d] all claim[s] of sovereignty . .

. and title.'" *Id.* at 2258 (citing Treaty of Paris, Dec. 10, 1898, U.S.-Spain, Art. I, 30 Stat. 1755,

T.S. No. 343).  Although after the Cuban Republic was established the United States recognized

that Cuba retained "ultimate sovereignty" over Guantanamo by entering into the 1903 Lease

Agreement, the Court emphasized that "the United States continued to maintain the same plenary

control it had enjoyed since 1898." *Id.*  And further, according to the Court, under the terms of

the two countries' 1934 treaty, "Cuba effectively has no rights as a sovereign until the parties

agree to modification of the 1903 Lease Agreement or the United States abandons the base." *Id.*

at 2252 (citing Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, Art. III. 48 Stat.

1683, T.S. No. 866); *see also* Lease of Lands for Coaling and Naval Station, Feb. 23, 1903, U.S.-

Cuba, Art. III, T.S. No. 418.  "[T]he objective degree of control the Nation asserts over

[Guantanamo Bay]," therefore, indicates that "the United States, by virtue of its complete

jurisdiction and control over the base, maintains *de facto* sovereignty over this territory." *Id.* at

2252, 2253.

Based on that exercise of "*de facto* sovereignty," the Court found that to limit the reach

of the Suspension Clause only to territories over which the United States has *de jure* sovereignty

potentially would raise troubling separations-of-powers concerns; according to the Court, "by

surrendering formal sovereignty over any unincorporated territory to a third party, while at the

same time entering into a lease that grants total control over the territory back to the United

States, it would be possible for the political branches to govern without legal constraint." *Id.* at

2258-59.  The Court read its extraterritoriality opinions, moreover, to teach that "a functional

approach" is more appropriate.  The Court noted, for example, that in *Johnson v. Eisentrager*,

339 U.S. 763 (1950), which the Court in *Boumediene* made clear remains good law, "practical considerations weighed heavily" on whether habeas corpus jurisdiction extended to enemy aliens convicted of violating the laws of war and held in a military base in Germany.  *Boumediene*, 128 S. Ct. at 2258.  The Insular Cases[9] – which addressed whether the Constitution, by its own force, applies in any territory that is not a State – also considered whether extraterritorial application of a constitutional provision would be "impracticable and anomalous."  *Id.* at 2255.  The Court, concluded, therefore, that at least three factors are relevant in determining the reach of the Suspension Clause:  (1) the citizenship and status of the detainees and the process for determining their status; (2) the nature of the sites of apprehension and detention; and (3) the practical obstacles to extraterritorial application of the Suspension Clause.  *Id.* at 2259.

Applying those factors to the alien detainees held at Guantanamo Bay, the Court found, as to the first factor, that the process these detainees received for determining their enemy combatant status fell short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review.  *See id.* at 2260.  As to the second factor, the Court found that, while the sites of the Guantanamo detainees' apprehension and detention were both technically outside the sovereign territory of the United States as in *Eisentrager*, there are "critical differences" between the Landsberg prison at issue in *Eisentrager* and Guantanamo Bay.  *See id.*  The United States' control of the Landsberg prison was "neither absolute nor indefinite" because the entire military base was under the jurisdiction of the combined Allied Forces and the United States "was answerable to its Allies for all activities occurring there."  *Id.* And whereas the Allies had not planned a long-term occupation of Germany, the United States'

---

[9]  *See De Lima v. Bidwell,* 182 U.S. 1 (1901); *Dooley v. United States,* 182 U.S. 222 (1901); *Armstrong v. United States,* 182 U.S. 243 (1901); *Downes v. Bidwell,* 182 U.S. 244 (1901); *Hawaii v. Mankichi,* 190 U.S. 197 (1903); *Dorr v. United States,* 195 U.S. 138 (1904).

presence in Guantanamo Bay "is not transient possession." *Id.* at 2261. "In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States." *Id.* Thus, while *Eisentrager* was consistent with the Insular Cases, where it had held there was no need to extend full constitutional protections to territories the United States did not intend to govern indefinitely, the Court found the Suspension Clause appropriately extended to Guantanamo Bay. *Id.* at 2260-61.

