**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------x

| | | |
|---|---|---|
| **FADI AL MAQALEH,** | ) | |
| **Detainee,** | ) | |
| **United States Air Base at** | ) | |
| **Bagram, Afghanistan; and** | ) | |
| | ) | |
| **AHMAD AL MAQALEH,** | ) | |
| **as the Next Friend of Fadi Al Maqaleh,** | ) | |
| | ) | **1:06-CV-01669 (JDB)** |
| **Petitioners/Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ROBERT GATES** | ) | **ORAL ARGUMENT REQUESTED** |
| **Secretary, United States** | ) | |
| **Department of Defense** | ) | |
| **1000 Defense Pentagon** | ) | |
| **Washington, D.C.  20301-1000;** | ) | |
| | ) | |
| **JOHN DOE 1,** | ) | |
| **Custodian of Petitioner; and** | ) | |
| | ) | |
| **JOHN DOE 2,** | ) | |
| **Custodian of Petitioner,** | ) | |
| | ) | |
| **Respondents/Defendants.** | ) | |
| | ) | |
| **Respondents sued in their official** | ) | |
| **capacities.** | ) | |

-------------------------------------------------------------x

**PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO DISMISS**
**FOR LACK OF JURISDICTION**

**Table of Contents**

Preliminary Statement ........................................................................................................ 1

Statement of Facts ............................................................................................................. 5
    A.   Petitioner Fadi Al Maqaleh .......................................................................... 5
    B.   Bagram Air Base .......................................................................................... 7

Legal Background ............................................................................................................. 9
    A.   The *Boumediene v. Bush* Decision ............................................................. 14

Argument ......................................................................................................................... 15

I.   PETITIONER IS ENTITLED TO DISCOVERY AND A JUDICIAL
    DETERMINATION OF THE CONTESTED LEGALLY SIGNIFICANT
    JURISDICTIONAL FACTS ...................................................................................... 15

II.  THIS COURT HAS JURISDICTION TO HEAR PETITIONER'S CHALLENGE TO
    THE LEGALITY OF HIS DETENTION ................................................................. 17
    A.   The Court Has Jurisdiction under 28 U.S.C. §2241 .................................... 17
    B.   Both Article III and the Suspension Clause Protect Petitioner's Right to Habeas
        Corpus Review of the Lawfulness of His Detention .................................... 21
    C.   Section 7 of the MCA Does Not Apply to this Action ................................ 31

III. *BOUMEDIENE* MAKES CLEAR THAT JURISDICTION LIES WITH THIS COURT
    AND THAT PETITIONER MAY INVOKE THE WRIT ............................................... 33
    A.   Egregious Deficiencies in the Status and Process Analysis Weigh Significantly in
        Petitioner's Favor ........................................................................................ 33
    B.   The U.S. Government Has Exclusive Jurisdiction and Control Over Bagram .......... 46
    C.   There Are Few Practical Obstacles Inherent in Resolving Mr. Al Maqaleh's
        Entitlement to the Writ ................................................................................ 55

IV. THE GOVERNMENT HAS VIOLATED PETITIONER'S CONSTITUTIONAL,
    STATUTORY, COMMON LAW, AND INTERNATIONAL RIGHTS ......................... 58
    A.   Petitioner's Seizure and Detention Violates the Rule of Law ..................... 58
    B.   Petitioner's Seizure and Imprisonment Violates the Due Process Clause ................. 60

Conclusion ...................................................................................................................... 69

**Table of Authorities**

## CASES

*Bell v. Hood*, 327 U.S. 678 (1946)..................................................................................... 12

*BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp.2d 73 (D.D.C. 2003).................................. 16

*Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814)........................................................... 29

*Case of the Hottentot Venus*, (1810) 104 Eng. Rep. 344 (K.B.)............................................... 28

*Chicago v. Morales,* 527 U.S. 41, 56 (1999)......................................................................... 39

*Chisholm v. Georgia*, 2 U.S. 419 (1793) ............................................................................... 64

*Darnel's Case* (1627) 3 How. St. Tr. 1 (K.B.) ......................................................................... 2

*Dorr v. United States*, 195 U.S. 138 (1904)........................................................................... 25

*Downes v. Bidwell*, 182 U.S. 244 (1901)............................................................................... 25

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997)............................... 15

*England v. La. St. Bd. of Med. Exam'rs*, 375 U.S. 411 (1964)................................................... 22

*Ex parte Bollman*, 8 U.S. 75 (1807)..................................................................................... 27

*Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) ........................................................................ 59

*Felker v. Turpin,* 518 U.S. 651 (1996) ............................................................................ 18, 28

*Filartiga v. Pena Irala*, 630 F.2d 876 (2d Cir. 1980) .............................................................. 66

*Ford v. United States*, 273 U.S. 593 (1927)........................................................................... 68

*Ford v. Wainwright*, 477 U.S. 399 (1986) ............................................................................. 60

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ............................................................................. 60

*Fuentes v. Shevin*, 407 U.S. 67 (1972).................................................................................. 60

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979)............................... 64

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987). ................................................................. 16

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .............................................................. 10, 13, 18, 30

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ..................................................................... passim

*Head-Money Cases*, 112 US. 580 (1884) ............................................................................. 68

*Heller v. Doe*, 509 U.S. 312 (1993) ...................................................................................... 63

*Ignatiev v. United States*, 238 F.3d 464 (D.C. Cir. 2001)......................................................... 16

*In re Estate of Ferdinand Marcos*, Human Rights Litigation, 25 F.3d 1467 (9th Cir. 1994)....... 66

*In re Guantanamo Detainees*, 355 F. Supp. 2d 453 (D.D.C. 2005) ................................. 12, 15, 61

*In re Yamashita*, 327 U.S. 1 (1942) ...................................................................................... 41

*In re Yamashita*, 327 U.S. 1 (1946) ...................................................................................... 30

*INS v. St. Cyr*, 533 U.S. 289 (2001)................................................................... 18, 27, 28, 32

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)............................................................. 18, 36, 41

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)...................................................................... 66

*Kelo v. City of New London*, 545 U.S. 469 (2005) ................................................................. 27

*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) ............................................................... 12

*King v. Schiever*, (1759) 97 Eng. Rep. 551 (K.B.) .................................................................. 28

*Landon v. Plasencia*, 459 U.S. 21 (1982).............................................................................. 64

*Ludecke v. Watkins*, 335 U.S. 160 (1948)............................................................................. 29

*Macharia v. United States*, 334 F.3d 61 (D.C. Cir. 2003)........................................................ 15

*Martinez v. Los Angeles*, 141 F.3d 1373 (9th Cir. 1998).......................................................... 39

*Mathews v. Diaz*, 426 U.S. 67 (1976) .................................................................................... 29

*Munaf v. Geren*, 128 S. Ct. 2207 (2008)................................................................................ 20

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804).............................................. 67

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272 (1855) ........... 60

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) .................................... 21

*Nixon v. United States*, 506 U.S. 224 (1993) ................................................................................ 59

*Owing v. Norwood's Lesse*, 9 U.S. (5 Cranch) 344 (1809) .......................................................... 65

*Panetti v. Quarterman*, 127 S. Ct. 2842 (2007)............................................................................ 60

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000)........................... 16

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217-18 (1995) ..................................................... 22

*Plyler v. Doe*, 457 U.S. 202, 215 (1982)....................................................................................... 29

*Prakash v. American University*, 727 F.2d 1174 (D.C. Cir. 1984)................................................ 16

*Rasul v. Bush*, 215 F. Supp. 2d 55 (D.D.C. 2002) ....................................................................... 15

*Rasul v. Bush*, 542 U.S. 466 (2004) ...................................................................................... passim

*Rayphand v. Sablan*, 95 F. Supp. 2d 1133 (D.N.Mar.I. 1999)...................................................... 25

*Reid v. Covert*, 354 U.S. 1 (1957).................................................................................................. 55

*Reynolds v. United States*, 98 U.S. 145 (1879).............................................................................. 25

*Robertson v. Baldwin*, 165 U.S. 275 (1897).................................................................................. 60

*Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669 (2006)..................................................................... 28

*Sommersett v. Stewart*, (1772) 20 How. St. Tr. 1 79-82 (K.B.).................................................... 28

*Sosa v. Alvarez Machain*, 542 U.S. 692 (2004) ............................................................ 65, 66, 67

*Springville v. Thomas*, 166 U.S. 707 (1897) ................................................................................. 25

*St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38 (1936)................................................. 21

*The Pacquette Habana*, 175 U.S. 677 (1900)......................................................................... 64, 67

*Torres v. Puerto Rico*, 442 U.S. 465 (1979) .................................................................................. 25

*Torres v. Sablan*, 528 U.S. 1110 (2000) ....................................................................................... 25

*United States ex rel. Bradley v. Watkins,* 163 F.2d 328 (2d Cir. 1947)........................................ 30

*United States ex rel. Sommerkamp v. Zimmerman*, 178 F.2d 645 (3d Cir. 1949) ....................... 30

*United States ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116 (2d Cir. 1949) .................................. 30

*United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952)..................................................... 29

*United States ex rel. Ludwig v. Watkins*, 164 F.2d 456 (2d Cir. 1947) ........................................ 30

*United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004)................................... 15

*United States ex rel. von Heymann v. Watkins*, 159 F.2d 650 (2d Cir. 1947) .............................. 30

*United States v. Iran*, 1980 I.C.J. 3 ............................................................................................... 66

*United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871) ................................................................. 22

*United States v. Pink*, 315 US. 203 (1942) ................................................................................... 68

*United States v. Raddatz*, 447 U.S. 667 (1980) ............................................................................ 22

*United States v. Rauscher*, 119 US. 407 (1886) ........................................................................... 68

*United States v. Robel,* 389 U.S. 258 (1967) ................................................................................ 59

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)............................................................. 25

*Von Moltke v. Gillies*, 332 U.S. 708 (1948).................................................................................. 30

*Vuolanne v. Finland*, No. 265/1987, U.N. Humans Rts. Comm. Communication No. 25/1987,
    ¶9.6, U.N. Doc. CCPR/C/35/D/265/1987 (1989) .................................................................... 67

*Warren v. Dist. of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ........................................................ 15

*Wilson v. Izard*, 30 F. Cas. 131 (C.C.D.N.Y. 1815) (No. 17,810)................................................ 30

*Wiwa v. Royal Dutch Petroleum*, 2002 WL 319887 (S.D.N.Y. 2002) ......................................... 66

*Wong Wing v. United States*, 163 U.S. 228 (1896)........................................................................ 29

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995)............................................................... 66

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................................. 28

**STATUTES**

Act of July 6, 1798, ch. 66, § 1, 1 Stat. 577 (1798) ..................................................... 29
Authorization for the Use of Military Force, 115 Stat. 224 (2001). ...................................... 35, 61
Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2680, 2739-2744 (2005) ("DTA")12, 13, 14, 18
Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ("MCA") ........... passim

**RULES**

Federal Rule of Civil Procedure 12 ............................................................................. 15
Federal Rule of Civil Procedure 81(a). ........................................................................ 15

**TREATISES**

Restatement (Third) of the Foreign Relations Law of the United States § 702 cmt.h (1987) ...... 39

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Art. VI, §2 ............................................................................................ 64

**INTERNATIONAL LAWS AND TREATIES**

African Charter on Human and People's Rights, June 27, 1981 ...................................... 43
Agreement and Exchanges of Notes Between the United States of America and Great Britain Respecting Leased Naval and Air Bases, art. IV, Mar. 27, 1941, 55 Stat. 1560 ..................... 50
American Convention on Human Rights, Nov. 22, 1969 ........................................... 43, 66
American Declaration of the Rights and Duties of Man, May 2, 1948 ................................ 43, 66
European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 221 ............................................................................... 43, 66
Geneva Convention Relative to the Treatment of Prisoners of War, Art. 3, Aug. 12, 1949, 6 U.S.T. 3316 ............................................................................................... 13, 62
International Covenant on Civil and Political Rights, Dec. 19, 1966................................... 43, 66
International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, 999 U.N.T.S. 171 ......................................................................................................... 67
Lease of Certain Areas for Naval or Coaling Stations, July 2, 1903, U.S.-Cuba, art. I............... 48
Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III T.S. No. 418 .................................................................................................................... 47
Multilateral Treaties Deposited with the Secretary General: Status as of Dec. 31, 2002, U.N. Doc. ST/LEG/SER.E/22 (2002)................................................................................ 67
Protocol Additional to the Geneva Conventions of 12 Aug., 1949, and Relating to the Protection of Victims of Int'l Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 603 .............................. 35
Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, Art. III, 48 Stat. 1683, T.S. No. 866................................................................................................................... 47
United Nations Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, adopted by the General Assembly by Resolution 43/173 G.A. Res. 173, U.N. GAOR, 43rd Sess., Supp. No. 49, U.N. Doc. A/43/49 (1988)................................ 66

United Nations Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, G.A. Res. 43/173, U.N. GAOR, 43rd Sess., Supp. No. 49, U.N. Doc. A/43/49 (1988) ................................................................................................ 66
Universal Declaration of Human Rights, G.A. Res. 217A, U.N. GAOR, 3d Sess., 1st plen. mtg., U.N. Doc. A/810 (Dec. 12, 1948)................................................................... 42, 65

## EXECUTIVE AUTHORITIES

Dep't of Def. Mem., Combatant Status Review Tribunal (CSRT) Process at Guantanamo (Jul. 2007) ................................................................................................................ 44
Dep't of Def. Mem., Implementation of Combatant Status Review Tribunals for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bar, Cuba (July 14, 2004)............... 39
Dep't of Def. Memorandum, Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, Sept. 14, 2004 ............... 40
Exec. Order No. 10,0144, 15 Fed. Reg. 4705 (July 21, 1950)...................................... 54
Mem. to the Sec'y of the Navy from Paul Wolfowitz, Deputy Sec'y of Def. (July 7, 2004) 11, 31, 61

## OTHER AUTHORITIES

*$35 Million for Bagram AB Power Plant*, Defense Industry Daily (Aug. 4, 2008) .................... 52
1 Henckaerts & Doswald-Beck, Customary International Humanitarian Law 11 (2005)............ 62
138 Cong. Rec. 54781-01(1992)................................................................................ 67
14 United Nations War Crimes Commission, Law Reports of Trials of War Criminals 8-10 (1949) (reprint 1997)............................................................................................ 37
152 Cong. Rec. S10270 (daily ed. Sept. 27, 2006)....................................................... 26
152 Cong. Rec. S10368 (daily ed. Sept. 28, 2006)....................................................... 26
152 Cong. Rec. S10404 (daily ed. Sept. 28, 2006)....................................................... 26
3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War 35 (J. Pictet ed., 1960) ............................................................... 68
3 State Trials 1098 (T.B. Howell ed. 1816)................................................................... 2
3 Story, Commentaries on the Constitution of the United States § 1783 (1833)........................ 60
9 The Documentary History of the Ratification of the Constitution 1092 (John P. Kaminski & Gaspare J. Saladino eds., 1990) ........................................................................... 27
A. Denning, Leaves From My Library (1986)................................................................. 2
Agreement on Control Machinery in Germany, Adopted by the European Advisory Commission, art. 1, Nov. 14, 1944, 5 U.S.T. 2062 ...................................................................... 54
Agreement on Military Exchanges and Visits between the Government of the United States of America and Mongolia, art. X, Jun. 26, 1996................................................................ 50
Amnesty Int'l, No Substitute for Habeas Corpus: Six Years Without Judicial Review in Guantanamo, AMR 51/163/2007 (2007) ........................................................... 34, 40
Army and Airforce Exchange Service, *Serving Troops Downrange*....................................... 8, 52
Center for Constitutional Rights, *Report on Torture and Cruel, Inhuman, and Degrading Treatment of Prisoners at Guantanamo Bay, Cuba,* (July 2006) ............................................. 7
Construction Services for Bulk Fuel Storage and Transfer System at Bagram Airfield, Afghanistan, Army Corps of Engineers Contracting, Solicitation No. W912ER08R0054 (Apr. 25, 2008) ................................................................................................. 51

Department of the Navy, *Commander's Handbook on the Law of Naval Operations* 11.3 (1995) ........................................................................................................................................ 62

Diane P. Wood, *The Rule of Law in Times of Stress*, 70 U. Chi. L. Rev. 455 (2003) ................. 58

Environmental Conditions at Bagram Airfield Information for Health Care Providers (HCPs), June 2004 ...................................................................................................................... 51

Eric M. Freedman, *Hamdi and the Case of the Five Knights*, Legal Times, Feb. 3, 2003 ........... 16

Eric M. Freedman, *Lessons from Past Guide Future*, Newsday, June 17, 2008 .......................... 2

Fabric Aircraft Maintenance Hanger at Bagram Airfield, Afghanistan, Army Corps of Engineers Contracting, Solicitation No. W912ER08R0052 (Apr. 29, 2008) .......................................... 51

Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien: A Case Missing from the Canon*, 9 Green Bag 2d 39 (2005) ........................................................................ 29

Gerald L. Neuman, *The Habeas Corpus Suspension Clause After INS v. St. Cyr*, 33 Colum. Hum. Rts. L. Rev. 555 (2002) ...................................................................................................... 27

*Habeas Corpus Act of 1640* ..................................................................................................... 2

Human Rights First, *Arbitrary Justice: Trials of Bagram and Guantanamo Detainees in Afghanistan* (Apr. 2008) ..................................................................................................... 8

Installation Profile: U.S. Controlled Air Base in Bagram Equipped with Superior Essex Cable, © 2008, Superior Essex Inc. ................................................................................................. 52

International Committee of the Red Cross, *Afghanistan: Video Links Between Bagram Detainees and Families* (January 14, 2008) ........................................................................................ 52

Kent Harris, *Buildings Going up at Bagram Air Base as U.S. Forces Dig in for the Long Haul*, Stars ad Stripes, Mar. 15, 2005 ........................................................................................ 51

M. Cherif Bassiouni, *Human Rights in the Context of Criminal Justice:  Identifying International Procedural Protections and Equivalent Protections in National Constitutions*, 3 Duke J. Comp. & Int'l L. 235 (1993) ............................................................................................... 65

Magna Carta ............................................................................................................................ 3

Mark Denbeaux et al., *Report on Guantánamo Detainees: A Profile of 517 Detainees through Analysis of Dept. of Defense Data* (Seton Hall Univ. Feb. 8, 2006) .................................... 7

Mark Denbeaux, *No-Hearing Hearings, CSRT: The Modern Habeas Corpus*? (Seton Hall Univ. Apr. 2, 2007) .................................................................................................................... 34

Michael Schmitt, *Humanitarian Law and Direct Participation in Hostilities By Private Contractors or Civilian Employees*, 5 Chi. J. Int'l L. 511 (2005) ........................................ 62

*New Bagram Hospital Offers State of the Art Care*, Air Force Print News Today (Feb. 9, 2007) ........................................................................................................................................ 52

Occupation Statute Defining the Powers To Be Retained by the Occupation Authorities, *reprinted in* Staff of S. Comm. On Foreign Relations, 92d Cong., *Documents on Germany, 1944-1971* (Comm. Print 1971) ......................................................................................... 55

Press Release, Department of Defense, *Engineer Team Plans Bagram's Future* (Aug. 13, 2008) ................................................................................................................................... 8, 52

Richard H. Fallon, *"The Rule of Law" as a Concept in Constitutional Discourse*, 97 Colum. L. Rev. 1 (1997) .................................................................................................................... 59

SSgt Oshawn Jefferson, FET Keeps Bagram Improving, Growing, Air Force Print News Today, Dec. 4, 2007 .................................................................................................................... 53

Synopsis, Security Upgrades, Army Corps of Engineers Contracting ......................................... 51

T. Paine, Common Sense (Philadelphia 1776) ........................................................................... 2

The Federalist No. 47 (James Madison) ................................................................................... 59

The Federalist No. 80 (Alexander Hamilton) ............................................................ 64
The Federalist No. 83 .................................................................................................. 27
The Federalist No. 84 (Alexander Hamilton) ..................................................... 3, 27
The Tryal of John Hambden Esq. 131 (T. Salmon ed. 1719) ...................................... 2
Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. Times, May 22, 2005 .......... 5
Tim Golden, *Foiling U.S. Plan, Prison Expands in Afghanistan*, N.Y. Times, Jan. 7, 2008 ... 7, 53
Tom Lasseter, *Day 2: U.S. Abuse of Detainees Was Routine at Afghanistan Bases*, McClatchy
    Newspapers, June 16, 2008 .................................................................................... 8
*U.S. Air Force Pamphlet* 110-31, § 5-3(a)(1)(c) (Nov. 19, 1976) ............................... 62
William F. Duker, A Constitutional History of Habeas Corpus (1980) ...................... 27

## Preliminary Statement

Petitioner Fadi Al Maqaleh, acting through his Next Friend, his father, Ahmad Al Maqaleh, and by and through undersigned counsel, respectfully submits this Opposition to Respondents' Motion to Dismiss ("Resp. Mot.") the petition for a writ of habeas corpus for lack of subject matter jurisdiction. Petitioner Fadi Al Maqaleh ("Mr. Al Maqaleh" or "Petitioner"), who has been imprisoned without charge or trial by Respondents in a U.S. military prison for more than five years, seeks the Great Writ.

