IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FADI AL-MAQALEH, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | Civil Action No. 1:06-CV-01669 (JDB) |
| | ) | |
| ROBERT GATES, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| AMIN AL-BAKRI, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | Civil Action No. 1:08-CV-01307 (JDB) |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| REDHA AL-NAJAR, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | Civil Action No. 1:08-CV-02143 (JDB) |
| | ) | |
| ROBERT GATES, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**RESPONDENTS' MOTION TO DISMISS
AMENDED PETITIONS FOR WRITS OF HABEAS CORPUS**

Respondents respectfully move to dismiss the amended petitions for writs of habeas

corpus filed by a Tunisian and two Yemeni petitioners, who are detained by the Department of

Defense ("DoD") at Bagram Airfield in the Islamic Republic of Afghanistan.  The Court of

Appeals held in May 2010 that this Court has no jurisdiction to hear these petitioners' habeas

petitions because "the Suspension Clause does not extend to aliens held in Executive detention in

the Bagram detention facility in the Afghan theater of war."  *Maqaleh v. Gates*, 605 F.3d 84, 99

(D.C. Cir. 2010).  Two months later, the Court of Appeals denied Petitioners' petition for

rehearing without prejudice to their ability to present new evidence to this Court.   Thereafter, this Court granted Petitioners leave to amend their habeas petitions to include allegedly "newly discovered evidence," which Petitioners claim would undermine the Court of Appeals' jurisdictional determination.  In moving to dismiss, therefore, Respondents will address only the allegedly newly discovered evidence and other new allegations.

As established below, despite Petitioners' many new allegations mostly relating to the United States' detention policy, no new information undermines the Court of Appeals' ruling. The attached declarations of Deputy Assistant Secretary of Defense for Detainee Policy, William K. Lietzau, dated May 19, 2011, and the commander of detention operations at Bagram, Vice Admiral Robert S. Harward, dated May 13, 2011, demonstrate that, to the extent there are changes in the factual predicates to the Circuit Court's May 2010 holding, those changes actually bolster that holding.

First, consistent with Respondents' prior representation that the United States intends to transfer its detention operations to the Government of Afghanistan as soon as reasonably practicable, the transition began in January 2011, and DoD continues to work collaboratively with the Afghan government to facilitate the transfer.  Second, as part of that transition process and consistent with Afghan sovereignty, the Afghan government has begun conducting criminal trials at Bagram under Afghan law of detainees transferred to Afghan custody, bolstering the Court of Appeals' conclusion that the United States has no *de facto* sovereignty over Bagram. Third, since the D.C. Circuit last examined the detainee review procedures at Bagram, DoD has fully implemented more robust procedures that enhance a detainee's ability to challenge his detention and significantly improve DoD's ability to assess whether the facts support the detention of each detainee, the level of threat the detainee represents, and the detainee's potential

for rehabilitation and reconciliation.  Since the implementation of these new procedures,

hundreds of detainees have been released from Bagram or transferred to the Afghan or other

governments for prosecution, reconciliation, or release.

The allegedly newly discovered evidence in the amended petitions, on the other hand,

amounts to no more than the familiar disagreement with the government's detention policy in the

military campaign against the Taliban, al Qaeda, and associated forces.  Petitioners

mischaracterize the United States' detention policy both at Guantanamo Bay and Bagram as one

of attempting to evade judicial review, based on the military's apparent decision not to transfer

individuals captured during the armed conflict to the United States or later to Guantanamo Bay,

where habeas attaches.  Petitioners also challenge the perceived indefinite nature of the United

States' presence at Bagram in terms of both military and detention operations.

Neither challenge, however, justifies extending the writ to Bagram because they do not

alter the Court of Appeals' prior constitutional analysis.  The Court of Appeals' assessment of

Petitioners' "evasion of judicial review" argument remains true, namely that "the notion that the

United States deliberately confined the detainees in the theater of war rather than at, for example,

Guantanamo, is not only unsupported by the evidence, it is not supported by reason."  *Maqaleh*,

605 F.3d at 99.  As for the United States' continued presence at Bagram, it similarly remains true

that the detention operations at Bagram exist to support the ongoing war.  To be sure, as in most

wars, the operational demands of the war are fluid, and U.S. forces may need to maintain some

detention capacity in Afghanistan, pursuant to the laws of war, as long as military operations

continue.  But that is no basis for extending the writ to Bagram because the United States has no

intention to stay there permanently.  In fact, the active hostilities in Afghanistan confirm the

Court of Appeals' prior finding that the practical obstacles of extending the writ "weigh[ed]

overwhelmingly" against its extension.  *Id.* at 96.  Accordingly, this Court should dismiss the amended petitions for lack of subject matter jurisdiction.

## BACKGROUND

### I.    The Petitioners

Petitioners are citizens of Yemen and Tunisia who are held at the Detention Facility in Parwan ("DFIP"), a newly constructed detention facility located on the outer perimeter of Bagram Airfield.[1]  Lietzau Decl., ¶ 2; Harward Decl., ¶ 1.  Each petitioner alleges that he was captured outside Afghanistan, held in Central Intelligence Agency ("CIA") detention for several months to more than a year, and then transferred to Bagram in 2003 or 2004.  *Al-Maqaleh* 2d Am. Pet. ¶¶ 12-15; *al-Najar* Am. Pet. ¶¶ 15-18; *al-Bakri* Am. Pet. ¶¶ 15-18.  Specifically, al-Bakri alleges that he was captured in Bangkok, Thailand, *al-Bakri* Am. Pet. ¶ 15, and al-Najar alleges that he was captured in Karachi, Pakistan.  *Al-Najar* Am. Pet. ¶ 15.  Al-Maqaleh does not allege a specific place of capture outside Afghanistan, but DoD records reflect that he was captured in Zabul, Afghanistan.  Harward Decl., ¶ 14.  He does allege that in addition to CIA detention, he was also detained by U.S. forces at Abu Ghraib in Iraq prior to being transferred to Bagram.  *Al-Maqaleh* 2d Am. Pet. ¶ 12.

