IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FADI AL-MAQALEH, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | Civil Action No. 1:06-CV-01669 (JDB) |
| | ) | |
| LEON E. PANETTA, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| AMIN AL-BAKRI, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | Civil Action No. 1:08-CV-01307 (JDB) |
| | ) | |
| BARACK OBAMA, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| REDHA AL-NAJAR, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | Civil Action No. 1:08-CV-02143 (JDB) |
| | ) | |
| LEON E. PANETTA, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**RESPONDENTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
AMENDED PETITIONS FOR WRITS OF HABEAS CORPUS**

Respondents hereby reply to Petitioners' opposition to the motion to dismiss the amended

petitions for writs of habeas corpus.  It is apparent from Petitioners' opposition brief that in the

guise of proffering allegedly "newly discovered evidence," they seek to re-litigate the

jurisdictional question fully examined by the Court of Appeals.  Far from undermining the Court

of Appeals' holding that habeas jurisdiction does not extent to Bagram, the "new evidence" has

no factual basis or is otherwise irrelevant to the constitutional calculus involved in the

jurisdictional question.  To the extent the evidence is "new," it merely reflects fluid changes in

military operations in the Afghan theater of war and the concomitant detention operations in support of that on-going war.[1]  Indeed, those fluid changes actually bolster the Court of Appeals conclusion that "the Suspension Clause does not extend to aliens held in Executive detention in the Bagram detention facility in the Afghan theater of war."  *Maqaleh v. Gates*, 605 F.3d 84, 99 (D.C. Cir. 2010).

The central bases of both Petitioners' prior petition for panel rehearing in the D.C. Circuit and their subsequent motion to amend habeas petitions in this Court were that the Executive allegedly had announced plans (1) to detain non-Afghans detainees such as Petitioners at Bagram's detention facility indefinitely even as the United States transitions its detention operations to the Afghan government, and (2) to hold and interrogate people seized from countries outside Afghanistan in the future at Bagram.[2]  There were, of course, no such announcements.  Nor is there any plan to use Bagram as the centralized detention location for individuals captured outside Afghanistan,[3] and indeed, Petitioners no longer reference it in their opposition brief.  Although Petitioners continue to press the "new evidence" of their perceived indefinite detention, that is due to the on-going armed conflict, of which the detention of enemy

---

[1]  As this Court previously noted when granting Petitioners' motion to amend their habeas petitions, "not all of the evidence petitioners characterize as 'new' really represents any change of relevance with respect to the government's handling of detainees at Bagram."  Mem. Op., ECF No. 57 (Feb. 15, 2011), at 3.

[2]  *See* Petition for Panel Rehearing, 09-5265, ECF No. 1253544 (July, 06, 2010) at 9-10; Petrs' Motion to Amend, ECF No. 50 (Sept. 1, 2010), at 7-8; *see also al-Bakri* Am. Pet. ¶ 112; *al-Maqaleh* 2d Am. Pet. ¶ 120; *al-Najar* Am. Pet. ¶ 128.

[3]  Lieutenant General John R. Allen and Admiral William H. McRaven have testified before Congress that there is no intention to bring individuals captured outside Afghanistan to Bagram, owing at least in part "to the nature of the sovereignty of Afghanistan and the concern about the potential backlash from the Afghan government."  Testimony before the United States Senate Armed Services Committee, at 43-44 (June 28, 2011) (*available at* http://armed-services. senate.gov/testimony.cfm?wit_id=10288&id=5239).

forces is a necessary component, and does not undermine the Court of Appeals' finding that the United States has no "intent to occupy the base with permanence" and no *de facto* sovereignty over Bagram. *Maqaleh*, 605 F.3d at 97. Indeed, Petitioners do not, and cannot, controvert the government's sworn declarations reaffirming the United States' consistent position that Bagram is not intended to serve as a permanent facility to advance independent U.S. interests.

Petitioners' opposition brief also challenges the adequacy of the new detainee review process, or Detainee Review Board ("DRB"), at Bagram, making many of the same criticisms they had before with respect to the old procedures, such as the lack of access to counsel or to appellate review. They do not seriously dispute, however, that the DRB procedures provide more safeguards than those previously considered by the Court of Appeals, which were found to be insufficient to tip the constitutional balance in favor of extending the writ to Bagram. Petitioners attempt to dismiss the DRB as a sham because, although each of them allegedly has been cleared for release, they continue to be detained at Bagram. Petitioners, however, have simply conflated the United States' authority to detain them under the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), with the DRB's threat assessments for recommending discretionary releases or transfers. Even when the Court has habeas jurisdiction, the Court of Appeals has repeatedly held that "whether a detainee has been cleared for release is irrelevant to whether a petitioner may be detained lawfully." *Almerfedi v. Obama*, – F.3d – 2011, No. 10-5291, WL 2277607 at *8 n.3 (D.C. Cir. June 10, 2011). The Executive's ultimate decision whether to accept a transfer or release recommendation involves complex diplomatic, political and national security considerations, and says nothing about the integrity of the administrative review process at Bagram.

