# ATTACHMENT 1

to Supplemental Declaration of Tina M. Foster
(dated August 1, 2011)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FADI AL-MAQALEH, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> ROBERT GATES, *et al.*, <br><br> Respondents. | Civil Action No. 06-1669 (JDB) |
| AMIN AL-BAKRI, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> BARACK H. OBAMA, *et al.*, <br><br> Respondents. | Civil Action No. 08-1307 (JDB) |
| REDHA AL-NAJAR, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> ROBERT GATES, *et al.*, <br><br> Respondents. | Civil Action No. 08-2143 (JDB) |

DECLARATION OF AHMAD ALI AL-MAQALEH

I, Ahmad Ali al-Maqaleh, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1) I am 60 years old, and a citizen of Yemen. I currently reside in Sana'a, Yemen with my family.

2) I am fluent in English, as well as Arabic.

3) I am currently employed as an Aviation Engineer at a government company in Yemen. I have a Masters Degree in Engineering from the Ukranian University of Aeronautical Engineering in Kiev, Ukraine, and hold a British CAA Aircraft Maintenance Engineer License obtained in Scotland. I have attended many aviation training courses in the United States, France, the United Kingdom, Portugal, and many other countries.

4) I am the father of Fadi al-Maqaleh, who is currently imprisoned at the U.S. military base in Bagram, Afghanistan.

5) Prior to his seizure and imprisonment at Bagram, Fadi lived with his mother and me, and his eleven brothers and sisters at our family home in Sana'a.

6) My family and I first learned that Fadi was being held in U.S. military custody in 2004, when we received a letter from him through the International Committee of the Red Cross (ICRC). Since then, my family and I have sent and received many letters through the ICRC.

7) All of the letters we have received from Fadi have portions blackened-out, so that portions of what Fadi wrote are not visible. I have no idea why the U.S. government is holding Fadi or whether he will ever be released.

8) No one in our family ever tried to harm the United States or its people. To the contrary, from approximately 1981-1997, I visited the United States of America many times for business, and have attended trainings across the United States, including in Oklahoma City, Seattle, Washington DC, and Connecticut.

9) I greatly enjoyed the time I spent in the USA, and have never harbored any ill-will toward the United States or its people.

10) From my time in America, I thought that the United States legal system was supposed to treat all people fairly, even if they are from a different religious or ethnic background. That is why I decided to ask the United States courts to help my son, who has spent his entire adult life in prison even though he has committed no crime.

11) In 2006, I authorized attorney Tina M. Foster of the International Justice Network to file a legal case in U.S. courts seeking my son's release.

12) Because the U.S. government would not allow Fadi to communicate with any attorney, I acted as Fadi's "Next Friend" for the purpose of filing a petition for a writ of habeas corpus on his behalf. Since that time, I have kept up with Fadi's case through periodic updates provided by Ms. Foster.

13) In recent years, the U.S. military has permitted the ICRC to facilitate periodic telephone calls between my family, from the ICRC office in Sana'a, and Fadi at Bagram.

14) During a telephone call with Fadi on April 29, 2011, I learned that U.S. authorities had informed him in a letter that he had been approved for release after a detainee review board hearing. Apparently, the letter that was given to Fadi looked identical to another letter that Fadi had seen shown before by Amin al-Bakri, the other Yemeni citizen (and Fadi's former cell-mate) at Bagram, informing him that he too had been cleared for release.

15) During the same call, I learned that Fadi has agreed to be resettled to a third country because he was told that U.S. policy prohibits the transfer of detainees to Yemen. For that reason, Fadi asked me to obtain a letter from the Yemeni government that it would not object to the United States government's decision to transfer him to a third country.

16) After speaking Fadi, I called Ms. Foster to ask her to visit him at Bagram immediately. I did this because Fadi had requested that I call her, as he was informed that attorneys are now allowed to visit clients at Bagram according to the new prison rules, and he wanted her assistance in preparing his case for his next detainee review board hearing.

17) After speaking with Ms. Foster, I was extremely disappointed to learn that the information that Fadi had been given was false, that Ms. Foster is still unable to meet or speak with him, and that the US government intends to continue to imprison my son indefinitely despite the fact that he has committed no crime.

18) All of this misinformation and confusion regarding my son's fate has taken an enormous toll on Fadi, as well and our entire family.

19) No one from the U.S. military has ever contacted us to tell us why our son is being held, or what we can do to help him win his release. I am willing to provide any information or documentation that I can to help Fadi, however I have never been contacted by anyone from the U.S. military informing me about his case.

20) I attempted to provide a copy of this declaration to Ms. Foster prior June 23rd, 2011. However, despite my repeated best efforts for several weeks, I was unable to do so because of difficulties with overseas communications and electrical shortages in Yemen.

21) Therefore, I respectfully request that the honorable judge in this case allow me to submit my declaration at this time. I understand that this may be the last chance that I ever have to submit any statement in support of my son in the courts of the United States.

Executed this 20th day of July, 2011 in Sana'a, Yemen.

