# ATTACHMENT 4

**to Supplemental Declaration of Tina M. Foster
(dated August 1, 2011)**

# THE
# INTERROGATOR

*AN EDUCATION*

*Glenn L. Carle*



NATION
BOOKS
New York

Copyright © 2011 by Glenn L. Carle

Published by Nation Books,
A Member of the Perseus Books Group
116 East 16th Street, 8th Floor
New York, NY 10003

Nation Books is a co-publishing venture of
the Nation Institute and the Perseus Books Group

All rights reserved. Printed in the United States of America. No part of this book may
be reproduced in any manner whatsoever without written permission except in the case
of brief quotations embodied in critical articles and reviews. For information, address
the Perseus Books Group, 387 Park Avenue South, New York, NY 10016-8810.

Books published by Nation Books are available at special discounts for bulk purchases
in the United States by corporations, institutions, and other organizations. For more in-
formation, please contact the Special Markets Department at the Perseus Books Group,
2300 Chestnut Street, Suite 200, Philadelphia, PA 19103, or call (800) 810-4145, ext.
5000, or e-mail special.markets@perseusbooks.com.

Typeset in 11.5 point Bodini Std Book

Library of Congress Cataloging-in-Publication Data

Carle, Glenn.

    The interrogator : an education / Glenn Carle.
      p. cm.
    Includes index.
    ISBN 978-1-56858-673-1 (hardcover : alk. paper)—ISBN 978-1-56858-675-5
(e-book) 1. Carle, Glenn. 2. Spies—United States—Biography. 3. United States. Cen-
tral Intelligence Agency. 4. Military interrogation—United States. 5. War on Terrorism,
2001–2009. I. Title.
JK468.I6C358 2011
327.12730092—dc22

                                                                          [B]
                                                                    2011012548

10 9 8 7 6 5 4 3 2 1

## YOU WILL TELL ME
## THINGS WE WANT TO KNOW

*It is not what a lawyer tells me I may do, but what
humanity, reason, and justice tell me I ought to do.*
—Edmund Burke, Speech on Conciliation with the Colonies

I acted sterner, more of a judge, or an accuser from the moment I walked into
the interrogation room the following day. I wanted him to feel to his marrow
the forces that controlled him, and how implacable they, and I, were. I let my
anger build as I spoke—and found that I in truth became as angry as I had
begun by simulating. I wanted to appear as ruthless as I could. CAPTUS
needed to understand how he was linked to large stakes, in the grip of forces
far beyond his power to imagine, and that he was in real danger of . . . of what?
I wanted his imagination to work, imagining terrible things, but leaving them
largely unspecified. Our imaginations are much stronger than our realities.

"Before we begin our questions today," I told him coldly, "I want you to
know why you are here, what my government and I are doing, how important
what you say is for you, and for any future you might have. I want you to know
what might happen to you, and who I am. No one has told you these things
clearly. Is that right?"

CAPTUS nodded his head warily. "I know nothing."

"CAPTUS, you know that I am American. Is that right?"

He nodded his head again. He held one hand inside the other on his lap.

"I am an American intelligence officer. I am from the CIA."

I looked at him for a moment in silence.

"It is the CIA that took you off the street and brought you here. Do you know what the CIA is?"

CAPTUS nodded his head.

"We had been watching you for some time. We know all about you. We know many things. We decided it was time to stop you from working with al-Qa'ida—we believe you are part of al-Qa'ida. This means"—I said this part acidly—"that you are in tremendous trouble. You are in very, very deep trouble. We have only begun with you, when we took you off the street. You saw then, already, that we can do whatever we want, wherever we want. We were easy on you, CAPTUS, because my organization, because the CIA, wants me to talk with you. You will tell me things we want to know. This will be good for you.

"That is why I am sitting here. CIA officers do not travel around the world to waste their time. You will not waste my time, for I will know if you are wasting it, and I will become very angry. You do not want to make me, or my superiors, angry."

I was working myself into a state. For one of the only times during my months interrogating CAPTUS, I stood up from my chair and paced back and forth in front of him, hands on hips from time to time, stopping to stare at him, pacing again, pointing my finger at him and raising my voice in concert with what I was saying. CAPTUS followed me with his head, slowly, but dared hardly move.

"We took you off the street and took you out of your life because we wanted to."

I looked directly at him, paused, and lowered my voice.

"We can do anything we want, CAPTUS. I can do anything I want. Do you understand? No one knows what has happened to you. No one. You have just disappeared. You are gone from the world. This is your world now. And we have just begun with you.

"Three thousand of my countrymen are dead, in part because of *you*. Some of my friends are dead. They were burned alive. Some of my friends were burned alive in the al-Qa'ida attacks on September 11. Others fell—jumped!—five hundred meters, from the top of the towers, so that their heads burst like eggs when they hit the ground. *No one* does this to Americans, CAPTUS. Our hand is now reaching out to find and to crush the killers who did this. The CIA hand is everywhere. I am part of it—and you are now in *my* hands—and I will do what I need to do to find the men who killed my friends.

"Now, you are in tremendous trouble. My countrymen are dead. They were innocent. But my colleagues and I are not innocent, easy men. You are mine now, but there are nastier men than me in the CIA. And so far as we are concerned, you are in part responsible for my countrymen's deaths.

"So what am I going to do with you? What will happen is this: I will ask you questions. You will answer me with the truth. This is what you can do: You can tell me the truth when I ask you questions. This is in your power. I will know, or will find out, if you do not tell me the truth. Things are bad for you now; you do not want to make them worse. And that is *your* decision. I will recognize honesty. I will appreciate it. It will help you with me and with the CIA. I will tell my superiors in America, in the CIA, if you tell me the truth. It will make your life here better; that is in my power, too.

"*Fahimt*?!"

I did not want to give him any hint that I could be flexible at this meeting. This meeting was intended to terrify him, and yet leave him some sense that he had free will on some crucial decisions. I sought to lead him where I wanted him to go so he would answer my questions truthfully. They had to come from him; I could not extract them by force. I knew that the personal relationship between detainee and interrogator was the single most important tool to ascertain the truth. But intimidation and fear could be useful psychological tools. I would use all the psychological tools I had.

"Yes, I understand" was all CAPTUS said, wise enough to perceive that he should not at that moment protest his innocence or engage at all with someone so furious. I did not want to talk to CAPTUS just then, either. I had worked myself up, and I wanted him to mull over what I had told him.

"I am leaving this room now. I do not want to see you. I am too angry at you. You are part of al-Qa'ida, which has murdered my countrymen. You have misled the man who was here before me. I think I have come around the world and that you will waste my time now, too. I will not allow you to do that to me.

"Think about what I have told you, CAPTUS. Think about it. I will come back later. I will have questions to ask you then. You will need to answer. So you think now."

## OFFERING HOPE

*Our patience will achieve more than our force.*
—Edmund Burke

My main approach was to deepen his and my burgeoning relationship, not terrify him. Developing trust is more natural to me than intimidation. In any event, one can only be oneself. One's character will emerge eventually, even through concerted efforts to project certain attributes or attitudes.

Over the following days, CAPTUS became less tense. He showed what I came to find a likeable personality; a bit of the hustler and rough, but with bonhomie. It was unclear to me how clever CAPTUS was, and he was frustratingly incoherent. He reminded me of so many I had met in the Third World, who saw shapes and heard signs where I saw shadows and heard sounds, who often understood my words, but not my meaning. I supposed, too, of course, that I had my own delusions about what CAPTUS meant and thought. But how could I know what they were?

I tended to keep this sort of reflection to myself, or at least to be selective about to whom I shared my views on how cultural anthropology provided relevant insights to case officer operations—and interrogations. Many times over the years superiors had told me, one way or another, that "we don't do sociology

in the DO; we collect intelligence." This was not a moment to be the abstruse "Harvard guy." Nonetheless, each day I worked hard to know CAPTUS as a man. *Flies, honey, and vinegar*, I thought.

CAPTUS's and my worlds were so different. ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬.[1]

The KUBARK manual had noted the usefulness of discussing ideology or religion to establish rapport and motivation, and to help the detainee reason his own way toward cooperation. It noted the merits of "discussing the principles of and offering valid alternatives to the ideology that motivated the subject . . . to provide him reasons which he can use to justify for himself switching sides." I considered this sound advice and assessment, and followed KUBARK's precepts.

The KUBARK manual was remembered by the public, if at all, only from the Agency's involvement with the Contras in the mid-1980s, for a few controversial passages concerning coercive methods in interrogation. But I was repeatedly surprised to find that KUBARK presented a remarkably accurate portrayal of a detainee's reactions and thoughts, and in a number of regards a subtle and even humane approach to interrogation. This was ironic on a number of levels: Two decades earlier, as I was beginning my career, the KUBARK manual was cited by many as proof of the Agency's involvement in torture and human rights violations. But this misinterpreted the objective of the KUBARK manual. I knew then that the Agency had worked hard to *stop* human rights abuses by the participants in the Sandinista-Contra war—I worked the issue specifically in my assignment as an assistant to Alan Fiers, the head of our Central American Task Force—and that the KUBARK manual, for all its debatable points and faults—was part of our effort to stop abuses of detainees. As the days and weeks with CAPTUS passed, I was consistently surprised to find that my reactions and the approaches to interrogation that I developed

---

1 The passage above describes how I used CAPTUS's and my cultural and religious differences to assess his motivations, actions, and truthfulness.

myself, on the fly—emerging from my intense determination to accomplish my mission, and to do so morally, honorably, and legally—frequently corresponded to the psychological approaches described in the KUBARK manual.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Yet, I was no sucker that establishing good rapport and CAPTUS's willingness to discuss "safe" topics exonerated him from anything. I was interrogation team leader. The pressure to produce disseminable—operationally useable—intelligence *now* was intense. No one in the chain of command would care what I asked CAPTUS, or how I spoke to or with him, so long as I produced intelligence quickly. There was little time for what I knew would be considered irrelevant, soft conversations. An HVT interrogation team was a huge investment of precious officers, resources, liaison equities, and Headquarters support. The Agency had not spent years finding CAPTUS and committing huge resources so that a case officer could discuss comparative religion with a terrorist. And there was always the criticism against which I had to guard, that I was being duped into wasting my time by a clever opponent.

The days and nights ran together, and I always worked long hours, sending in my reports to a Headquarters waiting for the payoff from such a big coup. Sometimes I surged with frustration and anger at incomprehensible nonsense. I was not surprised to find that CAPTUS came to feel pleased to meet with me. I was the only world he had now; whatever my personal qualities or skills, the Stockholm Syndrome is powerful. Who else was CAPTUS going to identify with? Slow as the process was, the information he provided was useful. Al-Qa'ida member or not, CAPTUS knew things we did not, and needed to know. But my assessment started to challenge the official view that CAPTUS was a willing and critical member of the al-Qa'ida network.

