# ATTACHMENT 5

to Supplemental Declaration of Tina M. Foster
(dated August 1, 2011)

http://www.harpers.org/archive/2011/07/hbc-90008139



July 5, 9:28 AM, 2011

## "The Interrogator": Six Questions for Glenn Carle

By Scott Horton

*A career clandestine-services officer in the CIA, Glenn Carle drew an unusual assignment in the fall of 2002. He was sent to serve as the case officer of an Afghan merchant who had been seized and rendered, and who was believed to be Osama bin Laden's "banker." Carle quickly discerned, however, that the Agency's suspicions were unjustified — what followed was a frustrating effort by Carle to win his release. In* The Interrogator: An Education, *Carle describes his struggle against the lethargy and self-protective instincts of the U.S. intelligence community. In the process, he discloses a great deal about the renditions process and the Agency's reticence to acknowledge or act on its own mistakes. I put six questions to Glenn Carle about his book:*

*1. Your book was published following a year-long struggle with the CIA Publications Review Board, which insisted on redacting large amounts of material before it approved the work for publication. Even the fact that you speak fluent French has been blacked out. But a great deal of what was redacted is perfectly obvious or can easily be derived from the public record — for instance, we note in* "Unredacting The Interrogator" *that CAPTUS is in fact Pacha Wazir, that you first interrogated him at a location jointly operated by the CIA and Moroccan intelligence near Rabat, and that the prisoner was then removed to the CIA's Salt Pit prison in Afghanistan. The PRB claims that it redacts to protect national-security-sensitive materials. Do you think the heavy redaction of your book was appropriate?*

The PRB's mandate is to protect "sources and methods." This is a legitimate task, and it sounds clear. For the CAPTUS case and my book, the PRB sometimes used a more elastic interpretation and "redacted" many passages that described non-operational facts or events. They argued that non-operational facts would reveal sources or methods. That is a pretty slippery slope, though, as by that standard they could censor any passage, however innocuous, because it could supposedly reveal secrets. With that approach, one could argue that libraries should remove high-school chemistry texts, because a basic knowledge of chemistry could help someone trying to make a bomb. The PRB has a tough job, and I truly respect my colleagues there, but protecting sources and methods is their sole mandate. They went too far.

*2. In his 2006 book The One Percent Doctrine, Ron Suskind touted the seizure of a man named Pacha Wazir as a key breakthrough in American operations — a breakthrough aimed at crippling Al Qaeda's financial arrangements, because the captive was "bin Laden's banker." He also says that the prisoner was uncooperative with his CIA interrogators. You concluded that claims of this sort with your case were unwarranted, and that your detainee, CAPTUS, was essentially innocent of the suspicions used to justify his eight-year imprisonment under conditions that were often harsh and sometimes seriously abusive. As CAPTUS's case officer,*

*give us your frank assessment: was his seizure and rendition warranted? Did he cooperate? And do you believe his imprisonment and interrogation led to the discovery of vital intelligence about Al Qaeda's financial operations?*

Well, I write as clearly as I can that CAPTUS, on the whole, cooperated with me, as a direct function of basing my interrogation upon establishing rapport with him, rather than seeking to cow or humiliate him. Some of his answers I knew to be correct. Others I—we—were able to verify. Some few he did not answer truthfully. Some he avoided answering, when my colleagues and I believed he knew the answers. Overall, however, he cooperated with me. Concerning the usefulness of the information he provided, I also try to make clear that CAPTUS did provide useful, relevant information. He was not a random individual who knew nothing. But he did not provide, or I believe have, the critical information, or close ties with Al Qaeda, that the Agency believed he had and that had justified his rendition. This was one of the murky dilemmas of the case: he knew information relevant for our counter-terrorism operations—he was not a complete innocent, but he was less directly involved with Al Qaeda than we had assessed him to be; and he was no terrorist.