As to the third factor, the Court found few practical barriers to extending the writ to Guantanamo Bay. Unlike the military's mission in post-War Germany when the United States was responsible for massive reconstruction and aid efforts and the American forces faced potential security threats from a defeated enemy, the Court found no credible argument that the military mission at Guantanamo would be compromised if habeas corpus courts had jurisdiction to hear the detainees' claims, and "in light of the plenary control the United States asserts over the base," none was apparent to the Court. *Id.* at 2261. Instead, the Court reasoned, the Guantanamo detainees are contained in a secure prison facility located on "an isolated and heavily fortified military base." *Id.* There was "no indication that adjudicating a habeas corpus petition would cause friction with the host government," and "the United States is, for all practical purposes, answerable to no other sovereign for its acts on the base." *Id.* "Were that not the case, or if the detention facility were located in an active theater of war," the Court noted, "arguments that issuing the writ would be 'impracticable or anomalous' would have more weight." *Id.* at 2261-62. The Court held, therefore, that the Suspension Clause "has full effect at Guantanamo Bay." *Id.*

**B.**    **Application of the *Boumediene* Rationale Compels the Conclusion That the Suspension Clause Does Not Extend to Bagram Airfield**

**1.**    **The Nature of the United States' Presence at Bagram Airfield Strongly Weighs Against the Extraterritorial Application of the Suspension Clause to Bagram**

Applying *Boumediene*'s "functional approach" here, it is apparent that alien detainees held at Bagram Airfield cannot invoke the constitutional privilege of habeas corpus.  As an initial matter, it is evident that the holding in *Boumediene* hinges, to a significant degree, on the Court's finding that the United States exercises *de facto* jurisdiction over Guantanamo Bay, and the "striking anomaly" that the Court thought possible if the political branches were able to govern such a territory without the constraint of the Suspension Clause.  *Id.* at 2259.  Indeed, references to the Bay's unique status permeated the Court's analysis of the extraterritoriality question.  *See id.* at 2262 ("the detainees . . . are held in a territory that, while technically not part of the United States, is under the complete and total control of our Government"); *id.* at 2261 ("in light of the plenary control the United States asserts over the base," it was not apparent that the military mission there would be compromised by extending the writ there); *id.* at 2261 ("In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States."); *id.* at 2261 ("Guantanamo Bay . . . is not transient possession."); *id.* at 2252 ("Cuba effectively has no rights as a sovereign . . . ."); *id.* at 2251 ("no law other than the laws of the United States applies at the naval station"); *id.* at 2261-62 (the Guantanamo detention facility is "located on an isolated and heavily fortified military base" where "the United States is, for all practical purposes, answerable to no other sovereign for its acts"); *id.* at 2261 ("There is no indication . . . that adjudicating a habeas corpus petition would cause friction with the host government.").  As the Court recognized, it previously had never held that aliens detained by our Government in territory over which another country maintains *de jure* sovereignty have any

18

rights under our Constitution.  *Id.* at 2262.  But given the unique circumstances of the detainees

at Guantanamo Bay, which lack any precise historical parallel, the Court found the absence of a

precedent on point no barrier.  *Id.*

The United States' presence at Bagram Airfield, however, is entirely differently from that

in Guantanamo Bay.  First, the United States does not have "complete jurisdiction and control"

over Bagram Airfield as it does over Guantanamo.  According to *Boumediene*, Cuba "effectively

has no right as a sovereign" until its lease with the United States is modified or until the United

States abandons the base.  *Id.* at 2252.  Indeed, the great degree to which the United States has

control over Guantanamo Bay is underscored by the fact that such control has continued over the

course of decades during which Cuba has been anything but an ally.  The same is not true of