Respondents maintain that Petitioner is not entitled to know the reason for his seizure, detention, repeated interrogations, and continued imprisonment because Respondents–in their sole discretion–have chosen to house Mr. Al Maqaleh at the U.S. military prison in Bagram, Afghanistan, rather than the military prison at the U.S. Naval Station at Guantanamo Bay, Cuba ("Guantanamo"). Whatever "exigencies of battle" argument Respondents *might have* legitimately relied upon more than five years ago to justify Petitioner's temporary detention in Bagram Prison, they cannot now—after so much time has passed–insist that the very same unsupported contention supports Fadi Al Maqaleh's continued detention without charge, trial, or due process of any sort.[1] Resp. Mot. at 4. Respondents' view is that what they mislabel "separation of powers" permits them unilaterally to impose such a punishment without process, without appeal, and, as they have repeatedly stated, without end.[2] Respondents are dangerously mistaken. "Separation of powers" does not mean "concentration of powers." *See Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004). Contrary to the apparent logic of Respondents' position, habeas corpus is not unconstitutional. The requirement that the Executive justify its

---

[1] As the First Amended Petition amply demonstrates, Petitioner has pled facts that directly undermine Respondents' characterization of all pertinent events. *See generally*, First Amended Petition ("Petition").

[2] As Justice O'Connor describes in *Hamdi v. Rumsfeld*, 542 U.S. 507, 520 (2004) the so-called "war on terror" is "broad and malleable" and "'unlikely to end with a formal cease-fire agreement.'"

imprisonments before a neutral judge is, like other aspects of our system of checks and balances, designed to implement the Constitutional design of replacing a government where the King is Law[3] with one where the Law is King.[4] *See Boumediene v. Bush*, 128 S. Ct. 2229, 2277 (2008).

This case involves a young, Yemeni man who was seized and held in Respondents' custody for more than five years in the prison at THE U.S. Air Base in Bagram, Afghanistan ("Bagram"). At issue is whether the Executive can create a modern-day Star Chamber, where it can affix a label to an individual—*i.e.,* "enemy combatant" or "unlawful enemy combatant"—who has no meaningful ability to challenge that label, and on that basis, detain him indefinitely, virtually *incommunicado*, subject to interrogation and torture, without any right of redress. The English Parliament dissolved the original Star Chamber by the *Habeas Corpus Act of 1640,* and the U.S. Supreme Court has thrice-rejected Respondents' effort to build a modern-day Star Chamber in Guantanamo. Nevertheless, Respondents seek to revive their effort to create a prison beyond judicial scrutiny by arguing that habeas corpus does not extend to Bagram because, unlike the circumstances of the English Kings, they have deliberately located their Star Chamber in an airfield they contend is outside their "realm," for the express purpose of avoiding compliance with domestic civil, criminal, and military law, as well as international law.

Respondents' position is deeply at odds with the fundamental legal and moral principles of

---

[3] In an action known to history as the "ship money" case,  Charles I laid a defense tax, and John Hampden, a leader of the popular party in the House of Commons, refused to pay it on the grounds that Parliament had not authorized it. The Crown sued for the sum owed in the Court of Exchequer, and the twelve judges ruled in favor of the King. Concurring in this judgment, Sir Robert Berkeley stated: "I never read nor heard, that *Lex* was *Rex*, but it is common and most true, that *Rex* is *Lex*, for he is a *lex loquens*, a living, a speaking, an acting Law." The Tryal of John Hambden Esq. 131 (T. Salmon ed. 1719) *reprinted in* 3 State Trials 1098 (T.B. Howell ed. 1816). This judgment was one act in a drama that included Charles's assertion in *Darnel's Case* (1627) 3 How. St. Tr. 1 (K.B.), that he could simply invoke national security to preclude judicial review of detentions, *see Boumediene* discussion of this case; Eric M. Freedman, *Lessons from Past Guide Future*, Newsday, June 17, 2008, at A 31, and progressed to his execution and the creation of legal structures designed to end such pretensions permanently. *See* A. Denning, Leaves From My Library*, 34-49 (1986).

[4] *See* T. Paine, Common Sense 57 (Philadelphia 1776) ("[L]et a day be solemnly set apart for proclaiming the Charter; . . .let a crown be placed thereon, by which the World may know, that so far as we approve of monarchy, that in America THE LAW IS KING.  For as in absolute governments the King is Law, so in free Countries the law *ought* to be king; and there ought to be no other.")

American democracy as well as the historical grounding of habeas corpus in this country. The principle of ensuring people's freedom from arbitrary Executive detention dates back to the writing of the Magna Carta.[5] It has not been limited territorially, and it remains one of the most fundamental tenets of the rule of law. Indeed, it was a primary concern of the Framers.[6] Yet Respondents' Orwellian argument is that the Court lacks the constitutional authority to lift the veil of secrecy surrounding Bagram and is precluded by the Constitution from fulfilling the judiciary's essential role as a check on Executive power.

Respondents' justification for denying Petitioner access to any forum in which he can challenge the legality of his detention is by now an all too familiar one. Petitioner is not a U.S. citizen, and thus, Respondents allege, his imprisonment by the U.S. Government overseas cannot be challenged in this (or any) court of law.[7] However, Respondents' arguments that foreign nationals held outside of the mainland territory of the United States lack any cognizable rights and are not entitled to invoke this Court's jurisdiction have already been expressly considered and rejected by the Supreme Court. In addition, Respondents' position finds no support in the statutory scheme enacted by Congress to regulate the Defense Department's treatment of alleged "enemy combatants."

Respondents contend alternatively that: (a) the Military Commissions Act of 2006, Pub. L.

---

[5] The Great Writ of habeas corpus descends from the Magna Carta signed by King John at Runnymede in 1215.  *See* Art. 39 ("No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any other way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the laws of the land.").

[6] In Federalist Paper No. 84, Alexander Hamilton hails the writ of habeas corpus, saying "the practice of arbitrary imprisonments, [has] been, in all ages, [one of] the favorite and most formidable instruments of tyranny." The Federalist No. 84, at 435 (Alexander Hamilton) (Gary Wills ed., 1982) (Declaration of Barbara Olshansky, dated October 15, 2008 ("Olsh. Decl.") ¶1, Exh. 4). He goes on to quote "the judicious Blackstone," who wrote that punishment without accusation or trial "'. . . must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.'"

[7] Respondents do not take the position that there is any other court that has jurisdiction to hear Petitioner's case. Indeed, it is hard to imagine how any other court could attempt to adjudicate the claims of Petitioner–a Yemeni citizen held *incommunicado*, without access to counsel, held by U.S. forces at a U.S. military base in Afghanistan.

No. 109-366, 120 Stat. 2600 ("MCA"), precludes this Court from exercising jurisdiction under the federal habeas statute, 28 U.S.C. §§2241 *et seq.*; (b) the habeas statute does not extend to Bagram; (c) Fadi Al Maqaleh has no statutory, constitutional, or a common law entitlement to the writ; and (d) he is barred from enforcing any analogous international due process rights. For the following reasons, these arguments are legally untenable:

- This Court has jurisdiction to consider the Petition under the federal habeas statute, 28 U.S.C. §§2241 *et seq.* because the statute covers Petitioner, *Rasul v. Bush*, 542 U.S. 466 (2004), and he *has not been determined* to be an "enemy combatant" by a "competent tribunal" as required by the other arguably applicable statute, *i.e.*, the MCA §3a (2006);

- At minimum, this Court cannot decide whether Petitioner has been "determined by the United States to have been properly detained" as an "enemy combatant" without permitting him to take discovery regarding the meaning of the term "enemy combatant" as it is employed at Bagram, and the nature, operation, and personnel involved in the "Enemy Combatant Review Board" process[8] allegedly used at Bagram as to which Respondents have made factual representations to this Court, *see Hamdi*, 542 U.S. at 535;

- To the extent the MCA §7(a) is deemed to apply to this case, it works an unconstitutional violation of the Suspension Clause of the Constitution because Congress neither properly suspended the writ nor provided for an adequate alternative remedy for Petitioner, *see Boumediene*, 128 S. Ct. at 2306; and

- Petitioner's imprisonment without even a modicum of due process violates the Constitution, international human rights law (both treaty and customary), the laws of war, and his common law rights.

It is important not to lose sight of the context in which this case is presented. Bagram is not a temporary holding camp, intended to house enemy soldiers who have been apprehended on the battlefield for the duration of a declared war, finite in time and space. On the contrary, the "war on terror," as conceived by Respondents, is unlimited in duration and global in scope. *Hamdi*, 542 U.S. at 520 (citing to the Government's concession regarding the unconventional nature of the "war on terror"). Unlike the detention facilities at Guantánamo, moreover, Bagram is conceived of as a *permanent* prison - one located, according to Respondents, in a lawless

---

[8] Declaration of Colonel Charles A. Tennison, dated September 15, 2008, ("Tennison Decl.") ¶¶11-13.

enclave. Resp. Mot. at 2. People seized from many different locations around the world are brought to Bagram for whatever reasons Respondents may choose and held there for as long as Respondents may desire, while being subjected to whatever conditions of confinement and interrogation techniques Respondents may select. *See* Declaration of Jawed Ahmad, dated October 15, 2008 ("Ahmad Decl."), ¶¶10-16, (Declaration of Barbara Olshansky, dated October 15, 2008 ("Olshansky Decl."), ¶4, Exh. 1). Indeed, Respondents have admitted that interrogators tortured and killed at least two prisoners at Bagram. Pet. ¶42.[9] (citing Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. Times, May 22, 2005, (Olsh. Decl. ¶8, Exh. 5)). But, according to Respondents, their decisions are absolutely immune from judicial review. Petitioner respectfully urges the Court to reject that chilling proposition, deny Respondents' Motion to Dismiss, and issue the Great Writ.

## Statement of Facts

### A.  Petitioner Fadi Al Maqaleh

Petitioner Fadi Al Maqaleh has been held in Respondents' unlawful custody in Bagram Prison for more than five years. Though he has committed no wrong, he has been held virtually *incommunicado* in U.S. military custody without lawful basis, without any legally cognizable charge, without access to counsel, and without access to any fair process by which he might challenge the legality of his detention. Pet. ¶1.

Petitioner Al Maqaleh is now approximately 25 years old. Pet. ¶12. He is a citizen of Yemen. *Id.* at ¶7. Petitioner's Next Friend, his father, Ahmad Al Maqaleh, first learned that his son was in the custody of the United States military forces in 2003 when he received a letter from him via the International Committee of the Red Cross ("ICRC"). *Id.* at ¶14. Since that initial correspondence, Petitioner's father has received only a few additional letters from his son via the

---

[9] References in the brief to the First Amended Petition (filed Feb. 12, 2007) are cited as ("Pet.").

ICRC. *Id.* at ¶15. When Petitioner's father contacted the ICRC, he was informed by ICRC officials that his son was being detained by U.S. forces in the prison at the U.S. Air Base at Bagram, Afghanistan. *Id.* at ¶16. Respondents redacted the ICRC letters and did not permit Petitioner Al Maqaleh to explain the circumstances of his capture or how he came to be in Respondents' custody. *Id.* at ¶18.

After his transfer into U.S. military custody at Bagram Prison, Fadi Al Maqaleh promptly identified himself by correct name and nationality to the U.S. personnel questioning him, and then requested that the United States provide him with a means of access to his family and to legal counsel. *Id.* at ¶11. Since that time, Petitioner's only access to his family has been through the limited written correspondence delivered by the ICRC and two brief telephone conversations with his father over the last two months. *See* Declaration of Tina Foster, dated October 15, 2008 ("Foster Decl.") ¶X (Olsh. Decl. ¶5, Exh. 2). To this day, Respondents continue to deprive Fadi Al Maqaleh access to counsel, despite requests by Petitioner and counsel. *Id*. at ¶8. *See also* Letter to Respondents' Counsel Jean Lin dated October 13, 2008 (Olsh. Decl, ¶6, Exh. 3). Notwithstanding their refusal to allow counsel access to Petitioner, Respondents have authorized agents of the U.S. Departments of Defense and Justice to interrogate Mr. Al Maqaleh on repeated occasions and continue to hold him *incommunicado*. Pet. ¶28. He has been denied his rights under all sources of domestic law as well as international law, including treaties such as the Geneva Conventions, and customary international law. Pet. ¶¶80-89.

Petitioner has never had the opportunity to relate any information to counsel that may be relevant to the Courts' consideration of the instant motion. Accordingly, the circumstances under which Petitioner came to be in Respondents' custody remain a mystery.[10] Petitioner is not an

---

[10] Though Respondents have submitted a declaration alleging that Petitioner was "captured" in Afghanistan, Petitioner has not been provided any opportunity to counter this assertion because Respondents have not submitted a

"enemy combatant." Pet. ¶22. He has not received any fair process by which he has been determined to be an "enemy combatant" and therefore he has not been properly detained as such. Pet. ¶28. Despite the having been denied due process of law, Petitioner has been imprisoned for more than five years at a detention facility where the conditions of confinement are significantly worse than those at Guantanamo. *Id.* at ¶36.

## B. Bagram Air Base

Bagram Prison is not a transient possession being used out of war-time necessity. It is a *permanent* U.S. military base, under the exclusive jurisdiction of the United States. The United States exercises exclusive jurisdiction and control over the Air Base at Bagram in exactly the same way as it does over Guantanamo – the host nation (in this case, Afghanistan) has ceded ultimate control over the base to the United States under a lease agreement, which endures in perpetuity. *See* Accommodation Consignment Agreement in Afghanistan (Sept. 26, 2002) (Tennison Decl., Exh. A). Significantly, even if hostilities end, and all other U.S. forces have been withdrawn from the region, the terms of the lease do not require the United States to cede control of Bagram Airbase back to the Afghan government. *Id*. Bagram Prison has grown and continues to grow far beyond the size of the facility at Guantanamo. While the number of detainees at Guantanamo has decreased to close to two hundred, the number of detainees at Bagram has increased to more than 670. Tim Golden, *Foiling U.S. Plan, Prison Expands in*

---

traverse and are holding him *incommunicado* and without access to counsel. In fact, Respondents have prevented Petitioner from communicating to anyone how he came to be at Bagram. Pet. ¶18. As discussed more fully in Section I, *infra*, Respondents cannot rely on extrinsic evidence outside the pleadings and concomitantly deny Petitioner an opportunity to put forth his own evidence. Moreover, even taking Respondents' allegation that Petitioner was "captured" in Afghanistan at face value, such an unsupported factual assertion is meaningless without additional information concerning the circumstances and without further corroboration. Respondents' own records reveal that a large number of detainees purportedly "captured" by U.S. forces in Afghanistan were brought there by bounty hunters or other third parties and were not taken into custody by U.S. soldiers on a battlefield. *See* Mark Denbeaux et al., *Report on Guantánamo Detainees: A Profile of 517 Detainees through Analysis of Dept. of Defense Data* (Seton Hall Univ. Feb. 8, 2006) (Olsh. Decl. ¶9, Exh. 6). *See also* CIA's PsyOp Al Qaeda Bounty Flyer circulated by the U.S. Government in Afghanistan, found in Center for Constitutional Rights, *Report on Torture and Cruel, Inhuman, and Degrading Treatment of Prisoners at Guantanamo Bay, Cuba* (July 2006) at 8 (Olsh. Decl. ¶10, Exh. 7).

*Afghanistan*, N.Y. Times, Jan. 7, 2008 (showing the steady increase in detainees at Bagram Prison since 2004) (Olsh. Decl. ¶11, Exh. 8). The Army Corps of Engineers has contracted for costly, permanent additions to Bagram Airbase, including the addition of a bulk fuel service station, a central command center, and permanent barracks for army personnel. Press Release, Department of Defense, *Engineer Team Plans Bagram's Future* (Aug. 13, 2008) (Olsh. Decl. ¶12, Exh. 9). With no end in sight to the U.S. presence in Afghanistan, projects are underway to render Bagram more like home for U.S. troops and their families through the addition of a Dairy Queen, a beauty salon, a nail spa, an Orange Julius, a coffee shop, and a Burger King. Army and Air Force Exchange Service, *Serving Troops Downrange* (Olsh. Decl. ¶13, Exh. 10).

Detainee abuse at Bagram has been pervasive.  By December 2001—weeks before the first detainees arrived at Guantanamo—the Bagram Theater Internment Facility had already become "a center of systematic brutality." Tom Lasseter, *Day 2: U.S. Abuse of Detainees Was Routine at Afghanistan Bases*, McClatchy Newspapers, June 16, 2008 (Olsh. Decl. ¶14, Exh. 11). The detainees at Bagram, many of whom have been held for more than six years without the most minimal judicial process, have been subjected to the worst degradations of human dignity, including sexual assault, physical and psychological torture, and murder. *See Human Rights First, Arbitrary Justice: Trials of Bagram and Guantanamo Detainees in Afghanistan* (Apr. 2008) (Olsh. Decl. ¶15, Exh. 12). The reports of abuse and brutality perpetrated by interrogators at Bagram are well-documented from sources inside the military. Recently released detainees have confirmed that detainee abuse remains a routine occurrence. *See* Ahmad Decl. ¶10-16 (Olsh. Decl. ¶4, Exh. 1).[11]

---

[11] Describing 110 interrogations over the course of 11 months, during which he was deprived of sleep, exposed to extreme temperatures, taunted, screamed at, beaten with chairs and slammed into walls, breaking two of his ribs. When he fell unconscious twice, each time the guards forced him to stand up again, and as he cried, his captors laughed, calling him a spy for the Taliban. *Id*.

There is no judicial process afforded to Bagram detainees. Indeed, the Enemy Combatant Review Board ("ECRB") scheme offers detainees fewer due process protections than the Combatant Status Review Tribunals ("CSRT") at Guantanamo. Bagram detainees are often not told the charges against them (if any), they are not permitted to attend any hearings held, to question the Government's witnesses, to call their own witnesses, or to receive the guidance of an advocate. Ahmad Decl. ¶¶15-18 (Olsh. Decl. ¶4, Exh. 1). And unlike Guantanamo, for those held at Bagram, there is no appeal from the ECRB determination, no recourse to any tribunal or court. Because Bagram detainees lack any venue for a review of their status, the ECRBs fail to meet even the barest standards of due process. The inadequacies of the process at Bagram result in the torture and indefinite detention of countless detainees many of whom are innocent. For example, Jawed Ahmad, a journalist working for Canadian television who was erroneously detained by U.S. forces, was held in detention at Bagram for 11 months and suffered serious physical and psychological abuse. *Id.* at ¶25. Despite over 60 written requests to present letters and certificates which would have established his innocence, the U.S. Government never responded or otherwise permitted Petitioner to present any such evidence to those responsible for his case. *Id.* at ¶20.