### II.   Procedural Background and the Court of Appeals' May 2010 Decision

Petitioners initially filed their petitions for writs of habeas corpus in 2006 and 2008, respectively.  On April 2, 2009, this Court held that Petitioners, as non-Afghans captured outside Afghanistan, were entitled to seek the protection of the writ of habeas corpus.  604 F. Supp. 2d 205 (D.D.C. 2006).  Applying the multi-factor test for determining the reach of the Suspension

---

[1]  At the time of their original petitions, Petitioners were held at the Bagram Theater Internment Facility ("BTIF"), also at Bagram Airfield.  In 2009, all detainees housed at the BTIF were transferred to the DFIP.  Lietzau Decl., ¶ 2.

Clause articulated by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008), this Court reasoned that, "[a]side from where they are held, these Bagram detainees are no different than Guantanamo detainees." 605 F. Supp. 2d at 216. This Court thus invalidated, as applied to Petitioners, § 7(a) of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, which divests this Court of jurisdiction to review habeas petitions filed by or on behalf of aliens who have been determined by the United States to have been properly detained as "enemy combatants." 28 U.S.C. § 2241(e)(1). Thereafter, this Court certified the decision for interlocutory appeal under 28 U.S.C. § 1292(b). 620 F. Supp. 2d 51.

On May 21, 2010, the Court of Appeals reversed this Court's decision finding jurisdiction to extend the writ of habeas corpus to Petitioners. *Maqaleh*, 605 F.3d 84. The Court of Appeals reached a different conclusion after applying the following *Boumediene* factors: (1) the citizenship and status of the detainees and the process for determining their status; (2) the nature of the sites of apprehension and detention; and (3) the practical obstacles to extraterritorial application of the Suspension Clause. *See Boumediene*, 553 U.S. at 766. As relevant here, with respect to the adequacy of process prong of the first factor, the Court of Appeals found that it more strongly favored Petitioners than the *Boumediene* petitioners because the procedures then used to determine detainee status at Bagram afforded less protection to detainees than had been afforded to the detainees at Guantanamo, or those in *Johnson v. Eisentrager*, 339 U.S. 763 (1950). *See Maqaleh*, 605 F.3d at 96.

As for the site of apprehension prong of the second factor, however, the Court of Appeals rejected Petitioners' claim that their capture outside Afghanistan weighed in favor of extending the writ to Bagram. Instead, the Court focused on the fact that Petitioners, like the petitioners in *Boumediene* and *Eisentrager*, were captured outside the United States, and thus, that their

apprehension abroad "would appear to weigh against the extension of the writ." *Maqaleh*, 605
F.3d at 97-98.

The D.C. Circuit further found that the site of detention prong of the second factor
"weighs heavily in favor of the United States," because "whereas the United States has
maintained total control of Guantanamo Bay for over a century, even in the face of a hostile
government . . . there is no indication of any intent to occupy the [Bagram] base with
permanence, nor is there hostility on the part of the 'host' country." *Id.* at 96-97.  Thus,
according to the Court, "while it is certainly realistic to assert that the United States has *de facto*
sovereignty over Guantanamo, the same simply is not true with respect to Bagram." *Id.* at 97.

Finally, the Court found that the third, practical obstacles factor "weighs overwhelmingly
in favor of the position of the United States" because "[i]t is undisputed that Bagram, indeed the
entire nation of Afghanistan, remains a theater of war." *Id.*  The Court found that the position of
the United States is even stronger in *Maqaleh* than it was in *Eisentrager*, which rejected habeas
claims of petitioners held at the Landsberg prison in post-WWII Germany, because in
*Eisentrager* active hostilities in the European theater had already come to an end.  The Court
noted the fact that Bagram "has been subject to repeated attacks from the Taliban and al Qaeda,
including a March 2009 suicide bombing striking the gates of the facility, and Taliban rocket
attacks in June of 2009 resulting in death and injury to United States service members and other
personnel." *Id.*  Indeed, although not in the record before the Court of Appeals, around the time
of the Court's decision, Taliban insurgents attacked Bagram Airfield before dawn, firing their
weapons over American defenses into the base.  In the eight-hour firefight, an American
contractor and at least ten attackers were killed, and nine U.S. service members were wounded.
*See* Robert H. Reid, Associate Press, *Taliban Attack Key US Base in Afghanistan* (May 19,

2010).[2]  Significantly, the Court also found the fact that detention at Bagram is within the sovereign territory of another nation (where the United States does not enjoy *de facto* sovereignty) by itself creates practical difficulties.  *Maqaleh*, 605 F.3d at 99.  The Court thus concluded that "under both *Eisentrager* and *Boumediene*, the writ does not extend to the Bagram confinement in an active theater of war in a territory under neither the *de facto* nor *de jure* sovereignty of the United States and within the territory of another *de jure* sovereign."  *Id.* at 98.

The Court of Appeals reached this conclusion notwithstanding Petitioners' claim that the United States transferred them into an active conflict zone from outside Afghanistan for purposes of evading judicial review.  The Court expressed doubt that the claim "goes to either the second or third of the Supreme Court's enumerated factors" but held that it need not decide "whether such manipulation by the Executive might constitute an additional factor" because "the notion that the United States deliberately confined the detainees in the theater of war rather than at, for example, Guantanamo, is not only unsupported by the evidence, it is not supported by reason." *Id.* at 99.

On July 23, 2010, the Court of Appeals denied Petitioners' petition for panel rehearing, noting, however, that Petitioners had cited evidence not in the record, and thus, that the denial "[was] without prejudice to [Petitioners'] ability to present this evidence to the district court in the first instance."  *Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. July 23, 2010).  By leave of this Court, Petitioners have now amended their habeas petitions to include allegedly "newly discovered evidence."  Petrs' Mot. to Amend, Sept. 10, 2010, ECF No. 44 at 5-7.

---

[2] *Available at* http://abcnews.go.com/International/wireStory?id=10685064.