What remains of Petitioners' allegedly "newly discovered evidence" is the familiar argument that the Executive manipulated Petitioners' place of detention to evade judicial review.

According to Petitioners, the history of detainee transfers in and out of Guantanamo, when compared against the history of the Guantanamo habeas litigation, evidences an overall policy to evade judicial review.  Given that policy, Petitioners argue, the military's failure to transfer them to Guantanamo is sufficient to require the extension of the writ to Bagram.  The argument is untenable under *Boumediene v. Bush*, 553 U.S. 723, 763-65 (2008), however, because it would suggest world-wide reach of the writ in every war where the United States has detained alien enemy forces abroad.  Petitioners were not captured on U.S. soil, nor were they transferred from a location where habeas jurisdiction existed.  It is illogical to claim that the Suspension Clause nevertheless applies simply because the Executive did not transfer them from a place where the Suspension Clause does not apply to a place where it does.

Finally, Petitioners urge that should this Court decide to grant the motion to dismiss, it should first allow Petitioners to conduct discovery.  Petitioners, however, have not shown the requisite good cause for jurisdictional discovery in a habeas case.  It is evident that the basis of their alleged entitlement to discovery is pure conjecture, such as that the Executive may harbor some secret intention to occupy Bagram permanently despite official statements to the contrary; and that the Executive's detention policy is premised on the sinister motive to "take detainees *away from* rather than *to justice*."  Petrs' Opp'n at 32 (emphasis in original).   In any event, the many alleged "factual disputes" Petitioners assert have no relevance to the jurisdictional analysis, and discovery on those issues would intrude into matters committed to the Executive branch.

**ARGUMENT**

**NO ALLEGEDLY "NEWLY DISCOVERED EVIDENCE" ALTERS THE COURT OF APPEALS' JURISDICTIONAL FINDING IN *MAQALEH V. GATES***

**I.     Petitioners' Perceived Indefinite Detention at Bagram Is Not Relevant To the Jurisdictional Analysis Because It Is A Function of Ongoing Hostilities.**

Respondents demonstrated in their opening brief that nothing has changed to alter the Court of Appeals' finding that the United States does not have *de facto* sovereignty over Bagram.  The United States continues to respect Afghan sovereignty and territorial integrity and has begun transitioning detention operations at Bagram to the Government of Afghanistan. Although the military will need to maintain some detention operations "on a limited basis during the ongoing surge in military operations in Afghanistan and pending the transfer of non-Afghan detainees to their home countries or to third countries," the United States intends ultimately to transition all detention capacity to the Afghan government.  *See* Declaration of William Lietzau, dated May 19, 2011 (attached as Ex. 1 to Resp. Mot. to Dismiss), ¶ 5.

Petitioners criticize Respondents for failing to articulate "any definite plans for third country nationals" held at Bagram "if and when the transfer of custody of Afghan detainees is someday completed."  Petrs' Opp'n at 7.  In Petitioners view, that only Afghan detainees have been transferred to the Afghan government bolsters their argument that the United States has "exclusive custody and control over third country nationals."  *Id.* at 23.  And, the indefinite nature of Petitioners' detention is further highlighted, Petitioners argue, by the fact that "they are citizens of countries with no recent precedent for repatriation (*i.e.,* Yemen and Tunisia)."  *Id.* at 7.

The Court of Appeals, however, has already rejected the proposition that United States' long-term detention of an individual captured during an ongoing war abroad is relevant to

determining the reach of the Suspension Clause.[4]  The Court's opinion noted that the Court had

"engaged in an extensive dialog with counsel for the petitioners in which [the Court] repeatedly

sought some limiting principle that would distinguish Bagram from any other military

installation," and that "counsel was able to produce no such distinction."  *Maqaleh*, 605 F.3d at

95.  The exchange between the Court and counsel on the significance of the length of detention

was part of that dialogue:

| | |
|---|---|
| Judge Tatel: | *** The question is, does habeas for detainees captured outside the United States and detained outside the United States, does habeas extend to them.  And my question to you is, if we agree with you, what's the limiting principle?  If we agree with you, given the fact that the Supreme Court has not overruled *Eisentrager*, right?  Under your theory, there must be, there must be a basis to which habeas cannot extend. |
| Ms. Foster: | Yes. |
| Judge Tatel: | What are they? |
| Ms. Foster: | First and foremost, habeas does not attach unless the executive has held the detainee for an unreasonable period of time.  So even in *Boumediene* or in the Bagram situation, it doesn't – |
| Judge Sentelle: | That doesn't, that doesn't limit the reach. |
| Judge Tatel: | Right. |