_____
Ahmad Ali al-Maqaleh

# ATTACHMENT 2

**to Supplemental Declaration of Tina M. Foster
(dated August 1, 2011)**

http://www.aclu.org/print/national-security/government-seeks-return-improperly-classified-document-given-aclu

National Security | Detention, Secrecy, Torture

# Government Seeks Return of Improperly Classified Document Given to ACLU

July 14, 2011

**Document Lists Criteria for Detaining Prisoners Indefinitely at Bagram Prison**
FOR IMMEDIATE RELEASE
CONTACT: (212) 549-2666; media@aclu.org

NEW YORK – In response to an American Civil Liberties Union Freedom of Information Act request, the Defense Department disclosed to the ACLU a document that contains criteria for holding detainees at the Bagram detention center in Afghanistan. Now, the government contends the document is properly classified and is asking a federal court to order its return.

The ACLU says the document should never have been classified and should be made public under the Freedom of Information Act. It contains the criteria for labeling detainees an "enduring security threat," which results in prolonged and possibly indefinite detention.

"The U.S. military should not be detaining people indefinitely, based on secret criteria, in a war with no foreseeable end," said Hina Shamsi, director of the ACLU's National Security Project. "Having seen the enduring security threat criteria, we can say without a doubt that nothing about them is properly classifiable or could pose any threat to national security if disclosed. People may disagree whether the criteria are legally valid, and that's all the more reason they should be publicly debated. While we have concerns about the criteria themselves, there is nothing about them that would be a surprise to anyone who has followed the U.S. government's positions on detention and terrorism prosecution in the last ten years."

The government had withheld the detention criteria document from the ACLU even as it disclosed other detention-related documents in response to the ACLU's FOIA request. When the ACLU realized that the document was received as part of a May 2011 document production, it promptly notified the government and requested that the document be immediately declassified, but the government refused.

"The government should never have classified this document in the first place, and it is simply indefensible that it continues to seek suppression of the document now," said Shamsi.
The ACLU's FOIA request on the prison at Bagram was made in April 2009, when there were approximately 600 people being held there without a meaningful process to challenge their detention. That number has now nearly tripled, and Bagram detainees still do not have access to a court or independent and impartial tribunal to determine the legality of their detention.

Under policies issued in 2009, a military review board decides whether Bagram detainees meet detention criteria established by the Obama administration, including a recommendation of whether the enduring security threat criteria are met. Bagram detainees who are found to be an

enduring security threat may be kept in U.S. custody, even after other detention operations are transferred to Afghan authorities.

The other attorneys on the case are Jonathan Manes of the ACLU and Art Eisenberg and Chris Dunn of the New York Civil Liberties Union.
Additional information about the ACLU's Bagram FOIA request is available at:
www.aclu.org/national-security/bagram-foia
Information about the ACLU's challenge to indefinite detention at Bagram is available at:
www.aclu.org/national-security/unlawful-detention-bagram-air-base

Published on *American Civil Liberties Union* (http://www.aclu.org)
**Source URL:** http://www.aclu.org/national-security/government-seeks-return-improperly-classified-document-given-aclu

# ATTACHMENT 3

### to Supplemental Declaration of Tina M. Foster
### (dated August 1, 2011)

http://www.wired.com/dangerroom/2011/07/lockdown-u-s-building-new-jails-across-afghanistan/

# Lockdown: U.S. Builds New Jails Across Afghanistan

By Spencer Ackerman
July 12, 2011  |
6:33 pm  |
Categories: Af/Pak



The U.S. military is supposed to turn its massive jail on the outskirts of Bagram Air Field over to the Afghan government this year. But the U.S. is going to keep holding detainees in Afghanistan for a long, looooong time to come — as new military construction contracts reveal.

One of the big unanswered questions of the plan to give the Detention Facility at Parwan to the Afghans is what happens to insurgents U.S. troops detain in the future. Rumors abound about secret, off-the-books jails kept by Special Operations Forces, but those are supposed to be only for insurgents suspected of possessing high-level intelligence. Where will the rest go?

Here's a clue. The Army Corps of Engineers is just hired an Afghan contractor to build a

new "U.S. government controlled detention facility." The lockup has to include "[4 Modular Detention Housing Units (MDHU), 1 Special Holding Unit (SHU), guard towers, to include utilities, communications, fencing and related site work]." It's got to be built fast — as in, by November — and so the Afghan firm got a no-bid contract of unspecified value.

That's just for starters. After that facility goes up — and it's unclear where it'll be built — the Army will hold an open competition for an even larger detention center, awarding a contract worth $46 million. That facility will consist of seven modular detention units and a "Special Holding Unit."

Special Holding Units are a nice way to say "maximum security." The ones built in Parwan have [solid metal doors and a camera peeking in]. Reserved for "noncompliant" detainees, the cells are built for a single detainee, rather than the communal bunking and fenced barriers of much of Parwan.

Get used to more of these in a post-Parwan era. The Corps of Engineers expressed interest in building a [different detention facility] in late June. It doesn't sound like a temporary holding cell, either: desired features include "detainee housing, guard towers, administration building, medical clinic, laundry, food preparation, detainee processing, visitor and warehouse facilities; primary and secondary electrical power supply, CCTV and communications, waste water treatment, sanitary and water distribution, storm water and related infrastructure, ATFP [anti-terrorism and force protection] measures and building information systems necessary for a stand-alone US Government controlled detention facility."

Cost: between $25 and *$100 million.*
The Afghans may get the sprawling Parwan complex. But their landscape is about to be dotted with new, pop-up American military jails.

*Photo: Flickr/Combined Joint Task Force-435.*