# WHAT PAPERS?

*One thing only I know,*
*and that is that I know nothing.*

—Socrates

I came progressively to believe that what Headquarters considered CAPTUS's willful obfuscation or lying was due to a clash of cultural perspectives. His mind functioned differently than a Westerner's. He did not reason linearly, or conceive the world in terms of subject, verb, object. There was no shortest line between two points. No question or subject had a straightforward answer. I thought of the English essays my brother showed me from the high school English classes he taught. Many of them were incoherent, yet they were from my own world. CAPTUS's mind was as illogical as theirs, and he was not from my world. We were in Plato's cave, I spoke of figures of men, and at his best CAPTUS described wavering shadows.

As the days went by, CAPTUS visibly relaxed with me. He was careful with each of his answers, for which I did not blame him. ▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

what he imagined to be American power, knowledge, and sophistication.

. From a distance, back in Headquarters, many saw this to be disingenuous. I came to see this differently.

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████.[1] There were moments of frustrating farce amidst the toil, grime, mind games, and routine. There always are.

My team and I made the trip out to the interrogation facility. I jockeyed at jammed intersections with motorcycles whose roars hurt my ears. None of us ever spoke too much on the drives. Eventually I turned onto a small, nondescript side road. It was hard to locate, and several times I drove past it unaware, only recognizing my error dusty miles later.

The trees were always pleasant and shaded on this little country lane, and I could feel the cooler air and breeze and hear the leaves rustle peacefully through my open window as I drove. But I always had the impression we were approaching what the locals knew to be a place of taboo and fear, and that they stayed away lest they saw someone or something forbidden and dangerous, and so found themselves pulled into darkness. Never once did I see any other cars or humans on this road.

"There's no one around," one of my teammates said the first time she drove with me there, as we descended into a copse of deeper woods.

"Yeah. Pretty, though," I replied, keeping my thoughts to myself. I always worked to be even-tempered, or pleasant, or to allow myself to become angry, but only when I wished to show it. Usually I succeeded. This was not detachment, as many thought; it was an effort—more often futile than successful—to control what was happening to me, and to protect myself. She kept looking out the window, perhaps unconvinced. I hoped that she was unconvinced.

---

1 The redacted passages above describe in generic terms how CAPTUS thought, how various levels of the CIA assessed his answers and manner, and how we often disagreed among ourselves. There is no legitimate justification to redact the passages, unless the CIA has decided that saying CAPTUS's ignorance of current events and that differences of opinion constitute intelligence "methods." The public, however, already might suspect CIA officers usually are not monolithic blockheads and do have internal debates. As with so many redactions in this text, the Agency has overstepped its bounds and made itself a fool.

We drove up to a gate, the attendants looking down impassively at me from inside their booth as I rolled to a stop beside them.

The guards were always taciturn. Once I told them, as I had to every day, that I was there to meet with "Mr. Muhamad,"[2] they passed me through to a spare, quiet waiting room. ████████████████████████████████████████.
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████. It had a small transom, open to create an air current with the door on the other side of the room. Sometimes, for something to do while we waited, I stood in the door to look at the trees.

No car but mine that I saw entered or exited the compound during all the months I went there.

The factotum eventually received word that our hosts were ready to receive us. He escorted us to our next stop, disappearing as quickly as his pleasantness had been pro forma. This man was not a phony; he was simply dim and could manage to enact only a couple forms of learned behavior. I always imagined him sitting silent, stoic, motionless, and thoughtless until we arrived, whereupon he stirred, smiled his rote smile, and set to his task, and that he returned to passivity as soon as he had fulfilled his commission with us.

The door issued into an empty, dark service hallway. The only light came from a sole transom a couple dozen yards down the hallway. I was always blinded at first, passing from the day into the dark. My liaison counterparts met us standing just inside, silently shaking hands, at first only shadows to my vision: the chief, who wore ill-fitting, cheap polyester suits, whose looks were hard and ruthless, and who would leave us after shaking our hands; the thuggish officer with a craggy face who was usually in good humor, who enjoyed his work, and who in his simple mind revealed no apparent scruples, qualms, or thoughts beyond a willingness to do what his partner, or I, sug-

---

2   Of course, a pseudonym. Almost every name in the book is a pseudonym.

gested. I was happy that he and I rarely spoke. We would have had almost nothing to say to each other. The third, more intense and quick-minded officer was the counterpart I interacted with most of the time, more refined than the other. He always smoked intensely during our rare breaks, his hands and eyes restless.

We only ever knew the name of the boss, Mr. Muhamad. The COS and he had regular business together and I spoke with him from time to time when I had to arrange something with our host service. The officers with whom I worked would not tell me their names, so that for my whole time working the interrogation my team referred to them simply as "Big Guy" and "Little Guy." No one is anyone's friend in intelligence. Countries may have shared interests concerning specific issues and may work together, but no country, and certainly no intelligence service, ever has any friend. There is only each country's national interest, and each service's and officer's specific orders.

I came to like Little Guy a good deal. It was he and I who virtually lived with CAPTUS, who ███████████████████. He was patient with CAPTUS—sometimes more than I—and he was patient with me.

The holding room in which we met with our hosts was disheveled: a couple sofas around a coffee table, dirty ashtrays, and empty peanut and chip bags lying on the table, an overflowing trash can, unemptied for days. The place became progressively grungy over the weeks. Stale cigarette odors, faded pistachio walls, and the general mess wilted the spirit; at least they did mine. Little Guy and I left my teammates in the holding room to go meet CAPTUS.

CAPTUS sat, as always, in his salmon jumpsuit as we entered, hands in his lap. The tan walls were bare and had not been painted in decades. A single ceiling light lit the room. A single transom high up on one wall, cracked open but well out of reach, hinted of the outside world. The glass was opaque, though, so CAPTUS could see nothing but his cell and his interrogators. The room was always stuffy, the air stale, the transom useless, an empty evocation of relief.

CAPTUS answered with his typical narrative incoherence, combined with precision on some details. As usual, I wondered as CAPTUS spoke whether his brain was that disordered, or if he was dicking Little Guy and me around.

I put my notepad down on the floor.

"Look, CAPTUS. Listen."

I leaned back in my chair. I dropped my conversational tone and spoke forcefully. ███████████████████████████████████████████████ .

███████████████████████████████████████ .

I could feel that my pulse had risen, and my breathing. I had become angry. CAPTUS saw my intensity, blinked a couple of times, and looked down at his hands. He became anxious. He absently fretted with the cuffs of his jumpsuit.

CAPTUS replied to each question, but he replied in general terms. Then he stopped, bewildered.

He told me that the information I sought was in his papers, which we had seized when we rendered him. All I had to do was look in his papers for the answers.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████ .

Well, this was news to me. What papers? I attempted to mask to CAPTUS that I had been unaware that we possessed his personal papers until he told me so himself. *Wouldn't that have been nice to know?* I thought to myself as he spoke, confounded and annoyed at the absurdity that he knew more about our rendition operation than I did. But I looked at CAPTUS with an expressionless face.

I did not mention my irritation to my colleagues when I left. As team leader, I did not want to come across as an angry cynic. Better to project calmness and confidence. They also had been unaware that we held CAPTUS's documents. I figured that Big Guy was too slow to perceive the little moment. But I thought I—we—had been made to look a fool to CAPTUS and to Little Guy. Little Guy noted my discomfiture even if CAPTUS might not have. We, not CAPTUS, were supposed to hold all the cards. We were supposed to know what we were doing, not waste our liaison partners' time.

I always liked smelling the fresh, flower-laden air when I stepped out into the fading light. I always liked leaving the ████████████ compound, driving

Case 1:06-cv-01669-JDB   Document 67-3   Filed 08/03/11   Page 17 of 62

back up the deserted wooded lane, seeing the first headlights and pedestrians on the highway, being surrounded by the neon and noise of the city, and finally finding once again my brightly lit, cramped, and cluttered office, and the dirty carpeting of the station. I liked if my officemate, or someone else, was there so we could trade good-natured insults.

That evening I cabled to our station in the country where CAPTUS had been seized to request that they send me CAPTUS's papers by immediate courier.

Back at the hotel, as usual I sat alone in the back of the lounge, listening for a long time to locals sing karaoke to the house band, which consisted of classically trained Latin American musicians, incongruously making their living by playing pop tunes in a Middle Eastern hotel lounge to hookers, drunken businessmen, and tourists. The two hookers who always worked the lounge had no business this night, so their good humor was unfeigned. I watched them as they sat and chatted together below me, by the band, smoking endless chains of cigarettes, their hands performing slow, delicate arabesques to the music. Later, back in my room, I lay on my bed, the air conditioner high up on the wall blowing cold air over me, and stared at music videos, silent, stoic, motionless, and thoughtless until almost 3 in the morning, when, at last, I fell asleep.

# METHANE BREATHERS

*Only those who are the true authors of their acts,*
*which they are free to perform or not perform,*
*can be praised or blamed for what they do.*
—Isaiah Berlin, *Against the Current*

*Man cannot so far know the connection*
*of causes and events, as that he may*
*venture to do wrong in order to do right.*
—Samuel Johnson, *Rasselas*, XXXIV.30

The runway glistened in the cold, damp fog. Distant lights glared as halos in the black. A few isolated men, small dark shapes, stood off on the perimeter, where the dim light was overwhelmed by the night. The nearest building was several hundred yards away. ███████████████████████

████████████████████████████████████████

████████████. Muhamad chatted in low tones with Little Guy and Big Guy, about thirty yards away. Josh slapped his hands together to stay

warm. He and I were working together again. He had the lead this night, as I had had when we worked together on the elegant walk-in case. He ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ had arranged for us to use their runway ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. He was focused, calm, and professional. It was 2 a.m. We were waiting for our "black" plane to arrive for CAPTUS's second rendition, which would take him and me to Hotel California.

Earlier that night, Josh and I had driven out from my hotel, following directions that liaison had provided, through progressively deserted and ultimately dark and empty country roads, stopping at a nondescript, isolated gate in a chain-link fence. We turned off our car and its lights. There were no other roads, or people, just large scrub bushes fading into the night. The only light came from several buildings hundreds of yards away, inside the facility. Josh and I stood about in the darkness for ten minutes, waiting and largely silent. We checked our watches under our coat sleeves from time to time. I turned up my collar and hunched my shoulders against the cold. At the appointed hour, our contact drove up on the other side of the fence, his tires making sharp crinkling noises in the gravel.

Muhamad gestured us into an ornate but slightly dilapidated waiting room in one of the buildings, underlit by bare, wan bulbs, and unheated. It was freezing. We all kept our coats on. Its scruffy decay reminded me of an Arab version of waiting rooms in which I had spent time in Simferopol, in the Crimea, or outside of Kiev. We all sat awkwardly beside each other on a single long, hard sofa, running the length of the wall. Oriental rugs and a low tea table completed the furniture. Several of Muhamad's colleagues arrived a few minutes later and Muhamad introduced us. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

They were our hosts this night, and puffed themselves up to us in friendly but stilted formality. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮. We shook hands all around, smiled thinly at each other, and sat back on the long sofa to drink over-sweetened tea, served from a long-stemmed burnished copper teapot. We had little to say to one another. They did not know what we were doing or who we were and we had nothing to tell

Case 1:06-cv-01669-JDB   Document 67-3   Filed 08/03/11   Page 20 of 62

them. After a polite interval of staring mutely at ornate wall motifs, all of us with our hands on our knees, I excused myself, returning to pace slowly up and down the runway, in the dark. Josh joined me a couple of minutes later, also relieved to be quit of the tea room, and we stood silent on the tarmac, looking at and feeling the night. It was impossible not to think of the final, fog-filled airport scene in *Casablanca*; the resemblance was remarkable, but I did not mention this. I thought it would sound artificial and inappropriately light, given what we were doing.