It might make sense to compare him to a small shop owner who is doing business with the mob. He doesn't want to deal with them, but he really doesn't have any choice. An investigation would turn up those dealings, but it would also learn with time that he wasn't a willing aider and abettor, either. I believe CAPTUS's case was murkier still: some things he could not avoid knowing, much he did not know, some things he did not want to know, some things he was afraid to tell us or did not want us to know. But he was fundamentally a businessman; I do not believe he was actively colluding with Al Qaeda. I came to believe him when he said that he vehemently opposed Al Qaeda's theology and acts.

At the moment he was rendered it seemed the right decision to interrogate him and bore down into his activities. Huge effort had gone into his case, and the information appeared strong. It looked as though we had a chance to strike a truly damaging blow to Al Qaeda. It was the wrong decision to continue to hold him for eight years after we had established that many of our assumptions were simply wrong.

*3. The CIA would not permit you to describe the specific techniques used on CAPTUS, but you give us a clear idea of what they were by describing the techniques that were broadly approved and acknowledging that a well-informed and reasonable person might well conclude that they amounted to torture or cruel, inhuman and degrading treatment, particularly as applied cumulatively over time. In your opinion, did the use of these "enhanced interrogation techniques" (EITs) lead to actionable intelligence, and, if so, do you think that intelligence might have been acquired more effectively using other techniques?*

The period of my involvement in the CAPTUS case occurred early on in our counter-terrorism response to the 9/11 attacks. So, the specific guidelines for the techniques that came to be understood as EITs had not been developed. From the outset, the Agency pushed for clear legal guidance and authorization on what it could do in interrogations.

"Enhanced" techniques make it more difficult to ascertain when a detainee had answered truthfully. The techniques increased the detainee's resentment, confusion, and incentive to lie. Conducting a sound interrogation is remarkably similar to conducting a good human intelligence operation: it must be based upon a rapport between officer and detainee. Successful interrogation takes understanding of the detainee's motivations, hopes, and fears, and then interaction with the detainee as a trusted interlocutor. Fear and pain do not obtain

good intelligence; trust and a sound human relationship may. And I'd like to point out what is clear when one reads my book: I refused all physical measures from the get-go, as wrong on every conceivable level. I devoted a lot of effort to stopping the use of most measures of any sort on CAPTUS. To the extent possible, I questioned CAPTUS, and sought to keep any other measures from being used.

*4. You describe vividly a second rendition, which apparently occurred at an airport outside of Rabat, Morocco, in which CAPTUS — who was in his sixties, had already spent months in captivity, and presented no security threat — was manhandled in a humiliating fashion by CIA officers clad like ninjas. The scene took place in full view of Moroccan intelligence and military officers, and you note that one of your CIA colleagues objected and intervened to protect the prisoner, to no avail. What went through your mind as you witnessed this?*

Well, let me just reiterate that I have never said, nor acknowledged where I was. This said, my reaction, and the reaction of the colleague who witnessed the events with me, was that the rendition broke basic rules about how intelligence operations are supposed to be conducted. They should be clandestine, and should avoid arousing unnecessary attention or causing a scene. That's why my old service is now called the Clandestine Services. But in this case, on an airstrip ringed with security personnel from a cooperating foreign power, the rendition was carried out in a rote way that drew attention. Who wouldn't note and be surprised by the scene of a jet landing in the middle of the night, followed by personnel emerging dressed up as ninjas and carrying off a fully bound prisoner? It was stupid, bad tradecraft. Moreover, the aspects of the rendition designed to intimidate the detainee were completely new to me; I had no experience in or knowledge of rendition procedures. They are all part of the [KUBARK process](#), which seeks to "psychologically dislocate" a detainee, theoretically to make him more willing to cooperate. I consider renditions a sometimes-necessary tool of the United States. The procedures to "psychologically dislocate" a detainee that I describe in my book are foolish and unacceptable. And the ones used on CAPTUS at the airport combined theoretically reasonable security measures that took no account of the specific circumstances on site with measures intended to "psychologically dislocate" the detainee. My colleague and I were angry because so much of it was obtuse and unnecessarily offensive.