Bagram Airfield.  The lease agreement regarding Bagram Airfield provides that "in

consideration of the mutual benefits to be derived" from the agreement, Afghanistan, as the host

nation, and the United States, as the lessee, agreed that the Airfield may be used "by the United

States and Coalition Forces for military purposes."  Lease at 1.  The lease speaks of "exclusive,

peaceable, undisturbed and uninterrupted possession" and "exclusive use" of the leased premises

and provides certain warranties, *see* Lease ¶¶ 5, 9, which is no different from any ordinary lease

agreement.

To be sure, assuming that both governments continue to derive "mutual benefits" from

the lease – consideration that is not present in the lease with Cuba[10] – the consignment may

continue in effect until the United States (or its assigned successor) determines that it no longer

---

[10]  The lease with Cuba regarding Guantanamo instead requires the United States to pay a sum of money as consideration of the agreement.  *See* Lease of Coaling or Naval Stations, July 2, 1903, U.S.-Cuba, Art. I, T.S. No. 426.  The payment of rent, of course, is a matter exclusively within the United States' control.

requires the use of the Airfield.  *Id.* at 1 and ¶ 4.  That by no means suggests that Afghanistan is

ceding *de facto* or *de jure* sovereignty over the Airfield to the United States.  Not only is the

lease silent about the exercise of jurisdiction by the United States, but the very mission of the

U.S. military force at Bagram is to assist in enhancing the sovereignty of Afghanistan.  *See*

Tennison Decl. ¶ 2.  This is true whether the U.S. military is acting as part of the Operation

Enduring Freedom coalition forces or of NATO's International Security Assistance Force

("ISAF"), to which the United States contributes a significant portion of the troops.  The mission

of ISAF (or NATO) is to support Afghanistan's national sovereignty, independence, and

territorial integrity.  *See supra* Background I.B.  Clearly, the United States does not intend to

occupy Bagram Airfield for an extended period or to treat it as part of U.S. territory, and its use

of the Airfield is no more than a transient possession necessitated by war.  In that regard,

Bagram Airfield is more like *Eisentrager's*  Landsberg prison occupied by the combined Allied

Forces, which had neither "planned a long-term occupation of Germany, nor . . . intend[ed] to

displace all German institutions even during the period of occupation."  128 S.Ct. at 2260.

Indeed, except for Guantanamo Bay, courts have repeatedly recognized that the

establishment of a military base in foreign territory does not effect a transfer of sovereignty to

the United States.  *See United States v. Spelar*, 338 U.S. 217, 221-22 (1949) (lease for military

air base in Newfoundland "effected no transfer of sovereignty with respect to the military bases

concerned"); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380-81 (1948) (U.S. naval base in

Bermuda, controlled by the United States under lease with Great Britain, was outside United

States sovereignty because the governing lease had "effected no transfer of sovereignty");

*Holder v. Holder*, 392 F.3d 1009, 1020 n.10 (9th Cir. 2004) (recognizing U.S. air force base in

Germany not under United States sovereignty); *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("[A] United States military base is not sovereign territory of the United States.").

Moreover, whereas according to the Court "no law other than the laws of the United States applies at the naval station" in Guantanamo, *Boumediene*, 128 S.Ct. at 2251, Afghan law applies at Bagram Airfield subject to potential limitations by the two governments' Status of Force Agreement ("SOFA").  Like other SOFAs, pursuant to which the United States typically exercises criminal jurisdiction over U.S. personnel for offenses committed on the soil of a friendly host nation, the Afghan SOFA authorizes the United States to exercise criminal jurisdiction over U.S. personnel in Afghanistan without prejudice to the conduct of ongoing military operations by the United States.  *See* Ex. 2, Diplomatic Note 202, at 1.  Thus, for example, common crimes committed by Afghan citizens who access the Airfield would be prosecuted by Afghanistan, not the United States, and Afghanistan in that respect has legal jurisdiction over Bagram.