## Legal Background

Over the past four years, the Supreme Court has issued three decisions concerning the role of the federal courts in reviewing and, where necessary, invalidating, the acts of the Executive branch taken in the course of its prosecution of the "war on terror." *See Rasul*, 542 U.S. at 487 ("there are circumstances in which the courts maintain the power and the responsibility to protect persons from unlawful detention even where military affairs are implicated"); *Hamdi*, 542 U.S. at 535 ("[i]t does not infringe on the core role of the military for the courts to exercise their own

time-honored and constitutionally mandated roles of reviewing and resolving claims" related to Executive detention); *Hamdan v. Rumsfeld*, 548 U.S. 557, 588 (2006) ("*Ex parte Quirin* 'provides a compelling historical precedent for the power of civilian courts to entertain challenges that seek to interrupt the processes of military commissions.'")

During the same time period, Congress twice legislated to prohibit egregious conduct during interrogation and detention, such as torture and cruelty, while concomitantly imposing structure on the courts' oversight role. And just four months ago, the Supreme Court issued the definitive decision concerning the rights of "war on terror" detainees to the writ of habeas corpus. *See Boumediene,* 128 S. Ct. at 2229. The instant case is presented against the backdrop of this ongoing dialogue between the Courts and Congress, and, accordingly, Petitioner briefly summarizes the legislative and litigation history in this area.

In *Rasul*, four detainees imprisoned at Guantanamo filed a habeas petition seeking release from custody in February of 2002. 542 U.S. at 472. In resisting the *Rasul* Petition, the U.S. took the position that foreign nationals detained by the U.S. military were not entitled to the protection of the federal habeas statute, the Constitution, the common law, or any binding customary international law rule or treaty. *Id*. By June 2004, two cases[12] had made their way to the Supreme Court and were decided *sub nom Rasul v. Bush,* 542 U.S. 466 (2004). In *Rasul*, the Supreme Court ruled that detainees at Guantanamo were protected under the federal habeas statute and were therefore entitled to bring petitions to challenge the legality of their detention. The Court based its reasoning on three findings relevant here: (i) the U.S. exercises "exclusive jurisdiction and control" over the territory occupied by the Guantanamo Bay Naval Base, *id*. at 467; (ii) the Guantanamo detainees had "never been afforded access to any tribunal, much less

---

[12] One case was filed as a petition for a writ of habeas corpus on behalf of two British citizens and two Australian citizens under the caption *Rasul v. Bush*, and the other was filed as a complaint for declaratory and injunctive relief on behalf of Kuwaiti detainees under the caption *Al Odah v. Rumsfeld. Rasul,* 542 U.S. at 472.

charged with and convicted of wrongdoing," *id.* at 476; and (iii) the federal habeas statute makes no distinction between aliens and citizens, and thus "[a]liens held at the base, no less than American citizens, are entitled to invoke the federal courts' authority under §2241." *Id.* at 481. As a result of its determination that the Guantanamo detainees fell within the ambit of the statutory writ of habeas corpus, the Supreme Court remanded the cases for adjudication on the merits. *Id.* at 485.

In *Hamdi*, the Supreme Court addressed the role of the courts in considering the Executive's procedures for determining whether its "war on terror" detainees are in fact "enemy combatants." 542 U.S. at 516. *Hamdi* confirms that, "whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Id.* at 536. The plurality in *Hamdi* also held that a detainee "must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Id.* at 533. The *Hamdi* plurality considered the possibility that "an appropriately authorized and properly constituted military tribunal" might meet this minimum threshold. *Id.* at 537. In the wake of the *Hamdi* decision, the Defense Department ("DoD") announced the creation of so-called Combatant Status Review Tribunals ("CSRTs") at Guantanamo to provide prisoners with some modicum of due process. *See* Memorandum to the Secretary of the Navy from Paul Wolfowitz, Deputy Secretary of Defense (July 7, 2004) ("Wolfowitz Memo") (Olsh. Decl. ¶16, Exh. 13). The CSRTs are informal proceedings ostensibly offered to give detainees the opportunity to contest the prior secret Executive determinations that they are "enemy combatants." The CSRTs were purportedly "modeled after Army Regulation 190-8 which governs the determination of prisoner of war

status." *In re Guantanamo Detainees*, 355 F. Supp. 2d 443, 467-68 (D.D.C. 2005).[13]

On remand, Respondents filed motions to dismiss all of the habeas petitions, arguing that the *Rasul* decision had decided only a jurisdictional question and had left open the substantive question of whether the detainees had any constitutional, statutory, or international law rights that could be vindicated by means of the writ.[14] When two district courts reached conflicting decisions on the scope of *Rasul's* holding—including the definitively resolved question of whether petitioners were entitled to the writ—*see Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005); *In re Guantanamo Detainees*, 355 F. Supp. 2d 443 (D.D.C. 2005), the decisions were appealed and consolidated before the D.C. Circuit Court of Appeals. *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007).

In the fall of 2005, while the *Boumediene* appeal was pending, and after the majority of the CSRTs at Guantanamo had already been held, Congress passed the Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2680, 2739-2744 (2005) ("DTA"). The DTA: (a) mandates the humane treatment of *all* detainees—not just persons detained at Guantanamo—in U.S. custody, except for "persons" detained "pursuant to a criminal or immigration law of the United States," DTA, §1002(a)-(b); (b) prohibits "the cruel, inhuman, or degrading treatment or punishment" of any "individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location," *id.* at §1003(a); (c) provides that all Guantanamo

---

[13] As discussed at length, *infra*, the *Boumediene* Court determined that the CSRT process suffered from a number of egregious shortcomings in terms of due process requirements.

[14] In this way, Respondents try to dissect the Great Writ into two pieces, an argument seemingly unheard of in the decisional authority. In support of their argument, Respondents cited to *Bell v. Hood*, 327 U.S. 678, 681 (1946) where the Supreme Court held that in most civil actions, whether a court has jurisdiction and whether the complaint states a cause of action are distinct questions, and that the jurisdictional question should be resolved first and without regard to the cause of action question. This jurisdiction/cause of action dichotomy, however, has never been applied to habeas actions challenging Executive detention because the cause of action is inherent in the existence of jurisdiction to issue the writ. No other legal provision must be invoked to show entitlement to relief. In cases of Executive detention, the writ of habeas corpus is a procedural mechanism having a single purpose: it commands the respondent to bring the petitioner before the court, so the court may then determine the legality of respondent's detention of petitioner. *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 113 (1866) (a proceeding for habeas corpus is the "cause of the party applying for it" and the questions raised by it are a "matter of right and not of discretion").

detainees are to be afforded an opportunity to appear at a CSRT to challenge their designation by DoD as "enemy combatants," and to appeal any final decision of the CSRT directly to the D.C. Circuit Court of Appeals, *id.* at §1005(e)(2); and (d) amended 28 U.S.C. §2241 by adding a subsection which stripped U.S. courts of jurisdiction to consider the habeas petitions filed on behalf of the alleged "enemy combatants" at Guantanamo.  DTA, §1005(e)(1).

The Supreme Court reviewed the DTA in *Hamdan*, a case challenging the military commission trial process created by the Executive branch to hear the cases it selected for military prosecution.  The *Hamdan* Court held that: (a) the DTA could not be applied retroactively and therefore did not strip jurisdiction from courts with pending habeas corpus cases; (b) Common Article 3 of the Geneva Conventions—the "mini-convention" that protects detainees' core due process rights by prohibiting "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all judicial guarantees which are recognized as indispensable by civilized peoples," Geneva Convention Relative to the Treatment of Prisoners of War, Art. 3, Aug. 12, 1949, 6 U.S.T. 3316 ("GCIII") —governs Mr. Hamdan's treatment in U.S. custody; and (c) the newly-fabricated military commission slated to try him for war crimes was unconstitutional because it had not been authorized by Congress. *Hamdan,* 548 U.S. at 587.

In the fall of 2006, Congress passed the MCA, which, among other things, provided the necessary authorization for the military commission trial process.  The MCA also amended the habeas statute, 28 U.S.C. §§2241 *et seq.*, by adding the following provisions:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
>
> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee

> Treatment Act of 2005 (10 U.S.C. §801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. §2241(e). The instant petition was filed before the MCA was enacted.

## A. The *Boumediene v. Bush* Decision

In the consolidated cases testing MCA §7(a), stripping all courts of the power to hear §2241 petitions for a writ of habeas corpus, the Supreme Court ruled that the statutory provision could not be read to preclude foreign nationals held at Guantanamo from pursuing habeas challenges to the legality of their detention. *Boumediene*, 128 S. Ct. 2229. The Court, split 5-4 with Justice Kennedy writing the majority opinion, ruled that in enacting the MCA, Congress had not validly taken away the detainees' habeas rights because it only has the authority to do so within the framework of the Suspension Clause, which permits a temporary suspension of the writ only when the country faces an internal rebellion or invasion. No part of the MCA, nor any statement made in the debate prior to enactment, indicated that any member of Congress believed the necessary conditions to be extant at the time.

The Court also declared that detainees do not have to go through the special review process Congress created in the Detainee Treatment Act and later amended in the MCA, because that process does not constitute an "adequate and effective substitute" for the constitutional right to habeas corpus. *Id*. The Court refused to accept the Government's argument that the review process includes sufficient legal protection to make it an adequate replacement for the writ. Congress, the Court concluded, had unconstitutionally suspended the writ in enacting §7(a) of the MCA. *Id*.

The Court also stated that it was not ruling on the issue of whether the detainees are entitled

to be released—that is, entitled to have writs issued to end their confinement—nor was it addressing "whether the President has authority to detain" individuals during the "war on terrorism" and hold them in Guantanamo; both issues were left for the District Court judges to determine in the detainees' habeas corpus hearings.

Argument

## I. PETITIONER IS ENTITLED TO DISCOVERY AND A JUDICIAL DETERMINATION OF THE CONTESTED LEGALLY SIGNIFICANT JURISDICTIONAL FACTS

On a motion to dismiss a habeas petition brought under 28 U.S.C. §2241, the courts apply the standard mandated by Federal Rule of Civil Procedure 12.[15] *In re Guantanamo Detainees*, 355 F. Supp. 2d 453 (D.D.C. 2005) (applying F.R.C.P. 12); *see also Rasul v. Bush*, 215 F. Supp. 2d 55, 61 (D.D.C. 2002). Under Rule 12, the Court cannot dismiss the Petition for failure to state a claim unless Respondents can show *beyond doubt* that Petitioner can prove *no* set of facts in support of his claims that would entitle him to relief. *See Warren v. Dist. of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004). The Court must treat the Petition's allegations as true and draw all reasonable inferences in Petitioner's favor. *See Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997); *New*, 350 F. Supp. 2d at 88.[16]

Mr. Al Maqaleh is, at the very least, entitled to take discovery regarding all disputed jurisdictional facts. *E.g., Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41

---

[15] The Federal Rules of Civil Procedure apply to habeas petitions to the extent the rules do not conflict with the habeas statute or any applicable habeas rules. Fed. R. Civ. P. 81(a). Because this Petition was not brought under either 28 U.S.C. §2254 or §2255, no special habeas rules apply to this proceeding. The Petition is therefore governed by the Federal Rules. *See United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004).

[16] In this regard, Respondents have introduced: (1) the Declaration of Colonel James W. Gray, sworn to on March 3, 2007 and the three exhibits attached thereto ("Gray Decl. I"); (2) the Declaration of Colonel James W. Gray, sworn to on April 19, 2007, and the three exhibits attached thereto ("Gray Decl. II"); and (3) the Declaration of Colonel Charles A. Tennison, sworn to on September 15, 2008 ("Tennison Decl."), and the two exhibits thereto.

(D.C. Cir. 2000); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001) ("We have . . . required that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion."). The nonmoving party must be afforded an "'ample opportunity to secure and present evidence relevant to [the] existence of jurisdiction.'" *Phoenix Consulting*, 216 F.3d at 40 (quoting *Prakash v. American University*, 727 F.2d 1174, 1180 (D.C. Cir. 1984)). Furthermore, courts cannot convert motions to dismiss for want of jurisdiction into summary judgment proceedings merely because extrinsic material has been proffered. *See BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp.2d 73, 80 (D.D.C. 2003). Instead, the motion to dismiss must be denied, and, following discovery, a separate summary judgment motion may be filed. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

As the *Hamdi* Court held, construing §2241 consistently with the Due Process Clause, the Executive branch is not entitled simply to announce by fiat that the Petitioner is an "enemy combatant" and thereby forestall judicial review. *See Hamdi,* 542 U.S. at, 538. Indeed, that rule was solidly established in habeas corpus proceedings a century and a half before the Constitution–which, at a bare minimum, forbids suspension of the writ as it existed at common law–came into force. *See* Eric M. Freedman, *Hamdi and the Case of the Five Knights*, Legal Times, Feb. 3, 2003 (arguing on basis of 5 Knights Case for the result later reached by Supreme Court in *Hamdi*).

If the Executive cannot suspend the writ even for reasons of military necessity absent congressional authorization, neither can a court do so in an effort to safeguard the Executive's military powers from supposed interference by the judiciary. A decision by this Court to accept the Executive branch's assertions of jurisdictional facts would constitute an unlawful suspension of the writ. Such a decision would suspend the writ not because the Court would have refused to

grant Petitioner the relief he seeks, but because its ruling accepting the Executive's picture of the factual circumstances would limit this Court's review of Petitioner's detention to no more than that the review which would have been available to him if the writ had been suspended. If the Court based its determination that no habeas relief could be granted solely on facts alleged by the Executive and then held that the Executive's determination that Mr. Al Maqaleh was an "enemy combatant" was conclusive, it would be limiting Petitioner to the same crabbed form of judicial review as would obtain if Congress had suspended the writ. In reaching that result, the Court would be intruding on both the exclusive congressional power to suspend the writ in appropriate cases and on the judicial power to adjudicate the facts of the petitions properly before the courts. Under both scenarios, Petitioner would be effectively denied the opportunity to challenge his detention.

## II. THIS COURT HAS JURISDICTION TO HEAR PETITIONER'S CHALLENGE TO THE LEGALITY OF HIS DETENTION

### A. The Court Has Jurisdiction under 28 U.S.C. §2241

Neither the law nor the facts support Respondents' contention, *see* Resp. Mot. at 1, 9-13, that MCA §7(a) bars this Court from hearing Petitioner's request for relief under the federal habeas statute, 28 U.S.C. §§2241 *et seq*. The Supreme Court has definitively ruled that long term "war on terror" detainees held without adequate due process are entitled to the statutory writ. *Rasul*, 542 U.S at 483-84. There can be no other conclusion drawn from the line of decisional authority issued by the Supreme Court from its decision in *Rasul* through its most recent decision in *Boumediene*.

The Court in *Rasul* concluded unequivocally that the right of "persons detained at the [Guantanamo] base" to challenge their detention on habeas was "consistent with the historical reach of the writ of habeas corpus." 542 U.S. at 481. Expressly rejecting the Government's

contention that "habeas corpus has been categorically unavailable to aliens held outside sovereign territory," *id*. at 482 n.14, the *Rasul* Court stated that at common law, "the reach of the writ depended not on formal notions of territorial sovereignty, but rather on the practical question of 'the exact extent and nature of the jurisdiction or dominion exercised in fact by the Crown.'" *Id*. at 482. The Court also found that, where the Crown had exercised the requisite degree of control, the writ extended to *citizens and foreign nationals alike. See id*. at 482 n.14 (emphasis supplied). There is certainly no basis for this Court to revisit these determinations— reconfirmed recently in *Boumediene*--that the writ was available in 1789 to foreign nationals in territory (sovereign or not) under the King's control, and that given the authority on this precise issue, *see, e.g., INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (noting that "[A]t the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'") (quoting *Felker v. Turpin,* 518 U.S. 651, 663-664 (1996)), the same must be true here. *See Rasul*, 542 U.S. at 482 n. 11 (collecting cases historically where aliens' petitions were heard in England from 1759 on and in the U.S. from 1815 on). Based upon this analysis, the *Rasul* Court concluded that the habeas statute "confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base."[17] *Id.* at 483.

With its passage of the DTA in 2005,[18] and then the MCA in 2006,[19] Congress sought to strip from jurisdiction from the federal courts considering the Guantanamo Petitioners' habeas petitions. Addressing these two legislative efforts to deprive detainees of the writ--the most vital instrument to secure a person's freedom from unlawful restraint--the Court in *Boumediene*

---

[17] Noting that petitioners had also invoked the Court's jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1350, the Court found that nothing in *Johnson v. Eisentrager*, 339 U.S. 763 (1950) nor any other case excluding aliens in military custody outside the United States from exercising the "privilege of litigation' in U.S. courts. *Rasul*, 542 U.S. at 468.

[18] The DTA §1005(e) (2005) amended 28 U.S.C. §2241 to provide that "no court, justice, or judge shall have jurisdiction to hear or consider . . . an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba."

[19] In *Hamdan*, 548 U.S. at 576-77, the Court held this provision did not apply to cases (like the Guantanamo petitioners') pending when the DTA was enacted. Congress responded by passing the MCA, which again amended §2241.

stressed the importance of the writ as a fundamental part of the Framers' "constitutional plan that allocated powers among three independent branches." *Boumediene*, 128 S. Ct. at 2245 (noting that the "design serves not only to make Government accountable but also to secure individual liberty). Further, the *Boumediene* Court, noting that the substantive guarantee of the separation-of-powers structure, like those of Fifth and Fourteenth Amendments, also *makes no distinction between citizens and foreign nationals*, held that the detainees can seek enforcement of those principles in U.S. courts. *Id*. (Emphasis supplied.)

The Supreme Court's *Rasul* decision applies with equal force to Petitioner, a Yemeni man imprisoned at Bagram. *Rasul* held that the federal habeas statute, 28 U.S.C. §§2241 *et seq.,* has extraterritorial reach when the U.S. exercises complete jurisdiction and control over the territory where the detainee is being held. *Rasul*, 542 U.S. at 480. As shown in detail below, *see* Part B *infra*, the U.S. military maintains an even greater degree of control over the Air Base at Bagram than it does over the Naval Base at Guantanamo.[20] Because Bagram, like Guantanamo, is under the exclusive jurisdiction and control of the United States, Petitioner Al Maqaleh, imprisoned at Bagram like the detainees held at Guantanamo, is entitled to the protection of the statutory writ. In *Rasul*, the Court also determined that the habeas statute applies at Guantanamo because "[a]liens . . . no less than American citizens, are entitled to invoke the federal courts' authority under §2241 . . . ." 542 U.S. at 481. The Court thus found that the plain language of the statute draws *no distinction* between *U.S. citizens and foreign nationals* held in federal custody, and there is no reason to think that Congress intended the geographical coverage of the federal habeas statute would vary depending upon a detainee's citizenship. *Rasul* and *Boumediene* stand

---

[20] If the Court has any doubt as to the degree of control exercised by the U.S. at Bagram and how it compares with U.S. control at Guantánamo, Petitioners respectfully submit that there is an issue is a disputed question of fact that warrants determination. Petitioner has had no opportunity to take discovery concerning the facts asserted in the Miller and Gray Declarations, and should be permitted to do so before the Court decides the motion to dismiss.

for the proposition that foreign nationals may invoke the courts' authority under §2241 when they are held in territory under the jurisdiction and control of the U.S. and the reviewing court has jurisdiction over the petitioners' custodians.