**ARGUMENT**

**THIS COURT HAS NO SUBJECT MATTER JURISDICTION BECAUSE THE COURT OF APPEALS' MAY 2010 DECISION REMAINS CONTROLLING**

I.      **The Site of Detention Factor Continues to Weigh Strongly In Favor of the United States.**

      A.      **The United States Has No Intention to Remain at Bagram Permanently.**

When moving to amend their habeas petitions, Petitioners cited the alleged new evidence of the Executive's purported announcements to retain control of a section of the detention facility at Bagram permanently so that the United States can bring detainees from around the world there for detention without judicial oversight. *See* Petrs' Mot. to Amend, at 3, 5. As Respondents previously explained in opposing the amendment, however, that claim has no factual basis and is not even supported by the *Los Angeles Times* articles cited by Petitioners. *See* Resp. Opp'n to Mot. to Amend, Oct. 1, 2010, ECF No. 45, at 6. In those articles, unidentified government officials purportedly discussed a proposed plan to retain control over a portion of the DFIP, but did not provide a specified duration of such proposed control. *See Al-Bakri* Am. Pet. ¶¶ 111-12 (citing Julian Barnes, *U.S. May Seek Use of Afghan Prison*, L.A. Times, June 9, 2010, and *U.S. Hopes to Share Prison with Afghanistan*, L.A. Times, June 9, 2010). The amended petitions now additionally focus on the lack of a specified timeline and the conditional nature of the transfer of detention operations to the Afghan government, and the perceived indefinite nature of the detention of non-Afghan detainees at Bagram. *Al-Bakri* Am. Pet. ¶¶ 111-12, 125, 127-28; *al-Maqaleh* 2d Am. Pet. ¶¶ 111-120, 125, 133-38; *al-Najar* Am. Pet. ¶¶ 127-28, 141, 143-44. Petitioners further highlight the expanding detention capacity at Bagram, the increasing number of detainees there, and the large number of U.S. troops in Afghanistan facing active hostilities. *Al-Bakri* Am. Pet. ¶¶ 118-22; *al-Maqaleh* 2d Am. Pet. ¶¶ 126-32; *al-Najar* Am. Pet. ¶¶ 134-38.

Presumably these allegations go to the site of detention prong of the *Boumediene* analysis, which the Court of Appeals found weighs heavily against extending the writ to Bagram, because unlike Guantanamo Bay, "there is no indication of any intent [on the part of the United States] to occupy the base with permanence, nor is there hostility on the part of the 'host' country." *Maqaleh*, 605 F.3d at 97.  The D.C. Circuit's finding was based on the government's representation that, "[i]n contrast to Guantanamo, the United States does not have any plans, or even a desire, to establish a permanent military base at Bagram."  U.S. Opening Br., Nos. 09-5265, 09-5266, 09-5267, filed Sept. 14, 2009, at 44.  The government had also indicated that Bagram "is not intended to serve as a permanent facility to advance independent U.S. interests." U.S. Reply Br., filed Nov. 16, 2009, at 4.  With respect to its detention operations at Bagram, the government had further informed the Court of Appeals that "the United States has no interest in holding detainees longer than necessary," U.S. Opening Br. at 57, and "the goal of the United States is to transfer 'all detention operations in Afghanistan, to include [the detention facility at Bagram], to the Afghan government.'"  U.S. Reply Br. at 10 (quoting Gen. Stanley A. McChrystal, NATO International Security Assistance Force, Afghanistan, *Commander's Initial Assessment* (Aug. 30, 2009), at F-4).[3]  These representations remain accurate today.

The United States continues to have no "intent to occupy the base with permanence," *Maqaleh*, 605 F.3d at 97; its presence at Bagram is due to the ongoing war, which, in turn, necessitates the detention of individuals captured during the armed conflict.  And it is well-recognized that "the capture and detention of enemy forces is by universal agreement and

---

[3]  Indeed, when the government notified this Court of its intent to demolish the old detention facility known as the Bagram Theater Internment Facility ("BTIF"), it also explained that the new detention facility, the DFIP, "is on a corner of Bagram Airfield, which is expected to facilitate its transfer to Afghan government control as soon as reasonably practicable."  Notice to the Court, 06cv1669, Dec. 30, 2009, ECF No. 47.

practice an important incident of war." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518-19 (2004)

(plurality opinion); *see also id.* at 521 ("[W]e understand Congress's grant of authority for the

use of 'necessary and appropriate force' to include the authority to detain *for the duration of the*

*relevant conflict*, and our understanding is based on longstanding law-of-war principles.")

(emphasis added).  Thus, as Deputy Assistant Secretary of Defense Lietzau explains, the United

States "may need to maintain some detention capacity in Afghanistan, pursuant to the laws of

war, as long as military operations continue."  Lietzau Decl., ¶ 10.  Put differently, the United

States has no interest in maintaining such capacity "beyond the cessation of hostilities with the

Taliban, al-Qaeda and associated forces."  *Id.* ¶ 9.  In sum, Bagram exists only to support the

current war.

Nor has the nature of the U.S.-Afghan relationship changed, *cf. Maqaleh*, 605 F. 3d at 97

(observing that there was no "hostility on the part of the 'host' government").  Afghanistan, on

whose sovereign territory Bagram Airfield is located, remains an ally.  Afghan forces are

conducting military operations in concert with U.S. and coalition forces to defeat the Taliban, al

Qaeda and associated forces.  Far from having any *de facto* sovereignty, the United States fully

respects Afghan sovereignty and remains committed to transition detention operations to

Afghanistan.  In May 2010, the President specifically "reaffirmed [the United States']

commitment to transitioning responsibility for detention facilities to the Afghan Government."

*Joint Statement from the President and President Karzai of Afghanistan* (dated May 12, 2010).[4]

The President agreed with President Karzai of Afghanistan that "[t]his process [would] begin at

the Parwan detention facility in January 2011."  *Id.*  Moreover, in their joint statement, "[b]oth

---

[4] *Available at* http://www.whitehouse.gov/the-press-office/joint-statement-president-and-president-karzai-afghanistan.

Presidents recognized that a successful transition will be an important milestone toward
achieving President Karzai's inaugural pledge of having the Afghan Government assume full
responsibility over detention operations." *Id.*   The joint statement further provided:

> As part of this transition process, President Karzai welcomed continued U.S.
> assistance to build a safe, secure, and humane corrections system.  Underscoring
> the United States' respect for Afghanistan's sovereignty, President Obama also
> emphasized his strong desire to see all search, arrest, and detention operations be
> carried out by the Afghan National Security Forces.  He and President Karzai
> directed their senior defense advisors to accelerate and further clarify the timeline
> for the transition process, and also to consider additional steps to address this
> Afghan Government priority.