---

    [4]  This Court had previously emphasized that Petitioners had been detained for a
prolonged period.  *See Maqaleh*, 604 F. Supp. 2d 205, 216-17 (D.D.C. 2009) ("A seventh factor
tacitly informed *Boumediene*'s analysis as well:  the length of a petitioner's detention without
adequate review *** The *Boumediene* petitioners – like petitioners here – had been held for six
years or more.  Hence, whatever 'reasonable period of time' the Executive was entitled to had
long since passed.").  Petitioners' counsel also argued to the Court of Appeals that "[a]fter six
years of detention, the fact that they're at Bagram should be of very little weight."  *Maqaleh v.
Gates*, No. 09-5265, Oral Argument Tr. 54 (Jan. 7, 2010).  But the Court of Appeals did not cite
the length of detention as a relevant consideration in determining the reach of the Suspension
Clause.

| Judge Sentelle: | We are asking now for things that would limit the reach. |
|---|---|
| Ms. Foster: | Okay. |
| Judge Sentelle: | And you are telling us how it will be imposed once the reach is established.  But what is the limiting privilege on where, limiting principle on where it would apply? |

*Maqaleh v. Gates*, No. 09-5265, Oral Argument Tr. 31-32 (Jan. 7, 2010) [hereinafter "Oral

Argument Tr."] (Attachment).

The Court also engaged in a dialogue with Petitioners' counsel on the significance of the

degree of the United States' control over Petitioners, in which counsel unsuccessfully sought to

distinguish between the United States' control over Petitioners from the petitioners in

*Eisentrager*, who were under the control of the allied joint command:

| Judge Sentelle: | How did we find that distinction in either *Boumediene* or *Eisentrager*?  How do we find that fact that you just related. |
|---|---|
| Ms. Foster: | Well I think in -- |
| Judge Sentelle: | I don't think from reading *Eisentrager* that it's really at all clear that the joint command plays a whole lot of role in it beyond the United States' command of the prison, is it? |
| Ms. Foster: | I think -- |
| Judge Edwards: | It's not one of the factors listed by the court when it lists the *Eisentrager* factors. |
| Judge Tatel: | Right. |

Oral Argument Tr. at 34-35.

The Court similarly rejected the United States' plenary control over Petitioners at

Bagram as a factor distinguishing detention at Bagram from the military's detention of

belligerents elsewhere.  Were plenary control sufficient to confer jurisdiction, the Court said, "it

would seem to create the potential for the extraterritorial application of the Suspension Clause to

non-citizens held in any United States military facility in the world, and perhaps to an undeterminable number of other United States-leased facilities as well." *Maqaleh*, 605 F.3d at 95.  That extension, in the Court's view, "is not a tenable interpretation of *Boumediene*." *Id.*  In other words, Petitioners' alleged new evidence about the United States' alleged greater control over them in contrast to the control over Afghan detainees is beside the point.  This is especially true in light of the fact that Respondents have never disputed that they have control over the detainees in their custody at Bagram.  As Respondents previously argued to the Court of Appeals, the military exercises such control at any military base where it holds individuals who are captured during the course of hostilities, and, thus, reliance on such control as the basis of extending the writ would open the door to a sweeping expansion of the extraterritorial reach of constitutional habeas jurisdiction.  The Court of Appeals obviously agreed.

The same fundamental flaw exists in many of Petitioners' arguments about other allegedly newly discovered evidence, all of which have the apparent design to show that habeas should apply to some but not other detainees at Bagram.  *See*, *e.g.,* Petrs' Opp'n at 27 (arguing that extending the writ to non-Afghans would not pose practical obstacles for the military's mission because non-Afghan detainees constitute but a small minority of the detainees at Bagram).  Again, the Court of Appeals has rejected any such approach, as it reversed this Court's holding that habeas applies to non-Afghan detainees at Bagram but not to Afghan detainees.  *See also* Oral Argument Tr. 53 ("Ms. Foster: ***There may not be jurisdiction over everybody at Bagram.  Judge Sentelle:  There can't conceivably be jurisdiction over these three cases unless there is jurisdiction at Bagram.").

The relevant question for the jurisdictional analysis is whether the allegedly newly discovered evidence regarding Petitioners' indefinite detention and control by the United States

at Bagram affects the Court of Appeals' finding that United States has no intent "to occupy the [Bagram] base with permanence," *Maqaleh*, 605 F.3d at 96-97, and no *de facto* sovereignty over Bagram.  The answer is clearly a "no."  That the Executive has not announced a definitive plan as to each of the non-Afghan detainees at Bagram does not contradict the United States' express intention to relinquish its control of Bagram upon the cessation of hostilities with the Taliban, al-Qaeda, and associated forces.  Military hostilities remain ongoing, and as Respondents explained in their opening brief (at 9-10), the detention of individuals captured during an armed conflict is a necessary byproduct of war.  And, consistent with longstanding law-of-war principles, Congress's grant of authority under the AUMF "includes the authority to detain *for the duration of the relevant conflict*." *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (plurality opinion) (emphasis added).  Petitioners' opposition brief offers no response to these indisputable facts.