Muhamad somehow found me well off from the nearest building or man, walking alone with my thoughts. He handed me a small packet, with a satisfied look.

"█████████████████████████████

████████████████████████████." I slid the thin packet

into the inside pocket of my jacket. █████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████.

"So now I can disappear."

He nodded. "Yes."

*I'm already half disappeared*, I thought. Muhamad returned to his car and stood there with a couple of ████████████ officers. I walked to the end of the runway, to stare at nothing. My breath steamed when I exhaled, and I put my hands in my pockets.

A small convoy of three or four vehicles emerged from the darkness at the opposite end of the airport from that which Josh and I had entered. It was CAPTUS, escorted by security from the host intelligence service. I was about one hundred yards away from where they stopped. I could see CAPTUS bundled out of the middle vehicle—████████████████████████████████

████████, underdressed for the cold, a little hunched over. It struck me that in all the months I had been working the case I had never seen CAPTUS walk

before. The security men shuffled him into a building adjacent to the one where I had taken tea with the ████████ officers. I stared for a moment at the door that had closed after CAPTUS. I felt badly for him.

We continued to wait. I saw Little Guy standing under the small overhanging roof of the waiting room building, smoking a cigarette. Josh went to speak to a couple of our interlocutors, then caught up with me.

"It's coming. ███████████████████████████. Ten, fifteen minutes." This was our black plane. I went to our car and got my bag. The distant men on the perimeter moved off the runway. I could just glimpse that they were armed. We moved off the runway, too. Everyone in sight disappeared into the darkness, to attend to unknown tasks.

Shortly, an aircraft appeared out of the sky, very low, very close, and very ██████, and landed with ███████████████████ a ████████ ██████, rolling gently to a stop not more than seventy-five yards from me. I had not seen or heard anything until the very last seconds before it landed.

Doors opened. Men emerged and fanned out in bustling, silent, efficient activity around the plane. They were intimidating. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████. A lone black-clad ninja figure came out last. He wore a balaclava, covering his entire face except for his eyes. His jumpsuit was bloused inside heavy boots, and he carried an M-4. He strode toward the waiting room building and was met halfway by one of the locals.

"Methane breathers," I murmured.

"What fucks," Josh said.

I glanced at him, my brows knit. "What?" He did not answer.

He walked over to the lone ninja and the local official and talked for a moment. He gestured for me to join them. He and the ninja walked toward me, leaving the local behind. We met halfway between us on the runway, about forty yards from the plane. Bright light came out of the plane's doors.

To my surprise, the ninja was a woman. Up close, she was petite, fine-boned, with long, dark hair. Incongruous. We shook hands. Josh and the woman were engaged in a testy exchange, which she interrupted to greet me.

"You're the one going with the detainee?

"Yes."

"We'll leave ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [soon]."

She was all business.

Josh and the woman returned to their argument.

"It's protocol," she said. "This is how we do it."

"I don't care if it's protocol. It's unnecessary and we're insulting the ▮▮▮▮.[1] I would be. Why don't you adjust to circumstances? There's no danger here. I've worked all this out with the ▮▮▮▮." Josh was controlled, but direct. The woman took offense. I was bewildered but growing alarmed. What was going on?

"Can't do it. It's protocol. These are our orders. This is how we do it. The station has nothing to do with this." This woman was not budging.

"Who are you?" Josh asked. "I deal with these guys every day. You don't need to do this stuff."

"I am running this operation. It's protocol, designed for everyone's safety. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. There's no discussion about it. I don't care where we are. I run the rendition. As soon as we're done with the physical ▮▮▮▮▮▮▮, we're gone."

She looked at me. "Put your bag in the plane."

She ended the conversation abruptly and walked toward the building where CAPTUS was being held, and where several of her ninjas had entered while we spoke.

"What's going on?" I asked. Josh was contemptuous.

"She's a Headquarters fuck. These guys are clowns. She wouldn't know how to drop her pants and take a shit out here if she didn't have her 'protocol' to follow. Her field experience is—these people aren't field officers. They aren't using their heads. They don't know what they're doing. This is supposed

---

1 Josh mentioned the nationality of our hosts.

to be a *black* operation. That's the whole point. That's why we arranged it as we did. ▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐. But it's not normal with kung fu masters hopping around ▐▐▐▐▐▐▐▐."

I understood Josh's irritation now. They had given no thought to adjusting tradecraft to circumstances. ▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐. Bureaucracy at work again—*Check That Cable*.

"That's why we asked, and I arranged," he said, "for everything to be routine, and for our presence to be invisible and nonexistent. ▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐. That is not alerting. That's why—no one here knows what we're doing or who we are ▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐. Ninjas jump out, while a couple of Americans stand around waiting with some guy in chains? That's just how not to draw attention. ▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐. That's just perfect. You can bet now that all these guys here will see something pretty unusual has gone on. I wonder if someone might figure something out? ▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐. These clowns should have landed, ▐▐▐▐▐▐▐▐▐▐ have you and CAPTUS get on ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ with no hint of what's going on."

A minute or two later we walked over to where CAPTUS was being held. One of the ninjas was a doctor, who greeted us just as they were finishing up and taking a hooded and shackled CAPTUS onboard the plane ▐▐▐▐▐

▐▐▐. The doctor, Josh, and I followed. He was good-natured, if a bit hurried and wary of his surroundings. He explained that he had conducted a physical examination of CAPTUS, including a proctologic probe, to verify that the

detainee was in good health, and posed no threat to the rendition squad. ██████████████████████████, again so that he posed no threat to the team.

"You ██████████my guy?!" I asked, taking on the spirit of Josh's irritation. Josh snorted.

The doctor's face was covered with his black knit face mask, but he seemed less intransigent or officious than the woman had been and took my incredulous flippancy in good spirit.

"Sometimes these guys hide stuff there, that's all. Bombs, who knows what. Some of these guys are awful. We have to know before we get him on a plane where lives can be at stake if there's a screwup."[2]

██████ CAPTUS was onboard. We had reached the side of the plane. ██████████████████████. Everything had happened very fast. ██████████████████████. Little Guy and Big Guy approached from under the portico of the waiting room building. I thanked them for their help and shook hands. "*Choukran, choukran,*" I said, placing my hand on my heart. The exchange took only seconds. Two more people I would never see again. I noticed that the nearest people and vehicles were already a couple hundred yards off.

---

2 Several public documents are relevant: The KUBARK manual, which I found to be so much a foundational document for rendition, detention, and interrogation practices, instructs: "Subject is given a thorough medical examination, including all body cavities, by the facility doctor." The Council of Europe's Investigation into the CIA's rendition practices, issued summer 2009, asserts that "some accounts speak of a foreign object being forcibly inserted into the man's anus; some accounts speak more specifically of a tranquiliser or suppository being administered per rectum." Also, according to the "Background Paper on CIA's Combined Use of Interrogation Techniques," dated December 30, 2004, which sketches rendition and interrogation techniques for HVT al-Qa'ida detainees, and released to the ACLU under a Freedom of Information Act lawsuit, "a predictable set of events occur. . . . An HVD is flown to a black site [now acknowledged publicly to have included sites in Afghanistan]. . . . A medical examination is conducted prior to the flight. . . . Upon arrival at the destination airfield the HVD is moved to the Black Site . . . using appropriate security procedures. . . . The HVD is subjected to administrative procedures and medical assessment . . . the procedures are . . . precise, quiet, and almost clinical. . . . Procedures include:

a. the HVD's head and face are shaved.

b. A series of photographs are taken of the HVD while nude to document the physical condition of the HVD upon arrival.

c. A Medical Officer interviews the HVD and a medical evaluation is conducted to assess the physical condition of the HVD. The medical officer also determines if there are any contraindications to the use of interrogation techniques."

I turned to Josh.

"Josh."

His face looked hard and etched with fatigue. He was laboring to suppress his anger. We shook gloved hands.

"Okay."

███████████████████████████████████████████████

███████████████████████████████████████████████ .

I boarded the plane, followed by the petite ninja woman, the last one in, who did not shake hands or speak with anyone. The lights in the cabin were blinding after the darkness outside. She secured the door and leaned into the cockpit. "Go," she said. The plane's engines immediately revved and we taxied down the runway.

I slid down the aisle and found a seat behind the wing. No one spoke—I gathered that part of the "protocol" was to maintain silence at all times. Everyone pointedly ignored me. ██████████████████████████ . I watched the few lights in the darkness below recede quickly behind us and drew the shade.

About twenty minutes into the air I walked back to check on CAPTUS. He was motionless. ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████ . The ninjas were not welcoming. They drew a separator across the aisle. The cabin was filled with the roar of the engines. ██████ ███████████ I returned to my seat, pulled a blanket over my head, and slept fitfully for what seemed a long time.[3]

---

3  According to the Background Paper on CIA's Combined Use of Interrogation Techniques: "during the flight, the detainee is securely shackled and is deprived of sight and sound through the use of blindfolds, earmuffs, and hoods. There is no interaction with the HVD during this rendition. . . . The procedures he is subjected to are precise, quiet, and almost clinical."

# POINT ZERO IS FUCKED UP

*La ruse la mieux ourdie*
*Peut nuire à son inventeur;*
*Et souvent la perfidie*
*Retourne sur son auteur.*
*(The most clever ploy*
*Can harm the hand behind it;*
*And often perfidy*
*Recoils to its author.)*

—La Fontaine, *Le Rat et la grenouille*

The sky was leaden, and the darkness descended all the way to the ground. A mist hung in the air and one could not see far before one's vision disappeared into a formless, gray wall of cloud in every direction. I could not believe the murk into which we had landed.

The change of the engines' whine and our descent had awakened me five minutes before from a typically poor airplane sleep. I had the glassy eyes and wild hair, the slightly disjointed motions of just coming to, and had just enough time to glimpse raw, brown, snowy, and immense mountains as we spun in a tight turn and descended sharply. Point Zero.

There was commotion around the jet the instant we rolled to a stop. Our door immediately opened and the rendition squad leader hustled out of the plane. A convoy of 4x4 vehicles drove up within seconds. Bulky armed men piled out of them even before they had stopped. They established security quickly ███████████████████████████████████████

██████████████████████████████████████████████.

The security men immediately started to load the 4x4s with packets from the jet. I descended the steps of the plane, wanting to help and to stay out of the way. I asked the rendition squad leader, "Should I take my bag now?"

"No, it's better if you get it once they're done. There's plenty of time." She went back to organizing the luggage and supplies.