*5. What led you to recommend the release of CAPTUS? You write that you believe at least some of your cables arguing for his release disappeared. Why do you think this happened? In particular, do you think the Agency was concerned about a record demonstrating that it knew it was holding and mistreating an innocent man?*

Goodness. I recommended that he be released because we had assessed him to be a critical senior member of Al Qaeda when he wasn't. I have no problem with my colleagues or the CIA making mistakes. We all err. But we simply must try to rectify our errors if we can, even if it embarrasses us, especially when human lives are involved. We can't leave a man incorrectly detained in a prison because of an error we have recognized and can fix. It's simply obvious, and a duty.

I would say that the cables were never sent, rather than that they "disappeared." I think the cables were not sent because they appeared so out of the norm that they were viewed as problematic. They were impolitic. They challenged the premises of an entire program and operation, and would have upset the functioning of a vast, high-profile, highly regarded program that was considered one of the signal successes in the entire war on terrorism. And they were written in a style that could have been interpreted as coming from an officer who seemed really tired. In the Agency, an officer must work the system, the hallways, to prepare a cable's

recipients for what is coming. One must shape the recipients' perceptions so that they are receptive to what you write. I had tried. But what I argued challenged the entire operation: whom we had rendered, what he knew, what he was, how we did it, what our obligations were, what worked and didn't. So, if the cables were never sent, they didn't exist. Problem solved. A gadfly ignored.

*6. Did you ever learn that CAPTUS had a [habeas](habeas) case pending, or that the Afghan government was insisting on his release? Why do you think the Agency resisted his release so vigorously and for such a protracted period of time?*

After I left the CAPTUS case, I never heard anything more about it — need to know, new responsibilities, and so on. That is typical, sound practice in the Agency. Once I left the Agency I never permitted myself — never — to type CAPTUS's name in my computer, or any computer I used. I simply would not do it. I could not associate my name with CAPTUS's at all. So I knew nothing about any litigation surrounding CAPTUS. I learned that he had been released only in early December 2010. And only then did I dare, with some ill-ease, I must say, to do a search of his name and learn a little bit about the public aspects of his case.

I can think of two possible reasons why the Agency — if it was the Agency — continued to oppose CAPTUS's release. First, some there might have continued to believe he was complicit in Al Qaeda's activities, and was therefore guilty of the alleged activities that had led to his initial rendering. CAPTUS was not a complete innocent, I do not believe. I try to make that clear in my book. Or, second, some in the Agency might not have wanted him released because so much of his case was based on erroneous assessments that to have released him would have shown the operation to have been a house of cards, like so much of the war on terrorism. Frankly, I believe the main reason is that many people in the government have been sincere but deluded in their perceptions and actions in the "War on Terror." I wrote my book because I was so distressed by so many aspects of the case: our erroneous and dangerous exaggeration of the terrorist threats facing us; what we have done to ourselves, our society, and our laws with our interrogation programs during the "War on Terror;" how our views about acceptable behavior have become coarser; our freedoms compromised unnecessarily; and how we unjustly kept a largely innocent man in prison for years, it seems, so as to bury in a dungeon the dark multiple, egregious errors. CAPTUS's release proves me right on and substantiates every single point I argued about the case, and about him–eight years too late. The whole story is disturbing and sad.

# ATTACHMENT 6

**to Supplemental Declaration of Tina M. Foster
(dated August 1, 2011)**

http://www.harpers.org/archive/2011/07/hbc-90008135



July 5, 9:50 AM, 2011

Unredacting "The Interrogator"

By Scott Horton

In June 2006, Ron Suskind's best-selling book *The One Percent Doctrine* created ripples by reporting the success of a massive intelligence operation launched by the United States to cripple Al Qaeda's financial network. The operation had captured Haji Pacha Wazir, a man described as "bin Laden's banker," and had infiltrated Pacha Wazir's banking operation and seized vital information about the terrorist organization's financing. Pacha Wazir was "not cooperating" with CIA interrogators, Suskind noted at the time, but they had seized his brother as part of an effort to make him more talkative. If Suskind's report on Pacha Wazir were true, the case would indeed have marked an enormous intelligence breakthrough for the United States.