Furthermore, whereas *Boumediene* found that the United States is "answerable to no other sovereign for its acts on the [Guantanamo Bay] base," 128 S.Ct. at 2261, the United States' activities at Bagram Airfield are necessarily constrained by the multinational forces there, including the fact that as a visiting military force, the United States must answer to the friendly host nation.  As noted before, numerous nations are present on the Airfield as part of the U.S.-led coalition forces or ISAF.  Tennison Decl. ¶ 7.  ISAF's Regional Command East is headquartered at Bagram, and the commander of CJTF-101 is also the commander of Regional Command East.  *Id.*  The mission of the U.S. military force at Bagram is to partner with numerous other nations, as well as the host government, to establish security, deter the re-emergence of terrorism, and

enhance the sovereignty of Afghanistan. *See id.* ¶ 2. It therefore cannot reasonably be inferred that the United States can act without regard to its partner nations or the host government.

Admittedly, the detention operation at Bagram is under the command and control of the U.S. military, *see id.* ¶ 3, and petitioner "is in the physical and legal custody of the United States," 1st Amended Pet. ¶ 34. And, the Supreme Court's recent decision in *Munaf v. Geren*, 128 S.Ct. 2207 (2008), which involved habeas petitions brought by U.S. citizens detained abroad, held that individuals detained "overseas in the immediate custody of American soldiers who answer only to an American chain of command" were entitled to seek the writ of habeas corpus. *Id.* at 2216. But were U.S. control of the detention facility or custody of the habeas petitioner alone sufficient, then the Suspension Clause would have worldwide application, allowing all individuals captured by the United States during hostilities overseas to seek review in U.S. courts. Indeed, for security reasons alone, the United States would not detain enemy combatants on any long-term basis at a facility that it did not control. *Munaf*, which involved very different circumstances of detention, clearly does not stand for such broad proposition. It involved only American citizens, and the Supreme Court specifically noted that "habeas jurisdiction can depend on citizenship." *Munaf*, 128 S.Ct. at 2218. As the Supreme Court long ago noted in *Eisentrager*, 339 U.S. at 769-70, "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar" and "[e]ven by the most magnanimous view, our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens." Of course, petitioner is not a U.S. citizen, and thus *Munaf* does not help him.

In sum, the nature of U.S. presence at Bagram Airfield does not present the same type of unique considerations that motivated the Supreme Court to extend the Suspension Clause to Guantanamo Bay.  Rather, it strongly counsels against such extraterritorial application.

**2.     The Nature and Site of Petitioner's Apprehension and His Citizenship Do Not Warrant the Suspension Clause's Extraterritorial Application**

Petitioner places much emphasis on his allegations that he is a Yemeni citizen, who previously resided in Yemen and "was not in Afghanistan at the time of his capture."  1st Amended Pet. ¶¶ 11, 24.  While DoD's records actually reflect that petitioner was captured in Afghanistan, *see* Tennison Decl. ¶ 20, respondents will assume petitioner's allegations regarding his place of capture to be true for purposes of this motion to dismiss only.  Petitioner's citizenship and the place of his capture suggest that the privilege of habeas corpus does not extend to petitioner.

The Supreme Court in *Boumediene* cited the nature of the site where apprehension took place and the citizenship of the detainees as relevant to the extraterritorial question.  128 S.Ct. at 2259.  The Court then analyzed those factors as follows:  the *Boumediene* petitioners are noncitizens, and like the noncitizen petitioners in *Eisentrager*, "the sites of their apprehension and detention are technically outside the sovereign territory of the United States," which "is a factor that weighs against finding they have rights under the Suspension Clause."  *Id.* at 2260.  Of course, the *Boumediene* Court ultimately found the comparison to *Eisentrager* not apt for other reasons, *i.e.*, because "[i]n every practical sense Guantanamo is not abroad."  *Id.* at 2261.