If, however, these legal principles were in the slightest doubt, the Court need only consider the Supreme Court's even more recent ruling in the case *Munaf v. Geren*, 128 S. Ct. 2207 (2008), which upheld the Court's jurisdiction under §2241 over petitions filed by detainees held in the detention facility in Camp Cropper, the U.S. military base in Baghdad. *Id*. at 2228.[21] *Munaf* stands for exactly the proposition that Respondents (ignoring the extensive historical discussions in both *Rasul* and *Boumediene*) vehemently deny: that the test for habeas jurisdiction is whether the Government exercises practical control over the body of the prisoner. *Id*. If so, its agents must respond to a judicial order to account for the imprisonment.[22]

Respondents' claim that the *Rasul* and *Boumediene* decisions were "uniquely about the Guantanamo Bay Naval Base," Resp. Mot. at 12, is simply untenable. The *Rasul* decision's interpretation of §2241 applies with equal force to the foreign nationals held at Bagram as it does to the foreign nationals held at Guantanamo. Indeed, Respondents themselves have argued that there is *no* legally significant distinction between aliens held at Guantanamo and aliens held at Bagram. *See* Brief for Resp. at 56, *Rasul*, 542 U.S. 466 (arguing against "drawing an arbitrary legal distinction between aliens held at a facility, such as the Bagram Air Force Base in Afghanistan, which is controlled by the U.S. military and located outside the sovereign territory of the United States, and aliens held at a facility such as Guantanamo Naval Base in Cuba, which is controlled by the U.S. Military and located outside the sovereign territory of the United

---

[21] The Court went on to hold that the claims asserted by the petitioners in the two cases before it did not warrant the entry of preliminary injunctions. *Id*. at 2218-20. On remand, both petitioners filed amended petitions and their cases are still in litigation before Judges of this District.

[22] We need hardly add that Iraq is certainly as much a theatre of active military operations as Afghanistan. But, as *Munaf* shows, this is irrelevant. Bagram, like Camp Cropper, is a fully secure American-run prison, not a front-line holding facility.

States.")

In order to demonstrate that Petitioner is not entitled to invoke §2241, Respondents would need to show: (i) that its application has been displaced by §7 of the MCA; and (ii) that such displacement would be constitutional. Neither proposition is true.

**B.  Both Article III and the Suspension Clause Protect Petitioner's Right to Habeas Corpus Review of the Lawfulness of His Detention**

   **1.  MCA §7 Violates the Separation of Powers Principle by Forcing All Courts to Surrender Their Article III Power**

The three branches of our federal government are separate, but co-equal and the people have as much right to collectively enjoy the benefits of an independent judiciary as they do to enjoy the benefits of a wise legislature and an effective Executive. Respondents' position, far from protecting the Executive from unwarranted "second-guessing" and "superintendence" by the Judiciary, *see* Resp. Mot. at 3, violates the separation of powers principle by causing an unwarranted, expansive, and permanent surrender of the judicial power delineated in Article III of the Constitution.

Article III creates a federal judiciary that "stand[s] independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remain[s] impartial." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (plurality opinion). An essential element of the federal judiciary's responsibility and power under Article III is the "judicial duty to exercise an independent judgment." *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38 (1936). Neither Congress nor the Executive branch may constitutionally prevent the judiciary from fulfilling that duty; both branches lack the authority to require "the federal courts to exercise '[t]he judicial Power of the United States,' U.S. Const., art. III, §1, in a manner repugnant to the text, structure,

and traditions of Article III." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) (holding that Congress violated the separation of powers by retroactively commanding the federal courts to reopen final judgments).

Throughout history, often in cases other than habeas corpus, the Supreme Court has carefully guarded the judiciary's power to make independent judgments by reserving to Article III courts the power to determine whether the evidence is sufficient to support a claim properly before the court because "[h]ow the facts are found will often dictate the decision of federal claims." *England v. La. St. Bd. of Med. Exam'rs*, 375 U.S. 411, 416 (1964).[23] The principle that a coordinate branch cannot tell an Article III court how to determine the outcome of a specific cause properly before it is central to the separation of powers structure embodied in the Constitution. The paradigmatic example of this fundamental principle is that of *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871), in which the Court held unconstitutional a congressional enactment that required federal courts to find a former Confederate citizen's acceptance of a general presidential pardon to be conclusive evidence of prior disloyalty to the Union. The Court rejected the statute as an attempt by Congress to forbid the court to consider the evidence before it and reach its own judgment, and held it to be an unconstitutional violation of the separation of powers. *Id.* at 147. Since *Klein*, the Supreme Court has consistently continued to hold that Congress cannot "require federal courts to exercise the judicial power in a manner that Article III forbids" by "'prescrib[ing] rules of decision to the Judicial Department of the Government in cases pending before it.'" *Plaut*, 514 U.S. at 218 (quoting Klein, 80 U.S. (13 Wall.) at 146).

---

[23] The Court has held that under the "demands of due process and the constraints of Art[icle] III," a federal district court cannot constitutionally abdicate its duty to find facts, and can only defer to a record developed by a non-Article III officer when "the entire process takes place under the district court's total control and jurisdiction." *United States v. Raddatz*, 447 U.S. 667, 681, 683-84 (1980) (holding constitutional the provision of the Federal Magistrates Act, 28 U.S.C. §636(b)(1)(B) (2000), that permits a federal judge to determine and decide a motion to suppress evidence based on the record developed before a magistrate judge, because "the magistrate acts subsidiary to and only in aid of the district court").

In cases such as *Klein* and *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995) (invalidating Attorney General's statutorily-authorized certification as compelling an Article III court to rubber-stamp factual determinations made by the Executive branch), the Court preserved inviolate the power of the federal courts to engage in independent fact-finding in the face of Executive branch usurpations of judicial power and assertions that Congress had shifted the power to adjudicate facts out of the courts' control. Yet, according to Respondents' interpretation of the MCA, the people must accept a declaration by a member of the Defense Department certifying the "enemy combatant" status of a detainee, as a definitive factual finding which determines the detainee's fate of indefinite, *incommunicado* detention. Indeed, Respondents present here precisely the argument rejected by the Supreme Court in *Klein* and *Gutierrez de Martinez* that Congress may not shift the Article III power to engage in independent fact-finding to the Executive branch. Here, not only must the federal habeas court stand back and accept as conclusive an Executive branch representation of facts that purport to justify Petitioner's confinement, the people must as well. The Executive's claim of a constitutional right to displace the fact-finding prerogatives of the habeas court misunderstands the separation-of-powers principle. The Executive claims the power to intrude upon the adjudicatory function of the habeas court in derogation of explicit constitutional and common law commands that repose that fact-finding function in the courts.

## 2.  The MCA Violates the Suspension Clause by Permanently Suspending the Writ

Four years ago, the Supreme Court held in *Rasul* that people imprisoned as "enemy combatants" during the U.S. "war on terror" had a right to habeas corpus review of the lawfulness of their detention. *Rasul*, 542 U.S. 466. Respondents now claim that Congress abolished this right by enacting the §7(a) of the MCA, and acted constitutionally in doing so

when the detainees are held in any place other than Guantanamo. The fact that Respondents'
argument abolishes Petitioner's right to habeas corpus without providing *any substitute remedy
at all*—no less an adequate and effective alternative to "test the legality of a person's detention,"
*Swain v. Pressley*, 430 U.S. 372 (1977)—does not seem to be a cause for consternation in the
Executive branch. This is so despite the fact that there is little to no difference between the
circumstances of the Guantanamo detainees and those of the Bagram detainees save proximity
from the mainland United States, some degree of civil unrest in Afghanistan, and the vastly
greater amount of due process protection (although deeply flawed and found unconstitutional)
put in place for the Guantanamo detainees as an substitute for the writ.

Somehow, Respondents persist in their efforts to deprive people whom our military detains
of the most rudimentary due process protections acknowledged and accepted around the world.
Foreign nationals, like citizens, have a constitutional right to habeas corpus. *Boumediene*, 128 S.
Ct. at 2229. History has shown that our courts have long and consistently acknowledged the
rights of even enemy aliens and prisoners of war to challenge the legality of their detention. Even
during a "war on terror," absent a valid suspension, the writ "has remained a critical check on the
Executive, ensuring that it does not detain individuals except in accordance with law." *Hamdi*,
542 U.S. at 525. This constitutional requirement could not be evaded by detaining people at
Guantanamo, *see Boumediene*, 128 S. Ct. at 2259, and it cannot be evaded by detaining people at
Bagram.

As *Rasul* established, although the United States lacks ultimate sovereignty at Guantanamo,
it has exclusive governing authority there, exercising complete jurisdiction and control. The
same holds true with regard to Bagram. *See* Part III(B), *infra*. Under the rationale of the *Insular
Cases*, fundamental constitutional rights apply to both citizens and foreign nationals in such a

location.[24] The courts have consistently so held in comparable territories, where the United States has exercised sovereign powers without titular sovereignty. In this case too, Petitioner was deliberately transported to a highly secure base under U.S. control, to be detained, interrogated, and perhaps held indefinitely. It would certainly be anomalous for this Court to accept Respondents' invitation to authorize the United States to evade the Constitution by imprisoning men in a "rights-free zone," with no possibility for habeas review.

The "Privilege of the Writ of Habeas Corpus" was one of the few constitutional rights enshrined by the Framers in the original Constitution of 1787. The Suspension Clause of Article I, §9, prohibits Congress from suspending the writ "unless when in Cases of Rebellion or Invasion the public Safety may require it." The Framers narrowly defined the legislature's power to suspend the writ in order to preserve it against both temporary and permanent evisceration. Yet Respondents urge an interpretation of MCA §7(a) that would *permanently* eliminate a detainee's access to the writ, regardless of whether there has been provision of an adequate substitute. Interpreted in the fashion asserted by Respondents, §7(a) clearly violates the Suspension Clause.

Section 7(a) of the MCA provides:

> No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States

---

[24] In the 19th Century, the Supreme Court fully applied the Bill of Rights to all federally-governed territories. *See, e.g., Springvill Citye v. Thomas*, 166 U.S. 707 (1897); *Reynolds v. United States*, 98 U.S. 145 (1879). In 1901, however, in the *Insular Cases*, a majority of the Court held that only "fundamental" constitutional rights extended by their own force to "unincorporated" territories. The Insular Cases concluded that constitutional provisions do not extend to particular territory by the will of Congress, but rather, as a result of the relationship that Congress creates between the United States and the territory. *Dorr v. United States*, 195 U.S. 138, 142 (1904); *Downes v. Bidwell*, 182 U.S. 244 (1901). The *Insular Cases* struck a compromise between the forces of constitutionalism and the forces of empire by guaranteeing that the Constitution's most fundamental rights would be honored wherever the United States possesses governing authority. In such cases, it is the exercise of complete U.S. jurisdiction and control, not nominal sovereignty that justifies the application of a correlative set of fundamental rights. The Supreme Court has never repudiated the Insular Cases. *See Torres v. Puerto Rico*, 442 U.S. 465 (1979); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 268 (1990); *Rayphand v. Sablan*, 95 F. Supp. 2d 1133 (D.N.Mar.I. 1999), *aff'd mem. sub nom. Torres v. Sablan*, 528 U.S. 1110 (2000).

who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

Respondents do not claim that §7(a) was intended to be an exercise of Congress's authority to suspend the writ *temporarily* "in cases of Rebellion or Invasion." The statute itself makes no reference to suspension, and opponents of the legislation repeatedly stated, without contradiction, that there was no current "Rebellion or Invasion" that could justify suspending the writ. *See, e.g.*, 152 Cong. Rec. S10368 (daily ed. Sept. 28, 2006) (Sen. Specter) ("Fact No. 3, uncontested. We do not have a rebellion or an invasion."), Olsh. Decl. at ¶ 44, Exh. 40. Given these undisputed facts, there can be no other conclusion than that the MCA's stripping of habeas corpus jurisdiction is *permanent*, not limited to a particular span of years, the duration of a particular emergency, the circumstances of a specific sub-population, nor to a particular geographic area. Instead, it permanently alters the federal statute. The legislative history confirms this conclusion; the proponents of the MCA *did not intend to enact a temporary measure. See* 152 Cong. Rec. S10404 (daily ed. Sept. 28, 2006) (Sen. Sessions) ("We are legislating through this law for future generations [and] future wars"), Olsh. Decl. at ¶44, Exh. 41; 152 Cong. Rec. S10270 (daily ed. Sept. 27, 2006) (Sen. Kyl) ("all future conflicts"), Olsh. Decl. at ¶46, Exh. 43.[25]

Permanently abolishing the writ of habeas corpus for certain persons violates the Suspension Clause on its face. By limiting Congress's power to suspend habeas to cases of "Rebellion or Invasion" when "the public Safety may require it," the Clause necessarily precludes other abridgments of the writ. Logically, personal liberty would be even more threatened by a power of permanent abrogation than by a broad power of temporary suspension. Reading the Suspension Clause as prohibiting permanent abridgements is also consistent with the

---

[25] Nor can MCA §7(a) be viewed as limited to the lower federal courts, leaving unimpaired the jurisdiction of the Supreme Court and the state courts. The Act's plain language bars jurisdiction by any "court, justice or judge" in relevant cases. The constitutional limits on the Supreme Court's original jurisdiction would forbid the Court to serve as a court of initial jurisdiction for habeas inquiry into executive detention in such cases. *See Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 100-101 (1807).

interpretation of other constitutional provisions, such as the Takings Clause.[26] The Supreme

Court has always understood the Suspension Clause as prohibiting a permanent deprivation, as

well as limiting temporary withdrawal, of the writ, *see, e.g.*, *Ex parte Bollman*, 8 U.S. 75, 95

(1807), and has repeatedly viewed statutes permanently modifying habeas jurisdiction as raising

potential Suspension Clause problems. *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289 (2001).

Proponents of the federal Constitution fully understood that the Suspension Clause prohibited

permanent abrogation. Hamilton affirmed the Constitution's "establishment of the writ of habeas

corpus" in The Federalist No. 84, Olsh. Decl. ¶ 7, Exh. 4, and insisted that habeas corpus was

"provided for in the most ample manner in the plan of the convention." The Federalist No. 83,

Olsh. Decl. ¶7, Exh. 4. In *St. Cyr*, the Supreme Court rejected the sole suggestion to the contrary.

[27] Although a dissenting opinion argued that the Suspension Clause was intended to regulate

only temporary suspensions, not total abrogations, of the writ, the majority squarely rejected that

interpretation. 533 U.S. at 300-01, 336-38, 304 n.24. And history firmly rebuts that dissenting

argument. While four state ratifying conventions included habeas corpus clauses in the bills of

rights they proposed to add to the Constitution, these amendments mainly reflected their desire to

guarantee habeas in plain language.[28]

Nor is Congress constitutionally entitled to abolish Petitioner's right to the writ simply

because he is a foreign national or even an alleged alien enemy. The writ has always been

afforded to foreign nationals, in times of war and peace, including alleged and conceded enemy

---

[26] Although the Takings Clause of the Fifth Amendment states only "nor shall private property be taken for public use without just compensation," it has traditionally been understood as prohibiting all takings without a public purpose. *See Kelo v. City of New London*, 545 U.S. 469, 484 (2005).

[27] Virginia Convention, Debates (June 10, 1788), *reprinted* in 9 The Documentary History of the Ratification of the Constitution at 1092, 1099 (John P. Kaminski & Gaspare J. Saladino eds., 1990). Early commentators, such as James Kent, William Rawle, and Joseph Story, agreed. *See* Gerald L. Neuman, *The Habeas Corpus Suspension Clause After INS v. St. Cyr*, 33 Colum. Hum. Rts. L. Rev. 555, 582-83, 585-87 (2002).

[28] *See also* William F. Duker, A Constitutional History of Habeas Corpus 134-35 (1980) (explaining that this provision denied Congress the power to suspend the writ at all).

aliens and prisoners of war. Existing case law regarding the analogous categories of enemy aliens and prisoners of war demonstrates that foreign nationals accused of being "enemy combatants" must have some opportunity to challenge the legality of their detention. Indeed, precisely because the concept of "enemy combatant" and the scope of the "war on terror" are so ambiguous, there is an even greater need for such detentions to be reviewed by an independent court.

The Supreme Court has observed that "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" *St. Cyr,* 533 U.S. at 301 (quoting *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996)). At the same time, until its decision in *Boumediene*, the Court left open the degree to which subsequent developments in habeas corpus doctrine might also be protected by the Suspension Clause. *St. Cyr*, 533 U.S. at 300-01. But even before the *Boumediene* decision, there could be no question that foreign nationals enjoyed the protection of the writ. Both at common law and throughout this Nation's history, habeas corpus has been available to aliens. *Id.*, 533 U.S. at 301. This includes both foreign nationals who entered the country voluntarily, and those, like Petitioner, who were brought involuntarily within its domain. *See, e.g., id.* at 302 n.16 (citing *Case of the Hottentot Venus*, (1810) 104 Eng. Rep. 344 (K.B.); *Sommersett v. Stewart*, (1772) 20 How. St. Tr. 1 79-82 (K.B.); *King v. Schiever*, (1759) 97 Eng. Rep. 551 (K.B.)) The protection of foreign nationals by the Suspension Clause is consistent with other fundamental constitutional guarantees. As the Court held in *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886), the Equal Protection and Due Process Clauses of the Fourteenth Amendment are "universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *See also Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2681-82 (2006) (Roberts, C.J.) (quoting *Wong Wing v. United States*, 163 U.S. 228,

238 (1896)); *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (even if presence "unlawful, involuntary, or transitory").

The concept of an "enemy alien" reflects an earlier international practice permitting expulsion or detention of nationals of an enemy state during a declared war. *See Brown v. United States*, 12 U.S. (8 Cranch) 110, 122-26 (1814) (Marshall, C.J.). The Alien Enemies Act of 1798 authorized the President to detain, relocate, or deport aliens who were "natives, citizens, denizens, or subjects of the hostile nation." Act of July 6, 1798, ch. 66, §1, 1 Stat. 577 (1798) (current version codified at 50 U.S.C. §§21-24). Yet as early as 1813, in an unpublished judgment on circuit, Chief Justice Marshall released a conceded enemy alien on habeas because he had been detained without an opportunity to relocate, as required by the controlling regulations.[29] The Supreme Court itself ordered the release of a detained enemy alien on habeas corpus in *United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952), finding that Congress's termination of the war against Germany in 1951 ended the power of the Executive under the Alien Enemies Act.[30] Ever since that Act was first invoked in the War of 1812, courts have permitted detained enemy aliens to challenge on habeas corpus whether their detention complied with the statutory framework.[31]

In *Ludecke v. Watkins*, 335 U.S. 160 (1948), Justice Frankfurter summarized habeas practice under the Alien Enemies Act in the First and Second World Wars—the last occasions on which it was ever applied. The Court made clear that detained individuals were entitled "to challenge the construction and validity of the statute" and the factual predicates for applying it to them,

---

[29] *See* Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien: A Case Missing from the Canon*, 9 Green Bag 2d 39 (2005).

[30] The Supreme Court rejected the Government's claimed authority to execute removal orders that had been issued against dangerous enemy aliens before termination of the war. *See* Brief for Respondents at 26-27, *United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952).