*Id.*

Consistent with the President's commitment, U.S. forces began the transition process in
January this year when it turned over a detainee housing unit to the Afghan Ministry of Defense.
Lietzau Decl., ¶ 3; Harward Decl. ¶ 6.  The continued pace of transition will necessarily depend
on, among other things, the Afghan capacity and capability to detain insurgents securely and
whether the Afghan government is fully equipped and able to perform its detention, prosecution,
judicial and incarceration responsibilities in accordance with its international obligations and
Afghan law.  *See* Lietzau Decl. ¶ 3.  Moreover, in order to expedite transition of the DFIP to the
Afghan government, U.S. forces is planning for new construction to provide additional housing
capacity adjacent to the DFIP.  This additional detention capacity will enable U.S. forces to
continue to conduct detention operations on a limited basis during the ongoing surge in military
operations in Afghanistan and pending the transfer of non-Afghan detainees to their home
countries or to third countries.  *Id.* ¶ 5.  U.S. forces will eventually transition this additional
housing capacity to the Afghan government with the condition-based approach discussed above.
*Id.*  Although it is currently unknown when the full transition will occur, these fluid operational
demands of war in no way call into question the United States' commitment to support Afghan

11

sovereignty or to transition responsibility for detention operations to the Afghan government.  In

sum, the Court of Appeals' determination that the United States has no *de facto* sovereignty over

Bagram remains true today.

> **B.      Whether the United States Intends to House Detainees Captured
> Outside Afghanistan at Bagram Is Irrelevant to the Jurisdictional
> Question Here, And In Any Event, There Is No Evidence of
> Manipulation.**

A central focus of the amended petitions is the Executive's alleged intent to evade

judicial review and purported plan to "hold and interrogate people seized from countries outside

Afghanistan." *Al-Bakri* Am. Pet. ¶ 112; *al-Maqaleh* 2d Am. Pet. ¶ 120; *al-Najar* Am. Pet. ¶ 128.

The *New York Times* article cited by Petitioners, however, does not support the existence of such

a plan.  *See id.*  The article merely suggests that the government *could* use Bagram to hold and

interrogate terrorism suspects captured elsewhere in the world and possibly to house detainees

currently held at Guantanamo Bay.   *See* Julian Barnes, *U.S. Hopes to Share Prison with

Afghanistan*, L.A. Times, June 9, 2010.[5]

More importantly, whether the United States could bring hypothetical future detainees

from outside Afghanistan to Bagram has no relevance to Petitioners' claim of habeas jurisdiction.

In finding that habeas does not extend to Petitioners at Bagram, the Court of Appeals focused on

the fact that Petitioners were captured outside the United States, not that they were allegedly

captured outside Afghanistan.  The Court noted the fact that Petitioners, like the petitioners in

*Boumediene* and *Eisentrager*, were apprehended abroad "would appear to weigh against the

extension of the writ."  *See Maqaleh*, 605 F.3d at 97-98.  While the Court also noted Petitioners'

allegation that the United States had chosen to detain them at Bagram in order to evade judicial

---

[5]  *Available at* http://articles.latimes.com/2010/jun/09/world/la-fg-bagram-20100609.

review, the Court found that "that is not what happened here."  *Id.* at 98.  As the Court reasoned,

> [T]he notion that the United States deliberately confined the detainees in the
> theater of war rather than at, for example, Guantanamo, is not only unsupported
> by the evidence, it is not supported by reason.  To have made such a deliberate
> decision to "turn off the Constitution" would have required the military
> commanders or other Executive officials making the situs determination to
> anticipate the complex litigation history [regarding Guantanamo habeas litigation]
> set forth above and predict the *Boumediene* decision long before it came down.

*Id.*

No supposed "newly discovered evidence" cited by Petitioners changes this analysis.

Petitioners allege that between 2001 and 2004, there were some 45 communications involving

the Office of Legal Counsel pertaining to the transfer of detainees and habeas jurisdiction and/or

litigation.  *Al-Bakri* Am. Pet. ¶¶ 97-98; *al-Maqaleh* 2d Am. Pet. ¶¶ 75-76; *al-Najar* Am. Pet.

¶¶ 83-84.  This hardly constitutes evidence of manipulation.  Since the military campaign against

the Taliban, al Qaeda, and associated forces began in late 2001, the government legitimately has

had to consider the issue of detention of individuals captured during the ongoing armed conflict

and the detainees' potential right to habeas relief.  Indeed, Guantanamo habeas litigation began as

early as 2002, which necessarily generated considerable government deliberation in every stage

of the complex litigation history leading up to the Supreme Court's decision in *Boumediene*.

Such deliberation hardly supports the proposition that habeas therefore should apply to Bagram.

Petitioners speculate, based on news articles from 2006 and 2008, that transfers from

Bagram to Guantanamo Bay dropped significantly in 2004 in light of the Supreme Court's

decision in *Rasul v. Bush*, 542 U.S. 466 (2004), which held that Guantanamo detainees had

statutory habeas rights.  *See al-Bakri* Am. Pet. ¶¶ 93-96; *al-Maqaleh* 2d Am. Pet. ¶¶ 71-74; *al-*

*Najar* Am. Pet. ¶¶ 79-82.  Petitioners assert that this decline is due to an intent to evade judicial

review.  *See* Petrs' Mot. to Amend at 9 and n. 9 & 10.  If such allegations are sufficient to confer

13

jurisdiction, then federal courts would have world-wide habeas jurisdiction because in any war, the United States always has the option of bringing individuals captured during the armed conflict to the United States but may decide not to do so.  And yet any such decision may be based on considerations that have nothing to do with any intent to avoid judicial review. Moreover, Petitioners' speculation again ignores the complex legislative and litigation history leading up to the Supreme Court's decision in *Boumediene* in 2008 – history the Court of Appeals found negated any suggestion that Respondents made a deliberate decision to "turn off the Constitution" with respect to Petitioners.  Finally, even assuming that there was a decrease in the number of transfers to Guantanamo since *Rasul*, many factors could have been at play, including for example that by May 2006, the government had already expressed its wish to close the detention facility at Guantanamo.[6]

Petitioners further allege that the government had purposely instituted a "reverse flow from Guantanamo, moving [detainees] to other detention cites specifically to avoid habeas jurisdiction."  *Al-Bakri* Am. Pet. ¶ 102; *al-Maqaleh* 2d Am. Pet. ¶ 80; *al-Najar* Am. Pet. ¶ 88; *see also* Petrs' Mot. to Amend at 9-10.  In support, Petitioners cite media speculation that four high-value detainees were previously at an alleged CIA facility at Guantanamo in late 2003 but were transferred a few months later.  *See id.*  According to Petitioners, the government transferred them out of Guantanamo because it had predicted the Supreme Court's then pending (but not yet argued) decision in *Rasul*, which was handed down on June 28, 2004.  *See* Petrs' Mot. to Amend at 9-10.  Petitioners further allege that between 2007 and 2009, at least thirty-six detainees were moved from Guantanamo to Afghanistan, either to the detention facility at

---

[6] *See Bush Speaks of Closing Guantanamo Prison*, New York Times (May 8, 2006) (*available at* http://www.nytimes.com/2006/05/08/washington/08bush.html?fta=y).