It also follows that this Court should reject as irrelevant Petitioners' related allegations that they have each been cleared for release by the DRB, and yet continue to be held by the United States.  Petitioners have been determined to meet the criteria for internment under the AUMF, as informed by the laws of war, in each of their DRB reviews to date.  *See* Declaration of Robert S. Harward, dated May 13, 2011 (attached as Ex. 2 to Resp. Mot. to Dismiss), ¶¶ 15, 18, 21.  Even assuming *arguendo* that the DRBs have recommended Petitioners' release or transfer – which would have been based on an assessment that their threat may be mitigated by means other than the continued detention by U.S. forces, *see* Ex. B to Harward Decl. at 12 – the decision whether to accept such recommendations is committed to the discretion of the Executive and necessarily involves complex diplomatic, political, and national security considerations.

For example, with respect to Petitioners' countries of origin, Yemen and Tunisia, the President has imposed a moratorium on transfers to Yemen due to the ongoing security situation

there.  *See* Remarks by the President on Security Reviews (Jan. 5, 2010) (*available at*
http://www.whitehouse.gov/the-press-office/remarks-president-security-review); *see also* Final
Report, Guantanamo Review Task Force (Jan. 22, 2010) (*available at* http://www.justice.gov/ag
/guantanamo-review.final-report.pdf) at 18.  The declaration of the Deputy Assistant Secretary of
Defense for Detainee Policy notes that non-Afghan detainees may be transferred or released to
their home country or another country if, among other conditions, such transfer or release is
consistent with U.S. policies relating to the humane treatment of transferees.  *See* Lietzau Decl.
¶ 8.  Prior to making a decision to transfer non-Afghan detainees, the Departments of State and
Defense would need to determine whether to seek humane treatment assurances in light of the
circumstances of the individual detainee and the overall human rights record of the receiving
country, and then evaluate the credibility of the assurances obtained.  In the case of Tunisia,
concerns about the country's history of human rights practices would need to be considered,
including those noted in the State Department's annual Human Rights Reports to Congress.  *See,
e.g.,* Dept. of State, 2010 Country Human Rights Report, Tunisia (dated Apr. 8, 2011) (*available
at* http://www.state.gov/g/drl/rls/hrrpt/2010/index.htm).

    Importantly, even when habeas jurisdiction exists, the Court of Appeals has repeatedly
held that "whether a detainee has been cleared for release is irrelevant to whether a petitioner
may be detained lawfully."  *Almerfedi*, No. 10-5291, 2011 WL 2277607 at *8 n.3.  As the Court
of Appeals has said, "*Al-Bihani* [*v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010)] makes plain that
the United States' authority to detain an enemy combatant is not dependent on whether an
individual would pose a threat to the United States or its allies if released but rather *upon the
continuation of hostilities*."  *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010) (emphasis added).
Thus, it follows that even had Petitioners been recommended for repatriation to their home
countries, their continued detention would say nothing about the jurisdictional reach of the

Suspension Clause.

**II.    DoD's Implementation of New Procedures For Determining Detainee Status
Bolsters the Court of Appeals' Jurisdictional Determination.**

Respondents' opening brief (at 18-24) demonstrated that DoD's Detainee Review Board
("DRB") procedures, fully implemented after the Court of Appeals' decision, provide greater
procedural safeguards than the prior Unlawful Enemy Combatant Review Board ("UECRB")
procedures or even the Combatant Status Review Tribunals previously afforded to detainees at
Guantanamo.  Because the UECRB procedures were not sufficient to tip the constitutional scale
in favor of extending the writ to Bagram, the implementation of more robust procedures bolsters
the Court of Appeals' holding that habeas does not apply to Bagram.

Petitioners dismiss the DRB as "meaningless" because "even if the DRB clears a detainee
for release, there is no authority to compel Respondents to follow the DRB recommendation."
Petrs' Opp'n at 18, 20.  As discussed above, however, DoD's threat assessment, upon which any
release or transfer recommendation for a detainee meeting the criteria for internment would be
based, is distinct from the DRB's determination that an individual is lawfully detained under the
AUMF.  Only the latter is a relevant *Boumediene* factor.  *See Boumediene*, 553 U.S. at 727
(citing the status of the detainee as one component of the multi-factor test).  Accordingly,
Petitioners' new evidence about the alleged DRB recommendations does not affect the Court of
Appeals' prior analyses of the status or adequacy of process factors.  This is true whether the
Executive decides to transfer, based on considerations of sensitive issues discussed above, none
or only some of the detainees recommended for release or transfer.