I stood by the wing, to the side, and looked around. This was the main part of the airfield, near the control tower. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████.[1] I felt very exposed. Other than the security men and the 4x4s, there was no visible sign of life, but I could see only a short distance before the mist obscured everything.

████████████████████████████████████████████████

███████████████████████████████████████. Men hurried all around me. Various bags and duffels landed with a thud in the backs of the 4x4s.

Within moments the back door of the 4x4 nearest the jet slammed shut. "Okay. Let's go!" The security men broke off what they were doing and hurried to vehicles. The four 4x4s careened to form a caravan. The jet crew was climbing the embarkation stairs to take off. The rendition squad leader was gone.

"Hey!" I shouted, starting to run to the jet stairs. "I have to get my bag. I'm staying!"

---

1   The deleted passage describes what were to me alarming surroundings.

POINT ZERO IS PUSHED

*Goddamn it.* I sprinted up the stairs and down the plane, grabbed my bag, and ran out. I had taken perhaps thirty seconds. The plane was closing the embarkation door behind me. The vehicles were about seventy-five yards away, lights shining in the growing darkness and mist, moving quickly toward the gate, one hard up against the next.

One of the men who had met us saw me. He raised his arms in a cross over his head. "Halt! Halt!" he called. "Halt! You've got one more ████!"

He was closer than I to the convoy and managed to run up beside the lead driver's window. He crossed his arms again. "Halt!" The caravan stopped suddenly. I chose a vehicle, opened the door, tossed my bags in, and jumped in myself, having half run and half walked in an effort to go fast, while not appearing too much a high-strung neophyte.

"Okay! That's it," I said. The two men inside said nothing. The one riding shotgun held an ████ at the ready. They continued to look out the front intently. The last two men on the ground opened a gate.

"Come on, let's get out of here. We're just sitting ducks like this." The driver's voice was irritated, taut. We started to roll through the gate. We picked up speed into the wasteland around the airport. The men in the vehicle completely ignored me. ████████████████████████████

████████████████████████████

████████████████████████. I glanced back and saw the jet accelerate down the runway and take off, lifting sharply as soon as it was airborne.

The 4x4 started to buck and bump and rock, surging through puddles and twisting to avoid two-foot-deep potholes. A couple of minutes went by in silence, but for the revving of the motor and the crashes of the jeep. There were no people in sight, just buildings every so often. ████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████. I stared out the windows astonished as we bounced along and

thought of my college roommate from decades earlier, who through a haze of whiskey used to gaze out our living room windows on the Charles River, declaiming from T. S. Eliot's *The Waste Land*: "All about is stony rubbish and a heap of broken images where no branches grow."

I thought enough time had gone by for the new guy to say something and not disturb some task or danger I did not perceive.

"This place looks worse than Burundi," I said. There was a one- or two-beat pause. No one had even glanced at me yet.

Rain started to fall. Mist formed on the windshield. Then the guy in front of me spoke, staring ahead. "This place is fucked up, man. Point Zero is fucked up." I found that I could not open my window ███████████████ ████████████████.

The land was strewn with football-size stones everywhere. It was a desert-steppe moonscape, ████████████████████████████████. The driver turned the wheel sharply.

"Shit! ████████████! Look at that!" The car jerked and the tires of the 4x4 passed only a couple of feet from it. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████.

"Let's go, let's go! Let's get out of here!" he said, angry and anxious. The windshield wipers didn't work right. The murk and ruins were smeared on the windshield and we could see only distorted blurs of gray and brown out the front of the 4x4.

"Fuck," the guy sitting in front of me cursed.

I found that all my drives on this "road" were like this, although I would travel with men who were less on edge.

# REDEMPTOR

*Yet all man's life is but ailing and dim*
*And rest upon the earth comes never . . .*
*And the deeps below us are unrevealed,*
*And we drift on legends forever.*

—Euripides, *Hippolytus* 191–7.

A long while later we rolled to a stop at the station. The security was daunting and impressive. I looked up at a dilapidated building that had seen better days, but then every building I had passed had seen better days.

"He'll need to see the security officer." The driver was talking about me as though I were not there. He turned to me, shouldering his rifle: "You'll need to see the security officer." Then he and Mr. "This-place-is-fucked-up-man" walked up the steps, through the large wooden door, and left me. I watched after them a moment, then looked around at the quiet front of the building and the station's front steps. I hoisted my bag and walked into the front entrance. Like so many places I had been in suffering parts of the world, it was dimly lit with yellowish light from bare bulbs hanging from the ceiling.

Inside, it was bustling with nationals—local employees—and Agency officers. Beyond the ███████ desk and foyer was the dining room, where

197

numbers of men sat lounging and eating. ██████████████████████
████████████████████████████.

I found Cal, the compound security officer, up the stairs and through a ████████████ door, in a common work area. He was busy, so I sat outside his office and waited about ten minutes to speak to him. No one paid me any attention. Men and women in ████████████████ T-shirts went to and fro.

Cal came out of his office. He was physically . . . quirky, with wild eyes and longish hair. I told him I had just arrived and was checking in. I was to learn that Cal looked as though he had just rolled out of bed, whatever time of day it was. He always moved slowly. I never saw him laugh or become upset. But he was also more approachable than one would think from the first impression he created. Given his unvarying composure, of course he had been dubbed "Crazy Cal." He looked at me, eyes wide, one eyebrow cocked, and said after a moment's silence:

"You'll need some . . . stuff." He walked me to a storage room and kitted me out. ████████████████████████████████████████
████████████████████████████████████████████████

██████████████. I tried it on. "It'll keep you warm, too," he said. Two empty flaps of material extended down over my crotch.

"It doesn't protect the family jewels," I said, looking down. Crazy Cal tapped me on the chest.

"It's the pump. It protects the pump."

He handed me some clothes.

"You'll want to wear these. Not good to look like an American." I thought self-consciously of the Bean boots I was wearing, and of the officers who had brought me in from the airport ██████████████████████████
██████████████████████████—they had certainly not looked like the New England Yankee gone duck hunting that I did.

He issued me a two-way radio.

"You'll need a call sign." He checked a form. "Here. I have one. Your call sign will be REDEMPTOR. Got it? The guy who had that one isn't around anymore."

I nodded. "REDEMPTOR. Okay."

He walked me back to the office for the security briefing. It was almost the size of a broom closet and was a wild riot of scattered papers, radios, and boxes, ███████████████████████████████████████ and an overstuffed filing cabinet. He sat, I stood, and he handed me a clipboard with a form to sign, to show that I had been briefed, trained, and issued all the necessary equipment . . . and to cover the Agency's ass in the event I got killed.

I remembered the irritation and disbelief we had all expressed many years before when I went through our paramilitary, weapons training, and certification course. After weeks of firing and practicing how to handle, disassemble, and clean a huge variety of weapons, ranging from 9mm pistols (I prefer the Colt .45 for its power), to ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ and a range of machine guns ████████████████████████████████████████████ ████████████████████████████████████ after training in planning ██████████████ reconnaissance missions, █████████ ████████████████████████████████████████████ desert survival techniques, field dressings for wounds, ████████████ ████████████████ parachuting ████████████████████████ ███████████████████████████████, and on and on . . . we received a briefing from a lawyer from OGC, the Office of General Counsel. He, too, had us all sign forms, like Crazy Cal now. Then, the lawyer had told us, "If ever you are called upon to use your weapon, and someone is killed or injured, you will be responsible to provide yourselves any legal representation that may be required."

We were incredulous, and asked pointedly, "Do you mean to tell us that if we are sent into potentially lethal situations, or combat, and that if we use our weapon in the performance of our duty, or in self-defense, and someone is shot or killed, that the Agency *will not represent us legally*?"

The lawyer went through a little legalistic verbal dance, the gist of which was that the answer was yes.

My mind returned to the clipboard in my hands, and Crazy Cal impassively staring at me. I signed the form.

"Okay," Crazy Cal said. "This is the briefing: ███████████
████████████████████████████████. Always take your radio with you. Let us know where you are, ████████████████████████████████

████████████████████████████████

████████████. Do not draw attention to yourself as an American. Do not look like an American. ████████████████████████████████
████████████████████████████████████████. Leave space in front of you when in your vehicle; ████████████████. Have 360-degree awareness at all times ████████████████████████████

████████."

He stopped. He looked at me, impassive. "Okay." He said it as a statement.

"Okay," I replied. Briefing over.

I found the COS visibly swamped with work. Officers waited to see him, held off by his secretary. His phone rang. The Deputy Chief of Station (DCOS) and small groups of men just in from all sorts of operations tramped heavily into his office and closed the door for crisp five-minute meetings. He saw me after about a fifteen-minute wait. He was distracted and hurried, polite and projecting competence, but preoccupied; I was one of a hundred competing claims on his time, and not the most critical. He saw me for about three minutes. I told him who I was and why I was in country. He was aware of the interrogations of our HVTs, of course, and about the CAPTUS case in general. It was clear that he did not know anything beyond that. That was my job. He told me to see the DCOS, who would take care of me. I saw the COS only in the hallways during the rest of my stay. Too busy.

The DCOS arranged to have an officer assigned to me for security. He told me that we all had to hot-seat the computers in the station—multiple officers would use the same computer on a first-come, first-served basis—as there were far more officers than computers. The ops tempo was very high, resources tight. We worked on a first-come, first-served basis in a common room. I reported to no one. I ran my operation as I saw fit.

"You had your security briefing?"

Case 1:06-cv-01669-JDB   Document 67-3   Filed 08/03/11   Page 34 of 62

"Yeah."

"See Crazy Cal or the Chief of Logs for anything you need. Welcome," he said, ending the meeting, and passing through a door directly behind his desk chair into the COS's office before I could even stand up, closing the door behind him.

I collected my gear around me and sat on a bench in the hallway-foyer of the station, completely ignored. Had I sat there for hours I don't think anyone would have paid me any attention. This was a *very* busy station, full of transient TDYers like myself, comets orbiting in and out on irregular schedules, or arriving █████ as I had, or running ops nonstop. *CAPTUS and REDEMPTOR*, I thought, somewhat dully. I was wiped out.

After a few minutes of rest, I found the common office, a single room with plywood on sawhorse tables, a few laptops, and used Styrofoam coffee cups lying around, called the Bullpen. One of my first cables was to the location that continued to hold CAPTUS's still-absent papers, to renew my request that they be sent to me. The cable was a gesture of hope over experience. I assumed that I would receive the same nugatory responses as before. I now had no one I could even try to send to get them, and in the best of circumstances did not expect the documents to arrive until long after I had handed the case over to someone else. Sending the request both amused me perversely and was the right thing to do, past fustian results notwithstanding.

That afternoon I stepped out onto the landing of the station doorway to watch the dismal dark, fog, and rain. ████████████████████

█████████████████████████████████████████

████████████████████████████████████████.