But an explosive new book by retired intelligence officer Glenn Carle contradicts the claims Suskind published about Pacha Wazir (which were no doubt faithful reports of what Suskind was told by sources in the intelligence community). As *The Interrogator: An Education* details, in the fall of 2002, Carle was the CIA case officer for a man identified as CAPTUS — but who was clearly Pacha Wazir — who had operated an informal money-changing and transfer business, known as a *hawala* system, that may have had customers with terrorist ties. As the man who handled Pacha Wazir's interrogation and attempted to draw conclusions as to who he was and what he was up to, Carle concludes that his prisoner cooperated with his interrogators and told the truth about his operations, on the whole. The suggestion that Pacha Wazir was consciously managing bin Laden's financial affairs was then, and remains today, utterly baseless — more or less the same as claiming that a clerk at Grand Central Terminal who unwittingly sold a train ticket to Osama bin Laden was Al Qaeda's transportation logistics officer. Indeed, after learning of the accusations against him, Pacha Wazir had traveled to Dubai, determined to meet with American agents to explain to them why they were mistaken, only to be kidnapped and taken to an undisclosed country.

Its contradiction of Suskind's report aside, *The Interrogator* is most telling in its account of how Carle's superiors at the CIA reacted to his conclusions: by ignoring them. Perhaps the CIA was afraid to acknowledge that it had wrongly held and mistreated a businessman for eight years, without access to the legal system, and under harsh and possibly illegal conditions. Or perhaps the CIA was concerned that claims about the greatest success of its financial

intelligence program would be exposed as puffery. In any event, the CIA did not act on Carle's recommendation that Pacha Wazir be released, even after it was embraced by Carle's successor. American intelligence officials similarly resisted appeals by the Afghan government, ultimately including a 2008 order by Afghan President Hamid Karzai demanding his release. Not until February 2010, after eight years of American captivity, was Pacha Wazir finally set free and sent home. (Through his lawyer, Pacha Wazir declined a request to be interviewed for this post.)

Before it could be published, Carle's book was redacted by the CIA's Publications Review Board, which cut some forty percent of the text. While the PRB insists that its redactions cover only "disclosures which could be harmful to the national interest," embarrassment about Agency operations and mistakes — not to mention their possible criminality — may have played a role in the redactions. Among the changes the PRB insisted on was that Pacha Wazir's name be kept secret, and that Carle disguise the locations where the prisoner was initially and ultimately held. Ironically, this information can be readily derived from examining documents concerning the CIA's now-banned extraordinary-rendition program, among them reports prepared by the Council of Europe and human rights groups, data collected in various criminal investigations in Europe, and pleadings and documents submitted in *habeas corpus* litigation involving Pacha Wazir.

Tina Foster, a constitutional lawyer who represented Pacha Wazir in *habeas* proceedings brought in federal court in Washington, noted to me that Carle's account of his prisoner tallies in every detail with her client's experiences. "There is little doubt that he is the prisoner Carle is describing," she said. Foster also expressed concern that the government's decision to suppress information about the CIA's analysis of her client had led to an incorrect result in court. (Pacha Wazir's *habeas corpus* petition was declined prior to his release under pressure from the Afghan government.) "The Justice Department maintained that Pacha Wazir was legally detainable on unspecified grounds, but that the determination had been properly made by those with knowledge of his case," Foster said. "Had the conclusions reached by his interrogator not been destroyed, and instead acknowledged and disclosed by the government to the court, it would likely have tipped the scales of justice in his case and possibly also in other cases." She noted that in *habeas* cases coming out of Guantánamo, court opinions had turned based on the conclusions reached by CIA analysts handling the prisoners.