Here, like the petitioners in *Eisentrager*, petitioner is a non-U.S. citizen who was captured abroad and, at all relevant times, detained abroad.  Thus, as in *Eisentrager*, this "weighs against finding [petitioner] ha[s] rights under the Suspension Clause."  *Id.* at 2260.  To the extent

23

petitioner makes an issue of the lack of proximity between the alleged site of his capture and the place of his detention, neither *Boumediene* nor *Eisentrager* had found such factor to be material. The petitioners in *Eisentrager* were captured in China and detained in Germany, 339 U.S. at 765, while the named petitioners in *Boumediene* were captured in Bosnia and detained at Guantanamo, *see Boumediene v. Bush*, No. 06-1195, Br. for *Boumediene* Petrs., at 1-2.  And yet, neither case made any mention of these facts in analyzing the extraterritorial reach of the Suspension Clause.

Petitioner's allegation that he was not captured on a battlefield in Afghanistan is immaterial as well.  As noted before, *Boumediene* made no mention of the fact that the named petitioners there were captured in Bosnia, which is not an active theater of U.S. military operations.  *See Boumediene v. Bush*, No. 06-1195, Br. for *Boumediene* Petrs. at 1-2 (alleging that each of the six *Boumediene* petitioner was captured by Bosnian police and later delivered to U.S. military, and that no petitioner traveled to Afghanistan during the time that the United States has been engaged in hostilities there).  Indeed, given the nature of the war on terrorism, it would be a significant intrusion into the Executive's ability to wage war if the military were limited to detaining only those enemies who were captured on a traditional battlefield engaging in active combat – a limitation that would be inconsistent with Congress' Authorization for Use of Military Force ("AUMF"), 115 Stat. 224, note following 50 U.S.C. § 1542, which does not have a geographic limit.[11]

---

[11]  Section 2(a) of the AUMF authorizes the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."  AUMF § 2(a) 115 Stat. 224, note following 50 U.S.C. § 1542 (2000 ed. Supp. V).

Even *Eisentrager*, decided more than half a century ago involving a traditional war, did not require such a crabbed approach; rather, the *Eisentrager* petitioners' "hostile operations principally consist of collecting and furnishing intelligence concerning American forces and their movements to the Japanese armed forces." 339 U.S. at 765.  Thus, any suggestion that the writ should extend to Bagram Airfield with respect to any detainees not captured on the traditional battlefield must be rejected.  Were it otherwise, it would lead to the anomalous result that some alien detainees at Bagram Airfield would have habeas rights, while others do not, depending on where they were captured outside of the United States.  *Boumediene* gave no hint that the extraterritorial application of the Suspension Clause would be dependent on so arbitrary a factor.

### 3.   There Are Significant Practical Barriers to Extending the Writ to Bagram Airfield

The practical obstacles inherent in resolving petitioner's entitlement to the writ further confirms that the Suspension Clause does not extend to Bagram Airfield.  The Supreme Court recognized in *Boumediene* that "there are costs to holding the Suspension Clause applicable in a case of military detention abroad," and "[h]abeas corpus proceeding may require expenditure of funds by the Government and may divert the attention of military personnel from other pressing tasks."  *Id.* at 2261.  While these and other practical considerations were insufficient to tip the scale in the case of Guantanamo Bay because of the United States' plenary control over the base far from a theater of war, *see id.* at 2261, they are dispositive here.[12]

---

[12] Practical considerations also should govern analysis of the process through which enemy combatant status is evaluated at Bagram.  As noted before, the commanding general of Bagram Airfield has established an Unlawful Enemy Combatant Review Board ("UECRB") to review the enemy combatant status of detainees held there, which take place within 75 days of the detainee being in-processed into the detention facility and every six months thereafter.  *See*

(continued...)