[31] The Court has upheld the scheme of the Act against constitutional challenge, citing its lengthy historical pedigree, but has never accepted the theory that enemy aliens lack constitutional rights. *See Ludecke v. Watkins*, 335 U.S. 160, 171-72 (1948).

including "the existence of the 'declared war,'" *id*. at 171, and "whether the person restrained is in fact an alien enemy fourteen years of age or older," *id*. at 171 & n.17. Thus, individuals detained as enemy aliens have been permitted to challenge on habeas the determination of their enemy alien status, either on the ground that they were in fact citizens, or because they were aliens but not natives or nationals of an enemy power. *See Ludecke*, 335 U.S. at 165 n.8, 171 n.17 and cases cited therein. Finally, enemy aliens have always had access to the writ, whatever the reason for their detention. During the War of 1812, a federal court entertained, though later denied on the merits, habeas writs filed by British subjects in the U.S. army[32] seeking release from military service.[33] When the federal government sought to deport enemy alien internees under the immigration laws, the courts permitted them access to the writ.[34] Habeas corpus was also available to enemy aliens prosecuted for war-related crimes in Article III courts.[35]

Finally, in three landmark cases, the Supreme Court exercised habeas corpus jurisdiction over conceded prisoners of war—whether privileged or unprivileged combatants—challenging their trial by military commission. In *Ex parte Quirin*, 317 U.S. 1, 24-25 (1942), the Court passed quickly to the merits and ruled against the petitioners. *In re Yamashita*, 327 U.S. 1 (1946), which involved an enemy soldier held in the U.S. overseas territory of the Philippines, rejected the Government's objection to habeas corpus jurisdiction, holding that absent a suspension of the writ, the courts had "the duty and power to make such inquiry into the authority of the commission as may be made by habeas corpus." In *Hamdan*, the Court ruled in favor of an

---

[32] *See, e.g., United States ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116 (2d Cir. 1949) (finding adequate opportunity to depart); *United States ex rel. Ludwig v. Watkins*, 164 F.2d 456 (2d Cir. 1947) (granting the writ); *United States ex rel. von Heymann v. Watkins*, 159 F.2d 650 (2d Cir. 1947) (granting the writ). The two latter cases involved German nationals who had been brought to the United States involuntarily and detained as dangerous enemy aliens.

[33] *Wilson v. Izard*, 30 F. Cas. 131 (C.C.D.N.Y. 1815) (No. 17,810).

[34] *See, e.g., United States ex rel. Bradley v. Watkins*, 163 F.2d 328 (2d Cir. 1947) (granting the writ to former internee, who had been forcibly brought to the United States from Greenland); *United States ex rel. Sommerkamp v. Zimmerman*, 178 F.2d 645 (3d Cir. 1949) (denying the writ on the merits to former internee who had been forcibly brought to the United States from Guatemala).

[35] *See Von Moltke v. Gillies*, 332 U.S. 708 (1948) (espionage).

alleged "enemy combatant" held at Guantanamo both on jurisdiction and on the merits. 548 U.S. 557. Emphasizing "'the duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty,'" *id.* at 588 (quoting *Quirin*, 317 U.S. at 19), the Court invalidated the proceeding as unauthorized by law. Absent a legitimate suspension, the traditional scope of the writ must also extend to alleged "enemy combatants." Indeed, the Government's expansive interpretations of the concepts of "enemy combatant" and the "war on terror," and the very real factual questions surrounding some of the detentions, heighten the specter of imprisonment by Executive fiat and the corresponding importance of habeas.

**C.  Section 7 of the MCA Does Not Apply to this Action**

Section 7(a) of the MCA attempted to carve out an exception from the Court's historically broad jurisdiction to consider habeas corpus petitions. By definition, as an exception, the MCA precluded an exercise of jurisdiction in only a *limited* category of habeas cases—where statutory habeas relief is sought by a petitioner who: a) has already been "determined by the United States to have been properly detained as an enemy combatant"; or b) "is awaiting such determination." MCA §7(a). In all other habeas cases, the Court's jurisdiction remains unaffected. The MCA sets forth the only two procedures by which the U.S. can determine that an individual is an "enemy combatant" who may be held indefinitely without charge or trial. Prisoners in Guantanamo receive a CSRT proceeding which reconfirms (or not) a prior Executive determination of whether or not a detainee is an "enemy combatancy." *See* Wolfowitz Memo (Olsh. Decl. ¶16, Exh. 13). By contrast, the only relevant term for the purposes of the MCA is not "enemy combatant" but "unlawful enemy combatant," which is defined in §3 as:

(i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy

combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or

(ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal ["CSRT"] or another competent tribunal established under the authority of the President or the Secretary of Defense.

MCA §3.

Given that the only term used and defined in the MCA is that of "unlawful enemy combatant," the statute must be interpreted to mandate that the determination of such status for detainees, who, like Mr. Al Maqaleh, are imprisoned at Bagram, is to be made by some form of "competent tribunal." MCA §3(a)(1). Yet, Respondents, airily ignoring the text of the statute—to say nothing of the principle that statutes must be construed to avoid constitutional doubt, *St. Cyr*, 533 U.S. 289 - contend instead that not even a "competent tribunal" is required by the MCA. According to Respondents, "[t]he United States may determine that an alien meets the definition of subsection (i) *without having conducted a CSRT or a review by a 'competent tribunal.'*" Resp. Reply to Pet. Opp. at 4, n.2, *Ruzatullah v. Gates*, 06-CV-01707 (GK) (April 20, 2007) (Olsh. Decl. ¶17, Exh. 14). (Emphasis supplied.)

In this case, Petitioner has pled that he has not been determined to be an "enemy combatant" by a CSRT nor an "unlawful enemy combatant" by a "competent tribunal" or any other type of combatant. Nor is he awaiting such a determination.[36] Respondents do not deny these allegations. Rather, they interpret the statute to mean that no process at all is required to seize and hold Petitioner without charge or access to a neutral tribunal of any sort.

While Respondents assure the Court that as a matter of grace they give each prisoner a review after 75 days by an ECRB which decides the prisoner's fate based on "reasonably available information, including classified intelligence and testimony from individuals involved

---

[36] Because no procedure before a competent tribunal is available to any detainee at Bagram, Petitioner cannot be said to be "awaiting" such a procedure.

in the capture and interrogation of the detainee," Resp. Mot. at 8-9, they concede that there is no CSRT process at Bagram, Resp. Mot. at 11 n.7, and have expressly acknowledged that the "Enemy Combatant Review Board ["ECRB"] . . . is not the functional equivalent of a CSRT."[37] In short, Respondents' own description of the "process" afforded detainees at Bagram makes it clear that it is not a "competent tribunal," and that its procedures do not satisfy the requirements of the MCA.[38] In short, the statute is, accordingly, simply inapplicable.

## III. *BOUMEDIENE* MAKES CLEAR THAT JURISDICTION LIES WITH THIS COURT AND THAT PETITIONER MAY INVOKE THE WRIT

In *Boumediene,* the Supreme Court held that three factors are relevant in determining the reach of the Suspension Clause:

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place, and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

Key to the Court's analysis was the concept that "[I]ndefinite imprisonment on reasonable suspicion is not an available option of treatment for those accused of aiding the enemy, absent a suspension of the writ." *Boumediene,* 128 S. Ct. at 2262 (citing *Hamdi*, 542 U.S. at 564) (Scalia, J., dissenting)). Applying the *Boumediene* analysis to the situation of Mr. Al Maqaleh makes clear that he is entitled to invoke this Court's power to hear his Petition. Indeed, the Great Writ is the only vehicle by which Mr. Al Maqaleh can challenge his indefinite imprisonment without charge or trial by the Government.

### A. Egregious Deficiencies in the Status and Process Analysis Weigh Significantly in Petitioner's Favor

The first factor the *Boumediene* Court examined was the "citizenship and status of the

---

[37] Resp. Mot. at 10, n. 5, *Ruzatullah v. Gates*, 06-CV-01707 (Olsh. Decl. ¶18, Exh. 15).
[38] If Respondents in reply decide to contend that the ECRB process meets the "competent tribunal" requirement of the MCA or any due process standard at all, Petitioner is entitled to take discovery of the procedures purportedly used to make his "enemy combatant" or "unlawful enemy combatant" status determination.

detainee and the adequacy of the process through which th[e] status determination was made." *Id.* at 2259. Like Mr. Al Maqaleh, the Guantanamo Petitioners were not U.S. citizens, yet the Court proceeded to examine the extent to which the CSRTs provided sufficient due process protections to the Petitioners, and concluded that the CSRT hearings "fall well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review." *Id.* at 2260. A comparison of the CSRT process with the ECRB process in place at Bagram reveals a significant disparity between the two. The ECRB process does not ever meet the standard of the inadequate CSRT process, and its shortcomings are woefully apparent when analyzed under the *Boumediene* factors used to assess the adequacy of the process due foreign nationals: (1) the status of the detainee; (2) effective notice of factual allegations; (3) whether an advocate was assigned to represent the detainee; (4) whether the detainee had an adequate opportunity to rebut the Government's evidence against him; (5) whether the detainee had the opportunity to confront the Government's witnesses; (6) whether the detainee had the opportunity to present evidence to demonstrate his innocence; (7) the neutrality of the tribunal; and (8) the effectiveness of the review by higher courts. 128 S. Ct. at 2238, 2260, 2269. Viewed in relation to these standards, the ECRB process cannot withstand even the most minimal level of scrutiny. The ECRBs fall short in each area.[39] Given that the CSRT process failed the *Boumediene* status and process test, there can be no doubt that ECRB process must fail as well

---

[39] Several studies suggest that in reality, the process afforded detainees at Guantanamo never came close to meeting the standards suggested by Respondents' characterization of the CSRTs. *See e.g., Amnesty Int'l, No Substitute for Habeas Corpus: Six Years Without Judicial Review in Guantanamo*, AMR 51/163/2007 (2007) (Olsh. Decl. ¶24); Mark Denbeaux, *No-Hearing Hearings, CSRT: The Modern Habeas Corpus?* (Seton Hall Univ. Apr. 2, 2007) (Olsh. Decl. ¶23, Exh. 20). For example, while military guidelines state that a detainee may examine any witnesses the Government presents to establish his "enemy combatancy" the Government did not produce a single witness in any CSRT proceeding. *Id.* at 5. Moreover, requests by the detainees to produce witnesses were denied in 74% of cases, and no witnesses from outside Guantanamo were ever permitted to appear. *Id.* at 3. Finally, though the guidelines state that a detainee may present documentary evidence of his innocence, in most cases requests to present such evidence were denied—even when the documents at issue (passports, hospital forms, and other records) were in the Government's possession. *Id.* at 6. The disparity between stated process afforded at Guantanamo and that detainees actually experienced suggests that the status determination procedures at Bagram may also offer detainees far less protection than the framework suggests.

given that it offers far fewer protections to Bagram detainees like Petitioner.

**1. Petitioner is a citizen of Yemen seized outside of Afghanistan and is not an "enemy combatant."**

Respondents argue that because Petitioner is a "non-U.S. citizen who was captured abroad and, at all relevant times, detained abroad," Resp. Mot. at 23, he has no right to invoke the protection of the Suspension Clause. Yet it is precisely because he is a citizen of Yemen, a country which is not at war with the U.S., and a civilian who did not take up arms against the United States, that he cannot be denied the protections of the Suspension Clause to contest his unjustified and indefinite detention.

The Authorization for the Use of Military Force ("AUMF"), which authorizes the use of force against "organizations" that "planned, authorized, committed, or aided" the September 11 attacks, does not authorize the indefinite detention of civilian citizens of friendly nations who have not directly participated in the hostilities. AUMF, 115 Stat. 224 (2001). *Hamdi* set forth the principles by which judicial investigation of some of the parameters of "war on terror" detentions should be guided. The Court concluded that military detention of "enemy combatants"–a category limited to persons who actually took up arms against the United States during the war in Afghanistan–was "so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized . . ." *Hamdi*, 542 U.S. at 518. In reaching these conclusions, the Court relied on "longstanding law-of-war principles." *Id*. Under the laws of war, people like Mr. Al Maqaleh who were never took up arms and were not affiliated with the armed forces of an enemy State are not "combatants," but "civilians." Protocol Additional to the Geneva Conventions of 12 Aug., 1949, and Relating to the Protection of Victims of Int'l Armed Conflicts art. 50, June 8, 1977, 1125 U.N.T.S. 603 ("Additional Protocol"). The *Hamdi* plurality stresses that military detention is justified only "to prevent a

combatant's return to the battlefield," 542 U.S. at 519, and that because civilians were never participants in the battle on the "battlefield", the law does not permit a state to treat them as "combatants" who might return to the battle.[40] Under a law of war analysis (which is *not* applicable to the situation in Afghanistan now despite Respondents efforts to conflate what was once an international armed conflict with Afghanistan with the current anti-terrorism activities), because Mr. Al Maqaleh is the citizen of a nation that is friendly to the United States and has not taken up arms against the U.S., he cannot be considered an "enemy combatant" and the AUMF does not authorize his detention. *See Hamdi*, 542 U.S. at 518.  Because there is no longer an international armed conflict in Afghanistan and there is no basis in the law of internal armed conflict to detain any person, Respondents' detention of Petitioner is unlawful under international humanitarian law. In addition, Respondents are not permitted to detain Petitioner without due process without violating the constellation of human rights protections that apply both during war and peacetime.

Under the *Boumediene* analysis, Mr. Al Maqaleh's status is a far cry from that of the petitioners in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), who were German nationals accused of "engaging in, permitting or ordering continued military activity against the United States after surrender of Germany . . . .", 339 U.S. at 766, and placed in a jointly-controlled Allied prison in Germany, following their conviction by a military commission. The *Eisentrager* petitioners did not contest the allegation that they were "enemy alien[s]." *Id.* at 777.  And as the *Rasul* Court noted, there is a strong distinction to be made when the detained petitioners, like Mr. Al Maqaleh, are "not nationals of countries at war with the United States, and they deny that they

---

[40] The only detention authority upon which the Government can rely is that pertaining to combatants/POWs in an international armed conflict. This war with Afghanistan ended when the U.S. recognized the new provisional government of Afghanistan in 2002. To the extent that the violence in Afghanistan now can properly be characterized as an internal armed conflict, the Government is incorrect in its analysis; there is no basis in such a circumstance to detain anyone. That authority must derive from local law.

have engaged in or plotted acts of aggression against the United States. . . ." *Rasul,* 542 U.S. at 476. Acknowledging the correctness of the *Rasul* analysis, the *Boumediene* Court likewise held that petitioners from Bosnia and Algeria (nations not at war with the United States) who denied their "enemy combatant" status, were also entitled to the protection of the writ. 128 S. Ct. at 2241. Mr. Al Maqaleh's status is no different from the *Rasul* petitioners or the *Boumediene* petitioners and he is therefore entitled to the same protections.

**2.   Petitioner has never been provided notice of the charges against him.**

The Court in *Boumediene*, looking at the issue of notice provided to the detainees, noted that the *Eisentrager* petitioners were "charged by a bill of particulars that made detailed factual allegations against them." *Id*. at 2260 (*citing* 14 United Nations War Crimes Commission, *Law Reports of Trials of War Criminals* 8-10 (1949) (reprint 1997)). In Guantanamo, detainees are purportedly provided notice of the "factual basis" for their detention at some point in advance of their appearance before a CSRT. Brief of Respondent-Appellee at 49, *Boumediene*, 128 S. Ct. at 2229. Though never given the full notice provided to detainees in Landsberg Prison, the Guantanamo detainees have the ability to find out at their CSRTs at least some of what the Government contends they have done. Respondents concede that Bagram detainees are given no such information. According to Respondents, a detainee is given timely notice of the basis of his detention only if "operational requirements" permit. If circumstances require, presumably, a detainee can be kept in the dark regarding any charges or the nature of the evidence them. *Id*. Moreover, the regulations do not ensure that notice—when given—will be provided *in advance* of the detainee's hearing or his six-month review. *Id*. In reality, there is no guarantee that any detainee will be permitted to attend his hearing. This situation has been confirmed by Jawed Ahmad, a young Afghan journalist imprisoned at Bagram who was later declared innocent.

According to Mr. Ahmad, during his 11 months at Bagram, he was never informed about any charges against him and was never permitted to attend any hearing held on his case. Ahmad Decl. ¶17 (Olsh. Decl. ¶4, Exh. 1). In short, the much-heralded (though notably inadequate) notice purportedly afforded Guantanamo detainees are not available in any form to those imprisoned in Bagram. In the end, though, although the issue of whether any notice was ever provided to Petitioner remains a mystery, it is of little moment given that he has never been able to communicate with anyone other than his captors about his legal options.  Foster Decl. ¶¶7-9.

Even assuming that Mr. Al Maqaleh had been furnished with a summary of the factual basis for his detention, he still would not have been provided sufficient notice for due process purposes, because the Government has not revealed even the general criteria used to determine that Mr. Al Maqaleh is an "unlawful enemy combatant." With no reliable definition of the term, it is impossible for a detainee to effectively rebut the Government's claim that he falls within this status category--which also appears to be an offense, trial, and sentence combined in one Executive designation--and is therefore susceptible to indefinite detention. Indeed, the *Hamdi* Court appropriately queried why the Government has "never provided any court with the full criteria that it uses in classifying individuals" as enemy combatants. 542 U.S. at 516. Accepting the Government's articulated definition, the *Hamdi* Court determined the classification to include individuals who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Id.* (internal citations omitted). Since that time, the Government's definition of "enemy combatant" has undergone numerous iterations.[41]

---

[41] Apparently unsatisfied with the definition for "enemy combatancy" offered by the Court, the Government fabricated a new definition, extending the classification beyond those fighting in Afghanistan to apply to anyone "who was part of or supporting the Taliban or Al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid

The evolving definition of "enemy combatancy" makes it impossible for a detainee to gain any meaningful notice of the charges against him. In domestic and international law, detention is arbitrary in the absence of an adequate explanation of the legal basis for one's incarceration. *See, e.g., Martinez v. Los Angeles*, 141 F.3d 1373, 1384 (9th Cir. 1998) (stating that "[d]etention is arbitrary if it is 'not accompanied by notice of charges . . . .'" (*quoting* Restatement (Third) of the Foreign Relations Law of the United States §702 cmt. h (1987)). Where, as here, the legal standard is illusory and fluctuating, there can be no meaningful notice, and the accused cannot be informed of how he must conform his conduct to comport with the law.[42]

### 3.  Petitioner has been denied access to counsel.

The *Boumediene* Court's examination of the availability of legal representation to assist detainees in their rebuttal of the Government's charges found the system at Guantanamo to be seriously deficient. *Boumediene* 128 S.Ct. at 2260. Although a "Personal Representative" was available to any detainee who wished one, the individuals were not attorneys but military officers whose loyalty was to the officers making the CSRT determinations. There was no attorney-client confidentiality between a detainee and his representative and no guarantee that the Personal Representative would actually be willing or able to assist the detainee in gathering evidence to

---

of enemy armed forces." Wolfowitz Memo, (Olsh. Decl. ¶16, Exh. 13). The definition was again altered in the MCA, expanding the category to include individuals who provide "material" support to U.S. enemies. MCA §948.