Bagram or to the Afghan National Detention Facility ("ANDF").  *Al-Bakri* Am. Pet. ¶¶ 100-01; *al-Maqaleh* 2d Am. Pet. ¶¶ 78-79; *al-Najar* Am. Pet. ¶¶ 86-87.

Again, such speculation hardly supports the proposition that the government had manipulated Petitioners' place of detention to evade judicial review.  Petitioners themselves do not allege that they were captured or ever detained at a location where the Suspension Clause applied.  And as Respondents previously informed this Court, none of the detainees at Bagram (including Petitioners), who were determined by the United States to be properly held, were transferred from Guantanamo.  *See Maqaleh*, Motion to Dismiss Oral Argument Tr. at 61 (Jan. 7, 2010).  Petitioners' insinuation to the contrary is simply wrong.

As for the allegation that some 36 Afghan detainees were transferred from Guantanamo to Afghanistan between 2007 and 2009, Petitioners are wrong that some of them were moved to Bagram.  The transfers, if any, were pursuant to a diplomatic arrangement between the United States and Afghanistan reached as early as 2005 to repatriate Afghan nationals to the exclusive custody and control of the Afghan government at the ANDF, a facility operated by the Afghan Ministry of Defense.  *See* Declaration of Lieutenant Colonel David F. Koonce, *Wahab v. Bush*, 05cv0886, Nov. 7, 2008, ECF No. 80.  As part of that diplomatic arrangement, the United States had helped renovate the ANDF, the former block IV of the Pol-e-Charki prison located east of Kabul, and provided training, monitoring and other assistance to the Afghan national guard force in ensuring that the detention facility practices and procedures were consistent with international standards.  *See* Declaration of Lieutenant Colonel David F. Koonce, dated Oct. 31, 2008, *Wahab v. Bush*, 05cv0886, Nov. 7, 2008, ECF No. 80-1.  That arrangement was part of a still broader strategic partnership between the two governments designed to enhance Afghanistan's sovereignty, security, and democracy.  *See* Joint Declaration of the United States-Afghanistan

Strategic Partnership, *Wahab v. Bush*, 05cv0886, Nov. 7, 2008, ECF No. 80-2; *see also* Press

Release, Embassy of the United States, ECF No. 80-3.  In other words, the only "reverse flow" of

Afghan detainees from Guantanamo was to transfer them out of U.S. custody.

Further, Petitioners' "reverse flow" claim, even if true, is undermined by the fact that just

three months after *Rasul* was decided, the government actually transferred ten detainees from

Afghanistan to Guantanamo, *see* DoD News Release, dated September 22, 2004.[7]  Moreover, the

high-value detainees, who Petitioners claim were at Guantanamo in 2003, have been in military

custody at Guantanamo since being transferred from CIA detention in 2006, after *Rasul* was

decided.  There is no evidence of manipulation, and no basis to upset the Court of Appeals' prior

conclusion that habeas does not extend to Bagram.

## II.    The Practical Obstacles of Extending the Writ to Bagram Continue to Weigh Overwhelmingly Against the Extension.

The Court of Appeals previously found that the practical obstacles prong of the

*Boumediene* analysis "weighs overwhelmingly in favor of the position of the United States"

because Afghanistan remains a theater of war.  *Maqaleh*, 605 F.3d at 97.  The Court also found

the fact that "the detention at Bagram is within the sovereign territory of another nation (where

the United States does not enjoy *de facto* sovereignty) by itself creates practical difficulties."  *Id.*

at 99.  In moving to amend their petitions, Petitioners argued that because civilian criminal trials

of Afghan detainees, allegedly "jointly-run" by the United States and Afghanistan, are now

conducted at Bagram Airfield, and because media and monitoring groups have been traveling to

observe these trials without incident, the government can no longer claim that there are practical

barriers to extending the writ to Bagram.  Petrs' Mot. to Amend, at 11; *see also al-Bakri* Am.

---

[7] *Available at* http://www.defense.gov/releases/release.aspx?releaseid=7765.

Pet. ¶¶ 113-115; *al-Maqaleh* 2d Am. Pet. ¶¶ 121-23; *al-Najar* Am. Pet. ¶¶ 129-31.

This "new evidence" does not undermine the Court of Appeals' prior conclusion that the practical obstacles of extending the writ to Bagram strongly counsel against the extension.  As Deputy Assistant Secretary Lietzau explains, an integral part of the United States' effort to transition detention operations to Afghanistan is to build Afghan legal capacity for prosecuting national security cases under Afghan law.  *See* Lietzau ¶ 7.  Indeed, it is expected that once the DFIP is transferred to the Afghan government, it will become part of the larger Afghan Justice Center in Parwan, which will be used for the pre-trial detention, prosecution, and post-trial incarceration of individuals who commit crimes against Afghan security.  *Id.* ¶ 6. Consistent with these goals, beginning in June 2010, Afghan judges, prosecutors, and defense counsel began conducting civilian criminal trials of Afghan detainees who were transferred to Afghan custody, first at the DFIP and now at the not-yet-completed Afghan Justice Center in Parwan, which is adjacent to the DFIP.  *Id.* ¶ 7; *see also Afghan Court Tries, Convicts Three Men*, U.S. Central Command, Press Release*,* August 3, 2010 (discussing the Government of Afghanistan's investigation and prosecution of the cases under the Afghan Penal Code).[8]  The fact that these purely Afghan-run trials are now occurring demonstrates that the Afghan government is conducting quintessentially sovereign acts in Bagram, making it even more clear why Bagram is readily distinguishable from Guantanamo, and bolstering the Court of Appeals' conclusion that extending habeas to Bagram could complicate U.S.-Afghan relations.