Notably, Petitioners themselves also claim that they have each been classified as an
"Enduring Security Threat" ("EST"), *see* Petrs' Opp'n at 26, which identifies the highest threat
detainees for purposes of the type of discretionary transfer and release determinations discussed

above, *see* Ex. B to Harward Decl. at 5.  While Petitioners make this assertion as "evidence of Respondents' intent to detain them indefinitely," *id.*, if Petitioners are in fact classified as ESTs, it would mean that analyses of their transfer or release recommendations are more complex than those for detainees not classified as ESTs.  Due to the significant threat posed, the transfer or release of ESTs must be approved at a higher level than is required to approve the transfer or release of non-ESTs.  *See* Ex. C to Harward Decl. at 9-10.  Specifically, the Commander or Deputy Commander of U.S. Central Command is the approval authority for the transfer or release of detainees classified as ESTs.  *Id.* at 11.

Another category of Petitioners' criticisms of the DRB procedures consists of arguments similar to those already made to the Court of Appeals about the UECRB procedures – *i.e.,* that the DRB procedures are deficient because there is no right to counsel, to appellate review, or to the adversarial processes that, in Petitioners' view, would be necessary to an adequate substitute for habeas.  That deficiency purportedly distinguishes this case from *Eisentrager*, where the petitioners "had been *convicted* after a criminal trial before the case reached the Supreme Court." Petrs' Opp'n at 13 (emphasis in original).[5]  For example, Petitioners complain about their

---

[5]  Petitioners' counsel made this same argument about *Eisentrager* in the following colloquy with the panel regarding a potential limiting principle for determining the reach of the Suspension Clause:

| Judge Tatel: | *** Now they mentioned also that [the petitioners] had been tried before military commissions and things like that, but the holding of *Eisentrager* is a lot more solid than just that they were tried before military commissions in China. |
|---|---|
| Ms. Foster: | No, that's not the only factor, Your Honor.  There's several, there's several factors. |
| Judge Sentelle: | It's hardly a factor at all in *Eisentrager.* |
| Judge Tatel: | Right. |

inability to meet with counsel and contend that personal representatives now provided under the DRB are inadequate substitutes for competent legal counsel because of the personal representatives' heavy workload and lack of legal training. *Id.* at 15-16.

Petitioners' arguments have no merit. Neither *Boumediene* nor the Court of Appeals' opinion suggests that the process for determining detainee status must be an adequate substitute for habeas corpus review. In *Boumediene*, the Supreme Court assessed whether the review process provided to Guantanamo detainees by Congress through the Detainee Treatment Act of 2005, 199 Stat. 2739, constituted an adequate and effective substitute for habeas review *only after* holding that the Suspension Clause applies at Guantanamo Bay. *See Boumediene*, 553 U.S. at 771-72 ("In light of this holding the question becomes whether the statute stripping jurisdiction to issue the writ avoids the Suspension Clause mandate because Congress has provided adequate substitute procedures for habeas corpus."). Here, in contrast, the question before this Court is whether the writ of habeas corpus extends to Bagram in the first place. The adequacy of process at Bagram is but one component of the *Boumediene* multi-factor test for making that determination.

Petitioners' remaining arguments regarding the adequacy of the DRB procedures are based on conjecture, erroneous information, or gross generalizations, all of which, in any event, are irrelevant to the jurisdictional analysis. For example, Petitioners speculate that the DRB may

---

| Ms. Foster: | I disagree. |
| Judge Sentelle: | We read that opinion, and that is in the background section, but that's not anything that the Court used to turn its decision on. It never said they don't have habeas until they've been tried. |

Oral Argument Tr. 32-33.

rely on "classified information [which] may have been obtained through torture or other illegal means."  Petrs' Opp'n at 14 n.5; *see also id* at 17 (stating that al-Bakri's counsel, who was permitted to participate in only the open session of the DRB, "did not know if Personal Representative raised the very high likelihood that [statements reportedly made by al-Bakri] were obtained as a result of torture or coercive interrogations").  Contrary to such speculation, DoD policy explicitly provides that "[n]o statement obtained by torture, or through cruel, inhumane, or degrading treatment will be considered by a DRB."  Ex. C to Harward Decl. at 7.

Petitioners also speculate that, unlike Afghan detainees, their personal representatives appear unable to "call witnesses to testify on their behalf," Petrs' Opp'n at 19, even though counsel for al-Bakri also averred inconsistently that he was contacted by al-Bakri's personal representative and ultimately testified as a witness by telephone in al-Bakri's DRB in February 2011.  *See* Kassem Decl. ¶¶ 8-15.  Petitioners also assert that personal representatives cannot place telephone calls to witnesses outside the United States or Afghanistan.  *See* Petrs' Opp'n at 20.  These assertions, however, are erroneous; DRB personal representatives have both global E-mail and telephone support – both classified and unclassified.  No DoD policy or technological limitations restrict personal representatives in witness outreach.  Indeed, witnesses from outside Afghanistan (or the United States) have testified in non-Afghan detainees' DRBs.