A man sat ██████████ on guard duty off to the side, ████████ leaning against the wall in front of him. One could see only seventy-five yards before the fog shrouded everything. Cars had to use their headlights in the middle of the day, the lights appearing suddenly out of the impenetrable gray. People appeared as dark, bulky outlines against the fog, or faded from view in just a few steps. I would find that this astounding gloom blanketed Point Zero for over a week, rendering ghouls of us all, floating in a death mist. One expected the lowing of a deep foghorn and the creaking timbers of a ghost ship; the fog, though, was often brown.

## HAD THIS LAND
## ALWAYS BEEN SO BLEAK?

*The yellow fog that rubs its back*
*upon the window-panes,*
*Licked its tongue into the corners of the evening . . .*
*There will be time, there will be time*
*To prepare a face to meet the faces that you meet;*
*There will be time to murder and create,*
*And time for all the works and days of hands*
*That lift and drop a question on your plate . . .*

—T. S. Eliot, *The Waste Land*

Hotel California lay low in the middle of a brown moonscape.

, every landscape I saw in this country was
a rubble field. I hardly saw a tree or bush my whole time there. The astounding
fog continued to shroud the ground, so that people and objects appeared to
float in a dim dreamscape, looming suddenly into sight, or diminished in the
distance, small islets of hard reality surrounded by the unknown, or un-
dreamed, or unreal, a world without horizon.

209

███████████████████████████. A security officer, an analyst named Parker who had attached himself to me upon my arrival in country to offer support, and I had taken one of the standard-issue 4x4s from the motor pool to travel to Point Zero to see CAPTUS. I would meet up there with the chief and the psychologist assigned to work with me on my HVT interrogations.

I radioed ahead before leaving the station that REDEMPTOR was on his way.

I gazed out the window as we bounced along, the vehicle rocking violently, and tried to tune out Parker's prattle. The air chilled my fingers through my gloves as we drove, the landscape chilled me as I looked at it, anything man-made lay cold and inert as we passed by. Failed then. Futile now. The landscape on the drive resolved itself into barren, scraggly fields. Once, we stopped by a derelict vehicle to get our bearings. I did not look into it. The helmet in the Jihadi Bar had been enough.

"███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████."

We pulled up to a discreet guard post. ████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████[1]

I sat motionless.

The guard gestured for me to show my pass.

"Pass?" I said. "I have no pass." I was in charge of this little contingent, but no one had told me during any of my preparatory briefings and planning that I needed a stinking badge to get in. No one focused on the fact that I had just arrived in country.

The guard was polite but firm. He had strict orders: No pass, no entry. Another guard in the post perked up, a little more interested than before at the commotion. ███████████████████████████████████

---

1 This passage describes security measures.

211

▓▓▓▓▓▓▓▓. I did not want us sitting there.[2]

The security officer with me knew the guards and started to try to argue our way in. He explained that I was an important officer. Parker, the analyst assigned to me, chimed in, imperious and condescending to the towering, weathered guard. Parker was young, in his mid-twenties, not a field officer, and I would consistently find in the coming days that he overcompensated, trying to play the tough and hard-eyed spy or man of war. The security officer was relaxed but mildly exasperated, a little embarrassed, that we had spent half a day preparing and getting here, and now were unable even to get in.

"Enough, enough," I said after no more than a minute of discussion. "Look, that's it. This guy's following orders. He's right. We aren't going to crash this bloody place. We go back and get me the pass I need, that's all. I'm fine with that."

The security officer agreed. I looked at Parker and he shut up, good-natured and unaware that he was defining himself as a mild ass. So, we turned around and made the ▓▓▓▓ trip through the endless fog back to the compound.

We returned the next day, a security officer, Parker, and me, once again radioing from the compound that REDEMPTOR was on his way, bouncing ourselves over the potholes and rubble ▓▓▓▓▓▓▓▓▓, peering out the smudgy windows of my 4x4 at the desolate landscape. My driver spoke little, while Parker was, once again, a little overeager to project an unearned, hard-bitten swagger.

The same towering and hard-faced local guard met us at the guard post and gate. I had my pass this time and the guard, the driver, and I apologized to one another, he for having been obliged to deny us entry, we for having not come with the proper pass and having put him in an awkward position. He raised the gate, motioned us to a courtyard, and escorted us toward the entrance. It was a nondescript door into a derelict building. We walked easily,

---

2 This passage describes my security concerns at that moment.

212                                  GLENN L. CARLE

but with some tension, for what we were about to enter, and because we did not want to draw attention or, for all we knew, something worse.

As we walked, Parker approached the guard, who was six inches taller than he was. He put his hand on the man's shoulder in a patronizing gesture, then patted it twice and spoke in the tone one uses with a child, or a pet:

"You did the right thing. That was well done! We should inform your superior. You are a *good* guard. A *good* guard!" Parker then walked on ahead, master of his perceived moment, encourager of the simple and pure.

The security officer and I were walking four or five paces behind. "One," my companion murmured to me after he and I had thanked the guard, ████████████████████ slightly bowing our heads, "that guy doesn't understand a word of English. But two, he understands perfectly what that little shit said. I bet this guy would just rip Parker's head off and eat it if he got mad. I don't like to be alone around him."

I agreed, but my attention shifted quickly. We had arrived at the Hotel California entrance. I was on.

The music was harsh and incongruous, heavy metal, and it made the frigid building feel even colder, the darkness more ominous, and the ever-present, all-defining browns harder to resolve into recognizable objects when you looked at them. We were indoors, but our breath made clouds as we stood in the chief's office and he went over procedures. He had a pleasant manner.

"No one speaks but you ████████. Ever. No one speaks. The only noise in this place is the music. ████████████████████████████
████████████. The doc will intervene if necessary. ████████████
████████████████████████. Your asset appears fine. No one has seen him, except at the processing in, when we examined him. Okay?"

"Yes."

I wondered whether his processing in included another ████████ intrusive body procedure.

"Yes. . . . Oh. He keeps asking for 'Jacques.' Over and over, he says he wants to talk to 'Jacques.'"

"That's me. I'm his friend."

The chief laughed. He thought I was making a joke; this was true, but I was also speaking more than one truth.

"I'll get one of the guards to take you to your boy."

A minute later a guard indicated with a head gesture that I was to follow him. He and I entered the building. He carried a flashlight and a set of keys. It was immediately pitch black. ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ [3]

We turned onto another passage and continued. We turned again. And again. I could not see and was totally disoriented. My eyes clung to the heels of the guard in front of me, rising and falling, the only things I could see.

*This is right out of the KUBARK manual and the SERE training I received twenty years ago,* I thought as we walked (SERE: Survival, Evasion, Resistance, Escape). As a Career Trainee in the Directorate of Operations I had gone through days of capture, detention, and interrogation training, part of the months of paramilitary training we received. None of it had been relevant to my career for almost twenty years, not since I had spent eighteen months working in the CT office and on ████ Lebanon ████, when we had been trying to free Americans whom Hizballah had kidnapped, tortured, and, in William Buckley's case, killed by torture, simply for the sadistic pleasure of doing so to an American official.

I flashed back to memories from many years earlier of what was around me as we padded through the black, and the frigid air. The interrogation techniques I had experienced were designed to disorient me, to disrupt my circadian rhythms so that I started to feel detached from the world I had always known. Our Office of Medical Services had captured well what the interrogation methods were designed to accomplish:

---

[3] This passage describes the sinister inside of Hotel California and making my way through it.

These are designed to psychologically "dislocate" the detainee, maxi-
mize his feeling of vulnerability and helplessness, and reduce or elimi-
nate his will to resist our efforts to obtain critical intelligence.

I could not tell night from day, how long any period of time was, even wak-
ing from sleep, in the end. Times changed. Temperatures changed dramati-
cally. My food was irregular, or awful, or not enough, or too much. I was forced
to stay awake, or my sleep was spastic and interrupted without pattern. The
noise was endless and very loud. People screamed and sobbed in other rooms.
Fabrics tore in long rips, explosions hurt my ears, and babies cried and cried
and cried, wailed and simpered and hollered and cried again. Dogs barked
and growled. Hour after hour after hour. Sometimes I had to stand against a
wall, with a hood on. For a long, long time. It was hard to do. It was hard to
breathe—I felt like I was suffocating. I started to panic. I took the hood off,
just a little, just barely over my nose; they put it back on roughly, all the way
over my face. I had to contort myself into cramped boxes, in which I could
not sit or stand. I was too tired to stay awake, but I was not able to sleep; when
I dropped off, a guard woke me. I descended into a world of trauma and
dreams, where I was not awake, or asleep, or coherent, or able to think
straight. For the first time in my life, I lost the ability to distinguish where I
ended, and where the outside world began. I could not tell. I started to lose
control of my personality, to inhabit a world in which I was completely iso-
lated, and in which I could not trust my senses. I hallucinated—I saw slimy
things, told myself they did not exist, but also told myself I had better stay
still so that they would go away. At first the capture and detention training
was unpleasant, but each discrete segment was even interesting. At first. But
it kept on. It all accumulated on my mind. It never stopped. Nothing existed
but the dark, cold, confusion, pain, fear . . . and the slow loss of myself. The
only salvation was the moment of sanity when I sat facing an interrogator.

And through it all, *I knew it was a training exercise.* It would last for days,
but I knew it would end, and I knew my instructors would do me no real harm.

We stopped at CAPTUS's cell. The guard let me in. I immediately recog-
nized that it was designed according to the old KUBARK manual guidelines:

Cells should be about 3 meters long and 2 meters wide. . . . Cell doors should be of heavy steel with judas port for viewing and separate port for putting food and water into the cell. The slamming of a heavy steel door impresses upon the subject that he is cut off from the rest of the world. . . . Heat, air and light may be externally controlled, but not to the point of torture. . . . Bedding should be minimal—cot and blanket— no mattress. The idea is to prevent the subject from relaxing and recovering from shock.

CAPTUS ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ stirred as the door opened, rousing himself to lean up on one arm and to cast off a single, small blanket.

I sat down opposite CAPTUS and looked at him. I was shocked at his appearance.

I was no longer aware of the loud noise outside. The chair was cold through my pants.

"CAPTUS." He looked at me, not understanding what was happening. My tone was declaratory, matter-of-fact, not imperious.

"CAPTUS, it's Jacques." He continued to stare, his eyes glassy, not making sense of anything yet. I could see his mind starting to work.

"CAPTUS, it's Jacques. I am here too, now."

"Jacques . . ."

He realized now who I was. His circumstances were so disorienting that it took a moment to put someone he knew into this context. I gestured, in a way I hoped was kind, for CAPTUS to take a seat. He rose slowly, hunched over, with a murmured "*choukran, choukran.*"

"CAPTUS, what has happened to you ▮▮▮▮▮? You do not look good."

He tried to dismiss his appearance, responding vaguely and softly, "Your men . . . arriving. No. No men. It is nothing, it is nothing. I do not mind. It is no trouble."

I persisted. "What 'arriving' and 'men'? My men did this?" I found that unbelievable.

"No, no. Yes. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. It is all right."

With some work—every explanation from CAPTUS took work and was a labor, even in better circumstances than this—CAPTUS explained what had happened to him. He said ███████████████████████

████████.