As for the location of the initial rendition, the opening chapters of Carle's book play out in an unnamed desert country where French and Arabic are spoken interchangeably, and where domestic intelligence services were holding terrorism suspects for CIA interrogation under a program a New York City Bar Association Report described as "torture by proxy." "There is no doubt that Carle is talking about Morocco," said John Sifton, an attorney who studied the CIA detentions program on behalf of Human Rights Watch and other organizations, and who travelled to Morocco in early 2006 to look into reports that the CIA was holding terrorism suspects there. "Most of the events described in the early chapters occurred in and around Rabat, which is where it appears the CIA detention arrangements were being carried out."

In my interview with him, Sifton pointed to flight records from CIA aircraft used for detainee transport, which detailed several flights from Rabat to Afghanistan that matched the flight described by Carle in a chapter entitled "Methane Breathers" (a term he used to describe the CIA officers clad as ninjas who roughed up and humiliated Pacha Wazir on a Moroccan airstrip). The prisoner was then transferred to a CIA-run prison near Kabul. The description in Carle's book perfectly matches existing accounts of the Salt Pit, a prison maintained by the CIA in an abandoned brick factory north of Kabul. After President Bush shut down the CIA's black-site

system in September 2006, Pacha Wazir was transferred to military custody at the Soviet-era prison at Bagram Air Base.

Carle's book also recounts that an elderly brother of CAPTUS was seized as part of a special effort to press the prisoner on his suspected relationships with terrorists. The brother, Haji Ghaljai, was arrested in Jalalabad in December 2002 and released about six months later. Joanne Mariner, director of the human rights program at Hunter College, interviewed Ghaljai in Kabul in February 2008, in an effort to learn more about his detention and that of his brother. She told me that the disclosures in Carle's book "demonstrate the wisdom of President Obama's decision to take detention authority away from the CIA, but they also demonstrate the inertia of the detention system and the tendency to continue to hold prisoners not because they present a security risk but because their stories — once widely known — might embarrass figures in the intelligence community."

# ATTACHMENT 7
## to Supplemental Declaration of Tina M. Foster
## (dated August 1, 2011)

http://abcnews.go.com/Blotter/wireStory?id=14059451

By ADAM GOLDMAN and MATT APUZZO Associated Press

# AP Sources: Feds Eye CIA Officer in Prisoner Death

WASHINGTON July 13, 2011 (AP)



A CIA officer who oversaw the agency's interrogation program at the Abu Ghraib prison in Iraq and pushed for approval to use increasingly harsh tactics has come under scrutiny in a federal war crimes investigation involving the death of a prisoner, witnesses told The Associated Press. Steve Stormoen, who is now retired from the CIA, supervised an unofficial program in which the CIA imprisoned and interrogated men without entering their names in the Army's books.

The so-called "ghosting" program was unsanctioned by CIA headquarters. In fact, in early 2003, CIA lawyers expressly prohibited the agency from running its own interrogations, current and former intelligence officials said. The lawyers said agency officers could be present during military interrogations and add their expertise but, under the laws of war, the military must always have the lead.

Yet, in November 2003, CIA officers brought a prisoner, Manadel al-Jamadi, to Abu Ghraib and, instead of turning him over to the Army, took him to a shower stall. They put a sandbag over his head, handcuffed him behind his back and chained his arms to a barred window. When he leaned forward, his arms stretched painfully behind and above his back.

The CIA interrogated al-Jamadi alone. Within an hour, he was dead.

Now, nearly eight years after a photo of an Army officer grinning over al-Jamadi's body became an indelible image in the Abu Ghraib prison abuse scandal, federal prosecutors are investigating whether al-Jamadi's death amounted to a war crime.

The instructions from CIA lawyers could become an important element of that inquiry. Though it's not required for prosecutors to show that someone knew such interrogations were against the rules, it's still valuable evidence, said David Crane, a Syracuse law professor and former war crimes prosecutor. The instructions also undercut the argument that the CIA officers were simply following rules laid out by their superiors. "The government can say, 'He was told not to, and he went ahead and did it anyways,'" Crane said.

Two witnesses who testified before a grand jury in Virginia said they were asked about Stormoen's role at the prison and his whereabouts when al-Jamadi died. The witnesses and officials agreed to discuss the case only on condition of anonymity because they were told not to speak with reporters.