In *Boumediene*, the Court noted that if the Guantanamo detention facility was not "located on an isolated and heavily fortified military base" but instead was found "in an active theater of war," arguments that issuing the writ would be "impracticable or anomalous" would have more weight.  128 S.Ct. 2261-62.  Bagram Airfield is in an active theater of war and is the largest U.S. base in Afghanistan.  The war there has claimed more than 500 American lives, with the last few months being the deadliest for American troops, who are contending with a sharp increase in attacks by Taliban militants and its al-Qaeda allies.[13]  The President recently announced that more American units will be deployed to Afghanistan in the coming months, and additional troops already have deployed to Afghanistan from many other nations, including the

---

[12](...continued)

Tennison Decl. ¶ 13.  The UECRB makes a recommendation by majority vote to the commanding general regarding the detainee's status based on a variety of reasonably available information, including classified intelligence and testimony from individuals involved in the capture and interrogation of the detainee.  *Id.*  Barring military operational requirements, the detainees are notified of the general basis of their detention, and they also have the opportunity to make written statements for review by the UECRB, and since April 2008, to appear before the board when being screened for the first time.  *Id.*

The purpose of enemy combatant determination and detention at Bagram is to deprive the enemy of the combatants needed to conduct attacks and perpetrate further hostilities against the United States, the coalition forces, and Afghanistan.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004); Tennison Decl. ¶ 9.  The United States also gathers important intelligence from the enemy combatants during their detention, which in turn enables the United States to prevent future attacks.  Tennison Decl. ¶ 9.  These practical considerations and exigencies of war should guide the determination of whether the procedures of enemy combatant status review at Bagram are adequate.

[13]  *See* Tom Shanker, *Gates Pushing Plan for Afghan Army*, the New York Times (August 7, 2008) (available at http://www.nytimes.com/2008/08/08/world/asia/08military.html?_r =1&scp=1&sq=Gates%20Pushing%20Plan%20for%20Afghan%20Army&st=cse&oref=slogin).

United Kingdom, France, Poland, Bulgaria, Romania, Australia, German, Denmark, and the Czech Republic.[14]

Given the ongoing war, there is every reason to believe that our military mission in Afghanistan would be compromised if the writ is extended to Bagram. Indeed, the practical considerations that weighed heavily in *Eisentrager* – which involved the American forces' post-War occupation of Germany – apply with equal, if not greater, force here. As *Boumediene* noted, the *Eisentrager* court stressed the difficulties of ordering the Government to produce the prisoners in a habeas corpus. 128 S.Ct. at 2257. "'It would require allocation of shipping space, guarding personnel, billeting and rations' and would damage the prestige of military commanders at a sensitive time." *Id.* Similar burdens would be entailed in extending habeas rights to Bagram to the extent such rights involved actual detainee presence for habeas proceedings, and perhaps with respect to in person, counsel access to detainees. The *Eisentrager* court observed:

> It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

*Eisentrager*, 339 U.S. at 779. As Judge Hogan aptly noted in a slightly different context when dismissing a suit by former detainees in Afghanistan and Iraq against U.S. government officials:

> The discovery process alone risks aiding our enemies by affording them a mechanism to obtain what information they could about military affairs and disrupt command missions by wresting officials from the battlefield to answer compelled deposition and

---

[14] *See* Jim Garamone, *Bush Announces Iraq Troop Cut*, September 9, 2008 (available at http://www.defenselink.mil/news/newsarticle.aspx?id=51083).

> other discovery inquiries about the military's interrogation and
> detention policies, practices, and procedures.

*In re Iraq and Afghanistan Detainees Litigation*, 497 F. Supp. 2d 85, 105 (D.D.C. 2007).

Besides the effect on our war effort at a time of active hostilities, the logistical difficulty of

providing thousands of alien enemy combatants access to our civil courts alone would cripple

even the administration of our judicial system.  In other words, to provide alien enemy

combatants detained in a theater of war the privilege of access to our civil courts is unthinkable

both legally and practically.