[42] The inconsistent definition of "enemy combatancy" creates the same constitutional problems as vague or poorly defined criminal statutes. As the Supreme Court held in *Chicago v. Morales*, a vague statute may "fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; [and] . . . it may authorize and even encourage arbitrary and discriminatory enforcement." 527 U.S. 41, 56 (1999). The broad and ever-evolving standard for "enemy combatancy" raises exactly these concerns. For example, while the MCA promulgates a definition of unlawful "enemy combatancy" that requires material and purposeful support for U.S. enemies, the definition offered in the Department of Defense's directive includes no such provisions. As such, a detainee who offered only minor and even accidental support to Al Qaida could be deemed an "enemy combatant" under the DoD standard, while his lack of intent and minor role would exculpate him under the MCA. The problems inherent in the inconsistent definitions of enemy combatancy ensure that, even with knowledge of the factual basis of the Government's case against him, a detainee cannot mount an effective defense. Thus, even if such information is provided, it cannot be said that a detainee has received meaningful notice of the charges against him for due process purposes.

present at the CSRT hearing to rebut the factual basis for the Government's determination that he is an "enemy combatant". Brief of Respondent-Appellee at 51-52, *Boumediene*, 128 S. Ct. at 2229. And while the regulations may state that when a detainee's case is reviewed by an ARB, he is to be assigned an "Assisting Military Officer" to help him review the summary of the Government's evidence against him and to aid him in presenting information supporting his declassification as an "enemy combatant", Dep't of Def. Memorandum, Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, Sept. 14, 2004 ("ARB Memorandum") (Olsh. Decl. ¶24, Exh. 21) reality actually looks nothing like this.[43]

But even the meager and ineffective assistance offered at Guantanamo has never been available to the detainees at Bagram. Counsel has been repeatedly denied access to Petitioner. Olshansky Decl., ¶2. *See also* Ahmad Decl. ¶19 ("[d]uring the entire time I was at Bagram, I never had a lawyer or anyone advocating on my behalf") (Olsh. Decl. ¶94, Exh. 1). Ultimately, the Court in *Boumediene* was so unimpressed by the representation offered detainees as part of the CSRT process at Guantanamo, *see* 128 S. Ct. at 2260, that this aspect of the process added little weight to Respondents' due process side of the scale. For Petitioner and other Bagram detainees, however, the lack of any assistance at all must weigh heavily against Respondents' due process claim. At Bagram, there is no guarantee that a detainee will even be given an interpreter through which to plead his case or assist him during interrogations. According to former detainee Jawed Ahmad, *never* during the 110 interrogations he endured at Bagram was he provided an interpreter so that he could respond to the interrogators in his native tongue. Ahmad Decl., ¶¶14, 19 (Olsh. Decl. ¶4, Exh. 1). Without an interpreter, detainees are prevented from

---

[43] *See, e.g.*, *Amnesty Int'l, No Substitute for Habeas Corpus: Six Years Without Judicial Review in Guantanamo*, AMR 51/163/2007 (2007) (Olsh. Decl. ¶23).

understanding the charges against them, cannot respond to the questioning of interrogators, and have no way to gather and submit evidence to challenge the Government's factual allegations.

### 4. Petitioner has had no opportunity to rebut the evidence against him.

In examining the question of whether the detainees were ever in a position to present evidence to counter the Government's evidence against them, the Court in *Boumediene* compared the CSRTs to the military tribunals held for the German prisoners in *Eisentrager*. In *Eisentrager*, "[the defendants] were allowed to introduce evidence on their own behalf and permitted to cross-examine the prosecution's witnesses." *Boumediene*, 128 S. Ct. 2260. Indeed, the 27 German defendants received a full trial—albeit a military trial—lasting months and six of the accused were acquitted.[44] Moreover, in *Eisentrager*, as in *Ex Parte Quirin,* 317 U.S. 1 (1942) and *In re Yamashita*, 327 U.S. 1 (1942), the Supreme Court engaged in a searching and detailed analysis of whether the jurisdiction of the military commissions was proper, whether the admission of certain types of evidence violated constitutional, military, or treaty law, and whether procedural irregularities occurred in violation of the Geneva Conventions. *See Eisentrager*, 339 U.S. at 780-81, 785-91; *Quirin*, 317 U.S. at 24; *Yamashita*, 327 U.S. at 5-6, 9.

In stark comparison, the Supreme Court found that the Rasul petitioners "never have been afforded access to any tribunal, much less charged with and convicted of wrongdoing," 542 U.S. at 476, and concluded that the CSRT proceedings did not provide adequate due process protections because, in the final analysis, a detainee's ability to rebut evidence against him "[was] limited by the circumstances of his confinement and his lack of counsel . . . ." *Id.* Given that the limited procedure in place at Bagram is significantly inferior to the flawed procedures used at Guantanamo, there can be no doubt that there are insurmountable barriers facing

---

[44] *See Eisentrager*, Index to Pleadings filed in the Supreme Court, Exh. F – "Regulations Governing the Trial of War Criminals in the China Theater" at 34.

detainees who seek an opportunity to be heard. While Respondents claim that detainees are permitted to appear before a review panel (called the Unlawful Enemy Combatant Review Board ("UECRB")) at a screening that apparently takes place after one year of imprisonment, *see* Resp. Mot. at 9, this new rule has been in place only since April 2008 and therefore was not available to Mr. Al Maqaleh for the duration of his five year imprisonment at Bagram. Petitioner in this case was given no opportunity to appear before any officer or any Board. And while Respondents claim that detainees are permitted to make written statements to the UECRB, suggesting that this constitutes a meaningful opportunity to be heard, little could be further from the truth. Former Bagram detainee Jawed Ahmad made numerous attempts to submit statements from his employer, CTV News, the biggest private news organization in Canada, from the Governor of the province in which his family lives, and from journalists whom he had worked with from around the world, and he was never given the chance to speak to any U.S. personnel no less submit exculpatory information that his family had collected on his behalf. *See* Ahmad Decl. ¶20 (Olsh. Decl. ¶4, Exh. 1). A process that prohibits a detainee from facing and cross-examining his accusers, hearing the charge and evidence against him, and submitting exculpatory documentation and testimony, does not meet any recognizable standard for due process. In fact, given the lack of any response to Mr. Ahmad's 60 written requests to prison authorities for permission to present evidence, Ahmad Decl., ¶18, detention at Bagram seems to meet the very definition of "arbitrary".  The right against arbitrary detention is protected by customary international law, as reflected in a broad range of international instruments, decisions, commentaries and State practice. The Universal Declaration of Human Rights, which is recognized as an authoritative statement of customary international law, contains the obligation to provide detainees with an opportunity to challenge their detention in court. Universal

Declaration of Human Rights, Dec. 10, 1948, arts. 9-10, G.A. Res. 217A, 3 U.N. GAOR, U.N. Doc. A/810. This obligation is included in every other major international human rights convention that contains a general enumeration of rights.[45]

### 5.  Mr. Al Maqaleh has not had the opportunity to confront the Government's witnesses.

As noted above, the *Boumediene* Court suggested that the procedures in *Eisentrager* were adequate in part because the accused were permitted to confront the Government's witnesses. *Boumediene,* 128 S. Ct. at 2260. Although the CSRT guidelines state that detainees will be able to confront the witnesses against them, the Court found that in reality the Guantanamo detainees lack meaningful adversarial mechanisms because of the circumstances of their confinement. Brief of Respondent-Appellee at 49, *Boumediene*, 128 S. Ct. at 2229. The detainees at Bagram suffer from the same procedural deficiency, although to an even greater degree. There is no provision allowing for the confrontation of witnesses. Though Respondents concede that "unlawful enemy combatant" determinations are made based on "testimony from individuals involved in the capture and interrogation of the detainee," Tennison Decl. ¶13, detainees are not permitted to know the names of those who have spoken against them, no less question them. This is confirmed by Jawed Ahmad, who said that he never had any opportunity to hear the statements of witnesses whom the Government claimed had testified against him. Ahmad Decl. ¶20 (Olsh. Decl. ¶4, Exh. 1).

### 6.  Mr. Al Maqaleh has not had the opportunity to gather and present evidence to demonstrate his innocence.

---

[45] *See, e.g.,* American Declaration of the Rights and Duties of Man, May 2, 1948, arts. XXV, XXVI (expressing the obligations of members of the Organization of American States, including the U.S.); European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, art. 5, 213 U.N.T.S. 221; International Covenant on Civil and Political Rights, Dec. 19, 1966, art. 9, 999 U.N.T.S. 171, 6 I.L.M. 368; American Convention on Human Rights, Nov. 22, 1969, art. 7(5), 1144 U.N.T.S.123, 9 I.L.M. 673; African Charter on Human and People's Rights, June 27, 1981, arts. 6-7, 21 I.L.M. 58.

Further compounding the obstacles facing a detainee at Bagram is the lack of any opportunity to gather and present evidence to exonerate himself. At Guantanamo, while the rules seem to permit detainees to present documentary information and witnesses at the CSRT, in actuality no detainee has been able to present witnesses that the Government has deemed to be "reasonably available" within the meaning of the rule. *See* Dep't of Def. Mem., Combatant Status Review Tribunal (CSRT) Process at Guantanamo, at 3 (Jul. 2007) ("CSRT Process") (Olsh. Decl. ¶ 25, Exh. 22). In addition, the CSRT Reporter is *obligated* to provide the Tribunal "evidence to suggest that the detainee should *not* be designated as an enemy combatant." Brief of Respondent-Appellee at 52, *Boumediene*, 128 S. Ct. at 2229. At Bagram, Respondents provided none of these safeguards against erroneous imprisonment, instead, any review of evidence seeming to exonerate the detainee is purely discretionary. According to Respondents, the detaining combatant commander, or his designee, *may* interview reasonably available witnesses if he so chooses, and only if doing so would "not affect combat, intelligence gathering, law enforcement, or support operations." Tennison Decl. ¶13. In other words, the very same commander who is responsible for "combat, intelligence gathering, law enforcement, or support operations" at Bagram is also tasked with seeking out evidence that demonstrates that individuals in their custody were not properly detained in the first place.

Moreover, unlike the CSRT guidelines which specify that the detainee must be determined to be an "enemy combatant" by a preponderance of the evidence, *see* CSRT Process at 6 (Olsh. Decl. ¶25, Exh. 22), the burden of proof is conspicuously absent from Respondents' explanation of the ECRB process. Consequently, the determination that Mr. Al Maqaleh is an "unlawful enemy combatant" – a label which results in potentially life-long sentence in a notoriously brutal prison camp – could have been based on more than a scintilla of the most unreliable evidence. In

the case of Jawed Ahmad, the Government never presented a single piece of evidence against him, and yet he was imprisoned at Bagram for nearly a year. Ahmad Decl. at ¶¶9, 17, 20 (Olsh. Decl. ¶4, Exh. 1).

### 7. The ECRB determinations at Bagram lack a neutral decision-maker to which Petitioner could plead his case and Petitioner Has Had No Access to Higher Courts.

The ECRBs implemented at Bagram fail to provide the detainees with access to a neutral decision-maker. In *Boumediene*, Respondents argued that the officers determining the status of detainees in Guantanamo were sufficiently neutral because "none . . . [were] involved in the apprehension, detention, interrogation, or previous determination of the status of the detainee." Brief of Respondent-Appellee at 49-50, *Boumediene*, 128 S. Ct. 2229 (internal citations omitted). The guidelines for "enemy combatant" status determinations at Bagram include no such protection. While Respondents note that annual determinations are made by an Unlawful Enemy Combatant Review Board comprised of "three commissioned officers," they make no mention of the neutrality of those individuals, offering no guarantee that they were not in fact involved in the capture of the detainee. Resp. Mot., at 8.

### 8. Petitioner has no right of appeal.

The final factor that the *Boumediene* Court analyzed was whether the CSRT determinations would be reviewed by a higher court. *Boumediene,* 128 S. Ct. at 2260. In *Boumediene*, the Court held that "although a detainee can seek review of his status determination in the Court of Appeals, that review process cannot cure all defects in the earlier proceedings." *Id*. At Bagram, there is no provision whatsoever for review of a detainee's status outside of the Department of Defense.[46] Thus, not only do the detainees lack access to a neutral tribunal for a review of their

---

[46]At Bagram, the decision of the ECRB is reviewed by the Commanding General. Tennison Decl. ¶ 13. There is no provision for subsequent review by civilian courts.

original hearing, they lack recourse to a neutral appellate court or tribunal and have no access at all to civilian courts.

It is apparent that the process afforded detainees at Bagram pales in comparison to that offered by CSRTs in Guantanamo. In as much as the CSRT regime was deemed insufficient to eliminate the need for habeas relief, Petitioner's entitlement to the Great Writ in this case is beyond doubt.

### B.  The U.S. Government Has Exclusive Jurisdiction and Control Over Bagram

In *Boumediene,* the Supreme Court rejected the proposition that "de jure sovereignty is the touchstone of habeas jurisdiction." 128 S. Ct. at 2235. Extraterritorial application of the Suspension Clause hinges upon "practical concerns" and "objective factors," not formal rules. *Id*. at 2236. Writing for the majority, Justice Kennedy identified "the nature of the sites where apprehension and then detention took place" as the second factor relevant to a determination of whether the Constitution extends to invalidate a suspension of the writ of habeas corpus. *Id*. at 2237.

The objective factor of "constant jurisdiction," 128 S. Ct. at 2261, that the Court found relevant in *Boumediene* are also implicated by the circumstances of Mr. Al Maqaleh's detention in Bagram. As Respondents admit, "the detention operation at Bagram is under the command and control of the U.S. military, and petitioner is in the physical and legal custody of the United States." Resp. Mot. at 22 (internal quotations omitted). Respondents also concede that "the United States would not detain enemy combatants on any long-term basis at a facility that it did not control." *Id*. The evidence overwhelmingly demonstrates that Bagram is in the "absolute and indefinite control" of the United States, 128 S. Ct. at 2237, that the United States is not "answerable to its Allies for all activities occurring there," 128 S. Ct. at 2260, and that in every

practical sense it is in the "constant jurisdiction of the United States." 128 S. Ct. at 2261. For

these reasons, the Suspension Clause protects Mr. Al Maqaleh at Bagram, no less than it would if

Respondents had decided to transfer him to Guantanamo instead.

> 1. **Respondents have admitted that the Afghan Government has ceded indefinite and exclusive control over Bagram to the United States under the terms of the agreements between the two nations.**

The Government concedes that Bagram is under the United States' command and control.

Resp. Mot. at 7.[47] The lease agreement proffered by the Government reveals that the United

States' control over Bagram is just as absolute and exclusive as its control over Guantanamo. A

comparison of the two lease agreements appears below.

| Indicia of Control (from lease) | Guantanamo Leases | Bagram Lease |
|---|---|---|
| 1. Right to exclusive use of the land | "[T]he Republic of Cuba consents that during this period of the occupation by the United States…the United States shall exercise complete jurisdiction and control over and within said areas." Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III T.S. No. 418 (Olsh. Decl. ¶26, Exh. 23). | Afghanistan "hereby consigns to the UNITED STATES to have and to hold for the exclusive use of the UNITED STATES Forces land, facilities, and appurtances (sic) currently owned by or otherwise under the control of Afghanistan…." Bagram Lease, Tennison Decl., Exh. A, ¶1. Afghanistan "warrants that the United States shall have exclusive, peaceable, undisturbed and uninterrupted possession without any interruption whatsoever by [Afghanistan] or its agents." *Id.* at ¶9. |
| 2. Right to perpetual possession at the United States' discretion | "So long as the United States of America shall not abandon the said naval station of Guantanamo Bay…" Treaty | The lease continues in effect "until the UNITED STATES or its successors determine that the Premises are no longer required for |

---

[47] *See also* Tennison Decl. ¶3 ("Task Force Guardian, a subordinate unit of CJTF-101, is under United States national command and control. Task Force Guardian is responsible for operating Bagram Theater Internment Facility ("BTIF"), a Department of Defense ("DoD") detention facility in support of Operation Enduring Freedom (OEF), located at the Bagram Airfield.  I have served as the Commander of Task Force Guardian and Commander of Detention Operations, CJTF-101, since November 16, 2007.  In this position, I am responsible for all aspects of detention operations for CJTF-101.").

| Indicia of Control (from lease) | Guantanamo Leases | Bagram Lease |
|---|---|---|
| | Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, Art. III, 48 Stat. 1683, T.S. No. 866 (Olsh. Decl. 27, Exh. 24). | its use." *Id*. at ¶4. |
| 3. Occupation with de minimis or no rental obligation | "[A]nnual sum of two thousand dollars, in gold coin." Lease of Certain Areas for Naval or Coaling Stations, July 2, 1903, U.S.-Cuba, art. I (Olsh. Decl. ¶28, Exh. 25). | "The HOST NATION makes the Premises available to the UNITED STATES, without rental or any other consideration for use of the premises." *Id*. at ¶5. |
| 4. Right of Host Nation to exert control over use of premises | None. | None. The United States is permitted to "hold and enjoy the Premises during the period of th[e] agreement without any interruption whatsoever by the HOST NATION or its agents." *Id*. at ¶9. |
| 5. Right to assignment of use of the property to another party without the consent of the host nation. | None. | "The UNITED STATES shall have the right to assign this agreement to a successor nation or organization." *Id*. at ¶2. |
| 6. Right of reversion | None | "The UNITED STATES shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use…." *Id*. at ¶12. |

Based on the terms of the lease agreements, a strong argument can be made that the degree of U.S. control over Bagram is *greater* than it is over Guantanamo. Not only can the United States occupy the land, *id*. at ¶¶1, 9, rent free, *id*. at ¶5, for as long as it wishes, *id*. at ¶4, but it is also guaranteed no interference from the government of Afghanistan. *Id*. at ¶9. The Bagram lease goes further still to grant the U.S. the right to assign the property, on the same terms, *id*. at ¶2, as well as a right of reverter to take back possession if the successor later abandons the property. *Id*. at ¶12.

Moreover, under the terms of the Diplomatic Notes that Respondents contend create the

Status of Forces Agreement ("SOFA"), Afghanistan has acceded to the United States' demand

for a critical facet of Afghanistan's sovereignty, the power to exercise criminal jurisdiction over

U.S. personnel in the country. Diplomatic Note (Sept. 26, 2002), Tennison Decl., Exh. 2. The

SOFA also relinquishes control in the following ways:

| Area of control (sovereign authority) relinquished by Afghanistan to the United States | Corresponding provisions in the Status of Force Agreement |
|---|---|
| 1. The right to exercise criminal jurisdiction over persons within Afghanistan | (a) "Afghanistan authorizes the United States Government to exercise criminal jurisdiction over the United States personnel." *Id.* at 20.<br>(b) "[P]ersonnel may not be surrendered to . . . the custody of an international tribunal or any other entity or state without the express consent of the Government of the United States." *Id.* at 20. |
| 2. The right to lay a civil claim against a hosted nation for damages within Afghanistan | "The parties waive any and all claims against each other for damages to, or loss or destruction of, property owned by each party, arising out of activities in Afghanistan under this agreement." *Id.* at 20. |
| 3. The right to regulate the entry and exit persons in Afghanistan | "United States personnel [are] permitted to enter and exit Afghanistan with United States identification." *Id.* at 18. |
| 4. The right to charge fees and tolls for the use of Afghan roads and airspace | "[V]ehicles and aircraft owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan." *Id.* |
| 5. The right to inspect vehicles within Afghan territory | "Aircraft and vehicles of the United States shall be free of inspections" *Id.* |
| 6. The right to impose taxes | (a) "The Government of the United States of America . . . shall not be liable to pay tax or similar charges assessed within Afghanistan." *Id.* "[A]cquisition of articles and services . . . shall not be subject to any taxes, customs, duties or similar charges in Afghanistan." *Id.* |
| 7. The right to regulate imports and exports into Afghanistan | (a) "The Government of the United States of America . . . may import into, export out of, and use in the Republic of Afghanistan any personal property, equipment, supplies, materials, technology, training, or services required to implement this agreement." *Id.*<br>(b) "[I]mportation, exportation and use shall be |

| Area of control (sovereign authority) relinquished by Afghanistan to the United States | Corresponding provisions in the Status of Force Agreement |
|---|---|
| | exempt from any inspection, licenses, other restrictions, customs, duties, taxes or any other charges assessed within Afghanistan." *Id.* |
| 8. The right to regulate commercial development in Afghanistan | "[C]ontracts for the acquisition of articles and services, including construction . . . . shall be awarded in accordance with the laws and regulations of the Government of the United States of America." *Id.* |
| 9. The right to the exclusive development, operation, and control of critical communication technologies in Afghanistan | (a) "The United States Government shall be allowed to operate its own telecommunications systems." *Id.* at 20. <br> (b) "Use of radio spectrum shall be free of cost." *Id.* at 3. |

The fact that the language establishing the United States' indefinite jurisdiction over its forces in Afghanistan and at Bagram is much stronger than that used in other SOFAs--which are acknowledged to create exclusive jurisdiction--leaves no doubt that Bagram is under the exclusive jurisdiction and control of the U.S.[48]

In sum, the agreements proffered by Respondents makes clear that any use of the Bagram property, by any person, entity or country, is solely permitted at the discretion of the United States.[49] Tennison Decl. Exh. A, ¶1 (consigning Bagram to United States for its "exclusive use"); and ¶9 (giving United States "exclusive, peaceable, undisturbed and uninterrupted possession" of the Bagram base). Contrary to the suggestion in the Tennison Declaration (¶6), the power to

---

[48] For example, the 1996 U.S. Executive Agreement with Mongolia provides, as the Afghan agreement does not, that Mongolia may request that the United States waive its exclusive jurisdiction and that it is entitled to "sympathetic consideration," but the Mongolian agreement does not provide that any waiver must be granted. Agreement on Military Exchanges and Visits between the Government of the United States of America and Mongolia, art. X, Jun. 26, 1996 (Olsh. Decl. ¶29, Exh. 26).  Similarly, unlike the Afghan agreements, Executive Agreements entered into by the U.S. prior to World War II with military bases in Newfoundland, Bermuda, Trinidad and other locations all provided shared jurisdiction, reserving exclusive jurisdiction only for offenses of a military nature.  *See* Agreement and Exchanges of Notes Between the United States of America and Great Britain Respecting Leased Naval and Air Bases, art. IV (1)(a-c), Mar. 27, 1941, 55 Stat. 1560 (Olsh. Decl. ¶20, Exh. 27).