The practical obstacles associated with conducting habeas litigation in a theater of war by a U.S. court, on the other hand, remain the same.  As the Court of Appeals previously noted,

---

[8]  *Available at* http://www.centcom.mil/en/press-releases/afghan-court-tries-convicts-three-men.

"[P]etitioners cannot credibly dispute[] that all of the attributes of a facility exposed to the vagaries of war are present in Bagram." *Maqaleh*, 605 F.3d at 97.  That the Afghan government legitimately must undertake the responsibility of carrying out its own criminal trials under Afghan law, and has now chosen to do so at Bagram, where the accused are housed, by no means suggests that the vagaries of war no longer exist.  In 2010, Bagram Airfield was attacked 29 times, and this year, there have been 11 attacks so far, even though the fighting season has just begun.[9]  The vagaries of war in Afghanistan were also seen recently when the Taliban took responsibility for the escape of more than 400 hundred prisoners, many of whom are insurgent fighters, from a prison facility in Kandahar, the same facility from which some 1,000 prisoners escaped in 2008.  *See Afghanistan Recaptures 65 Inmates: Hundreds at Large After Escape*, CNN World, April 26, 2011.[10]  Afghanistan remains an active war zone, a factor that the Court of Appeals held overwhelmingly weighs in favor of Respondents than the post-war situation in *Eisentrager*, 339 U.S. at 763.  *See Maqaleh*, 605 F.3d at 97.  The amended petitions have offered no basis to alter that conclusion.

**III.     No New Fact Related to the Adequacy of Process Factor Has Emerged That Would Alter the Court of Appeals' Conclusion That Habeas Does Not Extend to Bagram.**

**A.     Petitioners and Other Detainees Under DoD Custody and Control at Bagram Receive More Process Than Previously Considered by the Court of Appeals**.

When moving to amend their habeas petitions, Petitioners proposed to challenge, as they

---

[9] *See, e.g., Taliban Fires Rockets Into Main US Base Near Kabul* (*available at* http://www.aaj.tv/2010/12/taliban-fires-rockets-into-main-us-base-near-kabul); *2 Injured When Insurgents Rockets Hit Bagram* (*available at* http://www.militarytimes.com/news/2011/05/ gannett-afghanistan-bagram-rocket-attack-2-injured-050611).

[10] *Available at* http://www.cnn.com/2011/world/asiapcf/04/26/afghanistan.prison.break/ index/html.

did before, the administrative review process available at Bagram to determine their status.  *See* Petrs' Mot. to Amend at 8.  Selectively citing a statement in a May 27, 2010 National Security Strategy paper which stated that, "[w]hen we are able," we will "prosecute terrorists in Federal courts or in reformed military commissions that are fair, legitimate, and effective," *id.*; *see also al-Bakri* Am. Pet. ¶ 110; *al-Maqaleh* 2d Am. Pet. ¶ 118; *al-Najar* Am. Pet. ¶ 126, Petitioners leaped to the conclusion that the government plans "to imprison people like Petitioners at the Parwan facility without process," and that Bagram will become "a law-free zone."  Petrs' Mot. to Amend at 8.  However, as Respondents previously explained in opposing the amendment, what Petitioners failed to point out was that the paper goes on to state that "[f]or detainees who cannot be prosecuted—but pose a danger to the American people—we must have clear, defensible, and lawful standards.  We must have fair procedures and a thorough process of periodic review, so that any prolonged detention is carefully evaluated and justified.  And keeping with our Constitutional system, it will be subject to checks and balances ."[11]  This describes the enhanced review process Petitioners now receive at Bagram, known as the Detainee Review Board ("DRB") procedures.  And in conformity with § 1405(c) of the Detainee Treatment Act of 2005, Pub. L. No. 109-163, Tit. XIV, DoD duly provided Congress a 60-day notice of the new procedures prior to their implementation.  *See* Harward Decl., Ex. B at 1-2.

Petitioners allege that the DRB procedures continue to be deficient because as non-Afghans, they are being held "without being told why they are being detained, without access to lawyers, without any judicial forum in which they are able to challenge their detention, and without any meaningful or adequate administrative process to challenge the basis for their

---

[11]  The White House, *National Security Strategy* at 36, May 27, 2010 (*available at* http://www.whitehouse.gov/sites/default/files/rss_viewer/national_security_strategy.pdf).

detention." *Al-Bakri* Am. Pet. ¶¶ 1, 132; *al-Maqaleh* 2d Am. Pet. ¶¶ 1, 97; *al-Najar* Am. Pet. ¶¶ 1, 105.  In point of fact, however, the adequacy of process factor has actually changed to bolster the Court of Appeals prior holding that the Suspension Clause does not apply to Bagram. The Court of Appeals previously found this factor more strongly favored Petitioners than the *Boumediene* petitioners because the procedures available at Bagram at that time, known as the Unlawful Enemy Combatant Review Board ("UECRB"), afforded Petitioners less protection than had been afforded to the *Boumediene* petitioners, or to those in *Johnson v. Eisentrager*, 339 U.S. 763 (1950).  *See Maqaleh*, 605 F.3d at 96.  Despite that finding, the Court ultimately concluded that the adequacy of process factor was insufficient to tip the constitutional balance to extend the writ to Bagram.

Since the Court of Appeals' decision in May 2010, DoD has fully implemented and applied more robust procedures to review Petitioners' status.  In July 2009, the Deputy Secretary of Defense adopted new policy guidance which set forth enhanced detainee review procedures for assessing whether the facts support the detention of each detainee under the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), as informed by the laws of war.  *See* Harward Decl., Ex. B at 1-2.  As DoD informed Congress, the DRB procedures not only improved DoD's ability to assess the factual basis of each detainee's detention, the detainee's threat level, and his potential for rehabilitation and reconciliation, but they also enhanced the detainee's ability to challenge his detention.[12]  *See* Harward Decl., Ex. B at 1.  On July 11, 2010, the Combined Joint Interagency Task Force 435 ("CJIATF-435"), which is

---

[12]  Although the government had informed the Court of Appeals of the July 2, 2009 Policy which was then not yet fully implemented, the Court of Appeals "decide[d] the case based on the procedures that had been in place" when this Court decided the jurisdictional question. *Maqaleh*, 605 F.3d at 96 n. 4.

responsible for operating the DFIP, also provided further guidance on administering the new procedures.  Harward Decl., Ex. C.  Each of the three petitioners' status has been reviewed under the new procedures.  *See* Harward Decl., ¶¶ 15, 18, 21.