Despite Vice Admiral Harward's sworn statement that more than 1,792 witnesses had testified in person and another 425 testified by phone in DRBs between March 2010 and May 2011, Petitioners insist that Bagram detainees have "no meaningful ability to call witnesses" because in the seven DRB hearings that a human rights organization observed, no witness was called in the open session of the proceedings.  Petrs' Opp'n at 19.  Petitioners' attempt to grossly generalize from those situations has no merit.  In addition to the fact that witnesses sometimes are called in closed sessions, each detainee's DRB must be evaluated based on the individual

14

facts and circumstances of his particular case, including whether the detainee himself wishes to have witnesses called on his behalf and whether such witnesses would help the detainee's case.

### III.     The New Evidence Regarding the Conduct of Afghan Criminal Trials at Bagram Does Not Affect the Court of Appeals' Prior Analysis of Practical Obstacles Indicating that Habeas Jurisdiction Does Not Lie.

In their opening brief (at 16-18), Respondents demonstrated that the practical obstacles in conducting habeas litigation at Bagram have not changed, despite new evidence cited in the amended petitions that the Afghan government, consistent with its exercise of sovereignty, is now conducting criminal trials of detainees transferred to its custody at Bagram. Petitioners argue that they are aware of no "incidents" relating to the conduct of such criminal trials. *See* Petrs' Opp'n at 6, 26. But the argument plainly ignores the reality that Afghanistan remains a theater of war. The United Nation's mid-year report on civilian casualties in Afghanistan noted that in the first six months of 2011, the armed conflict in Afghanistan "brought increasingly grim impacts and a bleak outlook for Afghan civilians." U.N. Assistance Mission in Afghanistan, Mid-Year Report 2011, Protection of Civilians in Armed Conflict 1 (July 14, 2011). The war-weary nation experienced a 15% increase in civilian deaths mainly because of the use of improvised explosive devices by anti-government elements. 1,462 civilian deaths have been counted in the six-month period, including an increase of 28% in civilian deaths linked to militant activities from the same period last year. *Id.*

Petitioners also insist that "any practical obstacles posed by Bagram's physical location in a zone of military conflict can be overcome if Respondents so choose," and that the costs associated with it are "insufficient to justify suspension of the writ." Petrs' Opp'n at 27. There is, of course, no suspension of the writ at Bagram. The practical obstacles factor is not measured by whether the United States potentially could overcome the obstacles through the expenditure of resources. To the contrary, the Court of Appeals highlighted not only the "vagaries of war"

15

but also other considerations underlying *Eisentrager* that are unrelated to the expenditure of resources.  As the Court of Appeals noted, "trial of the writ would 'hamper the war effort and bring aid and comfort to the enemy'" and "constitute 'effective fettering of a field commander,' by allowing 'the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.'"  *Maqaleh*, 605 F.3d at 89 (quoting *Eisentrager*, 339 U.S. at 779). Thus, although this Court previously found that the burdens of litigating Petitioners' habeas petitions were not insurmountable due in part to technological advances, and thus that the practical obstacles factor did not weigh against extending the writ to Bagram, *see* Mem. Op., ECF No. 46 (Sept. 16, 2009) 39-40, the Court of Appeals held otherwise.  Petitioners' offering does not materially undermine that holding.

Finally, this Court should dismiss out of hand Petitioners' argument that DoD's conduct of DRB proceedings at Bagram evidences that there is no practical barrier to litigating the writ. As Respondents previously argued to the Court of Appeals, administrative proceedings conducted within an internal military system do not pose the same practical obstacles as civil litigation conducted at federal courts in Washington, D.C.  The experience of the Guantanamo habeas litigation – which does not involve counsel access in an active theater of war – demonstrates that the burden of litigating cases in such circumstances is substantial, given the evidentiary and discovery requirements that are imposed on the military's intelligence, detention, and war-fighting apparatus.

**IV.    Petitioners' Alleged Evidence of Manipulation As to Their Place of Detention Does Not Affect the Constitutional Analysis.**

Central to the theme of Petitioners' manipulation arguments are their allegations that Respondents took them to Bagram Airfield "rather than another site where jurisdiction would have clearly attached," and then "kept Petitioners at Bagram for years, rather than at other sites where jurisdiction attaches – including Guantanamo." Petrs' Opp'n at 31. They argue that such "facts" evidence the Executive's attempt to evade judicial review.[6] Even adding Petitioners' contention regarding the history of detainee transfers during this armed conflict, Petitioners' argument suffers from the same deficiency the Court of Appeals found in all of the arguments proffered by Petitioners in attempting to articulate a limiting principle that would distinguish Bagram from any other military installation. The proposition effectively means that failure to transfer an alien enemy captured overseas during an armed conflict to either the United States or Guantanamo would require the extension of habeas jurisdiction to wherever the detainee is held. In other words, the Suspension Clause would have worldwide application, and as the Court of Appeals has already held, "such an extended application is not a tenable interpretation of *Boumediene*. If it were the Supreme Court's intention to declare such a sweeping application, it would surely have said so." *Maqaleh*, 605 F.3d at 95.