I understood now. I had seen it happen ██████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████.

I apologized to CAPTUS, ████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████████.

More important, however, in my mind was the *way* CAPTUS narrated this little episode. I knew the facts of the episode he had just explained, and I still had trouble making sense of him. Yet, he had spoken accurately, allowance made for his way of perceiving and describing events. ████████████

████████████████████████████████. The episode strengthened his credibility in my eyes and confirmed that the way I had been describing him to Headquarters was fundamentally accurate: ████████████████

██████████████████████████████████

████████████████████.

I also knew how our business worked. This was the kind of contextual case knowledge that was virtually impossible to put in traffic but was so crucial to running good ops, and to being a good case officer. It was too subtle for the system to digest and accept in formal exchanges.

"CAPTUS. It is cold. Would you like another blanket?"

A noncommittal response.

Case 1:06-cv-01669-JDB   Document 67-3   Filed 08/03/11   Page 43 of 62

"I will get you one."



■■■■■■. But we were back at it once again.

As the session progressed I already was finding that what I had argued before was true: We had misread the man; he was not a jihadist or a member of al-Qa'ida; he did not warrant transfer to Hotel California, and doing so would serve no useful purpose.

Wilmington, Headquarters, the White House's Office of General Counsel or its Department of Justice scribes, and much of a fearful and angry public missed a critical distinction when considering the whole issue of using coercive measures in interrogation. The dilemma was, in fact, extensively considered in the various versions of the KUBARK interrogation manuals that had for decades served the U.S. military, and CIA, as guidelines for interrogations, and which I had mulled over in light of my personal experiences, as I had wrestled with what was effective and where I would set boundaries for how I would conduct an interrogation myself: "For centuries," the KUBARK manual deliberated,

> "questioners" have employed various methods of inducing physical weaknesses: prolonged constraint; prolonged exertion; extremes of heat, cold, or moisture; and deprivation of food or sleep. The assumption that lowering the subject's physiological resistance will lower his psychological capacity for resistance: however. [*sic*] There has been no scientific investigation of this assumption.

Just as the KUBARK manual noted, it is easy to stress a man physically and psychologically. I knew this firsthand; it had not taken long to break me

---

4  This passage describes what I told CAPTUS and what my plans were for him.

down. But I also knew—independent of the fundamental legal and moral considerations concerning coercive measures in interrogations—that breaking an individual down did *not* make him more likely to divulge reliable information. Some few men may break from coercive measures. In all cases, however, the decisive factor in a successful interrogation is an individual's personality, and the rapport the interrogator has with the detainee. One cannot conduct a productive, long-term interrogation with a rapport that consists of pain endured and fear engendered.

I opposed much of the reasoning behind, and acceptability of, Hotel California (with rare exceptions). I opposed the reasoning behind CAPTUS's transfer there. I had come to the conclusion that CAPTUS's tangential, inadvertent, and unwanted relationship with al-Qa'ida did not justify a rendition. I had come to disagree with the specific steps taken in the case I was running. I had come to oppose the entire coercive interrogation measures approach. What a fuckup.

The Hotel California chief, the shrink, and I held an after-interrogation meeting in the chief's dilapidated and unfurnished "office" ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

We spoke standing up, close together, and in low voices, so that we could hear each other, so that our voices did not carry. All substantive questions were left to me as C/O in charge of the interrogation and the case. I did not discuss them, except to give a general sense of how forthcoming he had been. But we reviewed how the conditions to which CAPTUS was subject contributed to or hindered the interrogation, and made certain that he was in general health.

The chief wanted to be helpful, with the tools he had to offer. What did I want him to do? What was the shrink's assessment of CAPTUS's mental state? Was the psychological dislocation in process? Was he within acceptable parameters of stress? Should the chief increase CAPTUS's level of discomfort and disorientation? Make it colder? Turn up the music? Turn on the lights? Let him sleep, or keep him awake? Give him additional amenities?



[The CIA Inspector General's *Special Review: Counterterrorism, Detention and Interrogation Activities (2003–7123-IG)*, declassified in August 2009, details the authorized "standard" and "enhanced" measures for interrogation. I quote:

Standard Measures (i.e., without physical or substantial psycho-
    logical pressure)
Shaving
Stripping
Diapering (generally for periods not greater than 72 hours)
Hooding
Isolation
White noise or loud music (at a decibel level that will not damage
    hearing)

Continuous light or darkness

Uncomfortably cool environment

Restricted diet, including reduced caloric intake (sufficient to
    maintain general health)

Shackling in upright, sitting, or horizontal position

Water dousing

Sleep deprivation (up to 72 hours)

Enhanced Measures (with physical or psychological pressure be-
    yond the above)

Attention grasp

Facial hold

Insult (facial slap)

Abdominal slap

Prolonged diapering

Sleep deprivation (over 72 hours)

Stress positions

    —on knees, body slanted forward or backward

    —leaning with forehead on wall

Walling

Cramped confinement (Confinement boxes)

Waterboard

In all instances the general goal of these techniques is a psycho-
    logical impact, and not some physical effect, with a specific
    goal of "dislocating" his expectations regarding the treatment
    he believes he will receive.]

The chief's automatic proposal of measures distressed me. I vetoed all the
chief's suggestions.

"Not now. Not yet."

I explained that I wanted CAPTUS to see that I was helping him; I noted
that CAPTUS responded to my relationship with him. I said that I wanted the
chief to give CAPTUS another blanket.

The chief agreed. I saw that the chief was a decent officer, completely will-
ing to follow the instructions of the C/O's running the interrogations. It was

many hours of work to do once back at the station, writing operational cables, intelligence reports, and taking care of administrative details. Nothing moved that I could see. The landscape was barren under low clouds. What had I become? What had my country become? Had this land always been so bleak?

Parker approached me after I had gazed out the window a couple of minutes, my hands in my jacket pockets and my collar pulled up against the chill.

"What're you looking at?"

"I'm Diogenes," I said slowly, at first not turning. I half smiled and glanced at Parker over my collar. "Got a light?"

"What?"

"Nothing. We gotta get out of here. Let's roll."

# WHAT SINS MIGHT
# ONE NOT COMMIT?

*Pericles: Indeed, I am more afraid of our
own blunders than of the enemy's devices.*
—Thucydides, *The Peloponnesian War*, I.V.143

The situation was deteriorating. Each concrete operational step I tried to take
proved impossible for reasons beyond my control. I disliked those I could take.
████████████████████████████████████████████████. This, of
course, frustrated and irritated me, and ██████████████████ in re-
sponse. But this, too, was no surprise. The KUBARK interrogation manual,
and my own experience, had anticipated this and discussed it openly: "Many
psychologists consider [that] . . . prolonged constraint or exertion, sustained
deprivation of food or sleep, etc., often become . . . counterproductive . . . the
subject may become apathetic and withdraw into himself." I had correctly an-
ticipated the evolution of the case, and each operational setback—but Cas-
sandra had derived no satisfaction from her prophesies, and I little from my
sardonic asides or efforts to have us all act sensibly.

████████████████████████████████████████████████

████████████████████████████████████████████████.

231

" ██████████████████████████████████████████
████████████████████████████."

Frankly, I continued to admire CAPTUS's character in these circumstances.

And yet, he lied. I asked him about individuals I knew he knew. He denied knowing them. I asked him about events I considered uncontroversial and "safe" for him, in which I knew he had been involved. He claimed not to know anything about them. I became very angry with him, despite myself.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████.[1]

I was furious. CAPTUS sat, silent and sullen.

I left him and returned to the chief's office. ████████████████
████████████████████████████████████████████████. I glowered. I was angry at CAPTUS. I felt badly for CAPTUS. I was angry at the entire situation. And yet, perversely, the issue I had raised was not fundamental.

"Not so good, huh?" the chief said. His attempts to be helpful deepened my anger. I refused everything he proposed, controlling myself.

The whole operation had become sordid. ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

1  This passage describes a specific exchange when I lost my temper because CAPTUS's behavior made it impossible to move forward, to address questions, or possibly to help him.

████████████. Almost everything we were doing to him was wrong. It was stupid, self-defeating, demeaning, and operationally useless to give no choice whatsoever to a person being interrogated, or whom one was trying to manipulate, or whose cooperation one sought. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

I was living the cautions of the KUBARK manual once again: Use of coercive measures, and pain, had the following consequences: "In general, direct physical brutality creates only resentment, hostility, and further defiance." Worse still, I was angry at myself; the circumstances affected me, too. The "dark side, if you will," enveloped and changed everyone involved in it.

No man willingly will lose his *soul*. For what is the soul but some shred of free will, hope, and dignity? In its psychological and operational obtuseness Headquarters had wanted to humiliate him, to dislocate him psychologically, in the belief that this would break him and cause him to tell all that he knew.

Even terrorists, even killers, define themselves by honor. Fear, honor, interest motivate men. The enhanced interrogation techniques, Hotel California; these played upon fear, and interest. This could be useful. They directly assaulted any man's honor, though, making it more likely that the individual would resist. "It is better to live like a hawk for one day than like a hen all your life," says a Kurdish proverb. We feel this, too, in America. But those driving the CAPTUS case, and the clumsiness of an institution in making decisions that require nuance, considered that terrorists had no honor, deserved none, and could be coerced to surrender what we took them not to have, and what gave meaning to their lives. I found moral clarity in ambiguity, and danger in certainty; Headquarters found this incomprehensible, or dangerous, or weak.

I had been right to establish rapport and to engage with CAPTUS as a man, instead of simply approaching him with a checklist of questions for him to answer. I cannot state forcefully enough how crucial it is in an interrogation, when developing an asset—when establishing any textured and worthy human

relation—to sustain and foster the other person's honor, sense of personal independence and control, integrity, and trust. To commit such a delicate, dangerous act as selling out his associates, betraying his oaths . . . or committing treason, an individual must come to depend upon and believe in a case officer as deeply as he has ever believed anything.

Dignity shorn, trust undone, and relationship perverted, the person being interrogated (or convinced to commit treason) has nothing with which to protect his pride and sense of self. Even a terrorist must retain some piece of himself, must in some way still be a man, for him to be potentially a useful interlocutor, or source of trustworthy information. Some men become abject, are totally destroyed, and surrender totally, but they are few. Most require far more subtle and decent treatment. It is both inhumane and operationally harmful to oblige a prisoner to choose between moral debasement and betrayal. An interrogator *can* and must develop a relationship with his prisoner, imbalanced as it will be. Perversely, interrogation and treason, like love, rest upon personal bonds and trust.

Will any man openly accept that he is become Judas? And yet, given a fig leaf, what sins might one not commit?

Parker was at the wheel as we returned to the compound after the latest interrogation session. He was in a boisterous, good mood. I did not have much to say, looking out as we stormed and bashed along, the landscape changing with our motion, benign or ominous depending on how I chose to look at it. He drove much too fast, knocking us in back all over the seat, banging our heads off the roof, and slamming against the doors, as he rammed through deep potholes, our vehicle lurching, yawing, and rearing.