Stormoen, who ran what was known in the CIA as the detainee exploitation cell, processed al-Jamadi into the prison but was not in the shower room when al-Jamadi died.
Stormoen, 56, was part of the CIA's paramilitary arm, the Special Activities Division, after leaving the Army. He retired after al-Jamadi's death and received a letter of reprimand for his role in Abu Ghraib. He has since rejoined the intelligence community as a contractor working for a company called SpecTal, which was bought last year by BAE Systems, a leading defense contractor.

Stormoen, whose identity is no longer classified, did not return numerous messages seeking comment. His lawyer also declined to comment.

CIA spokesman George Little had no comment on the inquiry.

Much of the public attention in the al-Jamadi case has been on interrogator Mark Swanner, who was in the shower room when al-Jamadi died. Another CIA officer, who goes by the nickname "Chili," also came up at the grand jury, one witness said. Chili continues to work with the agency and his name is classified. The witness, who was at the prison, told prosecutors that Chili was at Abu Ghraib the day al-Jamadi died.

Though President George W. Bush's administration allowed the CIA to interrogate terrorism suspects in secret overseas prisons, that authorization did not apply in Iraq. CIA lawyers determined that, as a traditional war zone, Iraq fell under the Geneva Convention rules of war. That meant prisoners had to be documented and treated without cruelty, with access to medical attention.

Tactics such as waterboarding and sleep deprivation, which the CIA used in other overseas prisons, were prohibited at Abu Ghraib without prior approval. In videoconferences with headquarters, Stormoen and other officers in Iraq repeatedly asked for permission to use harsher techniques, but that permission was never granted, one former senior intelligence official recalled.

Current and former officials say the CIA officers at Abu Ghraib saw ambiguity in the rules, believing they could interrogate detainees before they were formally processed into the military prison. That gray area could last several days or longer.

Military investigators said the informal nature of the CIA's ghosting program contributed to a sense that the rules didn't apply at the prison.
At the time, the CIA's station in Baghdad, which was in charge of overseeing agency operations at the prison, was in such disarray that its top two officers were pulled out for mismanagement. An internal CIA inquiry did not single out any officer as responsible for al-Jamadi's death and no one has been charged.

A military autopsy labeled the death a homicide. Doctors said al-Jamadi died from a combination of factors: injuries he received while being captured by Navy SEALs and breathing difficulties caused by a lung injury and made worse by having a sandbag over his head.
Shortly after al-Jamadi's death, senior CIA officials once again circulated the rules. In January 2004, the agency sent a blunt memo flatly ordering agency officials to stop all interrogations, officials said.

Al-Jamadi's death has twice been reviewed by the Justice Department and prosecutors have declined to bring charges. Attorney General Eric Holder has appointed a new prosecutor, John Durham, to investigate CIA interrogation tactics. Durham is now re-investigating the al-Jamadi death, and Holder said the investigation has uncovered new information, though he did not say what it was.

War crimes prosecutions are rare in the United States. The most high-profile recent case was the successful prosecution of the son of former Liberian President Charles Taylor in Florida in 2008.

There is no statute of limitations on war crimes if a death is involved.

# ATTACHMENT 8

to Supplemental Declaration of Tina M. Foster
(dated August 1, 2011)

Last month, the CSO sent an e-mail to petitioners' counsel providing security guidance with regard to the presence of purported detainee assessments on the WikiLeaks website. Since that time, many of you have responded with questions and requested further instructions. While the contents of the previous message should still be considered policy, we are providing clarification and additional guidance today. Please note that this guidance is limited to potentially classified information posted on the WikiLeaks website, or on other websites that reproduce such material found on the WikiLeaks site, and does not apply to any other collection of documents.

### *Counsel are required to protect "potentially classified information"*

As an initial matter, as individuals with security clearances, counsel are obligated to protect all classified information to which you have access. The following guidelines are intended to allow you to make responsible use of the "potentially classified information" accessible on WikiLeaks. For the purposes of this guidance, the phrase "potentially classified information" includes any material that: (1) is marked as or otherwise indicated to be classified; (2) is publically available; and (3) that the U.S. government has neither confirmed nor denied is a copy of an official government document.