　　　　Another significant, practical consideration counsels against extending the writ to

Bagram.  In *Boumediene*, the Court noted that there is no indication that adjudicating a habeas

corpus petition would cause friction with the host government.  *See* 128 S.Ct. at 2261.  But not

so here.  If habeas corpus were made available and relief were eventually ordered in some cases,

the release of detainees into Afghan sovereign territory could create tensions or frictions with the

host government.  In addition, unlike in Guantanamo Bay, where the United States has no formal

significant relationship with Cuba (other than through the Guantanamo Bay lease), the United

States has a close partnership with Afghanistan in terms of military operations, including

detention operations.  Pursuant to a diplomatic arrangement with Afghanistan, a significant

percentage of the Afghan detainees at the Bagram detention facility are expected to be

transferred to the Government of Afghanistan and many already have been transferred.  *See*

Tennison Decl. ¶ 16.  To facilitate such transfers, the United States funded the renovation of an

Afghan prison, known as the Afghan National Detention Facility, and has provided other

assistance to Afghanistan regarding the operation of this detention facility to ensure an Afghan

detention capability that meets international standards.  *Id.*  Allowing the detainees at Bagram to

invoke the privilege of habeas corpus would not only interfere with the orderly transfers of

Afghan detainees to the Government of Afghanistan and disrupt wartime operations, but also intrude into sensitive areas of foreign relations regarding the detention of enemy combatants on Afghan soil.

The capture and detention of enemy combatants is "by universal agreement and practice" an important incident of war.[15]  *See Hamdi*, 542 U.S. at 518-19 (plurality opinion) (citing *Ex parte Quirin*, 317 U.S. 1, 28 (1942)).  It is also beyond dispute that the conduct of war and foreign relations are within the exclusive province of the Executive Branch.  *See Matthews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) (recognizing that matters such as the conduct of foreign relations and the war power "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").  Military operations during an active war on foreign land that are partnered with multinational forces and the host government also implicate a variety of sensitive foreign affairs, diplomatic, and military considerations.  As the Supreme Court recently said, "[o]ur constitutional framework 'requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."  *Munaf*, 128 S.Ct. 2224-25 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)) (dismissing for failure to state a claim the habeas petitions of U.S. citizens held in Iraq due to separation-of-powers concerns that include, among other things, "sensitive foreign policy issues in the context of ongoing military operations").  This Court, therefore,

---

[15]  Indeed, in World War I, American forces had custody of approximately 48,000 prisoners of war in France between the 1918 armistice and the treaty of peace in 1920.  *See* George Lewis and John Mewha, *History of Prisoner of War Utilization by the United States Army 1776-1945*, Dep't of the Army Pamphlet No. 20-213 at 63.  By the end of World War II, U.S. forces had custody of approximately 2 million enemy combatants.  *See id.* at 244.  Many of the detainees were not repatriated for several years after the conclusion of the hostilities.  *See id.* at 243-245.  And as to both World Wars, only a small fraction of the detainees was prosecuted and punished for war crimes, while the vast majority were simply detained during the conflict.

should not thrust itself into the extraordinary role of reviewing the military's conduct of war overseas.  Nor should it second-guess the military's determination as to which captured aliens pose a threat to the United States or otherwise should be detained in connection with ongoing hostilities – a necessary scenario if the writ were to be extended to Bagram – ultimately interfering with the Nation's ability to effectively confront national security threats during an ongoing military conflict.

## CONCLUSION

For the foregoing reasons, this Court should dismiss petitioner's First Amended Petition for Writ of Habeas Corpus for want of jurisdiction.

Dated: September 15, 2008                              Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General

      /s/   *Jean Lin*
JOSEPH H. HUNT
VINCENT M. GARVEY
TERRY M. HENRY
JUDRY L. SUBAR
JEAN LIN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-3716
Attorneys for Respondents