[49] If the Court is in any doubt as to the degree of control exercised by the United States at Bagram, and its comparison with the United States' control of Guantanamo, Petitioner respectfully submits that, at the least, the issue is a disputed question of fact.  Petitioner has had no opportunity to take discovery concerning facts asserted in the Tennison Declaration. He should be permitted to do so before the Court dismiss the instant petition.

grant another country the right to use part of Bagram does not undermine the United States' control over the property, it confirms it.

### 2. The United States' control of Bagram has grown substantially and is expanding.

Respondents' unsupported claim that the United States "does not intend to occupy Bagram Airfield for an extended period or to treat it as part of U.S. territory, and its use of the Airfield is no more than a transient possession necessitated by war," Resp. Mot. at 20, is belied by the reams of information stated in DoD press releases, new articles, and insider reports that detail the multi-billion dollar investment in the expansion of the base. The Government has openly stated that "[a]t Bagram Airfield, improvements to the living and working conditions have been and are constantly being made." Environmental Conditions at Bagram Airfield Information for Health Care Providers (HCPs), June 2004 (Olsh. Decl. ¶31, Exh. 28). The United States' tremendous commitment of money and human capital to the development of Bagram demonstrates, beyond dispute, its intention to maintain long-term occupation and control of the base.

Since early 2005, Bagram has grown from a "glorified city of tents," Kent Harris, *Buildings Going up at Bagram Air Base as U.S. Forces Dig in for the Long Haul*, Stars and Stripes, Mar. 15, 2005 (Olsh. Decl. ¶32 Exh. 29), to a state-of-the-art Air Force base, complete with: 1) permanent housing for U.S. and coalition soldiers;[50] 2) a new runway, service taxiways, and aprons to meet military standards;[51] 3) guard towers and fencing to encircle the perimeter;[52] 4) an entry control point facility;[53] 5) bulk fuel storage areas;[54] 6) the recently constructed Craig

---

[50] Synopsis, Security Upgrades, Army Corps of Engineers Contracting ("Army Corps of Engineers Security Upgrades") (Olsh. Decl. ¶33, Exh. 30).
[51] Fabric Aircraft Maintenance Hanger at Bagram Airfield, Afghanistan, Army Corps of Engineers Contracting, Solicitation No. W912ER08R0052 (Apr. 29, 2008) (Olsh. Decl. ¶34, Exh. 31).
[52] Army Corps of Engineers Security Upgrades (Olsh. Decl. ¶33, Exh. 30).
[53] *Id.*
[54] Construction Services for Bulk Fuel Storage and Transfer System at Bagram Airfield, Afghanistan, Army Corps of Engineers Contracting, Solicitation No. W912ER08R0054 (Apr. 25, 2008)(Olsh. Decl. ¶35, Exh. 32).

Hospital and dental clinic;[55] 7) video-teleconference facilities;[56] 8) a $35 Million power plant;[57] and an 9) Army and Air Force Exchange Facility (AAFES) whose concessions include a Barber/Beauty Salon, Nail/Spa, Gift Shop, Jewelry, Alterations, Artisan, Gifts, Jewelry, Sports Apparel, Korean Snacks, Engraving, Sports, Coffee, Dairy Queen, Orange Julius, Thai Food, Pizza, Burger King, Phone Center, Tailor, [and] Bazaar, housed in a "3,000 sq. ft. **permanent** building."[58] One contractor, hired in 2008 to install 150,000 speed of information cable described development at Bagram as follows:

> With **no plans to reduce flight operations or personnel in the immediate future**, an **extensive overhaul and expansion project** that has already **spanned more than four years is underway**; and Superior Essex cable products are being instated to help the base meet **growing mission demands**.

Installation Profile: U.S. Controlled Air Base in Bagram Equipped with Superior Essex Cable, © 2008, Superior Essex Inc. (emphasis added) (Olsh. Decl. ¶47, Exh. 43).

Twenty-one military and civilian engineers as well as approximately 1,000 Afghan nationals coordinate the development on the base. The team oversees the "steady flow of projects designed to improve and expand Bagram Airfield." Department of Defense Press Release, *Engineer Team Plans Bagram's Future* (Aug. 13, 2008) (Olsh. Decl. ¶12, Exh. 9). At any given time, the group "juggles about 20 projects," including demolition work, barrier building, and structural work. *Id*. Among the ongoing initiatives is the construction of a $2.7 million administrative building. *Id*. According to a Department of Defense press release, fifty additional development projects are already in the pipeline for Bagram's expansion. *Id*.

In response to these projects, the U.S. military has also deployed a Facilities Engineering

---

[55] *New Bagram Hospital Offers State of the Art Care*, Air Force Print News Today (Feb. 9, 2007) (Olsh. Decl. ¶36, Exh. 33).
[56] International Committee of the Red Cross, *Afghanistan: Video Links Between Bagram Detainees and Families* (January 14, 2008) (Olsh. Decl. ¶37, Exh. 34).
[57] *$35 Million for Bagram AB Power Plant*, Defense Industry Daily (Aug. 4, 2008) (Olsh. Decl. ¶38, Exh. 35).
[58] Army and Air Force Exchange Service ("AAFES"), Serving Troops Downrange (Olsh. Decl. ¶13, Exh. 10).

Team (FET) to work at Bagram. Staff Sergeant Oshawn Jefferson, *FET Keeps Bagram Improving, Growing,* Air Force Print News Today, Dec. 4, 2007 (Olsh. Decl. ¶42, Exh. 38). The responsibilities of Bagram's FET include "support of more the 300 contractors on a daily basis." *Id*. Some of the many projects under FET management include "a new gym, dining facilities, a multipurpose facility, a contractor village for large military construction projects, surge housing war reserve material storage, a landfill wit an incinerator, and a wastewater treatment plant." Far from a "transient possession," the U.S. military has retrofitted the once Soviet-controlled airbase—without running water or permanent accommodation—into a small city; serving thousands of troops with advanced medical care, housing, sanitation, entertainment, and many of the luxuries of home for the comfort of their wives and families.

Although no mention was included in the aforementioned press releases, the expansion of Bagram Airfield has also included "quiet" additions to an internment facility, which has grown from a temporary holding pen for roughly 100 detainees to a prison that now accommodates an estimated 630 "enemy combatants." Tim Golden, *Foiling U.S. Plan, Prison Expands in Afghanistan*, N.Y. Times, Jan. 7, 2008, at A1 (Olsh. Decl. ¶11, Exh. 8). Recent Government announcements have detailed the plans for the construction of another prison on the Air Base, designed to hold up to 1100 detainees. Tim Golden and Eric Schmitt, *A Growing Afghan Prison Rivals Bleak Guantanamo*, N.Y. Times, Feb. 26, 2006, at A1 (Olsh. Decl.¶ 40, Exh. 37). As reported by the New York Times, "Privately, some administration officials acknowledge that the situation at Bagram has increasingly come to resemble the legal void that led to a landmark Supreme Court ruling in June 2004 affirming the right of prisoners at Guantanamo to challenge their detention in United States Courts." *Id*.

Bagram has become a permanent fixture in Afghanistan under the complete control of the

U.S. sufficient to pass muster under the test set forth in *Boumediene* and to ensure that detainees held there are entitled to Great Writ.

### 3.   U.S. control over Bagram Prison is much more extensive than its control over Landsberg Prison as analyzed in *Eisentrager.*

Respondents claim that Bagram is more like *Eisentrager*'s Landsberg Prison than Guantanamo, but the historical evidence shows that this is not the case. Resp. Mot. at 20. First, the nature and extent of U.S. authority over a sector of occupied Germany and Landsberg Prison within that sector changed continuously in the years after World War II, as the highly charged environment of the early Cold War led the U.S. to coordinate its operations ever more tightly with the United Kingdom and France, to shift responsibility for the occupation from military to civilian shoulders, and to set definite endpoints for its involvement in running a prison in Germany.[59] Further, the treatment of individual inmates at Landsberg Prison was split between a civilian official, the High Commissioner, and a military official, the Commander in Chief of the European Command, depending on which of the Allied authorities had tried that particular inmate. Respondents admit that the detention operation at Bagram is solely under the United States' command and control. *See* Exec. Order No. 100144, 15 Fed. Reg. 4705 (July 21, 1950) (Olsh. Decl., Exh. X); Resp. Mot. at 7. Finally, by 1950, when *Eisentrager* was decided, the U.S. had already established its intention to transfer Landsberg prison to the Germans, where the U.S. Government's control over Bagram only continues to expand. Occupation Statute Defining the Powers To Be Retained by the Occupation Authorities, *reprinted in* Staff of S. Comm. On

---

[59] Well before Germany surrendered, the Allies agreed that "[s]upreme authority in Germany will be exercised, on instructions from their respective governments, by the Commanders-in-Chief of [the Allies], each in his own zone of occupation, and also jointly, in matters affecting Germany as a whole, in their capacity as members of the [Control Council]." Agreement on Control Machinery in Germany, Adopted by the European Advisory Commission, art. 1, Nov. 14, 1944, 5 U.S.T. 2062 (Olsh. Decl. at ¶41, Exh. 38). Thus, any power the U.S. exercised within its zone in Occupied Germany constituted a power devolved from the Allied occupation authority, and its use, therefore, was subject to negotiation and deliberation by the other Allies if the Allied Control Council deemed the matter to "affect Germany as a whole," id., or to be an area in which the four Allies needed to "to ensure appropriate uniformity of action by the Commanders-in-Chief in their respective zones of occupation."[59] *Id.*, art. 3(b).

Foreign Relations, 92d Cong., *Documents on Germany, 1944-1971*, 148 (Comm. Print 1971) (Olsh. Decl. ¶43, Exh. 40). In sum, the circumstances in occupied Germany paint a stark contrast, by virtue of the turbulent and highly politicized environment in post-WW II Germany, with Bagram Air Base, where the Government of Afghanistan has expressly transferred control over the land on which the Air Base is located to the U.S. alone. *See* Tennison Decl., Exh. A.

### C.  There Are Few Practical Obstacles Inherent in Resolving Mr. Al Maqaleh's Entitlement to the Writ

The *Boumediene* Court finally looks at the practical obstacles inherent in resolving the prisoner's entitlement to the writ. *Boumediene*, 128 S. Ct. at 2261. In examining the practicalities of extending the Suspension Clause, the Court cited to the "impracticable or anomalous" test set forth in *Reid v. Covert*, in which Justice Harlan stated that all relevant circumstances should be examined before drawing a conclusion about whether a constitutional right applies in a given circumstance. *Boumediene,* 128 S. Ct. at 2262 (citing *Reid v. Covert,* 354 U.S. 1 (1957) (Harlan, J., concurring)). The Court reasoned that while there are always costs to holding the Suspension Clause applicable in a case of military detention abroad, such factors are not dispositive. *Id*. at 2261. Thus, while the Government agues that there are practical barriers to extending the writ to Bagram, these are far outweighed by the importance of upholding the rule of law and structure and protections of the Constitution, which "are designed to survive, and remain in force, even in extraordinary times." *Id*. at 2277.

Contrary to the Government's argument, providing adequate due process through habeas relief would not compromise the American mission in Afghanistan. Respondents argue that there will be complications because Bagram is located in an "active theater of war," but they present no evidence to support that claim. Resp. Mot. at 26. Instead, they make generalizations about the military mission all over Afghanistan, a country that is the size of Texas, as opposed to the

conditions at Bagram itself. Such generalizations have the effect of allowing the Government to perpetuate a "theater of war" argument and pluck individuals such as Mr. Al Maqaleh from outside any zone of conflict at its discretion rather than due to the exigencies of battle. The Government's argument that "Petitioner's allegation that he was not captured on a battlefield in Afghanistan is immaterial" bodes ill for us all. To allow the Government to continue to seize individuals from any country anywhere in the world and detain them in Bagram in order to hide their treatment under the cloak of "war" will inevitably result in thousands of persons being held indefinitely in a conflict that the Government concedes is "unlikely to end with a formal cease-fire agreement." *Hamdi,* 542 U.S. at 520. The Government cannot hold Mr. Al Maqaleh in detention indefinitely and claim that review of his status will disrupt combat operations when the only reason he is even near any area of hostilities is because the United States decided to place him there.

The absolute and indefinite control that the United States exerts over Bagram weighs in favor of extending due process protections to individuals detained there in spite of the de minimis practical difficulties that may arise. In *Boumediene*, the Court relied upon the "plenary control" of the Government over Guantanamo when it held that the factor of impracticality was outweighed by the importance of upholding the Constitution. 128 S. Ct. at 2261 (holding that "in light of the plenary control the United States asserts over the base" there are no apparent credible arguments that the military mission at Guantanamo would be compromised if habeas corpus courts had jurisdiction to hear the detainees' claims). Given that the U.S. Government exerts constant and complete jurisdiction and control over Bagram, the Court's failure to ensure that the Suspension Clause protects Mr. Al Maqaleh's right to the Great Writ would mean that he could be held for years to come with no opportunity to challenge his detention. The Government's

control over Bagram shows that it has the power to control the type of process that is, or could be, afforded the detainees there.

The Government also cites potential "friction with the host government" as a reason for the impracticability of affording Mr. Al Maqaleh sufficient process. Resp. Mot. at 28. But allowing Mr. Al Maqaleh to challenge his status would in no way be an affront to the government of Afghanistan. Mr. Al Maqaleh is a citizen of Yemen, not Afghanistan, and the Afghan Government has expressed no interest in his detention. Further, the Government points to the diplomatic arrangement with Afghanistan to transfer detainees to the Afghan National Detention Facility, but there is no indication that Mr. Al Maqaleh would be subject to such a transfer now or ever. *Id.* Thus, there is no reason to believe that the Afghan Government would be offended in any way by providing habeas corpus relief to Mr. Al Maqaleh, and the U.S. Government should not be permitted to hold him indefinitely based on pure speculation.

The practicalities of the situation in Bagram are a far cry from the circumstances surrounding *Eisentrager*, where the U.S. was facing a military mission in post-War Germany when it became responsible for an occupation zone encompassing over 57,000 square miles with a population of 18 million. *Boumediene*, 128 S. Ct. at 2261. Such conditions do not exist here, where the U.S. is overseeing one prison with a population of 670 detainees, in addition to American military personnel and contractors. Tim Golden and Eric Schmitt, *A Growing Afghan Prison Rivals Bleak Guantanamo*, N.Y. Times, Feb. 26, 2006 (Olsh. Decl. ¶ 40, Exh. 37); *Boumediene*, 128 S. Ct. at 2261 (contrasting the circumstances of *Eisentrager* with Guantanamo, where "other than the detainees themselves, the only long-term residents are American military personnel, their families, and a small number of workers"). Providing the detainees at Bagram with due process would in no way be impractical as it was in *Eisentrager*, where the sheer expansiveness of the

territory for which the U.S. was responsible made such measures impossible.

Indeed, even at Landsberg Prison, which the Government claims is analogous to Bagram, detainees were privy to more process than exists for Petitioner. In *Boumediene*, Justice Kennedy described the military commissions at Landsberg as a "rigorous adversarial process," where detainees were charged with a bill of particulars that contained detailed factual allegations, represented by counsel, and had the opportunity to introduce evidence and cross examine the prosecution's witnesses. *Boumediene*, 128 S. Ct. at 2259-60. If military commissions such as the one administered in *Eisentrager* were meant to take place in a "theater of war," there is no reason that such trials could not be administered at Bagram, where the U.S. maintains even greater control than it did at Landsberg.

The Government has not provided a single piece of evidence showing that ensuring the availability of the writ to Petitioner would be "impractical or anomalous." Mr. Al Maqaleh must be able to challenge his indefinite detention by the U.S. Government. The Great Writ incorporates the fundamental protection of human liberty developed under the common law requiring independent judicial review of the facts and circumstances surrounding a detention to ensure that no individual is deprived of liberty by the Executive without sufficient cause.

## IV. THE GOVERNMENT HAS VIOLATED PETITIONER'S CONSTITUTIONAL, STATUTORY, COMMON LAW, AND INTERNATIONAL RIGHTS

### A. Petitioner's Seizure and Detention Violates the Rule of Law

The fundamental precept that the Government may not take the life, liberty or property of a person without authority from the law is one of the cornerstones of our democracy. The rule of law encompasses both "procedural and substantive" limitations on Government power,[60] and it is agreed that the rule of law requires the supremacy of legal authority over officials as well as

---

[60] Diane P. Wood, *The Rule of Law in Times of Stress*, 70 U. Chi. L. Rev. 455, 457 (2003).

ordinary citizens, and the availability of the courts to enforce the law and employ fair procedures.[61] When officials act to deprive individuals of liberty without legal authority and seek to preclude the courts from reviewing their actions, the rule of law is violated. Petitioner in this case has been seized and subjected to indefinite detention by the Executive and in the absent of this Court's proper intervention will most likely not face any sort of impartial judgment regarding his continued detention. This consolidation of power is antithetical to the rule of law and undermines our system of checks and balances. *See Nixon v. United States*, 506 U.S. 224, 234-35 (1993). The Founders warned against these circumstances in advocating for the adoption of our Constitution: "[t]he accumulation of all powers legislative executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 244 (James Madison) (Olsh. Decl ¶7, Exh. 4).

Respondents assert that the undefined and amorphous exigencies of international terrorist activities warrant the creation of a black hole in which the rule of law disappears. But this assertion ignores the time-honored principle, forged in the heat of armed conflicts, that even armed combat does not eviscerate the Constitution. "No penance would ever expiate the sin against free Government of holding that a President can escape control of executive powers by law through assuming his military role." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645-46 (1952) (Jackson, J., concurring). The Constitution is applied "equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120-21 (1866); *accord United States v. Robel,* 389 U.S. 258, 263-64 (1967).

---

[61] Richard H. Fallon, *"The Rule of Law" as a Concept in Constitutional Discourse*, 97 Colum. L. Rev. 1, 8 (1997).