As Vice Admiral Harward explains, *see* Harward Decl., ¶¶ 10-11, under the DRB procedures, the commander of the facility is required to ensure that a detainee receives timely notice of the basis for his internment, including an unclassified summary of the specific facts that support the basis for such internment.  The status of each detainee is reviewed no later than sixty days after the detainee is initially transferred to the DFIP, and periodically thereafter, by a board of three field-grade officers.  The DRB process contains procedures that enable the detainee to challenge his detention, including a reasonable investigation into any exculpatory information the detainee offers, notice to the detainee of the purpose of the hearing, and the opportunity to present information including reasonably available witnesses and documentary information.  Additionally, every detainee is appointed a "personal representative" who has access to all reasonably available information, including classified information, relevant to the determination of whether the detainee meets the criteria for internment and whether the detainee's continued internment is necessary.  The personal representative is required to "act and advocate in the best interests of the detainee" by assisting the detainee in "gathering and presenting the information reasonably available in the light most favorable to the detainee."  Interpreters are provided to the detainee, if needed.  Subject to certain exceptions, the unclassified session of the board proceedings is open; and detainees are entitled to attend all open sessions, testify (but may not be compelled to do so), call witnesses, question the government's witnesses, and present documentary information.  Finally, the board makes its determination using the preponderance of the evidence standard and based on the same criteria for who may be lawfully detained that the

government has applied in the context of habeas review of detentions at Guantanamo Bay.

The DRB procedures provide greater procedural safeguards than the prior UECRB procedures available at Bagram, or even the Combatant Status Review Tribunal ("CSRT") previously afforded to detainees at Guantanamo Bay. *Compare* U.S. Mot. to Dismiss, *Maqaleh*, 06cv1669, ECF No. 18, at 8-9 (discussing UECRB procedures). To begin with, in contrast with the UECRB procedures, the DRB procedures readily provide detainees with an opportunity to call reasonably available witnesses and to present documentary evidence to an impartial board of commissioned officers. Indeed, between March 6, 2010 and May 6, 2011, one thousand seven hundred and ninety-two (1,792) witnesses were called to testify in-person at DRBs, and an additional four hundred and twenty-five (425) witnesses testified telephonically. *Id.* ¶ 11. Unlike in the CSRT process, the government's evidence presented at the DRB proceedings does not benefit from a presumption of validity.[13] *See* Harward Decl., ¶ 10.

The provision of a personal representative, which was not provided under the UECRB, also significantly improves the review process. Whereas the CSRT personal representative had no confidential relationship[14] with the detainee and there was no requirement that he act and advocate for the detainee, the DRB personal representative is bound by a non-disclosure policy, which prohibits him from disclosing information "detrimental to the detainee's case that was

---

[13] *See* Section G(11) of the CSRT procedures ("Burden of Proof. * * * There is a rebuttable presumption that the Government Evidence, as defined in paragraph H (4) herein, submitted by the Recorder to support a determination that the detainee is an enemy combatant, is genuine and accurate.").

[14] *See* Enclosure 3 to Combatant Status Review Tribunal Process, at 1, C.(1) ("Upon first contact with the detainee, the Personal Representative shall explain to the detainee that no confidential relationship exists or may be formed between the detainee and Personal Representative."). The Combatant Status Review Tribunal procedures, including all enclosures, are available at http://www.defense.gov/news/Aug2006/d20060809CSRTProcedures.pdf.

obtained through communications with the detainee" as well as "adverse information discovered by the personal representative's independent investigatory efforts."[15]   Harward Decl., Ex. C at 5. As noted above, the DRB personal representative is also required to "act and advocate in the best interests of the detainee" by assisting the detainee in "gathering and presenting the information reasonably available in the light most favorable to the detainee."  *Id.* ¶ 9(e)(2); *see also* Harward Decl., Ex. B at 6.   Whereas the CSRT personal representative's role was primarily to assist the detainee in reviewing the relevant unclassified information, prepare and present information, question witnesses at the CSRT proceeding, and provide comments to aid the tribunal's deliberations, *see* Enclosure (3) to CSRT Procedures July 2007 at 1-2, the DRB personal representative conducts independent investigations and calls and interviews witnesses. And, although the personal representatives are part of the chain of military command, the DRB procedures specifically provide that "[t]he personal representative's good faith efforts on behalf of the detainee shall not adversely affect his or her status as a military officer (e.g., evaluation, promotion, future assignment)."   Harward Decl., Ex. B at 6.   Finally, all personal representatives are supervised by the Officer-in-Charge of the Detainee Assistance Center, who is a Judge Advocate, to ensure that they carry out their duty of advocating and acting in the best interests of the detainees.

Since the implementation of the DRB procedures, more than three hundred detainees have been released from Bagram, and hundreds more were transferred to the Afghan government

---

[15]   There are, of course, exceptions to the non-disclosure policy that are akin to the crime-fraud exception to the attorney-client privilege.   Thus, the personal representative needs to make disclosure necessary to prevent property damage and serious bodily harm or death.   He is also obligated to disclose detainee conduct that is fraudulent and may refuse to offer evidence that he firmly believes is false, as long as such belief is grounded in an objectively reasonable assessment of the facts.   *See* Harward Decl., Ex. C at 4-5.

23

for prosecution or reconciliation, among other dispositions.  Harward Decl. ¶ 12.  Whatever

weight the Court of Appeals had placed on the UECRB procedures then at issue before it, it is

necessarily true that new DRB procedures can only further support the Court of Appeals'

ultimate conclusion that the Suspension Clause does not apply to Bagram Airfield.