In any event, in addressing Petitioners' manipulation argument that the military transferred them to Bagram in order to evade judicial review, the Court of Appeals stated that "we doubt that this fact goes to either the second or third of the Supreme Court's enumerated factors." *Maqaleh*, 605 F.3d at 98. The Court of Appeals made no determination on the

---

[6] Petitioners also argue that the history of detainee transfers to and from Guantanamo, and the fact that transfers from Bagram to Guantanamo ceased over time constitutes evidence of the Executive's policy of evading judicial review. Respondents have already addressed the specific examples of detainee transfers or alleged transfers cited by Petitioners, *see* Resp. Opening Br. at 12-16, and will not repeat them here.

importance in this case of this possibility, however, "given that it remains only a possibility; its resolution can await a case in which the claim is a reality rather than a speculation." *Id.*  To be sure, the Court also mused that "perhaps such manipulation by the Executive might constitute an additional factor in some cases in which it is in fact present."  But it concluded that in light of the history of the Guantanamo habeas litigation, "the notion that the United States deliberately confined the detainees in the theater of war rather than at, for example, Guantanamo, is not only unsupported by the evidence, it is not supported by reason." *Id.* at 99.

Another fundamental flaw in Petitioners' evasion-of-judicial-review argument is that the failure to provide a detainee with habeas rights when the detainee was not apprehended on U.S. soil – and thus, never had those rights in the first place – is not the type of evasion contemplated by the Supreme Court in *Boumediene*.  The manipulation discussed in *Boumediene* was in the context of the Court's analysis of sovereignty; that is, the Government, in the Court's view, attempted to treat Guantanamo, which has a unique history as the functional equivalent of an unincorporated territory of the United States, as the equivalent of other overseas military bases. *See Boumediene*, 553 U.S. at 763-65.

The history of the United States' movement or alleged movement of detainees in general now proffered by Petitioners as "newly discovered evidence" clearly does not implicate the type of manipulation of sovereignty discussed in *Boumediene*, nor does it controvert the Court of Appeals' conclusion that there is no evidence that the Executive manipulated Petitioners' place of detention to deprive them of habeas rights.  Petitioners do not allege that they were apprehended or ever held in a location where judicial review by an Article III court would have been available, but were then transferred to Bagram by the United States to deprive them of

habeas rights they had obtained.[7]  In fact, although the Department of Defense has sometimes transited Guantanamo detainees through Bagram in relinquishing custody and control of those detainees, as Respondents have previously informed this Court, no detainee who has been determined by the Department of Defense to be properly held under the AUMF, as informed by the laws of war, was transferred from Guantanamo to Bagram for continued detention.[8]  *See Maqaleh*, Motion to Dismiss Oral Argument Tr. 61 (Jan. 7, 2009).  These cases, therefore, do not raise the prospect that the political branches have sought to "switch the Constitution on or off at will" by manipulating Petitioners' place of detention.  *Boumediene*, 553 U.S. at 765.

**V.      Petitioners Have Not Shown Good Cause for Jurisdictional Discovery.**

Relying on the standard governing Fed. R. Civ. P. 12(b)(1) motions in routine civil litigation, Petitioners argue that should this Court be inclined to grant Respondents' motion to dismiss, it should first allow Petitioners to conduct discovery.  Jurisdictional discovery, however,

---

[7]  As noted in Respondents' opening brief (at 4), Petitioners al-Bakri and al-Najar each alleges that he was captured in a specified country outside Afghanistan, held in Central Intelligence Agency ("CIA") detention, and then transferred to Bagram.  Although Petitioner al-Maqaleh does not allege a specific place of capture, DoD records reflect that he was captured in Zabul, Afghanistan.  Harward Decl., ¶ 14.  Part of al-Maqaleh's "newly discovered evidence" is that, in addition to allegedly having been in CIA detention, he was also detained by U.S. forces at Abu Ghraib in Iraq prior to being transferred to Bagram.  *Al-Maqaleh* 2d Am. Pet. ¶ 12.  Respondents do not confirm or deny in this unclassified filing the alleged places of capture or detention.  It is sufficient for purposes of the Court's jurisdictional analysis, however, that Petitioners were neither captured nor detained at any time in the United States or at Guantanamo.