"I like to hear Glenn grunt 'uhh!' and say 'Jesus Christ!' as we go over the holes," he laughed.

"I think Parker is compensating for some low testosterone levels," I said to the officer sitting beside me as we bounced and jangled along.

"What?" Parker said.

"I said," I shouted, to be heard over the rattle and engine roar, and holding onto the back of the front seat as the 4x4 threw me around, "I—think—you—are—a—fucker!"

last, in a series of painful revelations, I had learned what had been happening, and sometimes I knew what to do. Sally's—our—recovery became possible once I recognized, and she acknowledged, the truth. We could handle the truth, or at least try.

I looked back through the windshield, the headlights casting a narrow beam of light into the dark. Countless snowflakes shone an evanescent moment before us, captured just an instant in their anonymous flight, before disappearing back into the enveloping black.

"I guess. Yeah. I know the truth."

Ryan had responsibility for CAPTUS now, in Point Zero, while the CTC desk carried on as before. I had hoped to see Keith, the branch chief, to talk about the two cables I had written as I was departing the station, and to try to change the direction of the case. I was dismayed to learn that Keith had changed positions, and moved to another branch. I did not even see him, as he was away TDY. His position was unfilled. I had no memorable discussion with Wilmington, either, who was always very busy, or out somewhere. I was unable to engage with him, but did not want to anyway. We knew each other's views. He obviously had no interest in seeing me. Our conversations were superficial. He had moved on to other operational issues. CAPTUS? Being handled by the branch. No problem. Thanks for your help. For the higher offices, for all that CAPTUS was a high-profile case, the higher offices referred operational issues back to the branch, which knew the case.

I looked for my two cables. No one knew anything about them. Point Zero had never sent them. They did not exist. The COS or DCOS had obviously decided that they were too incendiary. My views were not collegial and, had they been transmitted, would have raised awkward issues about CAPTUS, Hotel California, and CTC's handling of the case, over a long period of time. A single C/O who challenged *years* of DI assessments and DO operational practice was usually viewed as someone almost by definition bizarre and to be silenced, probably unfit because he was unable to meld with the team and how professionals did their jobs. Who was one officer to challenge the collective views of dozens of officers and offices, from both branches of the CIA.

LE

arned what had been happening,
our—recovery became possible
the truth. We could handle the

he headlights casting a narrow
lakes shone an evanescent mo-
eir anonymous flight, before dis-

Point Zero, while the CTC desk
, the branch chief, to talk about
the station, and to try to change
arn that Keith had changed po-
ot even see him, as he was away
emorable discussion with Wil-
out somewhere. I was unable to
We knew each other's views. He
conversations were superficial.
CAPTUS? Being handled by
p. For the higher offices, for all
her offices referred operational
se.

nything about them. Point Zero
e COS or DCOS had obviously
ews were not collegial and, had
wkward issues about CAPTUS,
ase, over a long period of time.
sessments and DO operational
ost by definition bizarre and to
able to meld with the team and
officer to challenge the collec-
rom both branches of the CIA,

over years of careful review? Who was I to challenge the foundations of an *entire program, ordered by the president?* I regretted not having sent them to myself, back channel, even though one was not supposed to do that.

All in all, CAPTUS, who had so consumed my life, viewed from the urgent, overworked atmosphere of CTC and the CIA, in the context of the aggressive GWOT, was just one case—albeit an important one—but one that no one would want to have complicate the larger operational issues of how to conduct counterterrorism operations, while following the White House's guidance on rendition, detention, and interrogation. There was a saying in the DO: On major issues, one should let "kings fight with kings." The issues raised by the case I had handled were issues for kings, such as the DDO—the senior operations officer in the CIA, or the DCI, or members of Congress, or the Office of the Vice President, or the White House. I had had my differences with Wilmington; CAPTUS was rotting in a dungeon; but most everyone in the DO would consider that any officer out in the field, or down in the bowels of the organization, who challenged Agency and U.S. government practices, to be a fool embarked on a fool's suicidal errand. The men running the country suppressed anyone who challenged them on these issues, even the most powerful officers in the government. A smart officer, a good officer, did his job and left philosophy in the classroom, law to the Office of General Counsel, and politics to our most senior masters. And that way, he would keep his head.

That summer, President Bush issued a statement in observance of United Nations International Day in Support of Victims of Torture. The statement said, in part:

The United States declares its strong solidarity with torture victims across the world. Torture anywhere is an affront to human dignity everywhere. We are committed to building a world where human rights are respected and protected by the rule of law. Freedom from torture is an inalienable human right. . . . Yet torture continues to be practiced around the world by rogue regimes whose cruel methods match their determination to crush the human spirit. . . . Notorious human rights abusers . . . have sought to shield their abuses from the eyes of the world

286                        GLENN L. CARLE

by staging elaborate deceptions and denying access to international
human rights monitors. . . . The United States is committed to the world-
wide elimination of torture and we are leading this fight by example.

I found this speech infuriating. I knew what we were doing; our actions
soiled what it meant to be American, perverted our oath, and betrayed our flag.

Lawyers could argue that our actions were legal. But I had lived what we
were doing. I knew otherwise. Our actions contravened the Geneva Conven-
tions, the Convention against Torture, and the U.S. Constitution, whatever ra-
tiocinations administration lawyers had tried to spin. At work, one did not
raise these issues, or question one's orders. Not in any conversations I had,
or heard about. These issues had been resolved. Do the job, or find another.

A month later Ambassador Joe Wilson's article "What I Didn't Find in
Africa" was published. Joe had been, essentially, my first boss twenty years
before in Burundi. He argued, of course, that the rationale for our invasion
of Iraq had had little to do with the facts about Saddam's ostensible weapons
of mass destruction programs. I paid special attention to Joe's article, as I
knew Joe, had worked with his wife, Valerie Plame, many years earlier, knew
that his article was fundamentally sound, and of course recognized that the
article would catalyze a heated polemic all around.

I had lunch with a senior DO colleague around this time. For years, he
had been heavily involved in our Iraq operations. We had known each other
for a decade and spoke openly with each other. Of course we spoke of Iraq
and Afghanistan, and the War on Terror. Joe's article was just beginning to
make waves. I told my colleague that Joe's article was simply one example of
an almost infinite number of crude distortions of intelligence and perception
concerning terrorism and Iraq. I said I had come to be appalled at how the
administration, and the CIA, so grotesquely mischaracterized the threat from
al-Qa'ida, rolling all terrorists together as though they posed one enemy, rather
than a broad range of challenges—even going so far as to assert the funda-
mental identity of and associations among al-Qa'ida, Hizballah, the narco-
traffickers in Latin America, Mexican "coyotes" along the U.S. border,
Saddam (who was secular!), Palestinian suicide bombers, and on and on, in a

frankly lunatic mishmash. I alluded to the CAPTUS case as representative of how distorted perception had led to mortifying error.

My colleague nodded. I was not telling him anything he did not know. Hundreds of people in the cafeteria around us created a loud background babble. No one could hear us even at the next table. It was hard to understand anything amidst all this noise, even when listening. The thought occurred to me—surely I was not the first to have it—that I was sitting in the middle of a ziggurat.

"I know, I know," he began, holding his fork and knife above his plate as he spoke. "I was involved early on in the planning for the Iraq invasion. This was Seventh Floor stuff. We went around the table, discussing specific tasks we would need to accomplish to support the invasion. This was long before the invasion. Way before it. We hadn't even started to deploy troops to the theater yet. When it was my turn to speak, I said that I had worked the Iraqi target for years, and everyone needed to understand that Saddam and al-Qa'ida had nothing to do with one another. Totally different problem sets. I said that we could not justify invading Iraq by citing the al-Qa'ida threat, because al-Qa'ida was not there, and had nothing to do with Saddam. No one said much of anything. We continued the planning. It was clear that we were going to war."

My colleague was dispassionate as he spoke. I slightly shook my head, although what he was telling me was no surprise. We all knew Saddam and al-Qa'ida had nothing to do with each other.

"So, then, a month or so later, we have our next big meeting. Same issues: planning the invasion of Iraq. It came my turn to speak again. This time I said that I had also worked proliferation issues for many years—this was the whole 'Saddam has WMD' thing; if we were concerned about the biggest threat from weapons of mass destruction, then we had to focus whatever we were doing on North Korea. Saddam posed little threat. Then I said that we also needed to consider the likely consequences of invading Iraq. We would probably cause the country to break apart, and for what? Al-Qa'ida wasn't there, Iraq posed no significant problem from a weapons of mass destruction perspective. We would create new problems for ourselves by invading. The assessment we

were basing our actions on was divorced from the facts; we couldn't accomplish what we claimed as our objectives; and we would create problems we probably could not solve. So we needed to make this clear to the White House. I finished, and the meeting carried on as before, planning the invasion of Iraq."

Here, my colleague paused, took a bite from his plate, and smiled slightly.

"After the meeting, as I was coming out of the conference room, one of DDO's senior assistants walked with me down the hall. 'Some advice from a friend,' he told me. 'Say what you want in the meetings. It's your decision. But you are doing yourself no favors. The decision has been made. Either one is onboard, or, well . . . No one can change this. The only effect of what you say will be to harm yourself. Be careful.' Then he walked away. So I thought, 'Fuck it. I'm done. I won't have anything to do with it.' I arranged my new assignment not too long afterward."

Two years later my friend and colleague Ryan, who had replaced me in Point Zero, sought me out. He was leaving CTC and the Agency, moving on to a different part of the government. I had not seen Ryan for over a year. This was to be a parting. We went for coffee in the Headquarters' cafeteria.

"Glenn, I know you had major differences with CTC about the CAPTUS case. I know your views. I'm out of here. I wanted to tell you something before I left. When I went out to Point Zero to take your place, Wilmington and the office gave me one order: 'Keep the case going. Do whatever you need to do, but keep the CAPTUS case going.'"

"I know."

"But there is something else I wanted you to know. You were right. You were right, Glenn. You got the case right. I came to see that. I wanted you to know. That is something to take with you. That is not something one can say in here, really; it undoes the whole fucking thing. But I wanted you to know I respected you for what you were doing. It took courage."

I have not seen Ryan since.

A little more than three years after CAPTUS's rendition, I came out of one of DCI Tenet's daily five o'clock meetings, the most senior operational and substantive meeting in the Intelligence Community on the conduct of the

Global War on Terror. Mark Lowenthal, the ADCI—the Assistant Director of
Central Intelligence for Analysis and Production—had also attended and we
walked together down the carpeted hall of the Seventh Floor, where the CIA's
most senior officers had their offices. Mark was a friend whose candor, judg-
ment, and wit I particularly enjoyed. One of the subjects of discussion at the
meeting had been what the White House wanted to do about the detainees we
were holding in various locations around the world. This was most definitely
a White House issue, not a CIA one. As always, there had been no resolution.
I knew, however, that in particular Under Secretary of Defense Douglas Feith
was one of the main obstacles to resolving the problem. In a series of meetings
held to resolve the detainee problem, Feith regularly became incensed at the
positions of various elements of the government, notably the State Department,
which urged that Guantanamo and our various detainee sites be closed, and
most of the detainees liberated or tried. Almost incoherent with anger, he ac-
cused the representatives of the other agencies of asserting that the adminis-
tration had broken the law with its policies toward detainees. "Are you
accusing us of breaking the law? We did not break the law! We did not break
the law!" he would shout over and over, furious. He invariably paralyzed the
meetings. Feith was widely viewed among my colleagues as a dangerous
zealot, who inhabited a world of his imagining. But in these meetings he was
a guilty queen: "The lady doth protest too much, methinks."