Although the U.S. Government has confirmed that purported detainee assessments were leaked to WikiLeaks, it has neither confirmed nor denied that individual reports are official government documents. All purported detainee assessments posted on the WikiLeaks website, or on other sites, therefore should be treated as potentially classified information.

### *Access to Potentially Classified Information on WikiLeaks and Other Sites*

Counsel are permitted to view on any non-U.S.-Government-issued computer, including personal and work computers, potentially classified information on the WikiLeaks website, or on other websites that reproduce such material found on the WikiLeaks site. While you may access such material from your non-U.S.-Government-issued personal and work computers, you are not permitted to download, save, print, disseminate, or otherwise reproduce, maintain, or transport potentially classified information.

### *Use of Purported Detainee Assessments in the Habeas Litigation*

The purported detainee assessments posted on the WikiLeaks website will be made available at the Secure Facility. In making these materials available, the Government is neither confirming nor denying that any individual detainee assessment posted on WikiLeaks or any other website is an official government report.

Counsel are permitted to use information from the purported detainee assessments in your clients' habeas cases to the same extent that you are permitted to use classified information, subject to the same security procedures and restrictions provided under the Protective Order issued by Judge Hogan. In any written submission in which you refer to such information, such as a court filing or correspondence with Justice Department counsel, you must identify the source of the information as potentially classified information found on WikiLeaks or another website, to make clear that you are citing to such material and not an official government report.

Such submissions must be treated as potentially classified and handled in accordance with the security procedures and restrictions stipulated in the Protective Order.

### *Discovery Requests Based Upon Potentially Classified Information Found on WikiLeaks or Other Websites*

If after viewing potentially classified information on the WikiLeaks site (or another website), you wish to submit a discovery request for one or more official government documents purportedly referenced on the site the request may be made by an UNCLASSIFIED letter or e-mail to Justice Department counsel assigned to the case. The subject line of the request should read: "Request for Discovery of Documents Referenced in WikiLeaks Information." The letter or e-mail should be strictly limited to a short, plain statement requesting production of the relevant document(s), including (i) the name and ISN of the petitioner on whose behalf the request is made, (ii) the case caption and civil action number, and (iii) information sufficient to identify the document(s) in question, such as the title, date, and unique identification number, as available. Your request must not discuss the contents of the requested document(s).

Alternatively, you may make a more detailed request for discovery based on potentially classified information found on WikiLeaks or other websites (*e.g.*, a request that discusses the contents of such information) at the SECRET//NOFORN level, in accordance with the procedures stipulated in the Protective Order.

All such requests for discovery based on potentially classified information posted on WikiLeaks, or other websites, will be evaluated by the Government under the terms of the Case Management Order and/or other applicable orders in your case.

### *Access to Secondary Reporting about WikiLeaks Information Such as News Articles, Blogs, Transcripts of Broadcasts, Etc.*

The restrictions discussed above that apply to potentially classified information posted on WikiLeaks or other websites do not apply to secondary reporting such as news articles, blogs, transcripts of broadcasts, and the like. You may download, print, copy, or otherwise access, maintain, disseminate, and transport secondary reporting that discusses or refers to potentially classified information.

### *Public and Private Statements Regarding WikiLeaks Information*

Judge Hogan's Protective Order provides instruction relevant to public and private statements by counsel concerning potentially classified information posted on WikiLeaks or other websites. Paragraph 31 states that in the event that classified information enters the public domain, you may make private or public statements about the information already in the public domain, but only to the extent that the information is in fact in the public domain. You may not make any public or private statements revealing personal knowledge from non-public sources regarding the classified status of the information or disclosing that you had personal access to classified information confirming, contradicting, or otherwise relating to the information already in the public domain.

The same provisions of Paragraph 31 of the Protective Order apply to discussion of potentially classified information posted on WikiLeaks or other websites, and to discussion of secondary reporting about such material, with your client.