**B. Petitioner's Seizure and Imprisonment Violates the Due Process Clause**

Petitioner's detention violates the fundamental Fifth Amendment right against imprisonment without due process of law—a right Petitioner may invoke due to his imprisonment on a military base subject to the exclusive jurisdiction and control of the United States. Due process requires that any serious deprivation of liberty—which indefinite and potentially life-long military detention clearly is—be based on fair procedures that afford meaningful notice of the basis for detention and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533 (plurality opinion); *see also Panetti v. Quarterman*, 127 S. Ct. 2842, 2856 (2007) (due process requires opportunity "to submit 'evidence and argument from the prisoner's counsel'") (quoting *Ford v. Wainwright*, 477 U.S. 399, 427 (1986) (Powell, J., concurring in part and concurring in the judgment))). Moreover, "the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Hamdi*, 542 U.S. at 533 (quoting *Fuentes v. Shevin*, 407 U.S. 67 (1972) (internal quotation marks omitted)). The Due Process Clause is particularly exacting where, as here, potentially lifelong confinement is contemplated without any of the protections that precede a criminal conviction. *See, e.g., Foucha v. Louisiana*, 504 U.S. 71, 93 (1992) (Kennedy, J., dissenting) ("We have often subjected to heightened due process scrutiny, with regard to both purpose and duration, deprivations of physical liberty imposed before a [criminal] judgment is rendered[.]").[62]

---

[62] The requirements of due process mirror the procedures familiar to the common law (discussed supra Part I.B.1), as the Due Process Clause has long been understood to "affirm[] the right of trial according to the process and proceedings of the common law." 3 Story, Commentaries on the Constitution of the United States §1783 (1833); *see also Robertson v. Baldwin*, 165 U.S. 275, 281 (1897) (aim of the Due Process Clause is "to embody certain guaranties and immunities which we had inherited from our English ancestors"); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 277 (1855) (due process inquiry "look[s] to those settled usages and modes of proceeding existing in the common and statute law of England"); cf. *Hamdi*, 542 U.S. at 556 (Scalia, J., dissenting) ("The gist of the Due Process Clause, as understood at the founding and since, was to force the Government to follow those common-law procedures traditionally deemed necessary before depriving a person of life, liberty, or property.").

In *Hamdi*, the Government claimed the power to imprison "enemy combatants," a defined category limited to persons who were "'part of or supporting forces hostile to the United States or coalition partners in Afghanistan' and who 'engaged in an armed conflict against the United States there.'" 542 U.S. at 516 (plurality opinion). The Supreme Court found that the AUMF authorized the military detention of persons falling within this narrowly cabined and "limited category." *Id*. at 518. Nine days after *Hamdi* was announced, the Deputy Secretary of Defense promulgated a far broader definition of the term "enemy combatant."[63] The Government has since claimed authority to subject to indefinite military imprisonment any individual falling within successive new definitions of the phrase, which all apparently include citizens of friendly nations whose conduct does not approach any definition of "combat," *see* Ahmad Decl. ¶¶ 1-6 (Olsh. Decl. at ¶ 4, Exh. 1), or whose supposed "support[]" for al Qaeda is wholly unintentional. *See Guantanamo Detainee Cases*, 355 F. Supp. 2d at 475 (noting the Government's position that the military could indefinitely detain "[a] little old lady in Switzerland who writes checks to what she thinks is a charity that helps orphans in Afghanistan but [what] really is a front to finance al-Qaeda activities" (internal quotation marks omitted)).

The laws of war justify extended military detention "to prevent a combatant's return to the battlefield." *Hamdi*, 542 U.S. at 519. "Indefinite detention for the purpose of interrogation is not authorized." *Id*. at 521. *Hamdi* rested on the fact that the laws of war authorize military detention of persons who join "'the military arm of the enemy Government,'" *id*. at 519 (quoting *Quirin*, 312 U.S. at 37-38), and who "'engage[] in an armed conflict against the United States'"

---

[63] *See* Wolfowitz Memo (describing an enemy combatant as "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.  Each detainee subject to this Order has been determined to be an enemy combatant through multiple levels of review by officers of the Department of Defense.") (Olsh. Decl. ¶16, Exh. 13).

*Id.*(citation omitted). Under the laws of war,[64] individuals who are not affiliated with the armed forces of an enemy State are not "combatants," but "civilians."[65] The laws of war permit the use of military force against civilians, but only and for such time as they "take a direct part in hostilities,"[66] which must be intentional.[67] *See U.S. Air Force Pamphlet* 110-31, §5-3(a)(1)(c) (Nov. 19, 1976); 1 Henckaerts & Doswald-Beck, Customary International Humanitarian Law 11, 20-21 (2005).

The Government's newest definition of "unlawful enemy combatant" as set forth in the MCA is not based on any recognized law-of-war principle. The notion of "support" for al Qaeda is extremely malleable and is not grounded in any principles that could give it a reasonable compass. The laws of war do not treat as "combatants," and do not authorize the use of military force against, persons who "support" forces of a group such as al Qaeda but do not directly engage in hostilities themselves. In fact, the MCA appears to label "combatants" persons who are clearly not lawful targets of force under the laws of war, such as civilians who (even unknowingly) provide "food or medicine" or "monetary aid" to al Qaeda. The Government should not be permitted to continually refashion the amorphous category of people it wishes to imprison indefinitely.

---

[64] *See also* 1949 Geneva Convention art. 4(A)(1) (defining "prisoners of war" as "[m]embers of the armed forces of a Party to the conflict as well as members of militias or volunteer corps forming part of such armed forces"); Additional Protocol, art. 43(2) (defining "combatants" as "[m]embers of the armed forces of a Party to a conflict" other than medical and religious personnel); 1 Henckaerts & Doswald-Beck, Customary International Humanitarian Law 11 (2005).

[65] Additional Protocol I, art. 50 (defining "civilian" as any person who does not fall under identified sections of article 4 of the Third Geneva Convention or article 43 of Additional Protocol I).

[66] Department of the Navy, *Commander's Handbook on the Law of Naval Operations* 11.3 (1995) (U.S. Navy Handbook) ("Civilians who take a direct part in hostilities by taking up arms or otherwise trying to kill, injure, or capture enemy personnel or destroy enemy property lose their immunity and may be attacked.") (Olsh. Decl. ¶19, Exh. 16); *U.S. Air Force Pamphlet* 110-31, §5-3(a)(1)(c) (Nov. 19, 1976) ("Civilians enjoy the protection afforded by law unless and for such time as they take a direct part in the hostilities.") (Olsh. Decl. ¶20, Exh. 17).

[67] *See, e.g.,* Michael Schmitt, *Humanitarian Law and Direct Participation in Hostilities By Private Contractors or Civilian Employees,* 5 Chi. J. Int'l L. 511, 538 (2005) ("[T]he mens rea of the civilian involved is the seminal factor in assessing whether an attack or other act against military personnel or military objects is direct participation.").

Although the *Hamdi* plurality suggested a procedural framework that might have satisfied the dictates of due process had it been implemented in 2004, the Government's ECRB process falls far short of even that approach. After hold Petitioner for nearly six years of unjustified imprisonment, the Government's failure to comply with even the most rudimentary aspects of due process deserves no further indulgence.

The Government's treatment of Petitioner is particularly unjustifiable given that, over three years ago, the *Hamdi* plurality described adversarial procedures for challenges to Executive detention of "enemy combatants" that might have complied with due process at that time. 542 U.S. at 538-539. The Government did not follow this guidance. Instead, it promulgated rules that allowed it to avoid any meaningful explication of the charges, prevented Petitioner from seeing the evidence used against him, forbade him from consulting counsel, and made it virtually impossible for him to identify and proffer favorable evidence. This Court need not decide whether different procedures, if offered "'at a meaningful time and in a meaningful manner,'" *Fuentes*, 407 U.S. at 80 (citation omitted), might satisfy due process. With Petitioner's unconstitutional imprisonment now approaching six years, no further procedural tinkering is justifiable. "It is not the habeas court's function to make illegal detention legal by supplying a process that the Government could have provided, but chose not to." *Hamdi*, 542 U.S. at 576 (Scalia, J., dissenting).

Respondents, in arguing for the total absence of law at Bagram, ignore the enormous practical flexibility which the Due Process Clause permits in its application. *See Heller v. Doe*, 509 U.S. 312, 332 (1993) ("[F]lexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.") (quoting *Greenholtz v. Inmates of Neb. Penal*

& *Corr. Complex*, 442 U.S. 1, 13 (1979)); *Landon v. Plasencia*, 459 U.S. 21, 34-35 (1982)

(holding the process required depends on the balance of interests at stake). In the present case,

where Respondents actively deny Petitioner all liberty rights, the "particular circumstances" cry

out for the provision of at least the most basic of due process rights, including the right to fairly

contest the legitimacy of his detention. The Government has denied Petitioner all basic due

process rights for over five years, and it argues that this Court should condone this limbo for an

indefinite period into the future. Whatever procedures or standards might have been acceptable

had they been implemented in a timely fashion and carried out neutrally, due process cannot

brook further experimentation or delay with respect to this Petitioner after all of this time. Mr. Al

Maqaleh is entitled to habeas relief.

## C.  Respondents' Detention of Petitioner Violates International Law

The U.S. was founded on a deep respect for international law[68] as reflected in the text of the

Constitution, which includes treaties as part of the supreme law of the land along with the

Constitution itself.[69] The Supreme Court has held that customary international law is also part of

federal law. *See The Pacquette Habana*, 175 U.S. 677, 700 (1900) ("International law is part of

our law, and must be ascertained and administered by the courts of justice of appropriate

jurisdiction, as often as questions of right depending on it are duly presented for their

determination"). And the competence of federal courts to adjudicate the effect of treaties and

---

[68] "The Union will undoubtedly be answerable to foreign powers for the conduct of its members. And the responsibility for injury ought ever to be accompanied by the faculty of preventing it. As the denial or perversion of justice by the sentences of courts, as well as in any other manner, is with reason classed among the just causes of war, it will follow that the federal judiciary ought to have cognizance of all of the causes in which the citizens of other countries are concerned. This is not less essential to the preservation of the public faith than to the security of the public tranquillity." The Federalist No. 80, at 403-404 (Alexander Hamilton) (Olsh. Decl. at ¶ 7, Exh. 4).; *see also Chisholm v. Georgia*, 2 U.S. 419, 474 (1793) (Chief Justice John Jay noting that "the United States had, by taking a place among the nations of the earth, become amenable to the laws of nations; and it was their interest as well as their duty to provide, that those laws should be respected and obeyed").

[69] U.S. Const. Art. VI, §2 (establishing that the Constitution, federal statutes and treaties are all "the Supreme law of the land").

customary international law has been definitively established by the Constitution,[70] case law[71] and statute.[72] Indeed, the Supreme Court has even applied international law to determine the legal status and rights of persons detained in the course of armed conflict. *See, e.g., Ex parte Quirin*, 317 U.S. 1, 27-28 (1942) (determining the rights of "unlawful combatants" under international law, as well as the Constitution, and observing that "[f]rom the beginning of its history this Court recognized and applied the laws of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as enemy individuals").

By treaty and customary law, international human rights law recognizes the right of persons to be free from arbitrary detention, and the concomitant right to meaningful judicial review to ensure that any detention is lawful. *See Sosa v. Alvarez Machain*, 542 U.S. 692, 732 (2004). The universally recognized norm prohibiting arbitrary arrest and detention is codified in every major comprehensive human rights instrument and is reflected in at least 119 national constitutions.[73] The Universal Declaration of Human Rights, which is recognized as an authoritative statement of customary international law, contains the obligation to provide detainees with an opportunity to challenge their detention in court. Universal Declaration of Human Rights, G.A. Res. 217A, U.N. GAOR, 3d Sess., 1st plen. mtg., U.N. Doc. A/810 (Dec. 12, 1948). This obligation is included in every other major international human rights convention that contains a general

---

[70] U.S. Const. Art. III, §2 (providing that cases arising under "the Laws of the United States…. and Treaties made…under their Authority" are within the federal judicial power).

[71] *See, e.g., Owing v. Norwood's Lesse*, 9 U.S. (5 Cranch) 344, 348 (1809) ("The reason for inserting that clause in the constitution [Art. III, Section 2] was that all persons who have real claims under a treaty should have their causes decided by the national tribunals…Whenever a right grows out of, or is protected by, a treaty, it is sanctioned against all the laws and judicial decisions of the states; and whoever may have this right, it is to be protected").

[72] 28 U.S.C. §1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").

[73] *See* M. Cherif Bassiouni, *Human Rights in the Context of Criminal Justice:  Identifying International Procedural Protections and Equivalent Protections in National Constitutions*, 3 Duke J. Comp. & Int'l L. 235, 260-61 (1993).

enumeration of rights.[74] There is also wide international practice in support of a principle akin to habeas corpus under international law.[75] The consistency and weight of international practice is such that the distinguished authors of the Third Restatement assert that, as a matter of customary international law, a State violates international law if, as a matter of policy, it practices, encourages, or condones "prolonged arbitrary detention." Restatement (Third) of Foreign Relations Law of the United States §702, n.6 (1987).

Customary international law claims are cognizable in U.S. courts provided they enforce "international norms with definite content and acceptance among civilized nations," and/or norms that rise to the level of "specific, universal and obligatory" standards. *Sosa*, 542 U.S. at 732. Petitioner's claims here include only those that have been endorsed by the courts as meeting that standard: torture;[76] cruel, inhuman or degrading treatment;[77] and prolonged arbitrary detention.[78] *See Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir. 1995). These claims are distinct from those arising under treaties ratified by the United States. *See* Restatement (Third) of the Foreign Relations Law of the United States §702(e) (1986).

---

[74] *See, e.g.*, Am. Decl. of the Rights and Duties of Man, O.A.S. Res. XXX, arts. XXV-XXVI, reprinted in 43 Am. J. Int'l L. Supp. 133 (1949) (expressing the obligations of members of the Organization of American States, including the U.S.); European Convention for the Protection of Human Rights and Fundamental Freedoms art. 5, Nov. 4, 1950, 213 U.N.T.S. 221; International Covenant on Civil and Political Rights, art. 9, Nov. 22, 1966, 999 U.N.T.S. 171; O.A.S., American Convention on Human Rights, art. 7(5), Nov. 22, 1969, O.A.S.T.S. No. 36, 1144 U.N.T.S. 123; African Charter on Human and People's Rights, arts. 6-7, June 27, 1981, 21 I.L.M. 58.

[75] For example, the United Nations Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, G.A. Res. 43/173, U.N. GAOR, 43rd Sess., Supp. No. 49, U.N. Doc. A/43/49 (1988) (Olsh. Decl. ¶21, Exh. 18), contains a requirement for judicial control (Principle 4), a right to legal assistance (Principle 17), a right to consult counsel (Principle 18) and a right to challenge the lawfulness of detention (Principle 32). The Body of Principles contains no provision for suspension of the guarantees in times of crisis.

[76] *See, e.g., Filartiga v. Pena Irala*, 630 F.2d 876 (2d Cir. 1980); *In re Estate of Ferdinand Marcos*, Human Rights Litigation, 25 F.3d 1467 (9th Cir. 1994).

[77] *See, e.g., Xuncax v. Gramajo*, 886 F. Supp. 162, 189 (D. Mass. 1995); *Wiwa v. Royal Dutch Petroleum*, 2002 WL 319887, at *7-*9 (S.D.N.Y. 2002); *Najarro de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385 (5th Cir. 1985); *see also United States v. Iran*, 1980 I.C.J. 3 (United States recognized norm of cruel, inhuman or degrading treatment or punishment in case before International Court of Justice).

[78] *See, e.g., Wiwa*, 2002 WL 319887; *Gramajo*, 886 F.Supp. at 184-85; Restatement (Third) of the Foreign Relations Law of the United States, Section 702 cmt. n.

Nor does the MCA foreclose Petitioner's international treaty law claims because the Supreme Court has confirmed that our courts are constrained to construe domestic law in keeping with international law. *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). The Supreme Court has long held that "international law is part of our law," *The Paquete Habana*, 175 U.S. at 700; *see also Sosa*, 542 U.S. at 732.

Petitioner is also protected from arbitrary detention under the International Covenant on Civil and Political Rights ("ICCPR"),[79] which has been ratified and is binding on the United States. The ICCPR provides, in pertinent part:

> Article 9(1): Everyone has the right to liberty and security of the person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.
> . . .
> Article 9(4): Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

As the plain language indicates, the essence of the prohibition against arbitrary detention is a right to judicial review.[80] The habeas corpus statute expressly provides that it is available where detention is contrary to treaties of the U.S., *see* 28 U.S.C §2241(c)(3), and therefore no new legislation is necessary to enforce Petitioner's rights under the ICCPR. *See Rasul*, 542 U.S. at 484 n. 15.

Petitioner is availing himself of the habeas statute, and therefore §2241 executes Article 9 of

---

[79] International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, 999 U.N.T.S. 171 ("ICCPR"). The U.S. ratified the ICCPR on June 8, 1992. *See* Multilateral Treaties Deposited with the Secretary General: Status as of Dec. 31, 2002, U.N. Doc. ST/LEG/SER.E/22 (2002); ICCPR art. 48, para. 2; *see also* 138 Cong. Rec. S4781-01(1992) (statement of Sen. Pell) (Olsh. Decl. ¶22, Exh. 19) ("The Covenant is part of the international community's early efforts to give the full force of international law to the principles of human rights embodied in the Universal Declaration of Human Rights and the United Nations Charter. The [ICCPR] is rooted in western legal and ethical values. The rights guaranteed by the Covenant are similar to those guaranteed by the U.S. Constitution and the Bill of Rights.").

[80] *See, e.g., Vuolanne v. Finland*, No. 265/1987, U.N. Humans Rts. Comm. Communication No. 25/1987, ¶9.6, U.N. Doc. CCPR/C/35/D/265/1987 (1989). (finding that review of petitioner's claim before a superior military officer lacked the "judicial character" of a court hearing, thus depriving petitioner of his right of recourse to a "court").

the ICCPR for purposes of Mr. Al Maqaleh's Petition.[81] Similarly, any reservation by the U.S. cannot nullify the binding nature of the ICCPR under the fundamental principle, embodied in the Supremacy Clause, that it constitutes supreme federal law. *See United States v. Pink*, 315 US. 203, 230 (1942). As "law of the land," the provisions of the ICCPR are directly enforceable through the habeas statute. *See United States v. Rauscher*, 119 US. 407, 418-19 (1886) (quoting *Head-Money Cases*, 112 US. 580, 599 (1884)). *See also Ford v. United States*, 273 US. 593, 600-01 (1927) (allowing use of a treaty as a defense to personal jurisdiction).

Protection against arbitrary detention is guaranteed by virtually every State's domestic laws, but it does not end at any one State's border. International law guarantees this fundamental right for any person detained under the authority and control of a State, regardless of whether the detention occurs within the State's sovereign territory and the guarantee applies equally in times of war and times of peace. The Supreme Court has recently made clear that detainees like Petitioner are entitled to the protection of Common Article 3 to the Geneva Conventions, which reflects "the rules of humanity which are recognized as essential by civilized nations. . . .". 3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War 35 (J. Pictet ed., 1960). Petitioner's allegations unequivocally state valid claims under Common Article 3, under nonderogable norms of customary international law, under binding international treaties, and under federal common law.

---

[81] For this reason, the U.S. declaration that articles 1 through 27 of the ICCPR are non-self-executing is of no effect. *See* Declarations and Reservations by United States of America made upon ratification, accession or succession of the ICCPR, 138 Cong. Rec. at *S4783. The U.S. did not add any specific reservation or understanding relating to the right against arbitrary detention under Article 9.

**Conclusion**

For the foregoing reasons, this Court should deny Respondents' Motion to Dismiss Mr. Al

Maqaleh First Amended Petition for Writ of Habeas Corpus.


Dated: October 15, 2008                      Respectfully submitted,


                                             _____/s/_____
                                             BARBARA OLSHANSKY (NY Bar No. NY0057)
                                             KATHLEEN KELLY (CA Bar No. 228571)
                                             International Human Rights Clinic
                                             Stanford Law School
                                             559 Nathan Abbott Way
                                             Stanford, CA, 94305
                                             Tel. 650.721-5885
                                             Fax 650.723.4426


                                             _____/s/_____
                                             Tina Monshipour Foster
                                             International Justice Network
                                             PO Box 610119
                                             New York, New York, 11361-0119
                                             Tel.:    917.442.9580
                                             Email: tina.foster@ijnetwork.org