      **B.**    **DoD Has Determined That Petitioners, Like Other Non-Afghan Detainees Held At Bagram, Meet the Criteria for Internment.**

Finally, Petitioners allege that "with regard to non-Afghan detainees, if they are cleared

for release by the DRB, Respondents may still detain them indefinitely without justification and

without evidence."  *Al-Bakri* Am. Pet. ¶¶ 117, 143; *al-Maqaleh* 2d Am. Pet. ¶¶ 118-125; *al-*

*Najar* Am. Pet., ¶¶ 116, 133.   Each Petitioner now alleges that he has been approved for release

by the DRB, and yet still remains in U.S. custody.  *See al-Bakri* Am. Pet. ¶ 146; *al-Maqaleh* 2d

Am. Pet. ¶ 109; *al-Najar* Am. Pet. ¶ 117.  In particular, al-Bakri's counsel states that counsel was

informed by a military officer at Bagram that a DRB has "approved Mr. al-Bakri for release" in

August 2010, but that another DRB panel nevertheless convened in February 2011 to review al-

Bakri's status.  *See al-Bakri* Am. Pet. ¶¶ 146-56; *see also* Declaration of Ramzi Kassem, dated

April 4, 2011, ECF No. 58-1.

To the extent Petitioners are alleging that the jurisdiction-stripping provision of § 7(a) of

the MCA of 2006 does not apply to them because they allegedly have been cleared for release by

the United States, *see* 28 U.S.C. § 2241(e)(1), they are wrong.  Vice Admiral Harward explains

that if the DRB finds that the criteria for internment for purposes of the AUMF, as informed by

the laws of war, are not met, the detainee must be released as soon as practicable.  Harward

Decl., ¶ 12.  There is no such finding with respect to Petitioners, however.  To the contrary, in

each of their DRB reviews to date, Petitioners were determined to meet the criteria for

internment.  *Id.* ¶¶ 15, 18, 21.

Petitioners cite the article of a Ms. Daphne Eviatar, a staff member of a human right organization, *see id.* ¶ 143, who, upon visiting Bagram, opined that "prisoners from outside Afghanistan who are imprisoned here aren't being sent home even after they've won their case and been recommended for release."  Daphne Eviatar, *Justice Remains Elusive for Many at U.S. Prison in Afghanistan*, Huffington Post, Feb. 13, 2011.[16]  Ms. Eviatar's article specifically cited the example of a "Hamidullah Khan," who was allegedly "cleared for release," and yet "for some reasons, the U.S. government isn't doing it."  *Id.*

Most likely Ms. Eviatar was confusing Bagram detainees Hamidullah and Jan Sher Khan as one person; both detainees are Pakistani citizens who have sought habeas relief in this Court. *See Hamidullah v. Bush*, 10-cv-758 (JDB); *Khan v. Bush*, 10-cv-535 (RWR).  Those two detainees' situations similarly do not indicate the existence of any U.S. policy of detaining non-Afghan detainees at Bagram indefinitely without justification.  With respect to Hamidullah*,* the United States has demonstrated through sworn declaration that he similarly has been determined to meet the criteria for internment.  *See*, Motion to Dismiss, *Hamidullah v. Bush*, 10-cv-758 (JDB), Dec. 17, 2010, ECF No. 11-2.  With respect to Khan, one month before Ms. Eviatar's article, the United States had informed the Court that Khan did not meet the criteria for internment; that Khan repatriation to his home country of Pakistan for release was approved by the Deputy Secretary of Defense; and that the Departments of Defense and State were undertaking steps to effect his repatriation.  *See* Response to Order to Show Cause, *Khan v. Obama*, 10-CV-535 (RWR), Jan. 10, 2011, ECF No. 7.  Khan has since been repatriated, and

---

[16]  *Available at* http://www.huffingtonpost.com/daphne-evitar/justice-remains-elusive-f_b_822669.html (last accessed May 19, 2011).

after Khan's return, the parties stipulated to dismiss Khan's habeas petition as moot.  *See* Stipulation of Dismissal, *Khan v. Obama*, 10-CV-535 (RWR), May 12, 2011, ECF No. 11.

To be sure, when a detainee is determined to meet the criteria for internment, the DRB is required to recommend an appropriate disposition to the convening authority based on its assessment of the detainee's threat level.  For Afghan detainees, the recommendations may include continued detention, transfer to Afghan authorities for criminal prosecution or for participation in a reconciliation program, or release.  *See* Harward Decl., Ex. B at 4; Ex. C at 9. For non-Afghan detainees, possible recommendations similarly may include transfer to a third country for criminal prosecution, participation in a reconciliation program, or release.  *Id.*  In this regard, non-Afghan detainees are treated differently from Afghan detainees only to the extent that their return to their countries of origin or their transfers to countries other than Afghanistan require approval by the Deputy Secretary of Defense or his designee.  Harward Decl., Ex. C at 11.  This is a practical necessity because appropriate diplomatic arrangements need to be made to facilitate such repatriation or transfer.  *See* Harward Decl., ¶ 13.  The repatriation of Jan Sher Khan, noted above, is such an example.

Contrary to Petitioners' suggestion, the United States has no interest in holding individuals at Bagram longer than necessary, whether or not the individual is a citizen of Afghanistan.  *See* Lietzau Decl., ¶ 9.  As Deputy Assistant Secretary of Defense for Detainee Policy explains, the policy of the United States is that if the detainee's threat may be mitigated by some lawful means other than continued detention by U.S. forces, the United States may seek to transfer the detainee to the control of other governments.  *Id.*, ¶ 8.  Any such transfer would be done in accordance with U.S. policy and applicable international law after determining that the receiving government is willing to accept responsibility for ensuring, consistent with their laws,

that the detainee will not continue to pose a threat to the United States and its allies, and that

such transfer would be consistent with the United States' policies relating to the humane

treatment of transferees.  *Id.*  These considerations do not cast doubt on the integrity of the DRB

process at Bagram with respect to non-Afghan detainees.  In sum, whatever differential treatment

non-Afghan detainees may receive in terms of transfers or repatriation, it is not a function of any

attempt to deprive Petitioners of the procedural safeguards of the DRB procedures.  The Court of

Appeals' prior conclusion that habeas does not extend to Bagram remains accurate today and is

binding on this Court.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the amended petitions for writs of

habeas corpus for lack of subject matter jurisdiction.

Dated: May 19, 2011                                    Respectfully submitted,

                                                       TONY WEST
                                                       Assistant Attorney General

                                                       JOHN R. TYLER
                                                       Assistant Branch Director

                                                       /s/ *Jean Lin*
                                                       JEAN LIN
                                                       Senior Trial Counsel
                                                       United States Department of Justice
                                                       Civil Division, Federal Programs Branch
                                                       20 Massachusetts Ave., N.W.
                                                       Washington, DC 20530
                                                       Tel: (202) 514-3716
                                                       Attorneys for Respondents