[8]  Petitioners cite two documents they obtained through Wikileaks as alleged evidence of the fact that Guantanamo detainees had been transferred to Bagram.  *See* Petrs' Opp'n at 30.  Petitioners' citation of these documents in an unclassified filing contravenes guidance provided by the government in the Guantanamo habeas litigation, in which one of Petitioners' counsel is included.  In any event, although the government cannot confirm or deny the authenticity of the cited documents, the two documents do not contradict Respondents' representation that no detainee who has been determined by the Department of Defense to be properly held under the AUMF, as informed by the laws of war, was transferred from Guantanamo to Bagram for continued detention.

is unwarranted in this case.  Even in a habeas case not involving wartime-detention in a theater of war, the Supreme Court has held that "'[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.'"  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 295 (1969)); *see also* Rule 6(a) of the Rules Governing Section 2254 Cases (requiring leave of court for good cause shown before discovery may be conducted in habeas case by state prisoners).[9]

Petitioners have not shown good cause for discovery.  As the above discussion makes clear, they have no basis to dispute Respondents' jurisdictional showing, and even if Petitioners' factual assertions were true, they do not change the constitutional analysis.  *Cf. Coalition for Underground Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003) (rejecting plaintiffs' argument that the district court erred in considering a declaration submitted by defendant on a Rule 12(b)(1) motion without affording plaintiff an opportunity for discovery, where plaintiff has made no factual allegations which, if substantiated, would establish jurisdiction).

For example, through both sworn declarations of DoD officials and the President's public statements, the United States has repeatedly indicated that it has no intention to maintain a permanent presence at Bagram.  Petitioners quibble with that representation, citing it as an example of information exclusively within the government's control.  *See* Petrs' Opp'n at 35. But it is unclear what discovery Petitioners believe is appropriate on this point, not to mention the fact that discovery on the Executive's plans regarding this would intrude into spheres of foreign relations and war powers, which have been constitutionally vested in the Executive and "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."  *Matthews v. Diaz*, 426 U.S. 67, 81 n.17 (1976).  More

---

[9] Whether or not the Rules Governing Section 2254 Cases actually apply here, the limitation of discovery in such cases is instructive at least by analogy.

importantly, discovery will not lead to any information that will rebut Respondents' showing that the United States' presence at Bagram is necessitated by the ongoing war.

Petitioners suggest that the Court could allow discovery regarding their site(s) of apprehension and detention, including the reasons for selecting Bagram as the detention site, as the government so far has provided only "vague and nonresponsive answers" about such issues. Petrs' Opp'n at 34.  But simply because the government has chosen not to confirm or deny in its unclassified filings Petitioners' allegations of places of apprehension and detention does not make it an appropriate subject for discovery.[10]  As already discussed before, such information would not change the constitutional analysis.  Moreover, in addition to potentially requiring the disclosure of sensitive national security information, such discovery, under Petitioners' theory, would be automatic in any non-Afghan detainee's habeas case regardless of the detainee's connection to the theater (such as through having carried out attacks there).  In every such case, the military would effectively be required to justify the place of detention, so as to ensure that the military's detention of a petitioner overseas – whether or not in the theater of war – was not motivated by a desire to evade judicial review.  The burdens occasioned by requiring the military to justify its judgments regarding the place of detention in every case brought by a non-Afghan detainee cannot be overstated.

Finally, Petitioners argue that this Court could at least grant them access to counsel so that they could have privileged attorney-client communications.  *See* Petrs' Opp'n at 36. Counsel access, however, would directly implicate the type of practical obstacles that weighed

---

[10]  In 2007, when the government filed its first motion to dismiss in a Bagram habeas case, namely Petitioner al-Maqaleh's case, the government did provide the detainee's place of capture, which is Zabul, Afghanistan.  *See Maqaleh*, 06-cv-1669, Declaration of Colonel James W. Gray, ECF No. 12 (Apr. 19, 2007), ¶ 2.  That information was therefore incorporated into the Harward declaration (at ¶ 14).

against extending the writ to Bagram.  Moreover, the only basis Petitioners offer for their request is that such meetings would allow counsel to learn "additional facts relevant to the jurisdictional analysis."  *Id.*  This is no more than a request to conduct a fishing expedition and clearly is not good cause for the extraordinary measure of allowing access to a military base in an active war zone.

## CONCLUSION

For the foregoing reasons and the reasons stated in Respondents' opening brief, this Court should dismiss the amended petitions for writs of habeas corpus for lack of subject matter jurisdiction.

Dated: July 18, 2011                              Respectfully submitted,

                                                  TONY WEST
                                                  Assistant Attorney General

                                                  JOHN R. TYLER
                                                  Assistant Branch Director

                                                  /s/ *Jean Lin*
                                                  JEAN LIN
                                                  Senior Trial Counsel
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  20 Massachusetts Ave., N.W.
                                                  Washington, DC 20530
                                                  Tel: (202) 514-3716
                                                  Attorneys for Respondents