I told Mark that I had handled one of the HVT cases. I told him—I could
speak frankly to Mark—that I thought we had, in effect, gotten everything
wrong, despite all our efforts, that we had been acting on delusions, and that
I was deeply concerned about it all. More important than that, though, was
what happened after that, and to all of the detainees, at least the HVTs.

"These guys are kept in abominable conditions. ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. They don't exist anymore. What is this? We
can't do that. The White House can't just keep these guys *forever*."

"I know," Mark agreed, frustrated, resigned. "But they don't know what to
do with them. The White House doesn't know what to do with them."

From what I could tell, the administration both did not care about holding
our detainees without habeas corpus forever, and did not want to acknowledge
what, based on their vehement and ruthless infighting in the government, even

# AFTERWORD: DELUSIONS, CONSEQUENCES, TRUTH

*One step at a time. One day at a time. Speak the truth.*
*Hide nothing. Admit failing and forgive it. Seek help*
*from others. It is good to lean sometimes. Never give up.*
*And then, you can even contend with demons.*

—Truths I have learned with my wife

The CAPTUS tale is darker than I have been allowed to tell. Under the guise of "protecting sources and methods," the CIA has imposed numerous redactions and elliptical phrases on my manuscript. These have eliminated or softened harsh facts about what our government has done in the pursuit of terrorists, rounded edges of wrongdoing, and obscured the corruption of our institutions and of our system of government caused by the rendition, detention, and coercive interrogation of terrorists or terrorist suspects. To oppose these policies risked one's career. To write about them challenges a governmental *omertà*.

The Agency initially redacted about 100 pages of the original 250-odd pages of my manuscript. I have written this book literally a dozen times over to meet the professed sources and methods concerns of the CIA. For two years, amidst legitimate issues, I have had to fight redactions of such egregious threats to national security as when I wanted to say that someone spoke "with

authority," or that "the fog was brown." I quoted T. S. Eliot, and they redacted that. Tastes vary, I know. Perhaps the Agency was striking a blow against obscure snobbery. I could not write "kidnap" in a certain sentence, even though I was quoting a previously published, CIA-approved book. I was not allowed to write that I "assumed" that a certain individual would act "innocent." I was not allowed to mention—ever the Harvard man—that at one point I discussed "the Bible, the Koran, and heuristics." In one spot I was not allowed to make the explosive revelation that CIA Headquarters, several colleagues, and I all . . . "disagreed." The Agency redacted such sensitive national security terms as "rot" and "shit hole." The Agency and I engaged in months of argument because they repeatedly refused to allow me to mention a U.S. government . . . urinal. The Agency censored passages on seduction—and they the sizzling romantic secrets of a WASP. At one point I was not allowed to note that I "vented my anger." The Agency censored that I considered someone "a gibbering fool."

It is clear that various elements of the CIA and executive branch, even after the departure of the Bush administration, are concerned about the implications of drawing a picture of the rendition, detention, and coercive interrogation policies of the United States while waging the Global War on Terror.

I share these concerns, which is why it is my duty to bring to public attention my firsthand knowledge of how these policies and practices debase the men and women and institutions involved with them, fail in their objectives, and even threaten our own freedoms.

Forlorn and narrowly focused as the CAPTUS narrative is, it illustrates broader actions, arguments, and policies of the CIA and the government during the Global War on Terror. Three critical elements emerge.

### Delusions

The CAPTUS case depicts that our government has been deluded about the nature and extent of the threat of jihadist terrorism. These delusions guided the policy makers of the Bush administration in waging what it characterized as the Global War on Terror, bounded the Intelligence Community's assessment of the threat from jihadist terrorism, and shaped a trusting public's conception of the depth of the dangers of "global jihad" confronting the United States.

I initially shared the Intelligence Community's, and what after 9/11 came to be the Bush administration's, standard view of the jihadist threat as coherent, structured, global, imminent, and nearly existential. Frankly, these became largely the views of the Office of the Vice President and his Neocon colleagues in the executive branch. The White House itself appears to have been conceptually inert in elaborating what came to pass for the strategic framework of the Global War on Terror, or overmatched in the policy debates by those advisers who zealously knew their own minds, and who confused nuance and distributed power with weakness.

The CAPTUS case disabused me of the coherent, structured, global, imminent, and nearly existential threat perspective. The facts showed that the Intelligence Community paradigm, and the White House Global War on Terror, were literally delusional.[1] I found that CAPTUS was not the critical member of al-Qa'ida we had convinced ourselves he was, and I found something far more important: that the closer one looked at al-Qa'ida, the further it receded and the smaller it was. I learned that we attributed excessive importance to the concrete threats we detected—and there are real threats—and threw a host of unfortunates, zealots, and a few real terrorists into dungeons, for fear that they were demons, and might kill or enslave us all. I found that we chose to sacrifice our own principles in the hunt for the few terrorists threatening us. This was a Faustian bargain; the Devil's ways could not make us any safer than had we retained our soul.

Analysts within the Intelligence Community (IC) who specialized in terrorism analysis, and the Office of Terrorism Analysis (OTA) of the CIA, tended (with many caveats and exceptions) to present al-Qa'ida and jihadists as coherent, global—"linked" was the operative jargon—growing, and perhaps even an existential threat to the United States and the West. This paradigm took shape in the early 1990s and dominated terrorism analysis. This perspective focused by definition on terrorist reporting,[2] which in relative isolation from other factors—economic, social, historical, psychological—tended to present an alarming and coherent narrative of threat. Clearly this perspective

---

1 Delusion: a persistent false belief held in the face of strong contradictory evidence.

2 For example, operational reports from the field that a terrorist individual or group was planning to do something.

comforted and shaped the view of the Neocon strategists in the Bush administration, who once the World Trade Center towers collapsed, finally consented to pay attention to the threat of Islamic terrorism and quickly married this perspective to the Neocons' geostrategic objectives for the Middle East, which included finishing with Saddam Hussein once and for all.[3]

Analysts with broader mandates, however, in general what are termed in the IC "regional analysts," tended to relativize the power and coherence of the various Islamic terrorist groups. Terrorists and terrorist groups were assessed as phenomena within the larger social, economic, technological, cultural, and religious forces affecting individuals and societies. This perspective, by definition, placed their role and importance in a much richer context. "Links" among various Islamic terrorists were not considered prima facie proof that terrorists in Indonesia, Yemen, and Morocco were therefore part of a "global movement." My experiences provided strong evidence in support of this broader perspective and assessment (while my subsequent work on the National Intelligence Council reinforced and deepened the assessments I had reached during the CAPTUS case).

The OTA perspective was ascendant for many years. When a terrorist incident occurs, or issue arises, logically, OTA (and now the National Counterterrorism Center, known as NCTC) takes the lead. Regional analysts, experts on Islam, and others play secondary roles. By definition and bureaucratic procedure, therefore, policy makers receive reporting and analyses of terrorist incidents that tend to overweigh the incidents' true position in the larger context of trends and issues in a given country or region.

In addition, after the horror and the "intelligence failure" of the September 11 attacks, the pressure to pass on to policy makers almost all terrorist threat reporting became nearly irresistible. It is safer to warn and have nothing happen than to assess that a report need not be passed on to policy makers, only to learn that another attack actually occurred. Psychologists have demon-

---

3  The Bush administration, from January 2001 until September 11, 2001, had three foreign policy priorities: confront the rise of China, taken to be hostile to U.S. preeminence; build a ballistic missile defense system; destroy Saddam Hussein. The Clinton administration's grave concerns and deep focus on the threat of terrorism were taken as a small-bore issue, unworthy of a superpower, and diverting U.S. attention from its true strategic interests.

strated that the very act of analyzing threats and future scenarios—in this in-
stance the assessment of the terrorist threat and specific kinds of possible ter-
rorist attacks—increases among experts the perceived likelihood that such
threats and attacks will occur.[4] Of course, policy makers will take the views
of experts as more likely to be "right" than the views of non-experts, thus val-
idating the biases developed by the experts in the act of analysis.

Policy makers post-9/11 have been awash in endless "streams" of ter-
rorist threat reporting.[5] Terrorist threat reporting almost always appears to
increase post any terrorism disaster. The reporting in turn formed the policy
makers' perceptions of what appeared myriad, pervasive terrorist threats. Of
course, policy makers also felt obliged to respond to these reports, lest an
attack occur on their watch. The dynamic of "streams" of reports shaping a
sense of pervasive threat, leading to vigorous preemptive counterterrorism
actions, was hard to resist with 3,000 Americans incinerated or decomposing
in lower Manhattan.

---

4   See in particular Richards J. Heuer Jr., *Psychology of Intelligence Analysis*, 3rd ed. (Wash-
ington, DC: Center for the Study of Intelligence, Central Intelligence Agency, 2003), especially
Chapter 12, p. 149; but also the work of Dr. John Ioannidis, who has found disturbing cognitive
bias and distortion among medical researchers, and the hard-to-resist pressures to conform to
dominant paradigms of thought. See David H. Freeman, "Lies, Damned Lies, and Medical Sci-
ence," *Atlantic Monthly*, November 2010.

5   The concept of "streams" of reporting is a malign consequence of the Bush administration's
and the Intelligence Community's responses to the 9/11 attacks. The term was, to my knowledge,
not used before 9/11. At least it was not in vogue inside the Intelligence Community. It implies
to the layman that there are numerous, concordant sources of information, providing regular re-
ports on a given threat or subject. But the term is largely meaningless. There are intelligence
sources and reports. Some are reliable; some not, some unreliable but accurate, others reliable
but wrong. There are rarely "streams," and no experienced intelligence professional whom I
know found the term to mean anything. Were there a "stream" of intelligence, the information in
the "stream" most likely then would have been substantial enough to act upon, rather than
merely allude to in public. The concept and expression endowed the confusing, sporadic, contra-
dictory, and on occasion critically revelatory process of collecting, disseminating, and acting
upon clandestine information with an aura of competence and awareness that policy makers were
only too happy to weave into the narrative of threat they presented to a public that had to trust its
leaders in time of danger. In fact, the stream of intelligence exaggeration has sometimes misled
senior intelligence officials (I have observed it happen), scared many citizens for years, and pro-
vided officials a way to appear to substantiate their assessments and policies, and to sound like
dynamic, courageous leaders. Worse, those using the term were often sincere, duped by the illu-
sion of professional assessment implied in the term "streams of intelligence," and confirmed in
their preconceptions. There is nothing so dangerous as a sincere ideologue, whatever the object
of his devotions.